IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| BRIAN SCOTT DUNN | ) |
| | ) |
|     Plaintiff, | ) |
| | )     Case No.     7:14-cv-00429 |
| v. | ) |
| | ) |
| SHERIFF MORGAN MILLIRONS | ) |
| | ) |
|     Defendant. | ) |

**PLAINTIFF'S BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW Plaintiff, Brian Scott Dunn, by counsel, and provides this Brief in Opposition to Defendant's Motion for Summary Judgment. The Defendant's Motion should be denied because of the large number of disputed material facts at the heart of this case. In support of his Brief, the Plaintiff provides as follows:

## I.     STANDARD OF REVIEW

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The relevant inquiry in a summary judgment analysis is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Marlow v. Chesterfield County Sch. Bd.*, 749 F. Supp. 2d 417, 426 (E.D. Va. 2010) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-252 (1986)). The Court must draw all justifiable inferences in favor of the nonmoving party, the Plaintiff in the instant matter, including

questions of credibility and of the weight to be accorded particular evidence. *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (*citing Anderson*, 477 U.S. at 255). The party moving for summary judgment, the Defendant, bears the burden of informing the Court of the basis for its motion and identifying those parts of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## II.    FACTS OF THE CASE

The Plaintiff has spent a long career in law enforcement including service with multiple law enforcement organizations. (Transcript of Deposition of Plaintiff in this matter, 6:1-24, appended to this document and made a part hereof as "**EXHIBIT A / DUNN DEP.**") In November of 2008, the Plaintiff was hired by the Defendant. (Declaration of Plaintiff, ¶ 1, appended to this document and made a part hereof as "**EXHIBIT B / DUNN DEC.**") The Plaintiff worked as a Lieutenant in the Defendant's chain of command. *Id*. Up until the point that he made protected statements to the Defendant, the Plaintiff had never received a workplace disciplinary action and consistently exhibited excellent work performance. (Dunn Dec. ¶ 1)

Contemporaneous with this employment under the Defendant, the Plaintiff was also an elected official, to-wit, a member of the Giles County Board of Supervisors (hereinafter, "the Board,"). (Dunn Dec. ¶ 2) After a series of events beginning in the Spring of 2013, the Defendant demoted the Plaintiff on September 27, 2013 and ultimately terminated the Plaintiff's employment on October 21, 2013. (Dunn Dec. ¶ 3)

In response to his termination, the Plaintiff's Second Amended Complaint incorporates three Counts: Count I, a state-court claim of wrongful termination pursuant to *Bowman v. State Bank of Keysville*, 331 S.E.2d 797 (Va. 1985); Count II, unlawful

2

retaliation pursuant to the False Claims Act, 31 U.S.C. § 373(h); and Count III, a violation of 42 U.S.C. § 1983 predicated upon an underlying First Amendment rights violation. As it relates to all of the Plaintiff's Counts within his Second Amended Complaint, his demotion in rank in September of 2013, and his termination in October of 2013, serve as the adverse employment actions for purposes of proving *prima facie* cases.

## A. Protected Speech

To sustain his claims against the Defendant, the Plaintiff must have engaged in some form of protected speech. It is the Plaintiff's theory of the case that, after having engaged in protected speech with his employer, his employer illegally retaliated against the Plaintiff based upon the protected speech. The Plaintiff made numerous statements to the Defendant regarding the illegality and inappropriateness of several actions and omissions on the part of the Defendant to the Defendant and others in the chain of command prior to the Plaintiff's termination.

Importantly, the Plaintiff was motivated to provide protected speech in the course and scope of his role on the Board. Prior to running for a position on the Giles County Board of Supervisors, the Plaintiff set the tone for how things would move forward between himself and the Defendant should the Plaintiff win office.

> Q. Okay. You had a discussion with Sheriff Millirons prior to running?
>
> A. Yes, sir.
>
> Q. Tell me about that discussion.
>
> A. Actually, I went to Sheriff – Sheriff Millirons was off and went to his residence and I spoke to him, and I said, Sheriff, I'm asking your permission to run for the Board of Supervisors, and I believe that I told him at that time, I said, but before you say yes, I said, I want to give you an idea of

3

> some of the things that I'm definitely going to stand on, and
> one of them was the issues with the Regional Jail, and I still
> have issues with the Regional Jail. I addressed some of those
> issues, but I think that we probably addressed a lot more of
> them if things had not went the way that they had with this,
> and he said, I don't care, so he gave me permission to run.

(Dunn Dep. 39:8-39:24) This scenario is evidence that, from the beginning of the Plaintiff's path into County leadership, he wished to indicate to his employer that part in parcel to his position on the Board, the Plaintiff would adopt a platform of constitutionally protected messages.

The following are a list of the statements made by the Plaintiff in his attempt to address numerous concerns plaguing his employer in 2013. All qualify as protected speech pursuant to each of the Plaintiff's three Counts:

1. In July of 2013, the other members of the Board requested that the Plaintiff approach the Defendant and discuss with him numerous issues plaguing the Giles County Animal Shelter (hereinafter, "the Shelter,"). (Dunn Dep. 64:14-65:1) At all times pertinent to this action, the Shelter was under the sole unilateral control and authority of the Defendant, but funded by the County as directed by the Board. (Dunn Dec. ¶ 4) *See EVIDENCE OF WRONGDOING* below. The Board had been notified of hazardous conditions at the Shelter due to complaints by Christine Link Owens, President of a volunteer-based organization that provided services to the Shelter, Giles Animal Rescue, hereinafter, "G.A.R."

2. The Plaintiff met with the Defendant within the Plaintiff's scope as an active Board member. The Plaintiff described this meeting he had with the Defendant in July of 2013 in his deposition:

4

A.    So I went into his office and I told him, I said, I've come here to discuss something, and I think that I may have even said, I don't want to be discussing it, but we will have to discuss it, and I basically did tell him, the Board is upset; there is all of these complaints coming in about the animal shelter and how the animal shelter is being run, and I basically told him my concern about, again, my biggest concern was about Chastity being paid for hours that she wasn't working, and he had already knew that.

We had previous meetings over the incident with the time sheets, and I told him, I said, you know, I'm afraid that, you know, this is not going to go away, and if we were audited and all of these things come to the front, it's not going to be good, I said, and I pled with him then; I said, you know, just make them pay her time back, put a time clock out at the shelter for Chastity, put a camera out there, and just, you know, investigate it and make sure that she's working what she's supposed to be working.

(Dunn Dep. 65:3-65:22)

. . .

Q.    I need you to tell me exactly what he said [in response], and I think that your attorney wants you to tell me.

A.    He said if you can him, I'm kicking them out and I begged him, please don't kick them out.

Q.    You mean G.A.R. [Giles Animal Rescue]?

A.    Yes, and the volunteers, and that is when I said, put the cameras in, put a time clock in, investigate what is really going on, because even Melvin had – Melvin was coming to me and he said, they are talking bad about my daughter on Facebook and other topics and I want to sue them, and they are saying this and that about her, and I think that Melvin had the Sheriff pumped up over it, and I told Melvin to forget about it, take the high road and don't pay any attention to it, but the -- I think that we even discussed the comments about the dog food being stolen, and I told Morgan then, the dog food is not being stolen, the breaking into the -- we have a box out there; they are breaking in to get food to feed the dogs because she hasn't been out there for four days.  They are not stealing it and taking it home, so anyway, he got upset and he said that I just need to basically mind my own business and it would be

5

in my best interest just not to worry about it, so I could tell
then that he wasn't happy that I confronted him about it.

Q.    Okay.  Anything else that you recall him saying in that
conversation?

A.    He just -- he gave the implication by telling me to drop it
that it would be in my best interest, and I took that as to, you
know, I better back off of it or he was going to do something
disciplinary wise or whatever.

(Dunn Dep. 67:18-68:24)

3.  The Plaintiff informed the Defendant at this July, 2013 meeting, that, by
mismanaging and neglecting the animal shelter (including lack of oversight of
Shelter worker Ms. Perkins, neglect of the animals, improper allocation of funds
by the Sheriff as to the management of shelter personnel, improper protocols and
practices as to the spay/neuter deposit requirement at the shelter), he was
exposing the entire Sheriff's office and the Plaintiff personally into criminal
liability.  (Dunn Dec. ¶ 4)

4.  After this conversation between the parties, the Plaintiff testified that he followed
up on this earlier discussion with the Defendant in August of 2013, by inquiring
with the Sheriff whether the Sheriff had the situation "straightened out." (Dunn
Dep. 93:12-14; Dunn Dec. ¶ 5)

5.  In August of 2013, the Plaintiff was contacted by Douglas Sadler, Chief of the
Pembroke Police Department regarding the possibility of acquiring vehicles for the
Pembroke Police Department.  Mr. Sadler informed the Plaintiff that he had
spoken to the Defendant about vehicles that had been "surplused" by the office of
the Defendant and resulting in ownership and title passing back to Giles County.
Mr. Sadler further informed the Plaintiff that he had already spoken with County

6

Administrator Chris McKlarney about receiving these vehicles from Giles County. According to Mr. Sadler, Mr. McKlarney had informed him that the Plaintiff would be the best contact person for Giles County on this issue because the Plaintiff had personal knowledge of the vehicles in question. (Dunn Dec. ¶ 6; Dunn Dep. 95:10-96:24)

Later in August of 2013, the Defendant approached the Plaintiff at the Giles County Garage and shouted angrily that he was the "God d---- mother fu--ing sheriff around here and I decide what kind of vehicles we get rid of mother fu----." (Edited for vulgarity). The Defendant angrily chastised the Plaintiff regarding the vehicles that had already been surplused to the Giles County Board. The Plaintiff informed the Defendant that he had already surplused the vehicles and that the Plaintiff had spoken with Chief Sadler lawfully and under proper Board procedures regarding the Pembroke Police Department acquiring vehicles from Giles County. The Plaintiff had facilitated communication with Mr. Sadler while in the scope of his duties as a Board member. (Dunn Dec. ¶ 7; Dunn Dep. 96:7-97:6)

6. On September 27, 2013, the Defendant demoted the Plaintiff. The reasoning behind the demotion, according to the Defendant, was related to an incident that occurred regarding the investigation of a burglary at a convenience store in Giles County. The burglary was reported to the Giles County Sheriff's Office around 7:00 AM on September 1, 2013. The Plaintiff did not begin his shift on September 1, 2013 until after 10:00 AM. He proceeded to the convenience store at that time. At the time that the Plaintiff arrived at the crime scene, other deputies had already visited the scene to process the evidence.

7

The Plaintiff noticed numerous pieces of uncollected evidence at the scene including evidence of the use bolt cutters by the burglars, foot prints, and vehicle tracks. The other deputies had not processed this evidence properly and left the scene. The Plaintiff then began a series of communications with the intent of receiving assistance from the other deputies regarding the collection of the relevant evidence. The Plaintiff called the on-call deputy at the time, Thomas Gautier, but Deputy Gautier was not available. The Plaintiff then called Deputy Eric Thwaites, a subordinate deputy in the chain of command, and Deputy Thwaites informed the Plaintiff that neither he nor forensic specialist Deputy Mason Boggess, would be returning to the crime scene. The Plaintiff next called Deputy Boggess, a subordinate deputy in the chain of command and the only on-call deputy capable of performing the forensic collection. Mr. Boggess refused to acquiesce to the Plaintiff's directives to return to the scene to collect evidence. The Plaintiff proceeded to call Deputy Thwaites again only to hear Mr. Thwaites state that they refused to return to the crime scene as he and other deputies were engaged in a fantasy football meeting.

The Office of the Sheriff uses a Computer Aided Dispatch, hereinafter "CAD," system in which employees digitally enter information regarding crime scene investigations. In his narrative portion of his CAD entry for the investigation, the Plaintiff included the statement, "Unit 15 advised that he had plans and could not respond. Unit 04 advised that Unit 15 was having his fantasy football meeting with Unit 09. At this time it was determined there were no technicians or investigators to assist on the investigation." This CAD report has been appended and made a part of this Brief as **EXHIBIT C**.

During the September 27, 2013 meeting between the Plaintiff and the Defendant, the Defendant angrily highlighted the Plaintiff's handling of the burgled convenience store as reason for his demotion. The Plaintiff noted that the Defendant had since directed that the CAD record be altered such that the "fantasy football" comment would be deleted. The Plaintiff advised the Defendant that such an action was illegal. Pursuant to Va. Code § 18.2-472, "If a clerk of court or other public officer fraudulently makes a false entry, or erase, alter, secrete or destroy any record, including a micro photographic copy . . . he shall be guilty of a Class 1 misdemeanor and shall forfeit his office." (Dunn Sep. 112:1-118:12; Dunn Dec. ¶ 11)

7. On or about September 29, 2013, less than a month before his termination on October 21, 2013, the Plaintiff, off-duty, visited the personal residence of Major Michael W. Falls, an individual high in the chain of command and under the employ of the Defendant. As Mr. Falls testified in his deposition, the Plaintiff informed Mr. Falls that the Plaintiff believed that the Defendant was engaged in "embezzlement" and wrongdoing that had "to do with the animal shelter." (Transcript of Deposition of Michael W. Falls in this matter, 14:19-15:14, appended to this document and made a part hereof as "**EXHIBIT D / FALLS DEP**"; Dunn Dec. ¶ 8)

## III.   <u>DEFENDANT'S ALLEGED REASONS FOR</u>
## <u>THE ADVERSE EMPLOYMENT ACTIONS</u>

The Plaintiff's claims require, in varying degrees, evidence supporting a causal link between protected activities in which he engaged and unlawful motivation or retaliatory intent on the part of the Defendant. The evidence supporting this causal link is the same

9

for each of the Plaintiff's claims. The Plaintiff offers essentially three forms of this evidence: (1) changes in the Defendant's behavior toward the Plaintiff after he engaged in protected activities; (2) evidence undermining the reliable probative value of the Defendant's proffered evidence allegedly justifying the Plaintiff's termination; and (3) temporal proximity between adverse employment actions and protected activity.

## A. Changes in the Defendant's Behavior After Protected Speech

After the Plaintiff's July, 2013 statements to the Defendant, the Plaintiff noticed a palpable change in the way in which the Defendant acted toward him. This evidence supports the Plaintiff's theory that his protected statements and the adverse employment actions he later suffered at the hand of the Defendant were causally linked. As the Plaintiff testified in his deposition:

> Q. In your Complaint, you indicated that "After you had the meeting with the Sheriff to tell him about Chastity Perkins and your concern up at the animal shelter, that he started acting differently towards you;" is that a fair assessment?
>
> A. Yes, sir.
>
> Q. And he was unprofessional and rude?
>
> A. Yes, sir.
>
> Q. Okay. It says, "The Sheriff indicated directly or through implication that the public fallout regarding the shelter was somehow the fault of the Plaintiff," that it was your fault. What was the public fallout?
>
> . . .
>
> A. The public fallout, well, I mean, you are talking about in the very end, the whole totality, or in the very beginning?
>
> Q. Well, I am trying to figure out what the public fallout was.
>
> A. Well, they were already publicizing it in the newspapers. They were -- I mean, it wasn't -- like I said before, it wasn't

10

> going away. It wasn't going to be quiet, but he was -- I had the feeling that he was under the impression that it was me, that I had initiated the complaint, that I had -- and I was told by Mr. McKlarney and the other Board members, they told him no. After this meeting in July, he starts telling the Board members, and I quote, "I'm going to fucking fire him." Well, they, in a board meeting in executive session, Chris McKlarney said, listen, Scott needs to stay out of this because he's drawing heat from the Sheriff and he needs to – he doesn't need to be any part of it, and they all agreed and I agreed, because, you know, I had been a very small part of it up until this point, so --

(Dunn Dep. 87:12 to 89:4) Moreover, after years of excellent service, Mr. Dunn suddenly saw himself demoted within two months of first articulating protected speech and disciplined for merely performing the duties of his job.

## B. Evidence Undermining Probative Value of the Defendant's Alleged Justification in Demoting and Terminating the Plaintiff

Under Virginia law, the Defendant need not possess a reason to support his decision to terminate the Plaintiff. However, the Defendant has articulated several reasons which allegedly justify his decision to terminate the Plaintiff. This evidence is relevant in the analysis of each of the Plaintiff's Counts as the differing standards and elements of the Plaintiff's claims require at times for the Defendant to bear a burden demonstrating that his motives remained lawful. Additionally, the Court should not weight the credibility of evidence at this stage of review. It is not the Plaintiff's position to argue issues of credibility here. However, it is the function of this Court, at this stage in the litigation, to acknowledge the very existence of that evidence which puts the alleged legitimate reasons for the Plaintiff's termination genuinely in dispute.

In the Defendant's discovery responses, he has highlighted a series of alleged work performance issues of the Plaintiff, each one allegedly memorialized in a memorandum.

The Plaintiff has indicated that it was office policy at the office of the Defendant for an employee to receive a written letter or memorandum from the Defendant at the time that work place discipline was being delivered to an employee. (Dunn Dec. ¶ 9) However, the Plaintiff has also indicated that he never received any of the memoranda that the Defendant produced in discovery related to alleged work performance deviations. (Dunn Dec. ¶ 10) According to the Defendant, the documents memorializing these work performance deficiencies were found within the Plaintiff's personnel file. These documents are:

    a.  August 27, 2013 letter from Sheriff Millirons; Bates Labelled, "Def response to PL RPD 000007". This document has been appended to this Brief and made a part hereof as **EXHIBIT E**

    b.  September 12, 2013 letter from Sheriff Millirons; Bates Labelled, "Def response to PL RPD 000004". This document has been appended to this Brief and made a part hereof as **EXHIBIT F**.

    c.  September 27, 2013 letter from Sheriff Millirons; Bates Labelled, "Def response to PL RPD 000006". This document has been appended to this Brief and made a part hereof as **EXHIBIT G**.

    d.  October 1, 2013 letter from Sheriff Millirons; Bates Labelled, "Def response to PL RPD 000005". This document has been appended to this Brief and made a part hereof as **EXHIBIT H**.

    e.  October 8, 2013 letter from Sheriff Millirons; Bates Labelled, "Def response to PL RPD 000003". This document has been appended to this Brief and made a part hereof as **EXHIBIT I**.

In the Defendant's Response to the Plaintiff's First Request for Production of Documents, the Defendant referred to "Exhibit 2" in reference to requests for "Plaintiff's performance evaluations and formal discipline, including demotions," and "documents relied upon to make the employment decision(s) including . . . termination." *See* Responses to Requests 4 and 5 in the appended discovery responses from the Defendant, hereinafter **EXHIBIT J**. All of the documents referenced above (Exhibits E through I) were included in this discovery response.

The Defendant was deposed in this matter on April 7, 2015. During the deposition, Plaintiff's counsel questioned the Defendant regarding whether Defendant himself had created Exhibits E through I and, if so, when he had done it. The Defendant testified that he created each document on the date printed on the document. (Transcript of Deposition of the Defendant in this matter, 161:1-162:22, 168:18-24, 170: 2-7, appended to this document and made a part hereof as "**EXHIBIT K / MILLIRONS DEP**.") These documents were in turn the subject matter of the Plaintiff's Third Motion to Compel (Dkt. #37).

Because the Plaintiff denied ever having seen these documents before, the Plaintiff retained the services of an expert digital discovery consultant. This consultant examined the digital data taken from the Defendant's computer in the course of discovery. This consultant's analysis was largely incorporated in Plaintiff's Brief in Support of his Third Motion to Compel (Dkt. #38), suffice to say, for ease of reference, consultant Sherry Harris' declaration and screenshots of her computer illustrating the meta data fields, have been collectively appended to this Brief and made a part hereof as **EXHIBIT L**. Ms. Harris was able to make the following conclusions in relation to her review of the digital material given to the Plaintiff by the Defendant in the course of discovery:

13

a. The metadata date fields associated with the files produced by the Defendant (Exhibits E through I of this Brief) indicates the files were all created, modified, accessed, saved and printed at various times within a three and a half (3.5) hour period on November 7, 2013.

b. Total editing time for the files ranges from four (4) to forty-nine (49) minutes per document.

c. Editing time for all files totals one hundred and eleven (111) minutes, or 1.85 hours.

d. The metadata date fields and editing time field indicate the documents were created and saved consecutively and in sequence.

e. The information in the "author" and "creator" metadata fields associated with all the files is "morgan."

Counsel for both parties began a series of communications involving a forensic computer consultant for each party regarding the finding of Ms. Harris. However, before the Plaintiff's consultant could schedule a visit to Giles County to forensically examine the Defendant's computer, the Defendant's counsel contacted counsel for the Plaintiff and informed him that the Defendant's digital consultant had verified the Plaintiff's analysis and that further forensic searches were unnecessary. This was followed by an August 4, 2015 declaration (Dkt. #48-1) endorsed by the Defendant in which the Defendant recounts that he "misspoke" under oath in his deposition. The Defendant further informs the Court that he had initially prepared handwritten documents and typed the current documents at a later time from review of the handwritten notes. The Defendant never provided these handwritten notes in discovery and the Defendant's declaration is the first

mention of them. This entire series of events serves to place the reasoning behind the Plaintiff's demotion and termination in dispute.

This analysis is not unlike that employed in an ADEA case that Plaintiff's counsel argued before Judge Samuel Wilson in the Western District of Virginia. In *Phillips v. StellarOne,* 2012 U.S. Dist. LEXIS 97859 (W.D. VA 2012), a wrongful termination case brought pursuant to the ADEA, the plaintiff uncovered two emails in discovery from the director or human resources. These emails indicated that the reasons articulated by the employer defendant that allegedly justifying the plaintiff's termination were less than credible. While the court did not weigh the credibility of the evidence in *Phillips*, the court found that the existence of the evidence created a triable question of fact as to the legitimacy of the termination. The same reasoning applies in the instant matter.

## C. Temporal Proximity

Finally, the Plaintiff offers the temporal proximity between his protected speech (July, August and September of 2013) and his demotion on September 27, 2013, and his termination on October 21, 2013, as evidence of a causal link between these events. While evidence as to the closeness in time "far from conclusively establishes the requisite causal connection, it certainly satisfies the less onerous burden of making a *prima facie* case of causality." *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989).

## IV.     COUNT I: BOWMAN

Count I of the Plaintiff's Second Amended Complaint incorporates a state tort claim of wrongful termination pursuant to *Bowman v. State Bank of Keysville*, 229 Va. 534, 331 S.E.2d 797 (1985), the case that outlined an exception to Virginia's at-will doctrine. *Bowman* was later clarified in *Rowan v. Tractor Supply Co*., 263 Va. 209, 559 S.E.2d 709 (2002). Pursuant to *Rowan*, a claim for wrongful termination may be

sustained in three possible scenarios: (1) an employer violates a policy enabling the exercise of an employee's statutorily created right; (2) an employer violates a policy expressed in a statute and the employee is a class member of the class of persons the statute intends to protect; and (3) an employee refuses to engage in criminal conduct. *Id.* at 214. All three of these scenarios apply in the present matter.

### A. Statutorily Created Rights and Classes

The first two scenarios are present in the instant matter due to the interesting factual relationship between the parties beyond the typical employer/employee relationship found in virtually every case following *Bowman*. The Plaintiff served on the Giles County Board of Supervisors and did so during all times pertinent to this action. The Virginia Code authorizes Counties to organize local governments into what it labels the "County Board" form of government. Va. Code § 15.2-401. The Virginia Code provides that the "powers and duties of the county as a body politic and corporate shall be vested in a board of county supervisors." Va. Code § 15.2-402. Most relevant to the instant action are the provisions of Va. Code § 15.2-403:

> A. The board shall be the policy-determining body of the county and shall be vested with all the rights and powers conferred on boards of supervisors by general law, not inconsistent with the form of county organization and government herein provided.
>
> B. The board may require of all departments, divisions, agencies and officers of the county and of the several districts of the county such annual reports and other reports as in its opinion the business of the county requires.
>
> C. ***The board may inquire into the official conduct of any office or officer, whether elective or appointive, of the county or of any district thereof, and to investigate the accounts, receipts, disbursements and expenses of any county or district officer***. For these purposes it may subpoena witnesses, administer oaths,

and require the production of books, papers and other evidence. If any witness fails or refuses to obey any such lawful order of the board he shall be deemed guilty of a misdemeanor.

(emphasis added). Moreover, Va. Code § 15.2-408 directly addresses the interactions between a sheriff and a county board of supervisors:

A. The attorney for the Commonwealth, the county clerk, *the sheriff*, the commissioner of the revenue and the treasurer of the county in office immediately prior to the day upon which the county board form becomes effective in the county shall continue, unless sooner removed, as attorney for the Commonwealth, county clerk, sheriff, commissioner of the revenue and treasurer, respectively, of the county until the expiration of their respective terms of office and until their successors have qualified. Thereafter, **such** officers shall be elected in such manner and for such terms as provided by general law.

. . .

D. *Each officer*, except the attorney for the Commonwealth, *named in subsection A* shall, except as otherwise provided in this chapter, exercise all the powers conferred and perform all the duties imposed upon such officer by general law. *He shall be accountable to the board in all matters affecting the county and shall perform such duties, not inconsistent with his office, as the board directs*.

These statutes create a statutory right of inquiry on the part of the Plaintiff, as a Board member, into the actions of the Defendant (15.2-403), and impose a duty of accountability on the part of the Defendant to the Plaintiff insofar as his membership on the Board is concerned (15.2-408). These statutes create thus two classes of individuals relative to the instant matter: (1) individuals who sit upon county boards as defined by § 15.2-403 and (2) officers so listed in subsection A of 15.2-408 ("the county clerk, the sheriff, the

17

commissioner of the revenue and the treasurer") who have a duty of accountability to members of the Board.

The Plaintiff as a member of the Giles County Board of Supervisors, is clearly within the class of individuals empowered to be an executive authority of his municipality as expressed by state statute (15.2-403). The Defendant, likewise, is also a member of a class which owes a statutory duty to be "accountable" to the class in which the Plaintiff belongs (15.2-408). The Defendant violated the express statutory right of the Plaintiff to both inquire and to hold the Defendant accountable when the Defendant terminated the Plaintiff due to his statutorily protected statements. The Defendant violated these statutes which were enacted to allow members of the Plaintiff's class, to-wit, a board of supervisors, to exercise its duties and rights.

These statues were enacted to create a leadership role for counties which the Plaintiff filled. The Plaintiff, during the course of his employment with the Defendant, became a member of this statutorily created class of individuals designated to run the "County Board" form of government in Virginia. The Plaintiff thus held a statutorily created right of inquiry such that he could seek accountability on matters from the Defendant. The Shelter was certainly "a matter affecting the county" as provided in § 15.2-408 allowing for such accountability and inquiry. The Defendant hampered the rights empowered by state statutes of the Plaintiff when the Defendant retaliated, demoted and ultimately terminated the Plaintiff.

### B. Criminal Conduct

Moreover, the third cause of action that may arise pursuant to *Bowman*, is also present in the instant mater and supported by the evidence. The Plaintiff refused to engage in criminal conduct on multiple occasions. As the Plaintiff testified in his

deposition, believed he was "in jeopardy of being charged with a criminal offense personally as a result of the conditions of the animal shelter." (Dunn Dep. 90:20-91:1) Discovery in this matter has overturned evidence supporting theories of a number of illegal activities in which the Defendant has engaged. Though discovery has not been completed as of the date of the filing of this Brief, it has been extensive in this matter. Many documents have been produced and numerous witnesses deposed. As of the filing of this Brief, the Plaintiff has compiled the following evidence of unlawful activities to which he complained, on the part of the Defendant:

1. The Defendant violated Va. Code § 15.2-408 by denying the Plaintiff his statutorily created right to seek accountability form the Defendant related to matters concerning Giles County.

2. The Defendant violated Va. Code § 15.2-403 by denying the Plaintiff his statutorily created right to inquire into the official conduct of the Defendant related to matters concerning Giles County.

3. The Defendant violated Va. Code § 18.2-472 by fraudulently deleting an entry from a CAD record.

4. The Defendant violated Va. Code §§ 3.2-6503, 6546, 6470 and 6574. These statutes regard care of animals at the Shelter and the care of animals in general. Christine Link Owens is a member of G.A.R., a volunteer animal service organization that provided assistance and care to the animals at the Shelter at times pertinent to this action. Ms. Link Owens was the President of G.A.R. and facilitated the volunteer operations at the Shelter in 2013. At this time, Shelter employee, Chastity Perkins, was allegedly working there seven days a week, but with no set time to report to the Shelter. (Transcript of Deposition of Chastity

Jones, formerly Chastity Perkins, in this matter, 11:13-24, appended to this document and made a part hereof as "**EXHIBIT M / JONES DEP**.")

In her deposition, Ms. Link Owens found the representation that Ms. Perkins worked at the shelter seven days a week to be less than credible.

> I find it hard to believe, because when volunteers would go to the shelter, there would be so much feces in the run; I mean, I have worked in facilities for twenty years, and I've cleaned a lot of kennels . . . and I know how much twenty-four hours' worth of food, what it looks like, so when I go there and see that there is so much feces and urine that the dog is covered from head to toe because the only place to lay down is in the piles and piles and piles of feces, and they have no water, they are so thirsty, that as soon as you turn on the water hose, they attack the hose and are trying to drink out of the hose.

(Transcript of Deposition of Christine Link Owens, in this matter, 15:3-24, appended to this document and made a part hereof as "**EXHIBIT N / OWENS DEP**.") Ms. Link Owens also testified that the Shelter worker did not wash the water bowls which were coated in a "thick film," and that she personally observed the Shelter worker to spend as little as twenty minutes performing services before leaving the Shelter. (Owens Dep. 30:1-31:12)

In the course of the investigation led by the Virginia Department of Agriculture into the care of animals at the Shelter, a number of images of mistreated animals were collected. These photographs have been collectively appended to this Brief and made a part hereof as **EXHIBIT O**. The pictures can best contextualized in light of Ms. Link Owens' August 9, 2013 email to the Investigator of the Virginia Department of Agriculture. This email has been appended to this Brief and made a part hereof as **EXHIBIT P**. In the email, Ms.

Link Owens recounted the conditions of the shelter as they were in the Spring of 2013. These conditions included:

> a. On Thursday March 28, 2013 and on Thursday March 29, 2013, the Shelter worker never opened the Shelter. (Posted hours for the Shelter were from 2:00 PM until 4:00 PM every day of the week)
>
> b. Pictures were taken showing that the animals had been "neglected for several days."
>
> c. "Volunteers arrived to find that 15 dogs had NO water, completely zero water (which is a common occurrence)."
>
> d. "All of the dogs were covered with feces."
>
> e. Dogs must "lie down" in their "own poop and urine because there is no bed."

5. The Defendant managed an enterprise that misappropriated funds regarding the work performed at the Shelter. As the Plaintiff declares, Giles County paid approximately $75,516 to Chastity Perkins for work she did not perform for the Shelter. (Dunn Dec. ¶ 12)

## V.    COUNT II: FALSE CLAIMS ACT

The Plaintiff incorporated into his Complaint a claim of retaliatory discharge violative of 31 U.S.C. § 3730(h), the whistle-blower provisions of the False Claims Act. At the time of the filing of this brief, the Plaintiff has been unable receive all of the relevant discovery materials in this matter. The Court recently Ordered that a deposition occur in relation to information relevant to the analysis of this claim. Plaintiff hereby requests that the Court take the Defendant's Motion for Summary Judgment under advisement as

it relates to Count II of the Defendant's Second Amended Complaint until such time as the discovery process may be completed.

## VI.    COUNT III: § 1983 & FREEDOM OF SPEECH

Under 42 U.S.C. § 1983, any person who, under color of state law, deprives another of any rights, privileges or immunities secured by the Constitution and other laws shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. Rather than creating substantive rights, § 1983 simply provides a remedy for rights that it designates. Thus, an underlying constitutional or statutory violation is required for liability under § 1983. In the employment context, § 1983 actions generally arise in the forms of violations of constitutional rights, such as the First Amendment rights to freedom of speech and expression. In his Second Amended Complaint, the Plaintiff has incorporated Count III, a violation of 42 U.S.C. § 1983 predicated upon the Defendant's retaliation against the Plaintiff due to the Plaintiff's exercise of his First Amendment rights.

The First Amendment provides, in pertinent part, that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. Amend. I. While a public employee does not have a constitutional right to his job, a public employer "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers*, 461 U.S. 138, 142 (1983). It follows, therefore, that a public employer is prohibited from discharging or taking other adverse action against one of its employees on a basis that infringes the employee's constitutionally protected interest in freedom of speech. *See Rankin v. McPherson*, 483 U.S. 378, 383-84, 97 L. Ed. 2d 315, 107 S. Ct. 2891 (1987) ("Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse,

not because it hampers public functions but simply because superiors disagree with the content of employees' speech.").

Under § 1983, a public employer is prohibited from discharging or taking other adverse action against its employees on a basis that infringes the employee's constitutionally protected interest in freedom of speech or expression. Moreover, a public employer is prohibited from threatening to discharge or to take other adverse action against its employees in an effort to chill the employee's rights under the First Amendment. *Rankin v. McPherson*, 483 U.S. 378, 383-84 (1987); *see also Perry v. Sindermann*, 408 U.S. 593 (1972). To state a claim of retaliation under the First Amendment, the Plaintiff must demonstrate that:

(1) his speech or expression was constitutionally protected, that is, the speech or expression involved a matter of public concern; and

(2) the Plaintiff's interest in participating in the speech or expression outweighed the public employer's interest in promoting the efficiency of the public services it provides.

(3) his or her speech or expression was a substantial or a motivating factor in the adverse decision.

*Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 283-87 (1977). If the plaintiff employee meets these initial burdens, the burden shifts to the public employer to show by a preponderance of the evidence that the employee would still have been discharged in the absence of the protected speech or expression. *Id.* at 283.

### A. Prong 1

Regarding Prong 1 of this test, an employee's speech or expression touches on a matter of public concern when it can be fairly considered as relating to any matter of

political, social or other concern to the community. Although the subject matter of the communication may generally be of public interest, the focus of the public concern inquiry is upon what is actually said or expressed. The Plaintiff's speech regarding inappropriate use of Giles County funds, improper management of the Shelter, inappropriate treatment of animals at the Shelter, are maters that clearly touch upon public concern. The very fact that the Plaintiff engaged the Defendant in discourse regarding these issues as a member of the Board only underscores the public concern. Furthermore, the Plaintiff contends that additional speech regarding his duty as a Board member to facilitate the transfer of surplused vehicles to another law enforcement agency also qualifies as speech that touches upon a public concern. Finally, Plaintiff's comments to the Defendant regarding the Defendant's alteration of police records qualifies as a matter of public concern due to the statute expressly rendering the act unlawful.

In *Cutts v. Peed*, 17 Fed. App'x 132 (4th Cir. 2001), the Fourth Circuit Court of Appeals determined that deputies of the Sheriff of Alexandria who had expressed statements regarding illegal racial discrimination at the office of the defendant employer, without question touched upon matters of public concern.

> Ascertaining whether a matter is of public concern requires examination of the "content, form, and context" of the statement. *Connick v. Myers*, 461 U.S. 138, 147-48, 75 L. Ed. 2d 708, 103 S. Ct. 1684 (1983); *Goldstein*, 218 F.3d at 352. Although internal employment matters are not matters of public concern, *see Goldstein*, 218 F.3d at 352, statements . . . . like those at issue here, involving purported fraud and racial discrimination in a law enforcement agency, indisputably do constitute matters of public concern. *See id.* at 353 (statements regarding public safety are "quintessential matters of public concern"); *Robinson v. Balog*, 160 F.3d 183, 188 (4th Cir. 1998) (speech seeking to bring to light "actual or potential wrongdoing or breach of public trust" is speech on a matter of public concern); *Cromer v. Brown*, 88 F.3d 1315, 1326 (4th Cir. 1996) (allegations of racial discrimination

24

within law enforcement agency are matters of "serious public import").

*Id.* at 135.

## B. Prong 2

Pursuant to Prong 2, if the employee's speech addresses a matter of public concern, the interests of both parties must be balanced, weighing the employee's interests, as a citizen, in commenting upon matters of public concern against the government employer's interest in regulating the speech or expression of its employees to promote the efficiency of its public services. Then, if the employee's interests outweigh the employer's, the employee must establish that employer would not have taken the challenged adverse employment action(s) but for the constitutionally protected conduct. *Connick v. Myers*, 461 U.S. 138, 146-47 (1983).

The *Cutts* Court analyzed whether the *Cutts* plaintiffs' interests in making their statements outweighed the defendant Sheriff's interest in managing his office:

> Because the deputies' speech involves a matter of public concern, we turn to the question of whether their interest in making those statements outweighed Sheriff Peed's interest in managing the internal affairs of his office. The Sheriff contends that the undisputed facts demonstrate that he was justified in taking all of the challenged actions -- including discharging Cutts and Shabazz -- to protect his office's efficiency from the disruption caused by the deputies' complaints. Undoubtedly, charges of racial discrimination may impinge upon the harmony among co-workers or interfere with the operation of a sheriff's office. The record here, however, provides little evidence that this actually occurred, or that the racially charged environment in the sheriff's office stemmed from these employees' remarks rather than other people or events.
>
> An employer wishing to defend against specific allegations of impermissible retaliation must present evidence that the speech triggering his actions actually

interfered with the functioning of his office, and may not merely assert a "generalized and unsubstantiated" interest against disruptions. *Goldstein*, 218 F.3d at 356; *Robinson*, 160 F.3d at 189. The Sheriff has put forth only speculative and unsubstantiated charges of office disruption. Moreover, the government's interest in efficiency generally bears more weight than an employee's interest in commenting on matters of public concern only when the employee-speaker is an agency-head or is in a policy making position. *See McVey v. Stacy*, 157 F.3d 271, 278-79 (4th Cir. 1998). The deputies were low ranking law enforcement officers without policy making authority. Accordingly, at this juncture, the deputies have alleged sufficient facts to satisfy the second prong of a retaliation claim.

*Id.* at 136. As in *Cutts*, the Defendant in the instant matter has not produced any specific reliable evidence that supports the assertion that the Plaintiff's actions operated to interfere with the functions of the office. Moreover, as cited by *Cutts*, the Plaintiff in the instant matter was not an agency-head or a policy-maker with the Defendant employer. *See McVey v. Stacy*, 157 F.3d 271, 278-79 (4th Cir. 1998). The Plaintiff has clearly demonstrated that he can satisfy Prong 2.

### C. Prong 3

Finally, Prong 3 is easily satisfied by the analysis provided above in this Brief. The Plaintiff has offered three reasons supporting the theory that his protected speech linked with the Defendant's decision to retaliate ((1) changes in the Defendant's behavior toward the Plaintiff after he engaged in protected activities; (2) evidence undermining the reliable probative value of the Defendant's proffered evidence allegedly justifying the Plaintiff's termination; and (3) temporal proximity between adverse employment actions.). Genuine questions exist as to the legitimacy of the Defendant's purported reason for demoting and terminating the Plaintiff. Thus, as it relates to Count III, the Defendant

would have a difficult time proving that the Plaintiff would still be discharged in the absence of the protected speech.

### D. The *Garcetti* Case and Qualified Immunity

In defense of the Plaintiff's claims related to Count III, the Defendant cites *Garcetti v. Ceballos*, 547 U.S. 410 (2006) for the general proposition that an employee making a statement to their employer in the official course of their duties and not as a citizen for First Amendment purposes, cannot be actionable. This reasoning is not new as this proposition and its interrelation with the issue of qualified immunity was analyzed well in the earlier case *of Edwards v. City of Goldsboro*, 178 F.3d 231, 246 (4th Cir. 1999). The difference between *Garcetti* and *Edwards* is that, as the Defendant has highlighted in his Brief, the plaintiff in *Garcetti* was very visibly not wearing the hat of a concerned public citizen at the time of his comments to his employer. In *Edwards*, the Fourth Circuit Court of Appeals held that the plaintiff had properly expressed his First Amendment rights outside of his official capacity and also that qualified immunity did not apply to the police chief defendant. The statements made in *Edwards* were expressed by the plaintiff while off-duty and in the context of an instructional course. Essentially, the *Edwards* Court concluded that the plaintiff was not speaking in any way on behalf of the Defendant or in furtherance of the Defendant's business interests.

As described above, when the Plaintiff engaged in protected speech with his employer, he was not speaking in the course and scope of his role as a deputy in the employ of the Defendant, but as a concerned citizen Board member. The issues that he brought forth to the Defendant were matters of public concern affecting Giles County. Unlike *Garcetti*, the Plaintiff in the instant matter possessed a second role outside of the scope of his employment. It was through this role that he addressed the Defendant.

As it regards the issue of whether qualified immunity should apply to the Defendant in this matter, the analysis employed in *Cutts* is highly relevant:

> We must next determine whether the Sheriff is nonetheless entitled to qualified immunity on the retaliatory discharge claims. He is not entitled to such immunity if (1) the violation of the deputies' constitutionally protected rights was clearly established at the time of the challenged acts and (2) a reasonable official would have understood that his conduct violated that clearly established law. *See Henderson v. Simms*, 223 F.3d 267, 271 (4th Cir. 2000). In this case, the law was clearly established; *Connick* and its balancing test were the law long before 1998 when the challenged conduct took place. Moreover, we agree with the district court that, if the deputies are able to prove their allegations, this is the rare case in which a reasonable official in the Sheriff's position would have understood that such conduct violated clearly established law. Accordingly, we affirm the district court's refusal to grant Sheriff Peed summary judgment on qualified immunity grounds on Cutts's and Shabazz's retaliatory discharge claims alleged in Counts IV through VI of their complaint.

In the instant matter, not only can the Plaintiff prove his allegations, but the evidence at hand demonstrates that (1) the violation of the Plaintiff's protected rights was clearly established as the time of the challenged acts, and (2) a reasonable official would have understood that his conduct violated that clearly established law. Qualified immunity should not apply to the Defendant.

## VII.   <u>CONCLUSION</u>

It is clear from the evidence in this matter that genuine issues of material fact exist in this matter. For all of the aforementioned reasons, the Defendant's Motion for Summary Judgment should be denied.

Respectfully submitted,


/s/ Thomas E. Strelka
Thomas E. Strelka, VA Bar No. 75488
Strelka Law Office, PC
119 Norfolk Avenue, S.W.
Suite 330, Warehouse Row
Roanoke, Virginia 24011
540.283.0802
thomas@strelkalaw.com

*Counsel for Plaintiff*




CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of August, 2015, I electronically filed this pleading on the Court's CM/ECF filing system which contemporaneously sent a Notice of Electronic Filing to:


Jim H. Guynn, Jr., Esq. (VSB #22299)
Guynn & Waddell, P.C.
415 S. College Avenue
Salem, Virginia 24153
Telephone: 540-387-2320
Fax: 540-389-2350
jim.guynn@gmdlawfirm.com

*Counsel for Defendant*

/s/ Thomas E. Strelka

29