1               IN THE UNITED STATES DISTRICT COURT

2                   WESTERN DISTRICT OF VIRGINIA

3                        ROANOKE DIVISION

4

5

6     - - - - - - - - - - - - - - - - - -
      BRIAN SCOTT DUNN,                    )
7                                          )
                      Plaintiff            )
8     -vs-                                 )        CASE NO.:
                                           )        7:14cv00429
9     SHERIFF MORGAN MILLIRONS,            )
                                           )
10                    Defendant            )
      - - - - - - - - - - - - - - - - - -
11

12

13

14

15    DEPOSITION OF:  MORGAN MILLIRONS

16

17    DATE:          APRIL 7, 2015 (Tuesday)

18    TIME:          9:00 a.m.

19    LOCATION:      GUYNN & WADDELL
                     415 College Avenue
20                   Salem, Virginia 24153

21

22    REPORTER:      Lisa M. Hooker, RPR
                     Registered Professional Reporter #29505
23

24

## Page 2

```
1              I N D E X

2

3  EXAMINATION BY:                               PAGE

4  Thomas E. Strelka, Esq.                          5

5

6  Appearance Page  ...............................  3

7  Exhibit Page    .................................  3-4

8  Witness Signature Page  .........................  167

9  Witness Signature Waiver  .......................  ---

10 Reporter's Certificate  .........................  166

11 Errata Sheet  ...................................  168

12

13

14

15

16

17

18

19

20

21

22

23

24
```

## Page 3

```
1         A P P E A R A N C E S
2  FOR THE PLAINTIFF:  STRELKA LAW OFFICE, PC
                       Attorneys at Law
3                      119 Norfolk Avenue, SW
                       Suite 330
4                      Roanoke, Virginia 24011
5                      (540) 283-0802
                       (no fax available)
6                      thomas@strelkalaw.com
7                      BY:  THOMAS E. STRELKA, ESQ.
8
9  FOR THE DEFENDANT:  GUYNN and WADDELL, PC
                       Attorneys at Law
10                     415 South College Avenue
                       Salem, Virginia 24153
11
                       (540) 387-2320
12                     (540) 389-2350
                       jim.guynn@gmdlawfirm.com
13
                       BY:  JIM H. GUYNN, JR., ESQ.
14
ALSO PRESENT:    Brian Scott Dunn
15
16         E X H I B I T S
17 NUMBER         DESCRIPTION               PAGE
18 Exhibit 6   Board of Supervisors Minutes dated
               10-2-2013.                      102
19 Exhibit 7   Letter from Sherry Helsel to Mr.
               McKlarney dated 5-23-12.        115
20 Exhibit 8   Animal Facility Inspection Report
               dated 5-10-12.                  116
21
   Exhibit 9   Letter from Mr. Millirons to Mr.
22             McKlarney dated 1-23-13.         117
   Exhibit 10  Letter from Ms. Helsel to Mr. McKlarney
23             dated 9-30-13.                   118
   Exhibit 11  Letter from Mr. McKlarney to Ms. Helsel
24             dated 11-14-13.                  119
```

## Page 4

```
1  Exhibit 12   "To Whom it May Concern" Letter from
                Chastity Perkins dated 11-5-13.   120
2  Exhibit 13   Letter from David B. Hunt dated
                10-17-13.                         122
3  Exhibit 14   Letter from Mr. McKlarney to Mr.
                Millirons dated 6-20-14.          123
4
   Exhibit 15   Letter from Mr. Millirons to Mr.
5               McKlarney dated 6-26-14.          127
   Exhibit 16   Email from Mr. Millirons to Mr.
6               McKlarney dated 4-11-12.          128
   Exhibit 17   Emails from Mr. Millirons to Mr.
7               McKlarney dated 2-1-13, et al.    128
   Exhibit 18   Email from Mr. Millirons to Mr.
8               McKlarney dated 4-2-13.           131
9  Exhibit 19   Email from Mr. Millirons to Mr.
                McKlarney dated 4-22-13, et al.   132
10 Exhibit 20   Email from Ms. Lowry to Mr. Dalton,
                et al. Dated 4-30-13.             134
11
   Exhibit 21   Email from Ms. Lowry to Mr. Millirons,
12              et al. dated 3-4-13.              134
   Exhibit 22   Email from Ms. Lowry to Mr. McKlarney
13              dated 1-31-13, et al.             135
   Exhibit 23   Email from Mr. McKlarney to GCAR, et
14              al., dated 5-13-15, et al.        141
15 Exhibit 24   Email from Mr. Millirons to Ms.
                Link-Owens, et al., 7-18-13.      143
16 Exhibit 25   Email from Mr. Millirons to Mr.
                McKlarney dated 8-29-13.          145
17 Exhibit 26   Email from Mr. Millirons to Mr.
                McKlarney dated 8-29-13.          146
18
   Exhibit 27   Various Letters Bates Stamped
19              PL RPD 000002-000016.             147
   Exhibit 28   Greenbrier Contract Services Invoice
20              dated 4-30-13 #5002.              181
   Exhibit 29   Document marked "Exhibit 14" Bates
21              Stamped PL RPD 000802-000811.     184
22 Exhibit 30   Giles County Animal Control Standard
                Operating Procedures Manual.      186
23
24
```

## Page 5

```
1               MORGAN MILLIRONS

2  having been sworn by the Registered Professional Reporter,

3  Lisa M. Hooker, to tell the truth, the whole truth, and

4  nothing but the truth, testified as follows:

5

6          EXAMINATION BY THOMAS E. STRELKA, ESQ.

7       Q.    All right, please state your name for the

8  Record.

9       A.    Morgan Millirons.

10      Q.    Good morning, Mr. Millirons.  I identified

11 myself earlier; I'm Tommy Strelka, counsel for the

12 Plaintiff in this action.  Just a few thing, basic rules.

13 Have you ever been deposed before?

14      A.    I was deposed years ago in a civil action.

15      Q.    Okay.

16      A.    In a vehicle accident.

17      Q.    All right, I'm sure that you've testified

18 many times in court?

19      A.    Hmm-hmm.

20      Q.    And so Rule Number 1 is you just answered

21 perfectly my question, but you said "hmm-hmm."

22      A.    Oh, yes, I'm sorry.

23      Q.    Okay, and so I would ask as we move

24 forward, and I will try to remind you as we progress, but
```

Page 6

1  all yes's and no's have to be yes's and no's.
2        A.      Okay.
3        Q.      No huh-huh or uh-huh; a slight, you know,
4  miswording or mis-typing or misunderstanding, and the
5  whole case will be flipped around; do you understand that?
6        A.      I understand that.
7        Q.      And the other thing is, unlike normal human
8  conversation, I mean, we're in a room, a nice room, and if
9  we were just talking, we would be talking all over each
10  other, but she can only type what one person is saying.
11        A.      I understand.
12        Q.      So please wait until I have completely
13  finished asking my question, even if you know exactly what
14  it is I'm going to ask, because it has to be all typed in
15  there; do you understand?
16        A.      I understand.
17        Q.      And you are not under arrest or anything
18  here today; you can take break, you can get water, speak
19  with your attorney, and I will let you know, though, that
20  if I ask you a question, you can't go, oh, okay, time out,
21  let me go and talk to Jim.
22        A.      I understand that.
23        Q.      You have to answer the question, and then
24  you can go talk to Jim or go to the bathroom or whatever

Page 7

1  it is.
2        A.      Okay.
3        Q.      All right.  Now, where are you currently
4  employed, sir?
5        A.      Giles County Sheriff's office.
6        Q.      Okay, and you are the Sheriff of Giles
7  County?
8        A.      Yes, sir.
9        Q.      And how long have you been a sheriff at
10  Giles County?
11        A.      Since January 1, 2008.
12        Q.      And that is an elected position?
13        A.      Yes, sir.
14        Q.      And is that -- have you served one term or
15  more than one term?
16        A.      I am in my second term.
17        Q.      In your second term, okay, and is it your
18  understanding that, as a sheriff, you are a constitutional
19  officer under the Virginia Code?
20        A.      Yes.
21        Q.      Okay.  Now, are you -- do you know the
22  Plaintiff in this matter?
23        A.      Yes.
24        Q.      And how do you know the Plaintiff?

Page 8

1        A.      He used to work for me.
2        Q.      Okay.  And do you remember when it was that
3  he began to work for you?
4        A.      Not exactly.  I know that it was February
5  or March of 2008.
6        Q.      Okay.  And what title did Mr. Dunn have
7  when he began to work with you?
8        A.      He was a deputy sheriff.
9        Q.      Okay.  And was he -- did he remain a deputy
10  sheriff throughout the course of his employment?
11        A.      He was a deputy sheriff, yes.
12        Q.      Was he ever given a promotion?
13        A.      He was.
14        Q.      And to what was he promoted; what rank was
15  he promoted to?
16        A.      He was a sergeant and then he was a first
17  sergeant and then he was a lieutenant.
18        Q.      Okay.  And are you aware of the date in
19  which Mr. Dunn was terminated from the sheriff's office?
20        A.      The exact date?
21        Q.      Well, are you aware that it was in 2013?
22        A.      Yes.
23        Q.      Are you aware that it was in October of
24  2013?

Page 9

1        A.      Yes.
2        Q.      The -- what I want to know is a little bit
3  more about the structure of the office and the people that
4  are there, okay?
5        A.      Okay.
6        Q.      So I want -- but I want to put it in the
7  time line of October of 2013.
8        A.      Okay.
9        Q.      Okay, so at that point in time, how many
10  deputies were working for the sheriff's office in Giles?
11        A.      I don't know.
12        Q.      Okay.
13        A.      I don't know the answer to that.
14        Q.      Was it less than ten?
15        A.      No, it was more than ten.
16        Q.      Okay, less than 20?
17        A.      Probably around 20.
18        Q.      Okay.
19        A.      If you are counting the school resource
20  officers and animal control, it was more than 20.
21        Q.      All right, and just prior to his
22  termination, Mr. Dunn was a lieutenant?
23        A.      Hmm-hmm, yes.
24        Q.      Were there any other lieutenants then

**Page 10**

1  working at the sheriff's office?

2      A.      Yes.

3      Q.      And about how many; do you know?

4      A.      Lieutenant Gautier, Lieutenant Thwaites,

5  and Lieutenant Hutchinson.

6      Q.      All right, now, as far as -- I would say,

7  for lack of a better term, the corporate ladder of the

8  sheriff's office?

9      A.      Okay.

10      Q.      As far as the corporate ladder of the

11  sheriff's office is concerned, if I was a lieutenant like

12  Mr. Dunn at that time, would those other lieutenants that

13  you just mentioned be exact peers, lateral peers; in other

14  words, that they wouldn't be supervisory to Mr. Dunn or

15  subordinate to Mr. Dunn?

16      A.      Yes.

17      Q.      Okay, now, if we're to go one rung up on

18  that corporate ladder at that time, who is up there?

19      A.      That would have been Captain Joe Shanks.

20      Q.      Captain Shanks, and were there any other

21  captains at that time?

22      A.      No.

23      Q.      Okay.  And if we are proceeding up that

24  ladder at that time, in October of 2013, who is above

**Page 11**

1  Captain Shanks?

2      A.      Mike Falls, he was the chief deputy.

3      Q.      Chief deputy, okay, and it is my

4  understanding that he had an accident?

5      A.      Yes.

6      Q.      All right.

7      A.      He will be here this afternoon.  He is on

8  crutches and all that good stuff.

9      Q.      Okay, not fun.  All right, so we have

10  Falls, and if I were to proceed up that ladder, who is

11  next above Falls?

12      A.      That is me.

13      Q.      Okay.  Now, going back down the ladder, we

14  have the lieutenants again, do -- in October of 2013, is

15  anybody -- you said that -- excuse me, I'm speaking all

16  gibberish now.  Mr. Dunn was promoted to lieutenant from

17  the position of sergeant?

18      A.      Yes.

19      Q.      Okay, and so in October of 2013, were there

20  other sergeants that were beneath the lieutenants?

21      A.      Yes.

22      Q.      Okay, were there any other positions

23  beneath sergeant at that time?

24      A.      You mean rank.

**Page 12**

1      Q.      Yes, as far as rank is concerned?

2      A.      No.

3      Q.      Okay.  And I don't mean it --

4      A.      Well, just ask it.

5      Q.      Well, I don't mean it in a derogatory way,

6  but the lowest position, I'm not trying to say --

7      A.      I understand.

8      Q.      -- is a sergeant?

9      A.      The lowest rank.

10      Q.      What is the lowest rank?

11      A.      Sergeant.

12      Q.      It is sergeant?

13      A.      Yes.

14      Q.      Okay, and the lieutenants have supervisory

15  authority over the sergeants; is that right?

16      A.      Yes.

17      Q.      Okay, and by that, let's break that down.

18  Does a lieutenant have the ability to give a sergeant

19  directions, directives to perform certain tasks?

20      A.      He does.

21      Q.      Does a lieutenant have the ability to write

22  up a sergeant for disciplinary violations, violations of

23  policy?

24      A.      He does.

**Page 13**

1      Q.      Okay.  But I don't think that a lieutenant,

2  you know, could fire a sergeant?

3      A.      No.

4      Q.      All right, and who possesses the authority

5  in October of 2013 at the sheriff's office to fire any

6  person who worked at the sheriff's office?

7      A.      The sheriff.

8      Q.      Okay.  Who -- does the lieutenant in

9  October of 2013 have the authority to alter or change in

10  any way the schedule, the work schedule, of a sergeant?

11      A.      He does.

12      Q.      Okay.  Let's go to lieutenants.  Are the

13  lieutenants in October of 2013, and let's say that Mr.

14  Dunn is still working there, do they handle different

15  areas of law enforcement or are there tasks and duties

16  uniform for each lieutenant?

17      A.      It is different areas.

18      Q.      Okay, so what area was Mr. Dunn working in

19  immediately prior to his termination?

20      A.      He was over patrol and he was part of our

21  interdiction program.  Okay.  And when you say "interdiction,"

22      Q.      Okay.  And when you say "interdiction,"

23  what do you mean by that?

24      A.      Stopping cars, you know, looking for

**Page 14**

1  drugs.  He had a drug dog.

2       Q.     Okay, was there any other lieutenant that

3  was working in his section?

4       A.     They would occasionally.

5       Q.     Okay.

6       A.     On overtime.

7       Q.     Okay.

8       A.     Special details.

9       Q.     All right, I understand.

10      A.     And if they needed help, they would -- you

11 know, we are a small department.  We did what we had to

12 do, and if there was a lieutenant there and we needed him

13 to do something, I mean, the lieutenant had to perform his

14 duties as a deputy sheriff as well.

15      Q.     Okay.

16      A.     And if the crime scene was being

17 investigated and the investigator was there, he pretty

18 much was more or less in charge of the crime scene.

19      Q.     Okay.  And in -- so you just highlighted

20 what Mr. Dunn -- his tasks were as a lieutenant.  What

21 were the other areas that lieutenants worked in in the

22 other divisions or sections, whatever you called it, at

23 the time in October of 2013?

24      A.     Okay, I had a Lieutenant Eric Thwaites, he

**Page 15**

1  was over investigations.

2       Q.     Okay.

3       A.     Lieutenant Timmy Hutchinson, he was over

4  court security, which is our Number One priority at the

5  sheriff's office.

6       Q.     Okay.

7       A.     He took care of all transport orders.  He

8  was over civil process, he made sure that the civil papers

9  were kept up to date, he made sure that the jury papers

10 were out, and he made sure that there was enough court

11 security for the courts.

12      Q.     Okay.

13      A.     And sometimes we were running two courts a

14 day, Circuit Court and General District.  He had to call

15 extra people in to make sure that those were covered.  We

16 had Lieutenant Gautier and he was over narcotics and he

17 was also an investigator, and if I needed him on the road,

18 he also worked the road.

19      Q.     Okay.  And does that cover everybody?  Did

20 we miss anybody there?  You said Gautier, Dunn, Thwaites,

21 and Hutchinson?

22      A.     Hutchinson, yes.

23      Q.     Okay.  All right.  And earlier you

24 mentioned that you had testified in a deposition earlier,

**Page 16**

1  a while back for a civil matter.  What was that about?

2  Was that a lawsuit?

3       A.     This was a lawsuit. This was in Blacksburg

4  and I worked a vehicle accident, and a young man tried to

5  beat a car across the road and got hit.

6       Q.     Okay, so you were essentially a witness for

7  the -- in the case at that time?

8       A.     Well, I was the investigating officer.

9       Q.     Sure.

10      A.     And I had to take the witness statements of

11 everyone who saw it.

12      Q.     Okay, I understand.  All right.  We're here

13 today because of a lawsuit.  Have you had the opportunity

14 to look or read, I will say read, the Plaintiff's

15 Complaint that he filed in this case?

16      A.     I have.

17      Q.     Okay.  And I'm going to go through a couple

18 of the -- a number of paragraphs in there, okay, and I'm

19 going to ask you, after I read it, if you agree with it or

20 not.

21      A.     Okay.

22      Q.     And if you don't agree with it, I want you

23 to tell me why you don't agree with it, okay?

24      A.     Okay.

**Page 17**

1       Q.     All right.  Let's see.  I will read this

2  because we didn't really talk about this so I'm

3  interested.  This is Paragraph 3 of the Second Amended

4  Complaint.  *At the time that his employment with the

5  sheriff's office ceased, the Plaintiff worked primarily as

6  a lieutenant K-9 officer. However, the Plaintiff's job

7  required the wearing of multiple hats;* would you

8  agree or disagree with that?

9       A.     I agree.

10      Q.     We didn't talk about K-9 officers.  In

11 October of 2013, do you know how many K-9 officers you

12 had?

13      A.     I had one.

14      Q.     Was that just Mr. Dunn?

15      A.     Yes.

16      Q.     And the simple fact that one is a K-9

17 officer does not give that officer, that employee, any

18 additional supervisory authority over anyone in the

19 corporate ladder, does it?

20      A.     No.

21      Q.     All right.  All right, and so this next

22 paragraph, I kind of list some of the duties that Mr. Dunn

23 did.

24      A.     Okay.

### Page 18

1    Q.    Okay, and so I'm going to read you some of
2  the duties, and then I will say, do you agree, is that
3  something that he did, and then we'll go to the next one.
4    A.    Okay.
5    Q.    Paragraph 4, "As an example of a
6  nonexhaustive list in the course of his duties in his job,
7  the Plaintiff, A, headed a drug interdiction program;" do
8  you agree or disagree?
9    A.    Yes.
10    Q.    And B, "Possessed oversight and
11  discretionary authority regarding maintenance of a fleet
12  of law enforcement vehicles;" do you agree or disagree?
13    A.    Him being totally responsible?
14    Q.    "Possessed" -- I will read it again and we
15  can talk more about it.
16    A.    Okay.
17    Q.    Because I want you to see whether you agree
18  or disagree.  "Possessed oversight and discretionary
19  authority regarding the maintenance of a fleet of law
20  enforcement vehicles;" do you agree or disagree?
21    A.    Disagree.
22    Q.    Okay, why do you disagree?
23    A.    Because if we needed something worked on at
24  the school bus garage, we took it to the school bus garage

### Page 19

1  and had it fixed, had it repaired, and I didn't have time
2  to wait to go through Scott Dunn to get that finished or
3  fixed.
4    Q.    Okay.
5    A.    And if he was around, we would tell him,
6  but if he wasn't around, the guys went ahead and had the
7  maintenance complete.
8    Q.    Okay.  Where is the school bus repair shop;
9  is that at the school?
10    A.    That is the County garage at the bottom of
11  -- just 460 West going out of Pearisburg.
12    Q.    Okay, so, and I understand that you are
13  talking about earlier about how you are not a big office
14  and people have to do the work, essentially, you know,
15  things have to get done?
16    A.    Yes.
17    Q.    But what I want to know is, did -- you said
18  that if he was there, you know, an officer might go to
19  him, so was he assigned some sort of duty regarding these
20  vehicles?
21    A.    He -- he looked at the vehicles; he was a
22  supervisor, and if he saw something wrong with the
23  vehicle, he made a complaint on it.  He had the guys go
24  fix it.

### Page 20

1    Q.    But why did Mr. Dunn do that; was that part
2  of his job?
3    A.    That was part of his job as a supervisor.
4    Q.    Did the other lieutenants do that?
5    A.    Yes, the sergeants did, and --
6    Q.    Okay.
7    A.    -- and if a sergeant saw something that was
8  wrong, he fixed it.
9    Q.    Okay.  So, what you are saying is kind of
10  the oversight of the fleet of vehicles, as far as getting
11  these things to repair shops if they needed it, I mean,
12  that was on an individual basis; no one had to go to Scott
13  Dunn to get it done?
14    A.    That's right.
15    Q.    Okay.  I will read you this one.  "He
16  possessed oversight and discretionary authority regarding
17  responses to employee grievances."  Do you agree or
18  disagree?
19    A.    Disagree.
20    Q.    Why is that?
21    A.    Because I had the grievances.
22    Q.    If a -- let me ask you this.  Does the
23  sheriff's office have a formal grievance process or
24  procedure?

### Page 21

1    A.    Not really.  If -- if he wrote -- if a
2  sergeant wrote a field deputy up, then it would -- they
3  would take care of the problem and it would come on up the
4  ladder.
5    Q.    Okay.  If -- let's say that an employee of
6  the sheriff's office had a complaint about how things were
7  going; you know, they didn't like something that happened
8  at work or they didn't like how things were being done,
9  and so how in October of 2013, how would -- how would a
10  sergeant air that complaint?  Is there any policy that
11  gives them guidance?
12    A.    They would go to the supervisor.
13    Q.    That would be the lieutenant?
14    A.    That would be the lieutenant.  If they
15  weren't happy with the lieutenant, they would go to the
16  next person in charge.
17    Q.    Okay.  And so I'm going to read you the
18  next paragraph, the next sentence; this is Letter D as in
19  dog, "Possess supervisory authority over numerous
20  employees of the sheriff's department;" do you agree or
21  disagree?
22    A.    Agree.
23    Q.    And Paragraph E, "Maintained employees'
24  schedules and leave requests;" agree or disagree?

Page 22

1      A.      Agree.

2      Q.      F, "Retained supervisory authority over
3  field operations;" agree or disagree?

4      A.      I would agree.

5      Q.      All right.  And sitting here
6  today, you are of course aware that Mr. Dunn is a Board
7  member of the Board of Giles County?

8      A.      Yes.

9      Q.      Okay.  And he was a Board member during the
10 course of his employment at the sheriff's office, wasn't
11 he, for a time?

12     A.      Yes.

13     Q.      And when was the first he -- strike that.
14 Do you recall when you first learned that Mr. Dunn wished
15 to seek a seat on the Board of Giles County?

16     A.      No, I don't.

17     Q.      Okay.

18     A.      I remember him coming to me, telling me
19 that he was interested in running for the Western End
20 District for the Board of Supervisors, but as far as the
21 date and time, no, I don't remember that.

22     Q.      Okay.  Was he a lieutenant at that time?

23     A.      I don't know.

24     Q.      Okay.

Page 23

1      A.      I think he probably was.

2      Q.      Where were you when you had this
3  conversation?

4      A.      I don't know.

5      Q.      Was it -- was it at the sheriff's office,
6  but you just don't know where?

7      A.      I'm not sure.  It could have been in a
8  parking lot for all I know.

9      Q.      It could have been over the phone?

10     A.      It could have been over the phone or on the
11 side of the road somewhere; I don't know.

12     Q.      Okay, I will read you this paragraph and
13 you let me know if you agree or disagree.  Next Paragraph,
14 "Prior to running for the aforementioned elected seat,"
15 and in the previous paragraph they talk about how he ran
16 for the seat of the Board, "the Plaintiff sought
17 permission from Sheriff Millirons;" do you agree or
18 disagree?

19     A.      I agree.

20     Q.      And you gave him that permission?

21     A.      Yes.

22     Q.      And did you have any more detailed
23 discussion about your roles, you know, his role, your
24 role, to move forward?  Go ahead.

Page 24

1      A.      Okay.  I told him that, you know, that he
2  could run.  There were other counties that had deputy
3  sheriffs on the Board of Supervisors, and I told him as
4  long as it didn't interfere with his duties as a deputy
5  sheriff in the Giles County sheriff's office, it would be
6  fine.

7      Q.      Okay.  As the Sheriff of Giles County,
8  you -- would it be fair to say that you interact
9  frequently with the Board of Giles County?

10     A.      Yes.

11     Q.      Are you present at all of the Board
12 meetings?

13     A.      No.

14     Q.      Okay, but you are present at some of the
15 Board meetings?

16     A.      Yes.

17     Q.      Okay.  All right, and are you familiar with
18 an animal shelter within Giles County?

19     A.      Yes.

20     Q.      And I've always just read it as the Giles
21 County Animal Shelter, but does it have a different name
22 other than that?

23     A.      If it does, I don't know about it.

24     Q.      And that shelter is owned by the County of

Page 25

1  Giles; is that right?

2      A.      I think it is.

3      Q.      Okay, and my understanding of that would be
4  that the Board of Giles County would then have authority
5  over the --

6      A.      Yes.

7      Q.      Okay.  But would you agree with me that the
8  Board has the authority to assign or -- well, strike
9  that.  At some point the sheriff's office took control of
10 the management of the Giles County Animal Shelter; is that
11 right?

12     A.      They did.

13     Q.      And was that before you were elected
14 sheriff?

15     A.      Yes.

16     Q.      And so when you were elected sheriff, that
17 was kind of the status quo, was that the sheriff's office
18 was in charge of running the Giles County Animal Shelter?

19     A.      Yes.

20     Q.      Okay.  And does the sheriff's office today
21 manage the Giles County Animal Shelter?

22     A.      No.

23     Q.      And it is my understanding that the -- who
24 manages it now?

**Page 26**

1    A.    Giles County.

2    Q.    Okay.

3    A.    I don't know the person that is over it,

4  the individual, but I know that I inherited it.

5    Q.    I understand.  During your oversight of the

6  animal shelter, the animal shelter -- how many -- how many

7  employees staff the animal shelter?

8    A.    Just one.

9    Q.    And who was that?

10   A.    That was Chastity Dalton Perkins.

11   Q.    Okay, and what are her general duties?

12   A.    She cleaned and fed the animals.

13   Q.    And you've been inside of the animal

14  shelter?

15   A.    Yes, I have.

16   Q.    And I've not; I've seen some pictures, but

17  can you describe it briefly for the Record, what it looks

18  like inside?  Is it just like cages?

19   A.    Well, what do you call them, kennels or

20  runs.  They are metal, concrete floor, painted, and that

21  is in the -- I don't know how many there is, maybe ten or

22  twelve.  It may not be that many, but there is a cat room

23  with the cat cages in it as well, and the kennels are

24  concrete and there is drains in them.

**Page 27**

1    Q.    Okay.  One of the functions of the animal

2  shelter is to provide adoption services for --

3    A.    Yes.

4    Q.    Okay, however, during the time in which the

5  sheriff's office managed the shelter, at times, animals

6  would have to be euthanized; is that right?

7    A.    That's right.

8    Q.    And that could be either due to health

9  reasons or perhaps overcrowding; would that be right?

10   A.    Yes.

11   Q.    And do you know when the sheriff's office

12  was in charge of the animal shelter whether or not there

13  was a policy in place by which if an animal had been at

14  the shelter for a certain amount of time, then that animal

15  would be euthanized?

16   A.    No.

17   Q.    Okay.  So no policy like that existed?

18   A.    If it did, I don't know about it.

19   Q.    Okay.  When you were -- when the sheriff's

20  office -- when you were sheriff, assuming you are sheriff,

21  did you have a policy book or manual that illustrated how

22  the animal shelter should be operated?

23   A.    No.

24   Q.    And the funds to pay for Ms. Perkins'

**Page 28**

1  salary came from where?

2    A.    I guess the Board of Supervisors.

3    Q.    Okay.  And -- okay, but the sheriff's

4  office didn't pay Ms. Perkins directly?

5    A.    No.

6    Q.    How did that work?

7    A.    I would get an invoice from Greenbrier

8  Contracting, and that is owned by Dave Hunt from Newport,

9  Virginia.

10   Q.    Okay.

11   A.    And he would give me a statement for a

12  monthly bill.  He was supposed to give me a statement for

13  a monthly bill.  Sometimes he would wait three or four

14  months before he would give me a statement.  He would just

15  get behind and then he would send three or four months at

16  one time, and, you know, they would pay him.

17   Q.    All right.

18   A.    Then I guess that he would pay her.

19   Q.    Would the bills -- excuse me, the invoices

20  from Greenbrier Services, the staffing company, would they

21  come from your office or go directly to the County?

22   A.    I don't know if they would go to the County

23  first or if they would come to my office first.

24   Q.    Okay.

**Page 29**

1    A.    I know that I would sign off on them when

2  we got them, you know, when it was time for them to be

3  paid.  I don't know about if they sent them to the County

4  administrator's office first.

5    Q.    All right.  Excuse me just one second.  Are

6  you aware of how much Ms. Perkins was paid?

7    A.    I'm not sure.  I think $7.50 an hour, six

8  hours a day, seven days a week, I believe.

9    Q.    Okay.  And the way it worked at the

10  staffing company, the bill would be a little higher for

11  the staffing company for the hourly rate, and then --

12  because the staffing company needs to take their cut,

13  right?

14   A.    I guess.

15   Q.    So is it your understanding that Ms.

16  Perkins was an hourly employee?

17   A.    She was a contract employee, six hours a

18  day, seven days a week, according to Mr. Hunt.

19   Q.    Okay.

20   A.    And that was set up by a former animal

21  control officer, William Clemons, we all know him as Buck

22  Clemons, and he said that he could not go out and clean

23  the kennels and feed the dogs and pick up animals, you

24  know, during his routine patrols.  He was spending too

**Page 30**

1    much time at the shelter, and he needed some help and they
2    hired her to do that.  I think that it was 2005 or 2006; I
3    don't know exactly.
4         Q.    So that was all before you became sheriff?
5         A.    Yes.
6         Q.    All right.  So it is your understanding
7    that Ms. Perkins was an hourly employee, not a salaried
8    employee, and by that I mean she got paid for the hours
9    she worked, and it wasn't like she got a guaranteed amount
10   and she could choose however many hours she wanted to
11   work, right?  It is my understanding that you are telling
12   me that she was an hourly employee; would you agree with
13   that?
14        A.    No.
15        Q.    No?
16        A.    No.  It was -- I asked Dave Hunt, the owner
17   of Greenbrier Contracting, and I said, is she supposed to
18   be working six hours a day, and he said, Morgan, it was
19   set up, if she worked two hours a day, if she worked six
20   hours a day, she got paid six hours a day, seven days a
21   week.
22        Q.    When did you have this conversation with
23   Buck, this conversation --
24        MR. GUYNN:  Hunt.

**Page 31**

1        THE WITNESS:  Dave Hunt.
2    BY MR. STRELKA:
3        Q.    Pardon me, thank you.
4        A.    I'm not exactly sure, but he wrote a letter
5    for me during that time and he told me, he said, that is
6    the way that they set it up with Buck Clemons.  He said
7    because sometimes, you know, she didn't need to be out
8    there six hours a day and sometimes she could get the work
9    done in two hours, maybe an hour, but he said she got paid
10   six hours a day, seven days a week.
11        Q.    Okay.  And so from this conversation, would
12   it be fair to say that -- well, strike that.  So would it
13   be fair to say that during the course of her employment,
14   Ms. Perkins, that you didn't know exactly how many hours
15   she was working at the sheriff's -- at the shelter?
16        A.    I did not.
17        Q.    Okay.  Is there a clock at the shelter?
18        A.    There is now, I think.
19        Q.    Okay.  But during the time when the
20   sheriff's office oversaw the shelter, there was no clock?
21        A.    There was a clock before I, you know, let
22   the County have it.
23        Q.    Did Ms. Perkins ever punch in and out like
24   on a time card when she got to work?

**Page 32**

1        A.    I think she probably did, the last little
2    bit of time that she was employed.  I'm thinking that; I
3    don't know exactly.
4        Q.    Okay, so it is your understanding that, the
5    majority of the time that she was employed working at the
6    shelter, she did not clock in or clock out?
7        A.    No.
8        Q.    Okay.
9        (The Court Reporter read back the preceding
10      question.)
11   BY MR. STRELKA:
12        Q.    Is this a truthful statement, that for the
13   majority of the time that Ms. Perkins worked at the
14   shelter, she did not clock in or clock out; is that a
15   truthful statement?
16        A.    That is a truthful statement.
17        MR. GUYNN:  Thanks.  That was going to be a
18      problem when we read the transcript.
19      MR. STRELKA:  No, no, that is a good eye.
20   BY MR. STRELKA:
21        Q.    All right.  Was there anyone at the
22   sheriff's office who exercised any supervisory authority
23   over Ms. Perkins?
24        A.    The animal control officer.

**Page 33**

1        Q.    Okay.  And how many, and let's say in
2    October of 2013, how many animal control officers were
3    there?
4        A.    We had one full-time animal control officer
5    that was Jeff Spicer.
6        Q.    Okay.  And in October of 2013, do you know
7    if he was a sergeant or a lieutenant or just --
8        A.    He is just an animal control officer.
9        Q.    So he was a separate --
10        A.    He was a deputy sheriff.
11        Q.    Okay.
12        A.    They were under the sheriff's office.
13        Q.    All right, and so let's put him in that
14   corporate ladder, okay.  In October of 2013, would a
15   lieutenant like Mr. Dunn have supervisory authority over
16   the animal control officer?
17        A.    If he was -- he was not considered a
18   fieldman but he was a deputy sheriff.
19        Q.    So under the rank and file system then in
20   place, he would have been beneath Mr. Dunn as a -- when
21   Mr. Dunn was a lieutenant; is that right?
22        A.    He could have been, if he -- he would have
23   been if he needed him for animal control.
24        Q.    Okay.

Page 34

1    A.    He -- he did not handle any law enforcement
2  issues.  He only handled animal control issues.
3    Q.    Okay, but Mr. Dunn could call him and give
4  him directions and order him to do tasks?
5    A.    Yes, if it had to do with animal control.
6    Q.    Okay.  And just to kind of flesh this out,
7  Jeff Spicer could not call Lieutenant Dunn and give him
8  directives and tell him what to do, could he?
9    A.    No.
10    Q.    All right, so could you describe -- just
11  flesh this out for me I guess is a good term to use, if
12  you can, the relationship between the animal control
13  officer and the employee at the shelter.  I mean, you said
14  that the animal control officer has some sort of
15  authority, I believe, you said over Chastity Perkins when
16  she worked at the shelter; is that right?
17    A.    He would come in, and if something needed
18  to be done --
19    Q.    Can you give me an example?
20    A.    If the animals needed to be looked after or
21  something of that sort, he would tell her and she would
22  get it done.
23    Q.    Okay.
24    A.    If there was one that needed special care,

Page 35

1  and if, you know, he would say, you know, this animal here
2  is sickly, you know, you may want to keep an eye on it and
3  help me out with this, she would do that, and if -- and
4  there had been times when she would call me and say, I've
5  got one sick, can I take it to the vet.
6    Q.    Okay.
7    A.    You know, we need to get this animal looked
8  at.
9    Q.    All right.
10    A.    They kind of worked together.
11    Q.    Okay.  Was there any other employee of the
12  sheriff's office who exercised authority other than this
13  animal control officer over this worker, Ms. Perkins?
14    A.    I would -- I would imagine if I wasn't
15  there, you know, the supervisor that was there, either the
16  major or the captain, you know, if I wasn't available.
17    Q.    Okay.  And so what you are saying is the
18  corporate hierarchy, or for lack of a better term,
19  corporate ladder, for lack of a better term, the ranking
20  system, rank and file?
21    A.    Okay.
22    Q.    Was such that -- well, how should I word
23  this.  I'm going to strike all of that nonsense.  Who
24  determines how much money Ms. Perkins is going to get

Page 36

1  paid?
2    A.    The Board of Supervisors.
3    Q.    Okay.  During Ms. Perkins' employment at
4  the animal shelter, did you ever write her up for any
5  policy violation?
6    A.    No.
7    Q.    All right.
8    A.    Not that I know of.
9    Q.    Okay, would you have had the authority to
10  do so?
11    A.    I would have.
12    Q.    Okay.  Does Ms. Perkins have a personnel
13  file that is at the sheriff's office at the time that she
14  was working there?
15    A.    No.
16    Q.    Are documents related to the animal shelter
17  maintained, records, at the sheriff's office?
18    A.    No, they are at the animal shelter.
19    Q.    Okay.
20    A.    And at the County Admin.
21    Q.    You said earlier that you signed off on Ms.
22  Perkins' time sheets?
23    A.    No.
24    Q.    No?

Page 37

1    A.    No, I said that I signed off on invoices.
2    Q.    Sorry, on invoices, from Greenbrier
3  Services --
4    A.    Yes.
5    Q.    -- that pay her?
6    A.    Yes.
7    Q.    Okay, and when you are presented the
8  invoice, do you have -- are you ever presented with an
9  allocation of the hours that Ms. Perkins has worked?
10    A.    No.
11    Q.    Okay.  So you just get the bill and you pay
12  the bill; is that what you are saying?
13    A.    Yes.
14    Q.    Okay, does the bill --
15    MR. GUYNN:  I think he said that he sends
16    the bills to the Board of Supervisors to be paid.
17  BY MR. STRELKA:
18    Q.    All right, so you process the bill to the
19  Board of Supervisors where it's then paid?
20    A.    Yes.
21    Q.    Okay.  And have you ever disputed an amount
22  that was on that invoice with Greenbrier Services?
23    A.    No.
24    Q.    All right.

Page 38

1    A.    I -- I did one time, because I had to call
2  them and tell them that I had not received a bill.
3    Q.    Okay.
4    A.    And it was like for the month of January
5  and I called him back and I told the secretary, I said, we
6  have not received a bill from like September through
7  December.
8    Q.    Okay.
9    A.    To that effect, and he checked his records
10 and he sent a bill in for that.
11    Q.    Okay.  Okay.
12    A.    But as far as -- they have all been the
13 same.
14    Q.    Do you physically sign the invoices before
15 you send them to the County?
16    A.    Yes.
17    Q.    All right.  And so the funds, like you
18 testified, the funds that paid for Ms. Perkins are
19 allocated by the County?
20    A.    Yes, the Board of Supervisors.
21    Q.    Okay, and the funds to pay for the animal
22 control officer are from the County as well?
23    A.    Yes.
24    Q.    Okay.  I'm going to read you this paragraph

Page 39

1  from the Complaint and you tell me if you agree or
2  disagree.
3    A.    Okay.
4    Q.    Paragraph 15, "At all times pertinent to
5  this Complaint, the sheriff's department was allocated
6  funds specifically for the hiring of two full-time animal
7  control employees to staff the shelter;" is that a
8  truthful state or not?
9    A.    Read it again.
10    Q.    Again, okay.  "At all times pertinent to
11 this complaint, the sheriff's department was allocated
12 funds specifically for the hiring of two full-time animal
13 control employees to staff the shelter."
14    A.    No.
15    Q.    Okay, and why is that not truthful or why
16 do you disagree?
17    A.    The animal control officers did not staff
18 the shelter.
19    Q.    Okay.
20    A.    The animal control officers were put out
21 there to pick up, you know, unwanted animals, domesticated
22 animals.  They hired Chastity to staff the shelter,
23 Chastity Perkins to staff the shelter.
24    Q.    Okay.  Was Melvin Dalton an animal control

Page 40

1  officer?
2    A.    He was.
3    Q.    Is he related to Ms. Perkins?
4    A.    He is her father.
5    Q.    Are you aware of an entity called Giles
6  Animal Rescue, formally Giles County Animal Rescue?
7    A.    I am.
8    Q.    And what is your -- what do you know about
9  them?
10    A.    I don't know a whole lot.
11    Q.    Okay.
12    A.    They -- I don't know if this is the group
13 or not that was causing problems at the shelter, but they
14 wanted to participate and I agreed, and I had things
15 missing, water buckets, dog leads, things like that.  The
16 office was broke into while Chastity wasn't there, nor was
17 Melvin or the other part-time animal control officer, and
18 I stopped it all.
19    Q.    Okay.  All right, and let's -- let me just
20 go back to what you said.  You said the other part-time
21 animal control officer?
22    A.    Yes.
23    Q.    Who was that?
24    A.    That would have probably been Frank Gough

Page 41

1  at the time.
2    Q.    Okay, so you had a -- during the period of
3  time in which the sheriff's office was in charge of the
4  shelter, at the shelter, you've got Chastity Perkins, but
5  you've also got a full-time animal control officer?
6    A.    Yes.
7    Q.    And you have a part-time animal control
8  officer?
9    A.    Yes.
10    Q.    And didn't that part-time animal control
11 officer have some health issues; wasn't he out of work for
12 a period of time?  Maybe it wasn't health issues.
13    A.    No.
14    Q.    No?
15    A.    No.
16    Q.    How frequently did the part-time, you know,
17 per week, roughly, the part-time animal control officer
18 work?
19    A.    He would probably have worked three or four
20 days a week.
21    Q.    Okay.
22    A.    Then he would take off and go to Florida on
23 vacation for two or three months at a time.
24    Q.    Okay, that is what I was getting at.

Page 42

1      A.      He doesn't have any health issues.

2      Q.      Okay.  So he was allowed vacation for two

3  to three months?

4      A.      He was.

5      Q.      And did you approve that?

6      A.      I did.

7      Q.      And did -- I mean, I've just never heard of

8  anyone, outside of working in France, taking three-month

9  vacations?  I mean --

10     A.      If -- if something would come up and we

11  would need him, need somebody, somebody else would fill

12  in, would take his vehicle and pick up an animal.

13     Q.      Okay.

14     A.      And we always okayed that month or months

15  ourselves before he would take off.

16     Q.      Okay.  All right, now, let's go back to

17  that.  I asked a question about Giles Animal Rescue.

18  Let's go back to volunteers.  All right, during the period

19  of time in which the sheriff's office was managing the

20  shelter, did volunteers perform any services at the

21  shelter?

22     A.      They would come in and, you know, walk the

23  dogs; some would help clean, some would help feed.

24     Q.      Okay.  Do you have any idea of how many

Page 43

1  volunteers, how many people, did this while you were in

2  charge of the shelter?

3      A.      Not really.

4      Q.      Okay.

5      A.      It started out with two or three and, you

6  know, that was fine.

7      Q.      Okay.

8      A.      I went by one day and I saw eight or ten

9  cars out there.  They weren't doing anything.  They were

10  just hanging around.  It had become a hangout for college

11  kids.

12     Q.      So a number of volunteers were from

13  Virginia Tech; is that right?

14     A.      I don't know if they were from Virginia

15  Tech or Radford University.

16     Q.      Okay.  All right.  When you became -- when

17  you first became sheriff of Giles County, had volunteers

18  to your knowledge ever performed services at the sheriff's

19  office before?

20     A.      No.  Well, I did have one.

21     Q.      Okay.

22     A.      Marilyn Hollie.

23     Q.      Okay.

24     A.      And as far as I know, she's still there.

Page 44

1      Q.      So the increase in frequency of volunteers

2  at the sheriff's -- excuse me, at the shelter, that

3  occurred during your tenure as Sheriff?

4      A.      Yes.

5      Q.      Did the sheriff's office implement any

6  requirements or policies regarding these shelter

7  volunteers?

8      A.      When -- just before I took -- I let it go

9  back to the County, we were going to make a policy on an

10  age requirement.  I don't think we ever made that.

11     Q.      Okay.  Okay.  Were volunteers able to

12  access the shelter and the animals within if Ms. Perkins

13  was not at the shelter?

14     A.      Yes, there was a key in this dispatch.

15     Q.      And where is dispatch?

16     A.      That is -- it is at the intersection of

17  Curve Road and Mountain Lake Road.  It is just a block and

18  a-half away from the sheriff's office; it is the old

19  ambulance building, because that is where we had to put

20  the 911 communication system in because we didn't have

21  enough room at the sheriff's office at the time.

22     Q.      When was the decision made to put that key

23  there?

24     A.      I think that it was there before I ever

Page 45

1  took over.

2      Q.      Okay.  And if I was a volunteer at that

3  time, let's say in October of 2013 -- well, before then,

4  let's say if I was a volunteer, how would I access that

5  key?  How would I get that key?

6      A.      You would go to the sheriff's office and

7  pick it up.

8      Q.      And there would be an employee at the

9  sheriff's office, I would tell them who I was, and they

10  would give it to me?

11     A.      Yes.

12     Q.      So it wasn't in like a lock box with a

13  combination that somebody would drive up and take it?

14     A.      No, the dispatcher had to give it to you.

15     Q.      And the dispatcher was an employee of the

16  sheriff's office?

17     A.      Yes.

18     Q.      And there was just that one key?

19     A.      It was supposed to be one key.

20     Q.      Okay.

21     A.      And there were multiple keys after that.

22     Q.      Okay.

23     A.      That is when we changed the lock.

24     Q.      All right.  So are you saying that, without

1  your authorization, other keys were made?

2      A.    Yes.

3      Q.    So it is your belief that volunteers were

4  making these keys?

5      A.    Yes.

6      Q.    Do you know if Ms. Perkins ever made any

7  copies of the keys?

8      A.    No, I don't.

9      Q.    Did you ever ask her?

10     A.    I did.

11     Q.    And what did she say?

12     A.    She told me she didn't know where the keys

13 came from.

14     Q.    What kind of -- you started to talk about

15 some issues and problems that you were having with

16 volunteers?

17     A.    Hmm-hmm.

18     Q.    Let's go through that.

19     A.    Okay.

20     Q.    What kind of problems were they giving you?

21     A.    I was missing equipment at the -- well, I

22 wasn't missing it.  There was equipment disappearing at

23 the shelter.

24     Q.    Okay.  And how -- let's go to that.  How

1  did you -- how were you aware of that?

2      A.    Chastity told me.

3      Q.    Okay.  And what equipment was taken?

4      A.    There were feed buckets, water buckets

5  missing.  Dog leads.  Of course, if you have an animal

6  shelter, you are going to lose dog leads, but when you

7  lose seven and eight on a weekend, and, you know, you just

8  can't keep buying dog leads.  That went on for a period of

9  time.  Water buckets were put in on Friday, you would come

10 back on Monday morning and they were gone.  Feed pans were

11 missing, and they would put some type of bedding or a mat

12 down and they will come back and they will be gone.

13     Q.    Okay.

14     A.    You know, I didn't know who was doing it,

15 and we -- you know, we tried to find out, we could not

16 find out, and sometimes it would correct itself, but, you

17 know, when you had things that would disappear, the door

18 to the office was broke into.

19     Q.    How do you know that?

20     A.    Melvin Dalton came and told me.  The office

21 door was broken into.  Papers were gone through.  We were

22 lucky, there were -- the drug that was used to euthanize

23 the animals was in there.  That didn't need to be

24 disturbed, or if that would have gotten out on the

1  streets, it would have been bad, and we were lucky that

2  nothing like that disappeared, and there was no money

3  there because the money was kept at the treasurer's

4  office.  You know, if a civilian or citizen wanted to come

5  in and adopt a dog, they made a deposit and it was taken

6  to the treasurer's office.  Once they went and had it

7  spayed or neutered, they brought the paperwork back and

8  the treasurer's office would give them a refund on their

9  deposit.  We didn't ever have any money that disappeared.

10 The paperwork was shuffled, and the equipment was missing

11 out there.

12     Q.    So this office, is that within the shelter?

13     A.    Yes, yes, sir.

14     Q.    And that office has its own lock?

15     A.    It does.

16     Q.    And the volunteers didn't have a key to

17 that lock, did they?

18     A.    No.

19     Q.    Not as far as you knew?

20     A.    Not as far as I know.

21     Q.    Okay.  And so the -- so I just want to make

22 sure, from what you are aware of, it didn't appear as if

23 the exterior of the shelter had been broken into?

24     A.    No, the exterior of the shelter never was

1  brought to my attention of being disturbed with the locks

2  or the doors or anything.  It was the office door inside.

3      Q.    Okay.  Now, do you know around when this

4  was?

5      A.    No.

6      Q.    Okay.  All right.  Did Ms. Perkins work on

7  the weekends?

8      A.    She did.

9      Q.    Were you ever made aware of Ms. Perkins

10 taking any items herself from the shelter improperly?

11     A.    No.

12     Q.    All right.

13     A.    I was -- it was brought to my attention by

14 somebody that said that she was carrying dog food out, and

15 I questioned her about it and she said yes, and she said,

16 we can't keep it there but so many days at a time, because

17 she said that it gets worms in it, and what they used to

18 do, they would go out behind the shelter and dump it over

19 the bank, an embankment, but the bears found it, and the

20 coons and the possums, they found out about it and they

21 figured out that there was food there, so they would take

22 it to a dumpster.

23     Q.    All right.

24     A.    All of our food is donated to us.

**Page 50**

1    Q.    Okay.  So during the course of time in
2  which the sheriff's office was overseeing the shelter, is
3  it your testimony that the shelter never took possession
4  of money that was intended to be returned to new pet
5  owners?
6    A.    We did.
7    Q.    Okay.
8    A.    At one time, when I first took over as
9  sheriff and Melvin Dalton was doing his thing, you know,
10  picking up animals, Chastity was doing her thing, if you
11  wanted to come and adopt a pet, you would pay whatever the
12  deposit was, and once you got your paperwork showing that
13  the animal had been spayed or neutered, you would come
14  back and they would give you your money back.  We had an
15  audit, and we didn't get written up for it, but the
16  auditor said that can't go on, because you need to have a
17  record of any transaction, and this is what you need to
18  do, and told us that we needed to turn this over to the
19  treasurer of the Giles County, and then once the procedure
20  was complete on the dog or the cat, they could go back
21  with their paperwork and the treasurer could reimburse the
22  individual.
23    Q.    Okay.
24    A.    And that is the way that it's been done

**Page 51**

1  since then.
2    Q.    Okay.
3    A.    I don't know when that was or -- but it was
4  after 2008.
5    Q.    Okay.  All right, and I'm going to read you
6  just a part of a paragraph, part of a sentence, and I just
7  want you to tell me if you agree or disagree with it,
8  okay?
9    A.    Okay.
10    Q.    "In early 2013, Ms. Perkins and Mr. Dalton
11  began storing animal food in a locked storage container,"
12  and that would be at the shelter.  Do you agree or
13  disagree with that?  "In early 2013, Ms. Perkins and Mr.
14  Dalton began storing animal food in a locked storage
15  container"?
16    A.    I don't --
17    Q.    You don't know?
18    A.    No, I don't know anything about that.
19    Q.    Okay.  Do you know where the -- when Ms.
20  Perkins was working there, do you know where she stored
21  the food?
22    A.    It was in a room.
23    Q.    All right.
24    A.    I don't know exactly where it was at.

**Page 52**

1    Q.    All right, were you ever made aware of any
2  conditions in which the food was being kept under lock?
3    A.    Yes.
4    Q.    Okay.  And how do you -- how were you made
5  aware of that?
6    A.    Melvin told me about it.
7    Q.    What did he say?
8    A.    He told me that they put a lock on the feed
9  room because they would feed the animals.
10    Q.    Who is "they"?
11    A.    Chastity or the volunteer, whoever the
12  volunteer was, Marilyn Hollie or himself or Frank Gough or
13  whoever was out there, and the volunteers would come in
14  and feed them again.
15    Q.    Okay.
16    A.    They were feeding them too much.
17    Q.    Okay.  Was there any other reason that Mr.
18  Dalton gave you for why he put a lock on the door?
19    A.    No.
20    Q.    Do you recall anyone else -- not anyone
21  else, but do you recall anyone ever complaining about that
22  specific issue?
23    A.    No.
24    Q.    All right.

**Page 53**

1    A.    There could have been, but I don't recall.
2    Q.    Under your understanding, who had at that
3  time the key or keys to be able to access the food room?
4    A.    It would have been probably Chastity and
5  Melvin Dalton and possibly Marilyn Hollie.
6    Q.    Okay.  Were you ever made aware that Ms.
7  Perkins was driving to and from the shelter in a patrol
8  vehicle?
9    A.    No.
10    Q.    Does the sheriff's department use vehicles
11  as part of the duties of the sheriff's office, undertaking
12  the duties of the sheriff's office?
13    A.    Yes.
14    Q.    And who owns those vehicles?
15    A.    The Board of Supervisors.
16    Q.    So the County?
17    A.    Yes.
18    Q.    Okay.  And is it your understanding that
19  the -- that it was provided for use by the sheriff's
20  department, is that right, by the County?
21    A.    Yes, yes.
22    Q.    All right.
23    A.    We also let other County agents have our
24  vehicles if they needed one.

Page 54

1    Q.    Okay.  Are -- let's talk just briefly about
2  vehicles.  Are employees of the sheriff's office allocated
3  a specifically vehicle for their individual use, in other
4  words, Lieutenant Dunn, this is your vehicle.  Lieutenant
5  Gautier, this is your vehicle, or are vehicles shared?
6    A.    They are assigned vehicles.  It is their
7  responsibility.  If someone needs a vehicle, I mean, I've
8  thrown them the keys to the vehicle that I drive and said,
9  here, take this one, and they've done me the same way.
10    Q.    Are employees of the sheriff's office
11  allowed to use these vehicles for personal use?
12    A.    No.
13    Q.    Doing so would be a violation of policy?
14    A.    It would be.
15    Q.    If Ms. Perkins was using a sheriff's office
16  vehicle to drive to and from the shelter, would that be a
17  violation of policy?
18    A.    I have seen Chastity Perkins driving that
19  old blue Chevrolet truck that we had.  She used to help
20  her dad haul feed from Walmart to the shelter, but as far
21  as Chastity Perkins driving a vehicle, I don't recall her
22  ever driving one -- a vehicle that belonged to the Giles
23  County Board of Supervisors or the sheriff's office.
24    Q.    Would it be against the sheriff of Giles

Page 55

1  County policy to have a civilian such as Chastity Perkins
2  operate a Giles County sheriff's vehicle?
3    A.    Probably not.
4    Q.    Okay.
5    A.    Using it in the -- using it in that form.
6    Q.    When you say "in that form," you mean
7  driving to the shelter?
8    A.    If she was going to the shelter, hauling
9  feed for the shelter for the County, I would say no.
10    Q.    Okay.
11    A.    If she was driving it to go and get her
12  groceries at Walmart or Kroger, yes, that would be a
13  violation.
14    Q.    Okay.  Ms. Perkins is not assigned a
15  sheriff's vehicle?
16    A.    No, she is not.
17    Q.    But her father is?
18    A.    Yes.
19    Q.    All right.
20    A.    And he always asked me if she could take
21  that old blue Chevrolet truck and help to haul the
22  feed.
23    Q.    At some point, you decided that you didn't
24  want any more volunteers at the shelter; is that right?

Page 56

1    A.    Yes, that's right.
2    Q.    What led you to that decision?
3    A.    Equipment walking off.
4    Q.    Okay.
5    A.    Or equipment leaving the shelter and the
6  door being opened to the office.
7    Q.    Okay.  So things you testified about
8  earlier?
9    A.    Yes.
10    Q.    And anything -- in addition to what you
11  testified about earlier when I asked you about the
12  problems and issues the shelter, was there anything else
13  that led you to stop the volunteers?
14    A.    No.
15    Q.    And how did you prevent the volunteers from
16  accessing the shelter?  How did you mandate this policy of
17  no more volunteers?
18    A.    We sent a letter and we changed the locks.
19    Q.    Okay.  And to whom did you send the letter?
20    A.    I think that it was Giles Animal Rescue.
21    Q.    Okay.  Do you know who is in charge of that
22  organization?
23    A.    I think that it used to be -- it was either
24  Charlie Herbert or Christine Owens.

Page 57

1    Q.    Okay.
2    A.    Christine Link-Owens.
3    Q.    Have you ever met her?
4    A.    Yes.
5    Q.    Have you ever had discussions with her
6  about the animal shelter?
7    A.    Yes.
8    Q.    And did you have any discussions with her
9  about the animal shelter prior to preventing volunteers --
10  making the decision to prevent volunteers from accessing
11  the shelter?
12    A.    I think that I probably did.
13    Q.    And you had some conversations with her
14  after that?
15    A.    I might have; I don't know.
16    Q.    Has she ever expressed to you at any
17  time -- well, let me strike that.  Are you aware of anyone
18  making complaints about the sheriff's office decision to
19  prevent volunteers from accessing the shelter?  Are you
20  aware if anyone ever made any complaint to, say, the Board
21  of Supervisors about your decision to prevent volunteers
22  access to the shelter?
23    A.    Yes.
24    Q.    And what are you aware of?

Page 58

1      A.      I was asked by the Board, and, of course, I
2  don't know if it was Scott or someone asked me, but they
3  said, did you tell the volunteers that they could not come
4  back to the shelter and I said, yes, I did, because
5  equipment was leaving, you know, and what put the icing on
6  the cake was when the office was broke into.
7      Q.      Okay.  So did you remove the key from
8  dispatch?
9      A.      I think I did.
10     Q.      Okay.
11     A.      And then we put another one back.
12     Q.      Okay.  So after you removed the volunteers
13 from the shelter, as far as your knowledge is concerned,
14 the only people that were providing services to the
15 animals there were the animal control officers and
16 Chastity Perkins?
17     A.      Yes.
18     Q.      Okay.  Did you discuss your decision to
19 prevent the volunteers from accessing the shelter at a
20 Board meeting ever?
21     A.      I don't know.
22     Q.      Okay.  Do you recall ever -- well, strike
23 that.
24     A.      Can we take a break?

Page 59

1              MR. STRELKA:  Absolutely, off the Record.
2              (Discussion off the Record.)
3              (A recess was taken.)
4  BY MR. STRELKA:
5      Q.      All right, back on the Record, did you ever
6  receive a letter from Giles Animal Rescue indicating that,
7  from their point of view, that a number of laws were being
8  broken with how the shelter was being managed?
9      A.      I'm not sure.
10     Q.      All right, we'll look at it later.  Okay.
11 I'm going to read you another paragraph and then ask you
12 if you agree or disagree.
13     A.      Okay.
14     Q.      "In May of 2013, the Plaintiff," and that
15 is Mr. Dunn --
16     A.      Okay.
17     Q.      -- approached the Sheriff to discuss these
18 issues plaguing the shelter," and now hold on, let me say
19 what these issues are, and I will just give you all of the
20 information so it's fair.  The previous paragraph says,
21 "In May of 2013, the G.A.R.," Giles Animal Rescue "mailed
22 a letter to the sheriff indicating that several laws had
23 been broken regarding the treatment of animals at the
24 shelter."

Page 60

1      Q.      Okay, you don't -- you already testified
2  that you don't really remember, and we'll talk about that
3  later, but specifically G.A.R. highlighted the following,
4  and these were Code Sections, I will represent to you,
5  that were in the letter that we'll look at, but the things
6  that are in these Code Sections are "Animals must be
7  provided a solid resting surface off of the floor enabling
8  the pet to be clean and dry.  Reasonable effort must be
9  made to determine whether each animal has a collar, tag,
10 and reasonable effort must be made to identify and notify
11 the owner.  Shelters should be accessible to the public at
12 reasonable hours during the week.  There should be a
13 designated and marked isolation area for incoming animals
14 that are ill or suspected of being ill.  Ill and suspected
15 ill animals are confined separately in an area for a
16 minimum of 48 hours before being placed in the main
17 housing area," and then the shelter must operate such that
18 lights are turned off at lights to provide regular cycles
19 of either natural or artificial light uniformly diffuse
20 throughout the facility."
21             Okay, so after having read that, and let me
22 read this again and I will ask you if you agree or
23 disagree, and then we'll talk all about it.  "In May of
24 2013, the Plaintiff approached the Sheriff to discuss

Page 61

1  these issues plaguing the shelter;" do you agree with that
2  statement, Paragraph 28?
3      A.      I'm going to say disagree.
4      Q.      Okay, why do you disagree with that?
5      A.      Because I don't remember that.
6      Q.      Do you recall a conversation with the
7  Plaintiff in May of 2013 about the animal shelter?
8      A.      I don't know if it was May, but we did
9  discuss the animal shelter.
10     Q.      And what do you recall that you discussed?
11     A.      He was telling me that Chastity wasn't
12 working the hours she was supposed to be working, and, you
13 know, she was under a contract with the animal shelter,
14 and we talked to -- I don't -- I don't know if it was the
15 licensing lady, whoever does the inspections, and she said
16 you have to have verification that someone was there
17 within a 24-hour period.  The animals could not be left
18 longer than 24 hours, and we decided that we would put
19 a -- try to get a camera so we can verify somebody being
20 there, and they said, well, it would be cheaper to do a
21 time clock, and I told them that would be fine.
22     Q.      Okay, and when you -- and in your testimony
23 just now, you said that they said it would be cheaper to
24 do a time clock?

**Page 62**

1     A.     That was Chris McKlarney and some of the

2  other Board members.  I don't know if it was John Mills or

3  Jimmy McCroskey or somebody.

4     Q.     Okay.

5     A.     I'm sorry.

6     Q.     And you also mentioned a contract regarding

7  Ms. Perkins.  What do you know about that?

8     A.     Well, I just know that Dave Hunt told me

9  that she was under contract, getting paid six hours a day,

10  seven days a week.

11     Q.     Okay.  Have you ever seen the contract?

12     A.     No.

13     Q.     All right.

14     A.     I have not.  It was a contract that was

15  agreed upon before I ever took office.

16     Q.     Okay.

17     A.     And it was going smooth and I didn't -- I

18  didn't do anything about it or ask to see anything.

19     Q.     Okay.

20     A.     Regarding the shelter.

21     Q.     All right, and let me read you this

22  paragraph and see if you agree or disagree, and don't

23  worry; this one is much smaller than all of that stuff I

24  just read.  Paragraph 29, "During this discussion," and

**Page 63**

1  we've referencing the May of 2013 which you don't remember

2  if it was May, but you recall talking to him?

3     A.     Okay.

4     Q.     "During this discussion, the Plaintiff

5  highlighted the numerous issues plaguing the shelter.  The

6  Plaintiff indicated the sheriff was responsible for the

7  management of the shelter and that currently, it was not

8  being managed adequately."  Let me stop there.  Do you

9  agree with that statement; did he say something like that

10  to you?

11     A.     I don't remember that.

12     Q.     Let me go further.  "The Plaintiff

13  indicated that the mismanagement of the shelter had

14  exposed the Board and County to legal action due to

15  illegality of the shelter's practices."  Do you recall

16  that?

17     A.     No.

18     Q.     All right.  Let me read further.  "The

19  Plaintiff as a member of the Board directed the Sheriff to

20  improve the conditions of the shelter and comply with all

21  pertinent laws."  Do you agree or disagree with that?

22     A.     Do what now?

23     Q.     "The Plaintiff as a member of the Board

24  directed the Sheriff to improve the conditions of the

**Page 64**

1  shelter and comply with all pertinent laws."  Do you agree

2  or disagree?

3     A.     I disagree.

4     Q.     Why is that?

5     A.     I don't remember him telling me that I

6  needed to do anything at the shelter to comply with any

7  laws.  The only time that I know that there was a problem

8  is when the state inspector came in and she said the

9  floors needed to be redone, and the walls and the cages,

10  you know, needed to have the housing welded and the locks

11  fixed and things like that.

12     Q.     When you had this discussion with the

13  Plaintiff about the animal shelter, did you know how he

14  became aware of the issues at the animal shelter?

15     A.     No.

16     Q.     Okay.

17     A.     I guess that he -- they did that in a Board

18  meeting.

19     Q.     So you don't recall him saying that the

20  Board had been discussing this?

21     A.     No.

22     Q.     Okay.

23     A.     He might have, and I just don't recall.

24     Q.     Okay.  Did you tell the Plaintiff in this

**Page 65**

1  discussion, and excuse my language, and this is regarding

2  the volunteers, "Fuck them, they are stealing food

3  anyway."  Did you say that to him?

4     A.     No.

5     Q.     During the course of Mr. Dunn's employment

6  with the sheriff's office, did he exhibit any work

7  performance issues?

8     A.     Yes.

9     Q.     Okay.  What were they?

10     A.     Not getting tickets turned in on time that

11  come from the clerk on several cases.

12     Q.     So tell me about that.  What was he

13  supposed to do and what was he not doing?

14     A.     When he would issue a summons out here on

15  the highway, you would have to turn your tickets in at the

16  office, the summons, and then the bailiffs would carry

17  them over the next morning to the General District clerk's

18  office, and that was a common practice.  If you wrote the

19  ticket on Friday night, you didn't have to do it on

20  Saturday or Sunday, but as long as it was in the General

21  District Court basket, the bailiffs could come by and pick

22  them up and take them to the clerk's office, and the

23  purpose of that is, if an individual wanted to pay off

24  their fine earlier, they could, you know, do that, and the

**Page 66**

1   clerk would have the copy of the summons that was issued,
2   whether it be speeding or defective equipment, something
3   that could be paid off, and there was several times that
4   the clerk would call and say that, you know, it hasn't
5   been done, and, you know, we talked to him, everything
6   would be fine for a few days, and then it would go back
7   again.
8       Q.      Was Mr. Dunn ever give a written notice of
9   this performance deficiency?
10      A.      I'm thinking that he was.
11      Q.      Was there any other issues with Mr. Dunn's
12  work performance?
13      A.      My mind just went blank.  I'm sorry.
14      Q.      Okay.
15      A.      He didn't like supervision.
16      Q.      Why do you say that?
17      A.      He didn't like people telling him to do
18  something, and, you know, you tell him you need to get
19  this done, I will get it done, I will get the assignment
20  completed, and he -- he had a hard time doing what was
21  supposed to be done on his part.
22      Q.      Okay.  All right, let's go to the first
23  thing that you said.  You said that he didn't like to be
24  supervised.  Can you give me some examples of that?

**Page 67**

1       A.      He didn't like people telling him what to
2   do.
3       Q.      How did you know what he did and didn't
4   like?
5       A.      Well, I would -- my chief deputy would tell
6   me, and he -- he would have issues sometimes with, you
7   know, getting your -- getting the tickets turned in on
8   time, time sheets.  You know, you need to -- in order to
9   get paid, you have to have your time sheet turned in.
10      Q.      Can you give me any other examples of where
11  Mr. Dunn demonstrated that he didn't enjoy being
12  supervised?
13      A.      Not right now.
14      Q.      All right, the other thing that -- I'm
15  sorry, you said that he didn't like being supervised, and
16  what was the other thing that you said, his other work
17  performance issue?
18      A.      He was always late with his, you know,
19  paperwork.
20      Q.      And that was the summonses that you talked
21  about?
22      A.      Yes.
23      Q.      But was there other paperwork, too?
24      A.      Time sheets.

**Page 68**

1       Q.      Time sheets?
2       A.      Yes.
3       Q.      Do you recall if Mr. Dunn ever received a
4   written notice of any of these work product deficiencies?
5       A.      Yes.
6       Q.      He did?
7       A.      I think that he did on the court summonses.
8       Q.      But as far as these other issues, the not
9   liking supervision and the time cards?
10      A.      No.
11      Q.      It wasn't written up?
12      A.      No.
13      Q.      Okay.  Does the -- during the course of Mr.
14  Dunn's employment at the sheriff's office, did the
15  sheriff's office implement any written annual review, also
16  known as an annual work performance evaluation?
17      A.      We did that one or two times.
18      Q.      Okay.
19      A.      And I don't know how we did that, but we
20  got away from that.
21      Q.      Okay.  So it wasn't done consistently year
22  to year?
23      A.      No.
24      Q.      Okay.  Do you know if Mr. Dunn ever

**Page 69**

1   performed below expectations on any written work
2   performance evaluation?
3       A.      No.
4       Q.      All right.
5       A.      On evaluation?
6       Q.      Yes.
7       A.      No.
8       Q.      Okay.  All right, I'm going to read you a
9   couple of sentences from the paragraph from the Complaint
10  and ask you if you agree or disagree.  All right,
11  "Plaintiff became greatly concerned that Ms. Perkins was
12  not working the hours that she was being paid to work with
13  County funds.  In July of 2013, the Plaintiff again met
14  with the Sheriff to discuss the issues plaguing the
15  shelter."  Do you recall a meeting or a discussion with
16  the Plaintiff in July of 2013?
17      A.      It may have been; I remember a discussion
18  with him.
19      Q.      And was that an face to face discussion?
20      A.      It was, he was working.
21      Q.      And were you in your office?
22      A.      I think so.
23      Q.      Was there anyone else inside of the office
24  when you two had this discussion?

Page 70

1    A.    I don't know.

2    Q.    Did anyone else join in on this discussion

3  with you?

4    A.    I'm not sure.

5    Q.    Let me read you this and ask you if you

6  agree or disagree.  "During this meeting, the Sheriff

7  acknowledged that he knew that Ms. Perkins was not working

8  all of the hours for which she was being paid."  Do you

9  agree or disagree?

10    A.    I disagree.

11    Q.    Why is that?

12    A.    One of those times where I don't know about

13  if I talked to Dave Hunt during that time to see what was

14  going on --

15    Q.    Okay.

16    A.    -- with her, and to see how many hours she

17  was working at the shelter.

18    Q.    All right.

19    A.    But then he made it clear that she was

20  paid, you know, six hours a day, seven days a week.

21    Q.    All right.

22    A.    Whether she worked, you know, four to six

23  or two to four.

24    Q.    Okay, and in July of 2013, was there a --

Page 71

1  when was the time clock put in place?

2    A.    I don't know that.

3    Q.    Okay.

4    A.    I don't know how to answer that, but I'm

5  thinking that it -- I don't know when Jay Williams got on

6  the Board.  Was it at the same time that you did?  Okay.

7  Jay asked about a time clock, that way -- we could put a

8  time clock at the shelter; that way she could mark in,

9  mark on, and then when she left, she could mark off, and

10  that way he could have some type of documentation of when

11  the shelter was occupied.

12    Q.    Okay.

13    A.    That was because of the state inspector.

14    Q.    Okay.

15    A.    And I don't know if they ever put a camera

16  out there or not.

17    Q.    Okay.

18    A.    But I think that they went the cheaper

19  route.

20    Q.    Let me ask you if you agree or disagree

21  with that.  Paragraph 39, "During this meeting, the

22  Plaintiff also indicated that he knew of other employees

23  of the sheriff's department who had falsified their time

24  cards."  Did you ever have a discussion with -- do you

Page 72

1  agree or disagree with that?

2    A.    I agree.

3    Q.    And what did you all talk about about that

4  subject?

5    A.    We talked about David Fields.

6    Q.    Okay.

7    A.    And Mark Wilburn.

8    Q.    Okay.  What did Mr. Dunn say?

9    A.    He said that their time sheets are not

10  right.

11    Q.    All right.

12    A.    And I didn't find any discrepancy for David

13  Fields.  David Fields would come into work early and stay

14  late.  Mark Wilburn, I did find some discrepancies.  He

15  was doing work for the school and he wasn't marking his

16  time sheet, and I told him he needed to start doing that,

17  and that problem was taken care of.

18    Q.    Did -- during this discussion, did you and

19  Mr. Dunn discuss the funds that were being allocated to

20  the sheriff's office to manage the shelter at all?  For

21  instance, did you all discuss --

22    A.    We were just talking about time sheets.

23    Q.    Yes.  In the paragraph that I read to you,

24  it said that this talk about the -- talk about issues with

Page 73

1  the shelter, Perkins' hours, and the time sheets of other

2  officers, according to the Complaint, all occurred at one

3  time?

4    A.    Okay.

5    Q.    Do you agree or disagree with that?

6    A.    I'm going to disagree because I don't

7  remember that.

8    Q.    Okay, did you ever recall any discussion

9  with Scott Dunn about the money that was going to the

10  sheriff's office from the County to pay for the services

11  of the County, for the employees and so forth?

12    A.    Yes.

13    Q.    Okay, and what do you recall about that

14  discussion?

15    A.    I remember he said the County puts a lot of

16  money into the shelter and animal control.

17    Q.    Okay.  And what was your response?

18    A.    I don't remember.

19    Q.    Is that the only thing that you recall?

20    A.    I remember him saying that.  I mean, that

21  is a lot of questions.  I'm trying to remember.  I don't

22  remember.

23    Q.    Do you recall the Plaintiff ever indicating

24  to you that he was concerned with being implicated in

**Page 74**

1  criminal liability for how the sheriff's office was
2  operating?
3       A.    No.
4       Q.    Did you ever have a discussion with Scott
5  Dunn about whether or not an individual could file some
6  sort of whistle blower action because of what was going
7  on?
8       A.    No.
9       Q.    Did the Board ever ask you to return the
10 key to dispatch?
11      A.    I don't know if they did or not.
12      Q.    All right.
13      A.    I don't know.  I remember we had a -- I was
14 talking to Chris McKlarney, the County administrator, and
15 I told him the last thing I wanted to do was keep good
16 help away from the shelter, because they are good people
17 out there, but one person can ruin it for everybody.
18 Anything that I do is not set in stone if I did return the
19 key back to dispatch, and whether or not it was there or
20 not, it did go back, and I told my people, you know, you
21 are going to have to get along with people.
22      Q.    Who did you tell that to?
23      A.    I told Chastity that; I told Marilyn
24 Hollie, and I told Frank Gough and I told -- I don't know

**Page 75**

1  if was Melvin or -- Melvin Dalton or if it was Jeff
2  Spicer.
3       Q.    Okay.
4       A.    But I told them, we have good people out
5  here that want to help and I am not against allowing
6  somebody to help that really wants to help.  If somebody
7  wants to help, they are going to make it work.
8       Q.    Did you ever appear at a Board meeting to
9  specifically address the issues regarding the volunteers
10 at the shelter?
11      A.    No, not that I know of.
12      Q.    Other than your conversation with Mr.
13 McKlarney, did you ever have any other conversations with
14 any other Board members regarding the animal shelter and
15 the volunteers?
16      A.    I could have, but I don't know.  I didn't
17 go before the Board in a Board meeting and do that, just
18 for that.
19      Q.    Do you recall when it was that the County
20 took over the management of the shelter?
21      A.    No, I don't.
22      Q.    What reason were you provided for that
23 action by the Board?
24      A.    There was a big lawsuit in Pulaski and I

**Page 76**

1  told them, you know, they asked us -- they asked me, do
2  you want us to take it over, and I said, sure, you know,
3  and I didn't want to be part of that.
4       Q.    Who -- who asked you --
5       A.    I'm thinking that -- I'm thinking that it
6  was Chris McKlarney.  I'm not sure, but I did ask them,
7  you know, if they would take it back.
8       Q.    All right.
9       A.    And they did take it back.
10      Q.    I want to make sure that I understand
11 this.  I want to know who asked who first.  Let me get it
12 on the Record.  Did you ask for the County to take over
13 the shelter or did the County ask you for them to -- do
14 you want us to take over the shelter; in other words, who
15 instigated this idea?
16      A.    I don't know who asked first.
17      Q.    Okay.
18      A.    I don't remember who asked first, and I
19 think that I was asked; I said -- I was asked, do you want
20 us to take it over, I'm thinking but I'm not positive, but
21 I said, let me think about it, and then Pulaski County had
22 an issue and I thought, well, I didn't want to be part of
23 that.
24      Q.    I'm trying to remember what was going on in

**Page 77**

1  Pulaski; do you recall?
2       A.    No, I don't.
3       Q.    But there was some lawsuit involving an
4  animal shelter?
5       A.    Yes, there was.  It may have been Radford;
6  I don't know.
7       Q.    Okay.  And so were you concerned about
8  liability?
9       A.    Yes.
10      Q.    Why were you concerned about liability?
11      A.    Because all it takes is one person to cause
12 you some problems.
13      Q.    Okay.
14      A.    And I have too much to worry about.
15      Q.    Okay.
16      A.    And somebody else, you know, has the time
17 and the dedication and they want to dedicate it to that
18 specific purpose.
19      Q.    Earlier you mentioned the state
20 investigator, and I believe that we were talking about the
21 Department of Agriculture investigator?
22      A.    I'm thinking; I think that is who it was.
23      Q.    Are you aware of whether or not someone
24 filed a claim or -- not a claim but a complaint with the

Page 78

1  Virginia Department of Agriculture because of what was
2  going on at the shelter?
3       A.    I don't know.
4       Q.    All right.
5       A.    I'm not aware of that.
6       Q.    Did you ever have any discussions with
7  anyone who was investigating for the State of Virginia
8  what was going on at the animal shelter?
9       A.    No.  We had a meeting set up at the animal
10  shelter one day.
11       Q.    Okay.
12       A.    And I did not get to attend that meeting.
13  We had something else going on.
14       Q.    What was going on?
15       A.    We had a call in Pembroke; an individual
16  got caught having sex with a dog.
17       Q.    Okay.  And you had to personally appear at
18  that?
19       A.    I did.
20       Q.    Was no one else available?
21       A.    It was my dog.
22            MR. STRELKA:  Okay.  Off the Record for a
23       second.
24            (Off the Record.)

Page 79

1  BY MR. STRELKA:
2       Q.    Back on the Record, all right, was that
3  meeting that you had attended, do you know if that was on
4  or around August of 2013?
5       A.    I'm thinking that it was.
6       Q.    Okay.
7       A.    Chris McKlarney attended.
8       Q.    Okay.
9       A.    And I didn't get to attend.
10       Q.    And Ms. Perkins attended; is that right?
11       A.    I don't know.
12       Q.    Do you know if Mr. Dalton attended?
13       A.    He might have.
14       Q.    Okay, and do you know if the investigator
15  for the Department of Agriculture attended?
16       A.    I think that she was there.  I think that
17  it was a female.
18       Q.    Yes, she was, but you never ultimately met
19  up with her?
20       A.    I didn't.
21       Q.    Did you ever speak with her over the phone?
22       A.    I don't know if I did or not.
23       Q.    Did you ever exchange emails with her?
24       A.    I'm not sure if I had any contact with her.

Page 80

1       Q.    Okay.
2       A.    I think that I went through Chris
3  McKlarney.
4       Q.    Okay, and we'll just leave the last
5  question, did you ever write her a letter?
6       A.    No, not that I know of.
7       Q.    Okay.  All right, if -- at the sheriff's
8  office, if there is equipment that you wish to surplus,
9  what does that mean to you?  What is the definition of
10  surplus in that statement?
11       A.    It means get rid of it.
12       Q.    Okay, and where does it go?
13       A.    Wherever -- if I have it, I take to the
14  County garage and take the tags off of it.
15       Q.    Okay, are you talking about like an
16  automobile?
17       A.    An automobile.
18       Q.    Okay, and who takes it from there, the
19  County?
20       A.    I think so.
21       Q.    Okay.  But you can surplus other things
22  other than a car, right?
23       A.    Do what?
24       Q.    You can -- the term "surplus" is used a lot

Page 81

1  by, for instance, Mr. Dunn.  He says it all the time and
2  I've read it in Board meetings and minutes and so forth,
3  and I just want to know what your understanding of that
4  word is.
5       A.    Get rid of.
6       Q.    Okay, and are there any policies about how
7  you are to surplus an item?
8       A.    No.
9       Q.    So you may dispose of any sheriff's office
10  property as you see fit?
11       A.    If -- if the County, you know, we always
12  let the County have it, so no, I don't get rid of anything
13  myself.
14       Q.    Okay.
15       A.    I always let them --
16       Q.    So your policy is to present it to the
17  County?
18       A.    Yes, it is just an unwritten policy, and I
19  will give it to them and let them do with it what they see
20  fit.
21       Q.    Have you ever given a vehicle to another
22  law enforcement agency?
23       A.    Me, no.
24       Q.    Okay, but the County has?

**Page 82**

1      A.    The County has.

2      Q.    Okay.  And I'm going to read you this

3   paragraph, and you let me know if you agree or disagree.

4      A.    Okay.

5      Q.    "In August of 2013, the Chief of the

6   Pembroke Police Department, Douglas Sadler, called the

7   Sheriff to inquire about the possibility of receiving a

8   surplus law enforcement vehicle from the sheriff's

9   office.  Did that ever occur; do you agree or disagree?

10     A.    I think that he did.  Different ones call

11  every year.  I'm sure that he did, pretty sure.

12     Q.    Did you tell him that you had a vehicle?

13     A.    I told him we probably did.  We had four or

14  five at the time.

15     Q.    Okay.  And did -- did you all discuss the

16  surplusing of multiple vehicles to the Pembroke Police

17  Department or just one?

18     A.    I'm thinking that he asked for one and his

19  mayor called me and asked for an additional vehicle.

20     Q.    Okay.  And that might have happened at a

21  later time?

22     A.    It might have, yes.

23     Q.    Okay.

24     A.    I think that it was Poteet who was the

**Page 83**

1   mayor then.

2      Q.    Okay.  And so after that conversation with

3   Mr. Sadler, what did you do regarding these vehicles?

4      A.    I didn't do anything.

5      Q.    Did you ever surplus -- did you ever give

6   them back to the County; did you ever present them to the

7   County?

8      A.    I think we talked to the County and told

9   them that I had a couple of other vehicles I wanted to

10  surplus.

11     Q.    Okay.

12     A.    And I -- I think that I sent an email to

13  Chris McKlarney telling him which one I wanted to get rid

14  of, plus he had some additional vehicles down at the

15  school bus garage.

16     Q.    Okay.

17     A.    The County garage.

18     Q.    Okay.  So who on the Board did you have a

19  discussion with?

20     A.    That is Chris McKlarney, County

21  administrator.

22     Q.    Okay.  Do you know if Scott Dunn ever met

23  with Chief Sadler about this, about these vehicles?

24     A.    I'm sure he probably did.

**Page 84**

1      Q.    Okay.  And do you know if he ever met with

2   him and the bookkeeper of the Town of Pembroke to inspect

3   one of the vehicles?

4      A.    No.

5      Q.    Did you ever get upset about how Mr. Dunn

6   was working or not working regarding these vehicles?  I

7   mean, was there ever any issue regarding these vehicles

8   and Mr. Dunn in your eyes?

9      A.    Yes.

10     Q.    What was that?

11     A.    I got a call from one of the field deputies

12  saying that they are taking the stripes off of a vehicle

13  that we were using on patrol.

14     Q.    All right.

15     A.    And myself and Mike Falls went to the

16  school bus garage and they had taken the stripes off of a

17  vehicle, and we just put a new transmission in and four

18  new tires on.

19     Q.    All right.

20     A.    And I did get mad.

21     Q.    So was that not the vehicle that you

22  intended to surplus?

23     A.    No.

24     Q.    It was -- so that vehicle was a completely

**Page 85**

1   separate vehicle from the ones that you had discussed with

2   Sadler and the Board.

3      A.    No, I -- I told Doug Sadler that they can

4   have whatever they have.  He had to work it out with the

5   County.  Once I got rid of them, that was out of my

6   control.

7      Q.    Okay.

8      A.    I mean, I could care less, but it was not

9   the ones that I sent, the VIN numbers to the County

10  administrator's office.

11     Q.    Okay.

12     A.    And I sent it by email.

13     Q.    Okay.

14     A.    I sent it to Chris McKlarney.

15     Q.    Okay.  Did you ever raise your voice at

16  Scott Dunn about this issue?

17     A.    I did.

18     Q.    Did you ever use profanity?

19     A.    I did.

20     Q.    I will read you this additional paragraph.

21  "In December of 2013, the Department of Agriculture

22  issued a report which cited a number of deficiencies then

23  present at the shelter."  Do you agree or disagree?

24     A.    I agree.

Page 86

1      Q.      Did you ever read that report?
2      A.      I did.
3      Q.      Did you agree with it?
4      A.      I did.
5      Q.      Let me read you this paragraph.  "The Board
6   demanded the Sheriff terminate the employment of Ms.
7   Perkins but the Sheriff refused to fire her."  Let's start
8   with the first half of that sentence.  Did the Board ever
9   demand you to terminate Ms. Perkins?
10     A.      No.
11     Q.      Okay.  Did they ever ask you to?
12     A.      No.
13     Q.      All right.  Did anyone ever ask you to and
14  you refused to fire her; you said that you will not fire
15  her?
16     A.      No.
17     Q.      All right.  If I said the word "CAD" to
18  you, what do you understand that to mean?
19     A.      Computer Aided Dispatch.
20     Q.      And what is that?
21     A.      That is a computer program that our
22  dispatchers use to log down each and every call that comes
23  into the Sheriff's office that has action to it.  If --
24  and every time that there is something brought up on the

Page 87

1   CAD system, it's locked in there, into the hard drive.
2      Q.      Okay.  And if an officer is on, let's say
3   dispatch indicates to an officer of the sheriff's office
4   that he's needed, at what point does that officer utilize
5   the CAD system?  In other words, what do they -- in the
6   course of his duties, when is a deputy going to utilize
7   the CAD system?
8      A.      The deputy has to utilize the CAD system
9   when they do their reports.
10     Q.      Okay.  And is everyone -- does everyone
11  have access to the CAD?
12     A.      They do.
13     Q.      And by "everyone" I mean all of the
14  deputies?
15     A.      All of the sheriff's office employees, yes.
16     Q.      Okay.
17     A.      And dispatchers.
18     Q.      Okay, and do I have it right that these
19  employees that I mentioned have individualized user names
20  and passwords to log in?
21     A.      Yes.
22     Q.      I'm sorry, just wait until I get it on the
23  Record.
24     A.      I'm sorry.

Page 88

1      Q.      That they have individualized user names
2   and passwords to log into the CAD system?
3      A.      Yes.
4      Q.      Okay.  Do -- as the sheriff, do you have
5   the ability to amend what has previously been entered in a
6   CAD entry?
7      A.      Yes.
8      Q.      And how do you do that?  If you were going
9   to do that, how do you do that, amend a CAD entry?
10     A.      If it was inappropriate, yes.  Anything
11  else, I would not.
12     Q.      I'm not asking why, okay; I'm asking
13  physically how you do it.
14     A.      I would contact the Dapro system.
15     Q.      Okay.
16     A.      And -- or have one of my employees to do
17  that.
18     Q.      Okay.
19     A.      And get instructions on how to amend or
20  edit an entry onto the system.
21     Q.      Okay, and have you ever done that before?
22     A.      I did.
23     Q.      And how did you go about doing that?
24     A.      I had Mark Skidmore, he was a retired

Page 89

1   investigator that worked for me, he was over my CAD
2   system.
3      Q.      Okay.
4      A.      Or the system at the sheriff's office, and
5   I told him I wanted a couple of lines deleted from the CAD
6   system.
7      Q.      Okay, and he was working at Dapro at this
8   time?
9      A.      No, no.
10     Q.      Okay.
11     A.      He wasn't working at Dapro; he was working
12  for the sheriff's office.
13     Q.      Okay.
14     A.      And he contacted the Dapro representative
15  and they told him how to remove that comment from the CAD
16  system.
17             MR. STRELKA:  Okay.  I will note for the
18          Record that there is no "Y" in Dapro; it's
19          D-A-P-R-O.
20  BY MR. STRELKA:
21     Q.      So they gave him instructions on how to do
22  it; is that what you are saying?
23     A.      Yes.
24     Q.      And did he ever share those instructions

**Page 90**

1  with you?

2      A.    No.

3      Q.    Okay.  But he did it at your direction?

4      A.    He did.

5      Q.    So you specifically told him what to

6  change?

7      A.    I told him and Captain Joe Shanks.

8      Q.    Okay.

9      A.    I said, take that out of there, if you

10  can.

11      Q.    Okay.

12      A.    And they contacted the Dapro system.

13      Q.    Okay.

14      A.    The coordinator, and he told them what to

15  do.

16      Q.    Are -- is the information that an officer

17  inputs into the CAD system, is that ever used in the

18  course of the prosecution of any case, any charge?

19      A.    The CAD system, it could be, yes.

20      Q.    And the information, you said it's like

21  stored in a hard drive.  Is that physically at the

22  sheriff's office?

23      A.    It is on the server.

24      Q.    It is on the server?

**Page 91**

1      A.    Yes.  I'm pretty sure -- I don't know if it

2  is at dispatch or the server is at the sheriff's office.

3      Q.    I will represent to you that I filed a

4  subpoena to Dapro early on in this case to get electronic

5  information based on the CAD.  I wanted their files; I

6  wanted this information, and they informed me that they

7  didn't possess any of it, that -- hold on one second.

8      A.    Yes.

9      Q.    That that information is possessed by the

10  sheriff's office; would you agree or disagree with that?

11      A.    I agree.

12      Q.    Okay, and it is on a server?

13      A.    Yes, and I don't know if there is a server

14  in dispatch -- see, dispatch is a block and a-half away

15  from the sheriff's office.  I don't know if it is on a

16  server at the sheriff's office or if there is a server in

17  dispatch.

18      Q.    Okay.  The dispatch, though, is part --

19      A.    It is part of sheriff's office.

20      Q.    Okay.  And why were you making deletions to

21  the CAD system that we were just talking about?

22      A.    There was an inappropriate comment.

23      Q.    And what was that comment?

24      A.    It was an investigator could not respond

**Page 92**

1  because he had a fantasy football meeting.

2      Q.    And why was that comment inappropriate?

3      A.    Because that was a derogatory comment from

4  an individual that was upset.

5      Q.    Was that Mr. Dunn --

6      A.    It was.

7      Q.    -- who entered that information?

8      A.    He did.

9      Q.    And did you ever have a personal discussion

10  with Mr. Dunn about that information?

11      A.    I did.

12      Q.    And can you tell me what he said?

13      A.    He said that is just the way that it was;

14  that is what happened, and that is -- you know, that is

15  inappropriate.

16      Q.    All right.

17      A.    You don't know where these CAD cards are

18  going to end up, ever.

19      Q.    Were you concerned about how this comment

20  might affect the image of the sheriff's office?

21      A.    Exactly.

22      Q.    And have you ever made any other deletions

23  to a CAD system other than this before?

24      A.    No.

**Page 93**

1      Q.    All right.

2      A.    Now, as far as a report, going in and

3  saying, hey, you put this sentence in here twice, you

4  know.

5      Q.    Sure.

6      A.    You know, but as far as a CAD card, no.

7      Q.    All right.

8      A.    And I got Bobby Lilly, the Commonwealth's

9  attorney's permission to remove that from the CAD system,

10  and he said that it has no bearing on the evidence

11  whatsoever.

12      Q.    Okay.  The individual that Mr. Dunn

13  indicated was at a fantasy football event, do you know why

14  Mr. Dunn needed that individual at the time?

15      A.    He said that he found some extra evidence

16  at that location.

17      Q.    Okay.

18      A.    And I had an investigator that was there

19  earlier that day to completely photograph and process

20  everything, and he had already been there; he had done

21  everything.  He said that if -- he said that he found a

22  set of tire tracks, and, well, they had already talked to

23  the owner of the business, but there was no -- there was

24  no photographs or anything or any proof that there was any

Page 94

1   other evidence that was there.
2        Q.    Did Mr. Dunn ever talk to you about a
3   footprint that he desired to have a -- I think that it is
4   called a static lift of to preserve for evidence?
5        A.    Was that the one on the door?
6        Q.    I'm just asking you, do you ever recall
7   that?
8        A.    Yes.
9        Q.    And do you ever recall Mr. Dunn indicating
10  to you the presence of a second set of tire tracks behind
11  the store that the owner indicated were not his?
12       A.    No.
13       Q.    Did you ever have a discussion with Mr.
14  Dunn about -- in which he told you that he had a
15  discussion with the owner about the evidence at the scene?
16       A.    I don't remember the second set of tracks.
17       Q.    Okay.  Did -- do you know if it rained that
18  evening?
19       A.    No.
20       Q.    All right.
21       A.    I don't; I can't remember that.
22       Q.    Okay.  All right, I will read you this,
23  part of this paragraph, and ask you if you agree or
24  disagree.  "On or around September 23, 2013, a work order

Page 95

1   was created indicating that the Sheriff intended to change
2   the locks on the investigator's office at the sheriff's
3   department."  Do you agree or disagree with that?
4        A.    Okay.
5        Q.    You agree?
6        A.    Okay, I will agree with it.
7        Q.    Okay, let me read this.  "However, the only
8   lock the Sheriff changed was a lock to the Plaintiff's
9   office."  Do you agree or disagree with that?
10       A.    I didn't change that.
11       Q.    Okay, was the lock changed?
12       A.    It was.
13       Q.    By whose direction?
14       A.    Mike Falls.
15       Q.    And you didn't tell Mike Falls to change
16  it?
17       A.    No.
18       A.    He just made that decision.
19       A.    He made that decision.
20       Q.    Do you know why he made that decision?
21       A.    He made that decision because the Plaintiff
22  was no longer a lieutenant.
23       Q.    Okay.
24       A.    And -- and he -- and he -- and he didn't

Page 96

1   have any reason to be in the chief deputy's office, but I
2   don't remember the exact date.
3        Q.    Okay.  So at some point, Mr. Dunn was
4   demoted?
5        A    He was.
6        Q.    Why was he demoted?
7        A.    For -- there was -- the CAD call, there was
8   the CAD call, putting the derogatory comment on the CAD
9   system.  There was an investigation of a larceny of a
10  firearm by a convicted felon, and he got a confession out
11  of him and he never placed a charge, and there was another
12  breaking and entering of a residence; I believe that it
13  was in the Wolf Creek area, and he had people running
14  everywhere, and I had two investigators that were going to
15  Alleghany County and they told me that they needed a
16  report done.
17            I told Scott to write a report, and -- and
18  he, in his narrative was "secured scene until
19  investigators arrived," and -- and there was a domestic
20  call which he responded to.  It took care of itself, which
21  a lot of them do, and it flared up again, the dispatcher,
22  T.J. Adkins, gave him a call to return to the location a
23  little while later; it may have been an hour or a couple
24  of hours, and his response was, I don't work the road,

Page 97

1   give that to a deputy, and he was a deputy sheriff just
2   like anybody else.  I mean, I answer calls, I make
3   arrests, and everybody else does.
4        Q.    Okay.  Did Mr. Dunn ever discuss with you
5   how he was upset about the revision to the CAD entry?
6        A.    No.
7        Q.    He never -- did you ever have a discussion
8   with him about it, a conversation?
9        A.    I don't know if I did or not, but I know
10  what was put on the CAD system from his computer.
11       Q.    Okay.
12       A.    And that was unacceptable.
13       Q.    All right, and so the decision to put the
14  lock by Major -- I think you said Major Falls?
15       A.    Yes, Mike Falls.
16       Q.    Mike Falls, okay, the decision to place the
17  lock on that door that we just talked about by Mike Falls
18  was made because Mr. Dunn had been demoted?
19       A.    Yes, this was after his demotion.
20       Q.    Okay.  And do you recall your conversation
21  with Mr. Dunn when you demoted him; you gave him the
22  demotion or let him know that he was going to be demoted?
23       A.    Yes.
24       Q.    Do you recall what you said?

**Page 98**

1    A.    I told him I wanted the old Scott Dunn
2  back.
3    Q.    Okay.  And in your mind, who was the old
4  Scott Dunn?
5    A.    Someone who wanted to get out here and
6  answer calls and do his work.
7    Q.    Do you recall saying to him that "everyone
8  in this department hates your F'ing guts"?
9    A.    No.
10    Q.    All right.
11    A.    I don't recall that.  Can we take a break
12  for a second?
13    Q.    Sure.
14          THE WITNESS:  I will be right back, excuse
15  me.
16          (A recess was taken.)
17  BY MR. STRELKA:
18    Q.    All right, back on the Record, my records
19  indicate, Sheriff, that Mr. Dunn was terminated on or
20  around October 21, 2013 from the sheriff's office; does
21  that sound right to you?
22    A.    Yes.
23    Q.    Now, I've got a bunch of documents here,
24  but a number of these we're going to look at just

**Page 99**

1  briefly.
2    A.    Okay.
3    Q.    I have an outline, and given that we've
4  already asked -- I've already asked you a number of
5  questions and you've given me a bunch of answers, I will
6  probably be skipping chunks of this outline with these
7  documents and moving past them, so for everyone's sake, if
8  I'm sitting here looking at my computer in space, we're
9  moving head, actually; I'm cutting stuff, just to let
10  everyone know.  Is there a policy and procedure manual for
11  the sheriff's department?
12    A.    Yes.
13    Q.    And has it been distributed to every
14  employee of the sheriff's office?
15    A.    It is on line.
16    Q.    It is on line?
17    A.    Yes.
18    Q.    Where is it on line?
19    A.    In the website for each individual.
20    Q.    And what does that mean?
21    A.    Each individual has their own email
22  account.
23    Q.    Okay.
24    A.    They can pull it up on the computer and the

**Page 100**

1  policy manual is there when they log in.  It's on the --
2  there is an icon for it.
3    Q.    All right.
4    A.    It's electronic.
5    Q.    Okay.  Did -- after the -- after this issue
6  with Ms. Perkins and the animal shelter arose, did anyone
7  ask you to see the invoices that Greenbrier had been
8  sending you?
9    A.    No.
10    Q.    No one from the Board asked?
11    A.    No.
12    Q.    And did Mr. Dunn ever ask?
13    A.    I don't know if -- I don't think that he
14  did.
15    Q.    Do you recall him ever sending a Freedom of
16  Information Act request to the sheriff's office after he
17  had been terminated?
18    A.    Yes.
19    Q.    Do you recall what he was looking for?
20    A.    I don't remember.
21    Q.    Okay.  Would you consider yourself to be
22  friends with Melvin Dalton or just professional
23  colleagues?
24    A.    We're friends.

**Page 101**

1    Q.    Okay.
2    A.    And professional colleagues.
3    Q.    Okay, but is it your testimony that Ms.
4  Perkins was hired by the sheriff's office before you took
5  the sheriff's job?
6    A.    Yes.
7    Q.    Of course, you would have the authority as
8  the sheriff to discontinue her employment at any time
9  because she was under your supervision; is that right?
10    A.    I guess probably I could.
11    Q.    All right.
12    A.    Even know she worked for -- I could have
13  Mr. Hunt to replace her.
14    Q.    All right, here is your copy, and I would
15  like this to be an Exhibit.  Where did we end up last
16  time?  I will tell you in two seconds.  I want to keep
17  continuous Exhibits throughout all of the depositions, you
18  understand, sequentially, so we don't have seven Exhibit
19  Number 1's.
20          MR. GUYNN:  Well, it will be marked as
21          Millirons Deposition Exhibits.
22          MR. STRELKA:  I request that we do it in
23          all of my cases.  Everyone has been nice enough to
24          do that with me.

### Page 102

1           (Discussion off the Record.)

2

3           (The document was marked as Deposition

4      Exhibit Number 6 and entered into the Deposition.)

5

6  BY MR. STRELKA:

7      Q.    All right, this will be Exhibit Number 6.

8  Have you ever seen the minutes of a Board meeting at Giles

9  County before?

10     A.    No.

11     Q.    All right.  I'd like to direct you to the

12 second page of this document.  I'd like you to look at the

13 second paragraph.  I'd like you to read that and tell me

14 when you are finished.  Have you read that second

15 paragraph?

16     A.    I have.

17     Q.    Okay.  Do you recall -- the date of this

18 document is October 2, 2013.  Do you recall appearing at a

19 Board meeting on October 2, 2013 and discussing the issues

20 as indicated in this paragraph?

21     A.    I do.

22     Q.    Okay.  And do you recall if Mr. Dunn was

23 present on the Board at the time?  It doesn't say in

24 here.

### Page 103

1      A.    Well, he would have been during that time.

2      Q.    Okay.  And appearing at the Board to

3  discuss these issues, did that upset you?

4      A.    No.

5      Q.    It says here "Ms. Hobbs suggested that

6  rules and regulations be put in place for volunteers to

7  follow and ensure that they were followed;" were they?

8      A.    I think they were.

9      Q.    But you don't know for sure?

10     A.    It wasn't long after that that the County

11 took them back over.

12     Q.    Okay.  How long after?  I know you said

13 that you could not remember, but are we talking six

14 months, three months?

15     A.    Maybe three or four months.  I'm not really

16 sure.

17     Q.    Okay.

18     A.    But I remember when they told them they

19 wanted them, in the morning and in the evening.

20     Q.    Okay.

21     A.    I do remember that.

22     Q.    All right.

23     A.    They wanted it to be occupied because the

24 people working the evening shift did not get there in the

### Page 104

1  morning and, you know, they wanted them to be available

2  for everyone.

3      Q.    Okay.

4           MR. GUYNN:  So what Exhibit Number did we

5      decide on?

6           MR. STRELKA:  That was 6.

7           (Discussion off the Record.)

8  BY MR. STRELKA:

9      Q.    That will be the procedure.  He gets a copy

10 but I hand a document to her, she hands the official one

11 to you, you look at it, I ask you questions, and we're

12 done and you stick it there.

13     A.    Okay.

14     Q.    All right, do you recall a time when a new

15 sheriff's office was being constructed?

16     A.    I remember when it was being talked about.

17     Q.    Okay.  Did the -- so it was being discussed

18 by the County whether or not they were actually going to

19 do the construction?

20     A.    I hope it's going to be done.

21     Q.    You hope it's going to be done, okay, and

22 was there -- let me read you this sentence and you tell me

23 if you agree with me or not.  "The County paid roughly

24 $25,000 in preliminary work on this new sheriff's office

### Page 105

1  and then the Sheriff changed his mind, creating a loss."

2  Did that occur?

3      A.    Do what?

4      Q.    "The County paid roughly $25,000 in

5  preliminary work on the new sheriff's office and then the

6  Sheriff changed his mind."

7      A.    I don't recall that.

8      Q.    Okay.  And do you recall three years ago at

9  a time when new portable radios were purchased by the

10 sheriff's office?

11     A.    We buy radios quite often.

12     Q.    Okay.  Do you recall -- when you buy new

13 radios, do you recall what you do with the older radios

14 when they are replaced?

15     A.    They are -- sometimes they are sent down to

16 dispatch, and if they are not any good, you know, they

17 throw them away.

18     Q.    And have you ever given any of these old

19 radios to private citizens who are not law enforcement

20 officials and not employees of the County?

21     A.    We have for the rescue squads.

22     Q.    Okay.

23     A.    And the fire department members.

24     Q.    You give them to them?

Page 106

1    A.    We give them to the department, yes.

2    Q.    For them to use in the course of their

3  professional duties as a fireman or rescue squad worker?

4    A.    Yes.

5    Q.    But you've never given an old radio that

6  was no longer to be used by the sheriff's office as a gift

7  to a private individual?

8    A.    No.

9    Q.    Have there ever been any issues at the

10  sheriff's office with missing firearms under your watch?

11    A.    Yes, there was.

12    Q.    Okay, and what can you recall about that

13  incident?

14    A.    We had one to retire and the firearm was

15  missing.

16    Q.    Okay, and what kind of a firearm was it?

17    A.    I think that it was a Glock pistol.

18    Q.    And by "retire," what do you mean by that?

19    A.    He left.  He retired.

20    Q.    Okay.  The officer who used that gun?

21    A.    Yes.

22    Q.    Okay.  And so what happened to the

23  firearm?  You don't know?

24    A.    I don't know.

Page 107

1    Q.    And did he -- so when this officer retired,

2  are you aware of whether or not that gun was left in the

3  possession of the sheriff's office initially?

4    A.    No, I'm not.

5    Q.    Okay.  And the sheriff's office, are they

6  required to keep paperwork on all of the firearms within

7  its possession?

8    A.    Yes.

9    Q.    And do you recall what the paperwork

10  regarding this gun, this Glock you are referring to, would

11  indicate?  I mean, where was the last known information

12  about this Glock?

13    A.    It was in his possession and I -- and, you

14  know, I don't know.  I don't know if it's been returned or

15  not.

16    Q.    All right.

17    A.    As far as I know, we're not missing any.

18    Q.    Are you aware of any night vision goggles

19  that were in the possession of the sheriff's office that

20  have been lost or turned up missing?

21    A.    That was brought to my attention a couple

22  of years ago, that a pair of night vision goggles

23  was missing, but we've checked our records for our

24  military equipment and everything and they are all there,

Page 108

1  and I contacted a guy that -- an officer that used to work

2  for the sheriff's office, and he supposedly took these

3  night vision goggles and he supposedly traded them for a

4  lawnmower or something, and we looked into this.

5         We could not prove it, because everything

6  that we ever had any dealings with was present at the

7  sheriff's office, and I contacted David Fields and I asked

8  him about it, and he said, I give -- he said, I may have

9  given a set of night vision goggles to that particular

10  officer, David Conley, and he said, I don't know where

11  they come from, or if they were mine or somebody gave them

12  to me, but it wasn't anything military or anything that we

13  had any records of purchasing.

14    Q.    Okay.  Are you aware of a thermal imaging

15  scope that was in the possession of sheriff's department

16  that has gone missing?

17    A.    No, we have two or three that are at the

18  sheriff's office.

19    Q.    And are you aware of one that was perhaps

20  -- it might refresh your memory, that you know was bought

21  via a grant and that it can't be located currently?

22    A.    No, it is in my vehicle.

23    Q.    And are you using it for --

24    A.    It is in my police car.

Page 109

1    Q.    Okay.

2    A.    And no, I have the night vision in my

3  police car; the thermal imaging is in Lieutenant Andy

4  Metro's vehicle.

5    Q.    Okay.  If I told you -- if I used the term

6  "license plate reader," do you know what I'm referring

7  to?

8    A.    I remember something about that, yes.

9    Q.    Well, just forgetting any specifics, if you

10  could just tell me, what is a license plate reader?  Is it

11  attached to your car?

12    A.    It was in his vehicle.

13    Q.    Well, forget the one in his vehicle; just

14  educate me because I'm not a police officer, what is a

15  license plate reader?

16    A.    I guess that it reads license plates.  I

17  don't know.

18    Q.    Okay.

19    A.    I know that we have one on the grant.

20    Q.    Okay.

21    A.    And I don't know where it is at now.

22    Q.    But there was an issue -- how does Mr. Dunn

23  factor into this?  You were about to tell me.

24    A.    It was put in his vehicle.

Page 110

1    Q.    Okay, and was it removed from his vehicle
2   at some point?
3    A.    I don't know.
4    Q.    But currently, it can't be found?
5    A.    Oh, I don't know.
6    Q.    Okay.
7    A.    I didn't know that it was missing.
8    Q.    What is -- is there an inmate work program?
9    A.    Yes.
10    Q.    And what is that?
11    A.    There is a program we started at the -- at
12   Giles County, they are the -- it is a -- anywhere from six
13   to eight inmates that are worked periodically through the
14   week and sometimes on the weekends and they are under a
15   guard, and they perform various duties for the County, you
16   know, mowing, digging ditches, laying block, brick, doing
17   tile work in the school systems. They paint, they prune
18   trees, trim bushes, whatever needs to be done.
19    Q.    And the sheriff's office oversees these
20   inmates performing the work?
21    A.    No, the County does. Well, the County pays
22   for everything and we have a -- there is what we use now;
23   there is the jailers from the New River Valley Regional
24   Jail at Dublin.

Page 111

1    Q.    Okay. But as far as how this work is to be
2   performed, does your office have any sort of authority to
3   direct how this work is being performed? I mean, like,
4   for instance, would inmates do work out in the public?
5   Does the sheriff's office ever -- you say that it's
6   jailers working it, but does the sheriff's office ever
7   have any authority over this?
8    A.    They are -- the sheriff's office, we
9   employ -- we have the jailers.
10    Q.    Are they --
11    A.    They are deputies.
12    Q.    Okay.
13    A.    But as far as the work, no.
14    Q.    Okay.
15    A.    The County tells them what they need to do
16   and they do the work.
17    Q.    Okay.
18    A.    Because I would not know the first thing
19   about telling them how to finish concrete and things like
20   that.
21    Q.    Okay. And have you ever been requested to
22   split the working performed by these inmates into two
23   crews?
24    A.    Yes.

Page 112

1    Q.    And has that happened?
2    A.    It did one time, and it should not have
3   happened.
4    Q.    Why is that?
5    A.    Because we are under an agreement with the
6   jail. These inmates have to be under law enforcement
7   supervision at all times.
8    Q.    Okay.
9    A.    I mean, I can't be working them here and
10   you come up and say, well, I want to take three or four
11   down the road here to do another job.
12    Q.    Okay.
13    A.    They have to be supervised by everyone, by
14   somebody that is a law enforcement agent.
15    Q.    Okay.
16    A.    Or a correctional officer --
17    Q.    All right.
18    A.    -- representing the Giles County sheriff's
19   office.
20    Q.    All right.
21    A.    Now, if somebody from the jail wants to
22   come, I guess that would be okay because we have a crew
23   that comes over from the jail that is supervised by a
24   correction officer.

Page 113

1    Q.    Okay. Prior to being elected sheriff,
2   where were you employed?
3    A.    Virginia Tech Police.
4    Q.    And how long did you work there?
5    A.    I think 13 years.
6    Q.    And did you ever have a discussion with
7   Scott Dunn about what Mr. Dunn's role might be if you were
8   elected sheriff?
9    A.    Yes.
10    Q.    What did you say?
11    A.    We talked about him coming to work for me,
12   possibly being a chief deputy.
13    Q.    But he never became a chief deputy?
14    A.    No.
15    Q.    Did you talk to Joe Shanks about that, too,
16   before being elected?
17    A.    About being chief deputy?
18    Q.    Yes.
19    A.    No.
20    Q.    Anybody else?
21    A.    Mike Falls.
22    Q.    And so you picked Mike over Scott?
23    A.    Yes.
24    Q.    Do you know if Ms. Perkins ever addressed

**Page 114**

1  the Board about her pay issues, her salary?

2      A.      I don't know.  She might have.  I think I

3  asked to help supplement her pay, you know, give her a

4  little bit more money a time or two.

5      Q.      Okay.  All right, I'm just going to

6  represent some information to you.  I'm holding a document

7  in front of the deponent, and I will represent to you that

8  these are Board minutes.  I'm going to read a section from

9  it and then ask if you have any knowledge or you agree or

10  disagree.  This is about the date by which the County took

11  over the shelter.

12      A.      Okay.

13      Q.      "Mr. McKlarney requested members to review

14  the procedures provided for the shelter, animal control,

15  and volunteers and provide any comments.  He related the

16  County had assumed responsibility of animal control on

17  August 15," and that would be of 2014; does that sound

18  right to you?

19      A.      I thought they did it earlier than that.

20  It may be, but I don't know.

21      MR. STRELKA:  Okay.  All right.  This is a

22      letter that I would like to be entered as Exhibit

23      Number 7.

24

**Page 115**

1      (The above-mentioned document was marked as

2      Deposition Exhibit Number 7 and entered into the

3      Deposition.)

4

5  BY MR. STRELKA:

6      Q.      Now, Mr. Millirons, this letter is not

7  addressed to you and it does not indicate that it was

8  written by you, Sheriff, but I want to know if you ever

9  read this before.

10      A.      This one here (indicating)?

11      Q.      Yes, sir.

12      A.      Yes.

13      Q.      How did this -- how did you -- excuse me,

14  when did you read this letter the first time?

15      A.      When it came out.

16      Q.      All right.

17      A.      And this was after the inspection.

18      Q.      Sure, and how did you receive a copy of

19  it?  Was a copy emailed to you?

20      A.      I think that there was a copy emailed.  I

21  think that Chris McKlarney also sent me one by email.

22      Q.      Okay.

23      A.      I'm not sure, but I think so.

24      MR. STRELKA:  Okay.  I would like this to

**Page 116**

1  be Exhibit Number 8, please.

2

3      (The above-mentioned document was marked as

4      Deposition Exhibit Number 8 and entered into the

5      Deposition.)

6

7  BY MR. STRELKA:

8      Q.      Have you ever seen this before?

9      A.      Yes.

10      Q.      And what is it?

11      A.      That is the USDA inspection.

12      Q.      All right.

13      A.      After everything had been taken care of.

14      Q.      And did you ever go over this report with

15  any Board member?

16      A.      I don't know.

17      Q.      All right.

18      A.      I think that Chris McKlarney talked about

19  it.

20      Q.      And what did he say?

21      A.      He said things were -- you know, needed to

22  be fixed, and then they were fixed.

23      Q.      Okay.  So as far as you are concerned from

24  your perspective, all of the issues that were impacting

**Page 117**

1  the shelter were fixed at the time that the County took it

2  back over?

3      A.      Yes, they were cosmetic.

4      Q.      Okay.

5      A.      And they were -- everything was fine.  The

6  hours that they wanted the shelter governed was placed on

7  the door, and as far as I know, the shelter was being

8  manned the way that the County wanted it.

9      MR. STRELKA:  I would like this to be

10      Exhibit Number 9, please.

11

12      (The above-mentioned document was marked as

13      Deposition Exhibit Number 9 and entered into the

14      Deposition.)

15

16  BY MR. STRELKA:

17      Q.      Do you recognize the document that has been

18  placed in front of you?

19      A.      I think so.

20      Q.      Okay.  Is this a letter that you sent?

21      A.      Yes.

22      Q.      And is that your signature at the bottom?

23      A.      Yes.

24      MR. STRELKA:  I would like this to be

**Page 118**

1          Exhibit Number 10.

2

3                (The above-mentioned document was marked as

4          Deposition Exhibit Number 10 and entered into the

5          Deposition.)

6

7    BY MR. STRELKA:

8          Q.     Did you ever see this letter before?  I

9    know that it does not purport to be written to you or by

10   you, but I'm curious as to whether you've ever seen it

11   before.

12         A.     I think so.

13         Q.     Okay, do you recall ever having any

14   discussions with any Board members regarding this letter?

15         A.     This is when we were talking about putting

16   the time clock -- the time clock and the camera there.

17   That way we could have proof that the shelter was being

18   occupied.

19         Q.     Okay.

20         A.     And the animals were not left over 24

21   hours.

22         Q.     Okay.  And do you recall ever having a

23   discussion with the Plaintiff about that letter?

24         A.     No.  I don't think so.

**Page 119**

1                MR. STRELKA:  All right.  Let's mark this

2          as Number 11.

3

4                (The above-mentioned document was marked as

5          Deposition Exhibit Number 11 and entered into the

6          Deposition.)

7

8    BY MR. STRELKA:

9          Q.     I will represent to you this is a letter

10   response -- this is a letter response from the Board of

11   Supervisors to the Department of Agriculture.  Did you

12   ever discuss with any Board member the drafting of this

13   letter?

14         A.     Wait a minute here.

15         Q.     All right.

16         A.     Is this the one here that you are asking

17   about?

18         Q.     I'm asking about Exhibit Number 11.

19         A.     Okay.

20         Q.     First of all, have you ever read this

21   letter before; have you ever seen it?

22         A.     I'm not sure.

23         Q.     Okay.  And did you ever have any

24   discussions with Chris McKlarney about how the Board

**Page 120**

1    should respond --

2          A.     Yes.

3          Q.     -- to the Department of Agriculture's --

4          A.     Yes.

5          Q.     All right.

6          A.     I remember this now.

7          Q.     All right.

8          A.     This is the one where he's talking about

9    the video surveillance camera and a time clock.

10         Q.     So at the time that this letter was sent,

11   you would have had -- you are saying that you would have

12   had discussions with Mr. McKlarney about some of the issue

13   presented in here; is that right?

14         A.     Yes.

15         Q.     Okay.

16         A.     Yes, I remember this now.

17                MR. STRELKA:  Okay.  This will be 12.

18

19                (The above-mentioned document was marked as

20         Deposition Exhibit Number 12 and entered into the

21         Deposition.)

22

23   BY MR. STRELKA:

24         Q.     I will represent to you that in the course

**Page 121**

1    of discovery in this case, we've got this letter that

2    indicated that she wrote it.  I know that you are not

3    Chastity Perkins, but have you ever seen this before?

4          A.     Yes.

5          Q.     And do you know why this letter was

6    written?

7          A.     I think she was wanting more money.

8          Q.     Okay.  And how did you --

9          A.     I think.

10         Q.     How did you get to be able to see this

11   letter?  When did you see it?

12         A.     I think she gave it to me.

13         Q.     Okay.  And --

14         A.     I'm thinking.

15         Q.     Okay.  Why would she have given it to you?

16         A.     I think that -- I guess she wanted me to go

17   to the Board and ask for more money.  I believe that this

18   is what I'm thinking about here.

19         Q.     So you recall a conversation with Ms.

20   Perkins in which she indicated that she wanted more money?

21         A.     She told me one or two times, you know,

22   that she had been doing the same job for the same amount

23   of money and never did receive a raise.

24         Q.     Okay.  And did you instruct Ms. Perkins to

**Page 122**

1  write this letter?

2      A.    I don't think so.

3      Q.    All right.

4      A.    But I did tell her to contact the Board.

5      Q.    Okay.

6      A.    And I'm thinking that I contacted the Board

7  as well.

8      Q.    All right.  So you contacted the Board on

9  behalf of Ms. Perkins?

10     A.    Yes, to get her some more money.

11     Q.    Okay.

12     A.    Wait a minute, this is not the one that I

13  was thinking about.

14           MR. STRELKA:  This will be marked as

15     Exhibit 13, please.

16

17           (The above-mentioned document was marked as

18     Deposition Exhibit Number 13 and entered into the

19     Deposition.)

20

21  BY MR. STRELKA:

22     Q.    We're on to another Exhibit, sir.

23     A.    Okay.

24     Q.    I'm not going to ask you any more questions

**Page 123**

1  about that.

2      A.    Okay.

3      Q.    Have you ever seen this letter?

4      A.    Yes.

5      Q.    Okay.  And do you know why Mr. Hunt wrote

6  this letter?

7      A.    I think that I may have contacted him.

8      Q.    Okay.  And requested that he write this

9  letter?

10     A.    And told him that, you know, the Board had

11  asked me about, you know, the hours she was working.

12     Q.    Okay.

13     A.    And he wrote this letter.

14     Q.    And you provided this letter to the Board?

15     A.    Yes.

16           MR. STRELKA:  All right.  I will ask that

17     this be marked as Exhibit Number 14.

18

19           (The above-mentioned document was marked as

20     Deposition Exhibit Number 14 and entered into the

21     Deposition.)

22

23  BY MR. STRELKA:

24     Q.    Do you recall receiving this letter?

**Page 124**

1      A.    I do.

2      Q.    And let's look at this second paragraph.

3  It says, "First, your budget currently has funding for two

4  full-time animal control officers, however, one full-time

5  position currently exists."  Would you agree with that

6  statement?

7      A.    Yes, at the time.

8      Q.    Okay.  And so the one full-time was Melvin

9  Dalton; is that right, the one full-time?

10     A.    At this time here it was probably Jeff.

11     Q.    Spicer?

12     A.    Spicer.

13     Q.    And so one full-time, we have Mr. Spicer?

14     A.    Yes.

15     Q.    And then we have our part-time guy, Mr.

16  Gough?

17     A.    At the time it was Frank Gough.

18     Q.    Okay.

19     A.    And one was being used as a road deputy.

20     Q.    That is what I was going to ask.  The funds

21  that were begin given for these full-time animal control

22  officers, where were the funds, because you weren't

23  utilizing two full-time animal control officers, where

24  were the funds that were extra going, that were left over?

**Page 125**

1      A.    They were being utilized as a road deputy.

2  What are you talking about, left over from?

3      Q.    Okay, so here we have Chris McKlarney

4  stating in a statement that you agreed to, first your

5  budget currently has funding for two full-time animal

6  control officers.

7      A.    Yes.

8      Q.    All right.  And where does the funding come

9  from your budget?

10     A.    The Board of Supervisors.

11     Q.    The County?

12     A.    The County.

13     Q.    Okay, and so the County has given the

14  sheriff's office money for two full-time animal control

15  officers, but we know that the sheriff's office does not

16  employ two, right?

17     A.    Yes.

18     Q.    So there would be money left over in the

19  budget because you weren't employing two full-time animal

20  control officers?

21     A.    Right; I was utilizing one as a field

22  deputy --

23     Q.    All right.

24     A.    -- that was working a shift.

**Page 126**

1    Q.    So the other full-time position that you
2  were using this money for was going to a road deputy?
3    A.    Yes.
4    Q.    Okay. And did you have the authority to
5  make that decision?
6    A.    I asked the Board of Supervisors if I could
7  do that in a closed meeting.
8    Q.    When?
9    A.    It was -- I believe that it was February of
10 2008.
11   Q.    Okay.
12   A.    The same time that I asked about the
13 leftover funding.
14   Q.    How often does the budget get redone for
15 the sheriff's office?
16   A.    Each year.
17   Q.    Okay. And so if this is in 2014, this
18 letter, why -- if that is -- if that meeting existed and
19 that decision was made in 2008, why did the budget never
20 change?
21   A.    I don't know.
22   Q.    All right.
23   A.    I never did have but one full-time animal
24 control officer.

**Page 127**

1    Q.    All right.
2    A.    From 2008 until I guess last year.
3    Q.    If the Board has given you money to utilize
4  and employ two full-time animal control officers, does the
5  Board have the authority to direct you to do that?
6    A.    I guess they could, but I asked them if I
7  could utilize that one person as a field deputy and they
8  said yes.
9    Q.    All right.
10   A.    I wouldn't have done something like that
11 unless they would have given me permission.
12         MR. STRELKA:  Let's mark this as 15,
13     please.
14
15         (The above-mentioned document was marked as
16     Deposition Exhibit Number 15 and entered into the
17     Deposition.)
18
19 BY MR. STRELKA:
20   Q.    Have you ever seen this letter?
21   A.    Yes, I wrote this letter, I think.
22   Q.    You wrote this letter?
23   A.    Yes.
24   Q.    Okay, I guess that I don't have any

**Page 128**

1  questions about that letter. I'd like this to be Exhibit
2  Number 16, please.
3
4          (The above-mentioned document was marked as
5      Deposition Exhibit Number 16 and entered into the
6      Deposition.)
7
8  BY MR. STRELKA:
9    Q.    Do you recall seeing this email to Mr.
10 McKlarney?
11   A.    I don't remember it, but I must have seen
12 it.
13   Q.    You don't have any reason to deny the truth
14 of that email, that document?
15   A.    No.
16         MR. STRELKA:  Okay. This is a two-page
17     document that I would like to be entered as
18     Exhibit Number 17.
19
20         (The above-mentioned document was marked as
21     Deposition Exhibit Number 17 and entered into the
22     Deposition.)
23
24 BY MR. STRELKA:

**Page 129**

1    Q.    All right, we will look at the first page
2  of this two-page document collectively labeled as Exhibit
3  Number 17. Do you recall seeing this email to Mr.
4  McKlarney and Mr. Dalton?
5    A.    I guess that I did. I remember talking to
6  him about it, but I don't remember ever sending an email.
7    Q.    All right, you say here in this email,
8  "I've received several emails from individuals about this
9  issue." Do you recall who sent you emails?
10   A.    I'm thinking that Charlie Herbert did, but
11 I'm not sure.
12   Q.    What did he say?
13   A.    He told me one day, he said that -- I had a
14 meeting with him and he said, I think that you've been fed
15 poison.
16   Q.    What did he mean by that?
17   A.    He said just bad rumors.
18   Q.    Okay.
19   A.    And he said, please don't take one person's
20 thoughts from everybody that wants to help.
21   Q.    Okay. I would like you to turn to the
22 second page. Do you see that bottom email where it says,
23 "From Giles County Animal Rescue to Morgan Millirons,
24 January 31, 2013"?

**Page 130**

1    A.    Hmm-hmm.

2    Q.    Is that a yes?

3    A.    Do what?

4    Q.    Is that a yes?  You said hmm-hmm.

5    A.    Yes, I see it.

6    Q.    Okay.  And do you recall, she says here, "I

7  take your silence as NO volunteers allowed, period."  Had

8  you received prior inquiries from Ms. Link-Owens?

9    A.    I'm not sure.

10    Q.    All right.

11    A.    I might have.

12    Q.    Do you know why you didn't contact her, why

13  you didn't respond?

14    A.    No, I don't.

15    Q.    Sitting here today, you don't have any idea

16  why you did not respond to her?

17    A.    No, I don't.

18    Q.    Were you concerned about the well-being of

19  the animals in the shelter after these volunteers were

20  prevented access?

21    A.    Sure.

22    Q.    All right.

23    A.    I just wanted to make sure that they were

24  being taken care of, adopted.  I mean, the euthanization

**Page 131**

1  rate had dropped, and that was the whole idea.

2    Q.    Hmm-hmm.

3    A.    We wanted -- we would start out with a lot

4  of cats and they would -- I think that Angels of Assisi or

5  somebody like that would come and get most of them.

6         MR. STRELKA:  Okay.  All right, I would

7         like this to be marked as Exhibit Number 18.

8

9         (The above-mentioned document was marked as

10         Deposition Exhibit Number 18 and entered into the

11         Deposition.)

12

13  BY MR. STRELKA:

14    Q.    All right, that top email -- excuse me, the

15  bottom email, do you recall seeing that email to Chris

16  McKlarney on February 4th?

17    A.    No, I don't.

18    Q.    All right.

19    A.    I don't remember this, but apparently, I

20  did.

21    Q.    So do you recall, I mean, you said that you

22  don't remember this, but I'm still going to ask this

23  question.  Do you recall any incident in which a member of

24  Giles County Animal Rescue was telling anybody else that

**Page 132**

1  the shelter was not accepting any more animals?

2    A.    I remember that comment.

3    Q.    Okay.

4    A.    That was made, but I don't remember when it

5  was and I don't remember --

6    Q.    Okay, so you don't have any memory of

7  conversations with anyone about that issue?

8    A.    No.

9         MR. STRELKA:  I'd like these to be admitted

10         as Exhibit Number 19.

11

12         (The above-mentioned document was marked as

13         Deposition Exhibit Number 19 and entered into the

14         Deposition.)

15

16         MR. GUYNN:  You mean marked as 19?

17         MR. STRELKA:  Yes.

18

19  BY MR. STRELKA:

20    Q.    All right.  Do you recall receiving the

21  email from Chris McKlarney that is on the bottom of that

22  first page there on April 22, 2013?

23    A.    Yes.

24    Q.    And is that your response above it on April

**Page 133**

1  22, 2013 at 4:22 p.m.?

2    A.    Yes.

3    Q.    All right, and let's look at the second

4  page there, the very bottom, you see it says April 22 at

5  9:27 in the morning.  Did you send that email to Chris

6  McKlarney?

7    A.    I must have.

8    Q.    All right.  Do you know an April Lowry?

9    A.    I think so.

10    Q.    Would she be a volunteer at Giles Animal

11  Rescue?

12    A.    I think she is, or she was.

13    Q.    Do you recall a complaint from her about

14  issues at the shelter?

15    A.    Yes.

16    Q.    And what do you recall?

17    A.    I remember she come in and she said that

18  Chastity was taking food.

19    Q.    Okay.

20    A.    I believe that she was the one telling me

21  that Chastity was carrying dog food out.

22    Q.    All right.

23    A.    And I think that she is the one that does

24  the photographs.  I am not sure.

Page 134

1          MR. STRELKA:  Well, let's just look at this
2     email.  Let's mark that as Exhibit Number 20,
3     please.
4
5          (The above-mentioned document was marked as
6     Deposition Exhibit Number 20 and entered into the
7     Deposition.)
8
9  BY MR. STRELKA:
10         Q.    Now, I will ask you if you recall receiving
11 this email.  Do you recall receiving this?
12         A.    No, I don't.
13         Q.    Do you recall ever issuing a response to
14 it?
15         A.    I'm not sure.
16         MR. STRELKA:  That will be Exhibit Number
17 21.
18
19         (The above-mentioned document was marked as
20 Deposition Exhibit Number 21 and entered into the
21 Deposition.)
22
23 BY MR. STRELKA:
24         Q.    Do you recall receiving this email from

Page 135

1  April Lowry on Monday, March 4, 2013?  Do you recall
2  receiving this?
3          A.    I'm thinking that I did.
4          Q.    Do you recall if you ever issued any
5  response to it?
6          A.    No.
7          Q.    You don't recall?
8          A.    Well, wait just a minute.  Okay.  I don't
9  know if I responded back to that or not.
10         MR. STRELKA:  All right, this two-page
11 document will be marked as Exhibit Number 22,
12 please.
13
14         (The above-mentioned document was marked as
15 Deposition Exhibit Number 22 and entered into the
16 Deposition.)
17
18         MR. STRELKA:  Let's go off the Record for a
19 second.
20         (Discussion off the Record.)
21         (A recess was taken.)
22 BY MR. STRELKA:
23         Q.    Have you had a chance to read this email?
24         A.    I did.

Page 136

1          Q.    All right.  Do you see the -- it is the
2     fourth paragraph.
3          A.    Yes.
4          Q.    "What I understand to be the issue is
5     someone getting into the locked room to give a puppy that
6     came in on the weekend food and someone 'allegedly'
7     breaking into the animal control officer's office - locked
8     room."  Did you ever have a discussion with this woman
9     about these issues?
10         A.    I don't know if I did or not.
11         Q.    All right.
12         A.    A lot of times I talk to people on the
13 telephone and I don't know how to put a face with it.
14         Q.    Here Ms. Lowry is indicating, and I'm
15 saying it's Ms. Lowry because it says, "From: Ms. Lowry."
16         A.    I understand.
17         Q.    Here Ms. Lowry is indicating in this email
18 that the locked food room was broken into to provide food
19 for an undernourished dog.  Would you agree that that was
20 an appropriate action by -- if true, by the volunteers?
21         A.    If true, yes.
22         Q.    Okay.  But I guess you don't know -- we
23 don't know if it was true or not?
24         A.    No, I don't.

Page 137

1          Q.    And I guess that you never touched base
2     with this woman?
3          A.    No.
4          Q.    All right.
5          A.    Not that I know of.
6          Q.    Upon receipt of this information, did this
7     give you pause about whether or not that food room should
8     be locked?  Did you reconsider that decision?
9          A.    I did, and I asked them why it was being
10 locked, and they told me that they leave out there during
11 the day after feeding the animals, and they would come
12 back and they would re-feed them, and you can give them
13 too much.
14         Q.    All right.
15         A.    They said that was the issue.
16         Q.    Okay.  Couldn't that issue have been solved
17 by a little piece of paper on a clipboard with a pencil
18 where you would write down who was fed and when?
19         A.    I guess it could have.
20         Q.    So really --
21         A.    I mean --
22         Q.    Would you agree with me that there were
23 other ways to address that issue other than locking the
24 food door?

**Page 138**

1      A.      Well, there are other ways but that is one
2  way to guarantee they are not getting re-fed.
3      Q.      But it's also a way to guarantee that, if a
4  dog is in need of nourishment and volunteers don't have
5  the key to get in the locker room, that the only way to
6  provide that nourishment at the shelter would be to break
7  in that locked room; isn't that right?
8      A.      They could do that or they could also call
9  and tell somebody what they have going on.
10     Q.      And was there -- I think that you addressed
11 this, but I just want to make sure.  I know that the
12 animal control officer's office was broken into and you
13 said the papers were shuffled in and disarray and so
14 forth?
15     A.      Yes.
16     Q.      Nothing was taken, though, right?
17     A.      As far as I know, there wasn't, except for
18 dog leads and buckets and pans.
19     Q.      But that had happened earlier; isn't that
20 right?
21     A.      Well, that is when, you know, things had
22 been disappearing.
23     Q.      Right, right, but my point is, it's not
24 like, in order to get access to the dog leads and buckets

**Page 139**

1  and pans, you would have to break into the animal control
2  officer's office; right; they are not just kept there?
3      A.      As far as I know, there is not anything
4  that is -- you know, there wasn't any medication missing.
5      Q.      Are you aware of -- just because you've
6  physically been to the animal shelter, right?
7      A.      Yes, sir.
8      Q.      Are you aware of whether or not you had
9  cell service when you were there?
10     A.      No, I'm not.
11     Q.      Have you ever heard of -- about there being
12 any difficulty with having cellular service at the animal
13 shelter?
14     A.      Yes.
15     Q.      And is there a phone that is at the animal
16 shelter?
17     A.      There is.
18     Q.      All right.
19     A.      It's probably locked up in the office.
20     Q.      It's locked up in the office?
21     A.      Yes.
22     Q.      Okay.  And you mentioned earlier that they
23 could always call, but assuming -- I mean, I know that we
24 don't know, I'm not the cellular god and you don't know;

**Page 140**

1  you are not Verizon, but if there was no cell service and
2  the phone was locked up, there is really no way for them
3  to call, is there?
4      A.      That is probably correct.
5      Q.      Do you see on this first page, do you see
6  the bottom line where it says, "The only sure way of
7  securing the facility and its items will be to have
8  cameras on hand.... and GCAR is more than willing to
9  purchase these items;" do you see that?
10     A.      Hmm-hmm.
11     Q.      You said hmm-hmm.
12     A.      Yes, I agree.
13     Q.      Did you ever have any discussion with any
14 member of Giles County Animal Rescue about the purchasing
15 of surveillance equipment for the shelter?
16     A.      No, sir.
17     Q.      Didn't you indicate earlier that you
18 desired cameras at the shelter?
19     A.      I did, but --
20     Q.      Didn't you indicate earlier that the
21 problem with that was the cost?  You said that it was
22 expensive, and they talked about a time clock; isn't that
23 right?
24     A.      Yes.

**Page 141**

1      Q.      Okay.  And --
2          MR. GUYNN:  I think what he said was the
3      County discussed that.
4          THE WITNESS:  The County discussed that.  I
5      didn't discuss that with GCAR.
6  BY MR. STRELKA:
7      Q.      All right, and we know that, and did you
8  have any discussions with the County about GCAR being
9  willing to purchase cameras?
10     A.      No, not that I know of, and they never
11 mentioned it to me.
12         MR. STRELKA:  All right.  This will be
13     Exhibit Number 23.
14
15         (The above-mentioned document was marked as
16     Deposition Exhibit Number 23 and entered into the
17     Deposition.)
18
19 BY MR. STRELKA:
20     Q.      Before you, Sheriff, is a multi-page
21 document which has been collectively marked as Exhibit
22 Number 23.  Do you recall receiving the first email, the
23 top email on the first page from Chris McKlarney on May
24 13, 2013?

1          A.     No, not right off.

2          Q.     Okay.  And do you recall reading or do you

3   recall ever being presented with this long email by

4   Christine Link-Owens before?

5          A.     No, sir.  I've had several emails from her,

6   but I don't remember this one in particular.

7          Q.     Okay.  And did you ever respond to an email

8   from Ms. Link-Owens?

9          A.     I think that I did.

10         Q.     Okay.

11         A.     As many as she sent me, I hope that I did.

12         Q.     All right, right, and did you ever have a

13  discussion with Chris McKlarney about her, specifically

14  her, Christine Link-Owens?

15         A.     I don't know.

16         Q.     Do you see where -- and I'm just curious,

17  do you see where on the first page, second email, in other

18  words, the email that is the middle of the way down from

19  "Giles County Animal Rescue," there is a line in the

20  email address where it says, "c.c." for carbon copy, where

21  you have "Susan Kidd, April Lowry, Chris Sokol, Jo

22  Thomason, Charlie Herbert;" do you know any of those

23  individuals?

24         A.     I know Susan Kidd, Chris Sokol, and Charlie

1   Herbert.

2          Q.     Were they volunteers, or who were they?

3          A.     I think that Charlie was and Chris.

4          Q.     Okay.

5          A.     But Susan, she was the secretary.

6          Q.     Okay.

7          A.     To the County administrator.

8          Q.     I got you, I got you, okay.  Do you recall

9   a publication in the Giles County newspaper in July of

10  2013 about the shelter?

11         A.     No.

12         Q.     Okay, let's just look at this.  You are

13  going to be handed -- this will be Exhibit Number 24.

14

15                (The above-mentioned document was marked as

16         Deposition Exhibit Number 24 and entered into the

17         Deposition.)

18

19  BY MR. STRELKA:

20         Q.     This is a two-page document, and do you see

21  the top part, the two paragraphs then it says

22  "Christine"?

23         A.     Yes.

24         Q.     Okay, ignore that, because I'm not asking

1   you questions about that.  I want you to go ahead and

2   flip -- well, you see at the bottom here, there is an

3   email cutoff, there is a time stamp and date, Christine

4   Line-Owens, and I want you to read this email that starts,

5   "Dear Sheriff, In today's local Giles newspaper."  Read

6   that and tell me when you are done.

7          A.     Okay.

8          Q.     Do you recall receiving this email?

9          A.     I do.

10         Q.     Did you have any discussions with anyone

11  about this email that she sent you?

12         A.     I'm thinking I did.

13         Q.     Do you recall with whom?

14         A.     I'm thinking Marilyn Hollie and Chastity.

15         Q.     All right, the email on the first page that

16  is -- that looks to be from you, do you recall seeing that

17  email in response to Ms. Link-Owens?

18         A.     No, I don't.

19         Q.     Okay.

20         A.     But apparently I did.

21         Q.     You have no reason to doubt that that would

22  be your email?

23         A.     No, that is my email address.

24         Q.     Do you see where it says, "I will have this

1   issue corrected if it is on my end"?

2          A.     Yes.

3          Q.     What steps did you take after responding to

4   this email in the furtherance of correcting this issue?

5          A.     Well, I told them that I didn't want to see

6   any negative publicity about anybody on our end.

7          Q.     All right, were you concerned about the

8   image of the sheriff's office?

9          A.     Well, the image of the sheriff's office and

10  the County.

11         Q.     All right.

12         A.     Are we done with this?

13         Q.     Yes, sir.  This will be Exhibit Number 25.

14

15                (The above-mentioned document was marked as

16         Deposition Exhibit Number 25 and entered into the

17         Deposition.)

18

19  BY MR. STRELKA:

20         Q.     Do you recall seeing this email to Chris

21  McKarney about Chastity Perkins?

22         A.     Yes.

23         Q.     Okay.  That is all that I was going to ask

24  you.  I just wanted to make sure that you wrote that.

**Page 146**

1    A.    Yes.

2          MR. STRELKA:  Exhibit Number 26, please.

3

4          (The above-mentioned document was marked as

5    Deposition Exhibit Number 26 and entered into the

6    Deposition.)

7

8    BY MR. STRELKA:

9    Q.    All right, the email on the bottom from

10   Chris McKarney to Morgan Millirons, November 7, 2013?

11   A.    Yes.

12   Q.    Do you recall receiving that?

13   A.    No, but I'm sure I probably did.

14   Q.    Where it says, "Scott filed a FOIA

15   request," are you aware of whether or not Brian Scott

16   Dunn filed a FOIA request?

17   A.    He probably did.

18   Q.    So is it your understanding that when

19   McKlarney here is saying "Scott filed a FOIA request,"

20   he's referring to Brian Scott Dunn?

21   A.    Hmm-hmm, yes, sir.

22   Q.    Okay.  And then did you respond with that

23   email on top, Thursday, November 7th?

24   A.    Yes.

**Page 147**

1    Q.    Okay.  And is that statement, "I checked

2    with Kelly McCroskey and she stated that we do not have

3    any time sheets for her here" a truthful statement?

4    A.    Yes, that's right.

5    Q.    So the sheriff's department never -- the

6    sheriff's office never maintained any time records for Ms.

7    Perkins?

8    A.    No.  Are we going to break for lunch?

9          (Discussion off the Record.)

10

11         (A lunch recess was taken.)

12

13   BY MR. STRELKA:

14   Q.    On the Record, all right, what is an IBR

15   report, Sheriff?

16   A.    It is an Incident Based Reporting report.

17   Q.    All right, and is it an electronic record?

18   A.    It could be.

19   Q.    How would someone at the sheriff's office

20   report an IBR report?

21   A.    An officer would have to get an incident

22   number, what we call a VFS, and this year it would be

23   201500 dash whatever the next incident number would be.

24   It's generated by the dispatcher.

**Page 148**

1    Q.    All right.

2    A.    And it refers back to your CAD call, the

3    Computer Aided Dispatch.

4    Q.    And what is the IBR report used for?

5    A.    That is used for -- well, for court, for

6    records, and it is also used for the victim and the -- my

7    mind just went blank.  I do this all of the time, the UCR,

8    Universal Crime Report.

9    Q.    Okay, so the information provided in an IBR

10   report is relied upon by other law enforcement officials;

11   would that be a fair statement?

12   A.    It could be.

13   Q.    Is an IBR report ever used in the course of

14   prosecution of a crime?

15   A.    It is, yes.  It is one of the best things

16   they ever came up with.

17   Q.    And did you ever alter or change an IBR

18   report in the course of your duties as sheriff, and when I

19   say alter or change an IBR report, I mean one that had

20   already been created and then you accessed at a later date

21   and made changes.

22   A.    Me?

23   Q.    Yes.

24   A.    I've edited IBR reports.

**Page 149**

1    Q.    Okay.  Do you recall an IBR report in

2    which -- well, as part of this case, that is, Mr. Dunn had

3    done an investigation and provided a report that you later

4    went back and changed?

5    A.    Which one are you talking about?

6    Q.    We'll look at it.  I will get to that in

7    just a few minutes.  I'm going to jump around.  I wish

8    that I had all of that stuff lined up here, but I don't

9    know.  I will just go in my order here.  All right.  Let's

10   mark this as Exhibit Number 27.  It is a collection of

11   documents that has been sequentially Bates labeled

12   Defendant's Response to Plaintiff's Request for Production

13   of Documents 2 all the way through 16.  This will be our

14   Exhibit Number 27.

15

16         (The above-mentioned document was marked as

17   Deposition Exhibit Number 27 and entered into the

18   Deposition.)

19

20   BY MR. STRELKA:

21   Q.    Now, we will go through this one by one, so

22   I just want to you to look at the first page now.

23   A.    Okay.

24   Q.    I believe that these were documents that

1  were contained within Mr. Dunn's personnel file, if I have
2  that right.
3       A.    Okay.
4       Q.    That is what we should be looking at.  If
5  I'm wrong, let me know.  This first letter, do you
6  recognize this?
7       A.    Yes.
8       Q.    And is that your signature at the bottom?
9       A.    It is.
10      Q.    And this is a letter that you wrote
11 terminating Scott Dunn?
12      A.    Yes, sir.
13      Q.    Okay.  Let's move on.  If you could take a
14 moment and read the letter that -- I'm going to refer to
15 these pages as Bates labeled; do you see the bottom right?
16      A.    Yes, sir.
17      Q.    It says 0003?
18      A.    Yes, sir.
19      Q.    And so you will refer to those for the
20 Record as -- you know, please look at the page that has
21 been Bates labeled Number 3 and then you look at this, so
22 we're looking at Number 3 right now.  Do you recall
23 writing this?
24      A.    I do.

1       Q.    And is that your signature?
2       A.    It is.
3       Q.    All right.
4       A.    But I thought that I sent one back that
5  didn't have the --
6       MR. GUYNN:  That is all right.
7  BY MR. STRELKA:
8       Q.    Do you know whose name is behind that?  I
9  think that we have that information.
10      A.    No, I don't.
11      Q.    Why did you write this?
12      A.    Do what?
13      Q.    Why did you write this letter, Bates
14 labeled 3, this note, whatever this is?
15      A.    Tommy Gautier told me that he had spoke
16 with Scott Dunn.
17      Q.    Okay.  I got that, and that is what is
18 written here, but my point is, did you feel it necessary
19 to type this out?
20      A.    I was -- this happened after Mr. Dunn had
21 been demoted.
22      Q.    Okay, so this was a -- was this a record
23 that you wanted to place in his personnel file?
24      A.    Yes.

1       Q.    Okay.  Did you send this to anyone or did
2  this just go in his personnel file?
3       A.    It just went to his personnel file.
4       Q.    That is what I was trying to get at, what
5  was the purpose of this?  When you say, "This was because
6  of a write-up that occurred on September 12, 2013," and I
7  guess that I go to the next page. Let's look at the next
8  page.
9       A.    Okay.
10      Q.    Is this the write-up that you were
11 referring to?
12      A.    Yes.
13      Q.    And is that your signature?
14      A.    Yes, it is.
15      Q.    Okay.  And --
16      A.    Are we finished with this one?
17      Q.    Yes, sir, we're just flipping through.
18 We're on Page 4 now.  All right.  You say here, "This was
19 unbecoming conduct of a Deputy Sheriff, General Order 23,
20 Section C, by making an entry into the CAD system of this
21 sort."  If I was a deputy sheriff, where would I find
22 General Order 23; where is that located?
23      A.    That was under -- that was -- it's conduct.
24      Q.    Okay.  It's like code of conduct?

1       A.    Yes.
2       Q.    And can you --
3       MR. GUYNN:  Wait a minute, where is it
4       stored, I think is what he's asking.
5  BY MR. STRELKA:
6       Q.    Well, the point is where would I access
7  it?  If I want to -- I'm a deputy sheriff, I want to read
8  General Order 23, where would I go?
9       A.    That would be under code of conduct.
10      Q.    In the operations manual?
11      A.    Yes, the procedures manual, I'm sorry.
12      Q.    All right.  And that is the one that is
13 available on line?
14      A.    Yes.
15      Q.    And you can sign onto it?
16      A.    Yes, and we have a hard copy there at the
17 office, too.
18      Q.    Okay, and so what you are essentially
19 saying here is that by entering this comment into the CAD,
20 the comment, "Investigators could not respond because they
21 had a fantasy football meeting," that Mr. Dunn had
22 violated the code of conduct of the sheriff's office?  Is
23 that what you are saying?
24      A.    No, the purpose of it was him putting on

Page 154

1  there a derogatory remark about the investigators being at
2  a fantasy football meeting.  You know, that was more
3  important than them coming to work.
4       Q.    Right, and Mr. Dunn didn't use the words
5  "more important," though, did he?
6       A.    No, he didn't.
7       Q.    Okay, and he -- and you say derogatory, but
8  he didn't use any adjectives or adverbs; he didn't --
9  wouldn't it be fair to say, a fair statement, that he just
10  wrote that facts in there?  I mean, how is that fact
11  derogatory?
12       A.    Well, it didn't need to be in there, and it
13  was very unprofessional.
14       Q.    And isn't it the job of a police officer or
15  a law enforcement official to record all of the facts as
16  they occur during the investigation into the CAD?
17       A.    That didn't have anything to do with the
18  investigation.
19       Q.    Wasn't he attempting to try to procure the
20  services of these other law enforcement officials to
21  assist with the collection of evidence?
22            MR. GUYNN:  I will object to what he was
23       doing.  Go ahead.
24            THE WITNESS:  He was already there.  The

Page 155

1       investigator had already been there and collected
2       the evidence and did the photographs.
3  BY MR. STRELKA:
4       Q.    Right, and do you recall Mr. Dunn's
5  position, that there was additional evidence?  Remember we
6  talked about a second set of tire tracks, a footprint in a
7  door, and he indicated that that was the reason why he had
8  put that in there, so my question is -- well, let me
9  strike that.  Have you ever found any other employee of
10  the sheriff's office to have violated General Order 23,
11  Section C?
12       A.    I have.
13       Q.    Can you give me an example of those other
14  violations that someone else did when they violated the
15  order, that order?
16       A.    Just being unprofessional.
17       Q.    Okay.  And can you give me an example?
18       A.    Alcohol.
19       Q.    Like drinking on the job?
20       A.    No, no, it wasn't drinking on the job.
21       Q.    But what -- what is the alcohol?
22  What happened with the alcohol?
23       A.    You know, being at a party with Facebook
24  and things like that, being involved, you know, with a

Page 156

1  person that was intoxicated and being videoed.
2       Q.    Okay.  So are you saying that you wrote up
3  somebody, an employee?
4       A.    Yes.
5       Q.    Who had been videoed being intoxicated and
6  it was posted on line, and you felt that that was conduct
7  not appropriate and unprofessional; is that what you are
8  saying?
9       A.    Yes, sir.
10       Q.    So that person was written up for a
11  violation of General Order 23, Section C; is that right?
12       A.    Yes.
13       Q.    And that person, is there a record of that
14  in their personnel file?
15       A.    There is.
16       Q.    And who is that person?
17       A.    I don't discuss personnel issues.
18       Q.    Well, you are under Oath by subpoena to
19  talk to me, regard let of whether it is personnel or not.
20       A.    Can I do that?
21            MR. GUYNN:  Have we entered into the
22       Protective Order yet?
23            MR. STRELKA:  Not yet.  Can we go off the
24       Record?

Page 157

1            (Discussion off the Record.)
2  BY MR. STRELKA:
3       Q.    Back on the Record, all right, you gave
4  that example of when an employee was deemed to have
5  violated that General Order 23.  Do you recall any other
6  behavior that any other deputy, you know, executed or
7  indicated in which they were in violation of General Order
8  23, Section C?
9       A.    I know that I have done this before, but my
10  mind -- I did.  I terminated a deputy one time.  He was
11  involved in an automobile accident and he had a BAC well
12  over the legal limit.
13       Q.    Okay.
14       A.    And he was terminated.
15       Q.    All right.  Who was it that was alleged to
16  have been at a fantasy football game?
17       A.    Mason Boggess.
18       Q.    Do you know if he was?
19       A.    No.  I don't even know what a fantasy
20  football meeting is.
21       Q.    Did you ever ask him about it?
22       A.    I did.
23       Q.    And what did he say?
24       A.    I don't remember what he said.  I think he

**Page 158**

1  said that he was, or was going or something.

2      Q.      Okay.

3      A.      Or was already there.

4      Q.      And so you don't take any issue with this

5  statement being a lie, do you, the fantasy football

6  meeting?  The fact that Mr. Dunn wrote it, you think that

7  it's unprofessional, from my perspective; that is what you

8  testified, right?

9      A.      Yes, it is.

10     Q.      But do you think the statement is

11 untruthful?

12     A.      I don't know.  I don't know if it is or

13 not.

14     Q.      Okay.  But you testified that you did talk

15 to Mason Boggess and -- am I saying that right?

16     A.      "Boggess."

17     Q.      Okay, and he did indicate that he was going

18 to a meeting or had gone to a meeting or something along

19 those lines?

20     A.      He did.

21     Q.      Okay, so --

22     A.      But he didn't tell me where he was exactly,

23 but he said that he did have some plans and he couldn't

24 get there right then.

**Page 159**

1      Q.      Right, the comment written by Mr. Dunn

2  didn't say exactly where he was either, though, did it?

3      A.      No.

4      Q.      Does Mason Boggess have any sort of special

5  duties at the Giles County sheriff's office in relation to

6  the collection of evidence at a crime scene?

7      A.      He does.

8      Q.      And what are those duties?

9      A.      He is our forensics evidence tech.

10     Q.      Do you have another forensics evidence

11 tech?

12     A.      No, not now.

13     Q.      At the time that this occurred, would you

14 have -- was Mason Boggess considered to be on call when

15 needed?

16     A.      They are all on call, yes.

17     Q.      Okay.  And so if an officer is requesting

18 the forensic specialist deputy to appear on a scene, it's

19 the job of Mason Boggess to get out to the scene, isn't

20 it?

21     A.      Yes, but he was already there.

22     Q.      He had been there earlier?

23     A.      Yes, he was there earlier.

24     Q.      Right, and -- but under these

**Page 160**

1  circumstances, Mr. Dunn is indicating that there was

2  additional evidence that was not collected, so wasn't --

3  wouldn't Mason Boggess be violating his duties by not

4  going back out there?

5      A.      If there was something there, yes.

6      Q.      Was Mason Boggess ever written up?

7      A.      No.

8      Q.      Did it make you mad when he put that in

9  there?

10     A.      It did; it disappointed me.

11     Q.      Why is that?

12     A.      To see somebody put something on a computer

13 system that you think cannot be taken off.

14     Q.      Okay.

15     A.      I've been involved in cases before where

16 you don't know where these things are going to end up.

17 You don't know if they are going to be at the prosecutor's

18 office or the defense attorney's office or the Court of

19 Appeals for the state Supreme Court or wherever.

20     Q.      Okay.  So is it your practice and procedure

21 to go back and amend and edit records so that your cases

22 aren't appealed?

23     A.      No.

24     Q.      But you did that here?

**Page 161**

1      A.      I did it on one, yes.  I did; I took that

2  off.

3      Q.      All right.

4      A.      Because it was unprofessional.

5      Q.      Do you know a Deputy Hahnlen?

6      A.      Yes.

7      Q.      Do you know if she was present at that

8  crime scene on that day?

9      A.      I do.

10     Q.      And do you know if she had indicated to

11 Scott Dunn that Mason Boggess had missed evidence?

12     A.      No.

13     Q.      Do you ever recall any discussion with

14 Deputy Hahnlen about these events?

15     A.      No, sir.

16     Q.      All right.

17     A.      I had some others that talked to her.

18     Q.      Let's go to the next page, 5.

19     A.      Okay.

20     Q.      Did you write this?

21     A.      Let me see.  I did.

22     Q.      And you wrote this, it said on September

23 29th and the date on this is October 1, so you wrote this

24 in response to the phone call that you got from Major

**Page 162**

1  Falls; is that correct?

2       A.    Yes, that's right.

3       Q.    Why was -- why was this document written?

4  This is -- you wanted to place this in Dunn's personnel

5  file; is that right?

6       A.    Yes.

7       Q.    Okay, for what purpose?

8       A.    Well, Number One, he goes to my chief

9  deputy's house after he's demoted, and he told me, he said

10  that Scott Dunn just left his house in Eggleston after

11  being ordered off his property. I asked him why, and he

12  said Scott had been to his home and he told him that he

13  wanted to talk to him, and when Scott got out of his

14  vehicle, the first thing that came out of his mouth is

15  "Things are going to get bad between me and Morgan."

16  Mike said he looked at him and asked him what he was

17  talking about, and he said the Board of Supervisors are

18  pissed, they had a special meeting, and the Board is going

19  to ask the Attorney General to investigate the Giles

20  County sheriff's office.

21       Q.    Do you mind if I stop you right there? Did

22  you ever have any conversation with Scott Dunn about that

23  information, about the Board asking the Attorney General's

24  office to investigate the sheriff's office?

**Page 163**

1       A.    No.

2       Q.    Did you ever have any discussion with any

3  Board member about that topic?

4       A.    No.

5       Q.    Did you ever hear about that other than

6  this incident?

7       A.    I've asked about it.

8       Q.    Okay, who did you ask?

9       A.    I asked Barbara Hobbs, I've asked Chris

10  McKlarney.

11       Q.    And what did they say?

12       A.    No.

13       Q.    And did they -- did they ever indicate

14  whether Mr. Dunn had asked the Board to do that?

15       A.    No.

16       Q.    Okay, and then the next paragraph, it goes

17  into, it says, "Scott Dunn stated the sheriff's office was

18  guilty of a number of things," all right, and let's move

19  beyond that. He said he also says the Board of

20  Supervisors were going to cut positions at the sheriff's

21  office and cut salaries. Did you ever have a discussion

22  with Scott Dunn about that specific issues?

23       A.    No.

24       Q.    Had you ever heard about that before?

**Page 164**

1       A.    No.

2       Q.    Have you discussed that with any member of

3  the Board since?

4       A.    I have.

5       Q.    And who did you discuss it with?

6       A.    I discussed with Barbara Hobbs.

7       Q.    And what did she say?

8       A.    And Chris McKlarney.

9       Q.    And what did he say?

10       A.    They didn't know anything about that at the

11  time.

12       Q.    Okay. Are you aware -- are you aware of

13  any topics that were discussed that are not included in

14  this letter between Mr. Falls and Mr. Dunn?

15       A.    No.

16       Q.    Are you aware of whether or not these

17  gentlemen shouted at each other or whether anyone shouted

18  at each other?

19       A.    Oh, I'm sure they did.

20       Q.    So did you consider this entire scene with

21  Scott Dunn and Mike Falls to be a deviation of policy on

22  behalf of Scott Dunn, and by "policy," I mean shares

23  policy?

24       A.    Yes.

**Page 165**

1       Q.    How so; what did he do wrong here?

2       A.    Well, he goes to a supervisor's house, my

3  second in command, and he threatens me, threatens the

4  sheriff's office in the capacity of a deputy sheriff, and

5  also spouting off things that the Board of Supervisors are

6  doing.

7       Q.    Okay, so Mike Falls would have been

8  obviously Mr. Dunn's supervisor; is that right?

9       A.    Yes.

10       Q.    And earlier we talked about if somebody had

11  a complaint about how things were done, you said that they

12  could go to their supervisor; is that right?

13       A.    Yes.

14       Q.    And how is this not in line with what you

15  just said earlier today? How is Scott Dunn not just

16  bringing something, a complaint to a supervisor?

17       A.    That is not a complaint; that is a threat.

18       Q.    "Things are going to get bad between me and

19  Morgan;" is that what you are talking about as a threat?

20       A.    No.

21       Q.    Where is the threat?

22       A.    The Board of Supervisors, and they had a

23  special meeting yesterday on the 28th, the Board is going

24  to ask the Attorney General to investigate the Giles

Page 166

1  County sheriff's office, and Dunn is stating the sheriff's
2  office is misappropriating of funds and embezzlement and
3  other things.  He also said that the Board is going to cut
4  positions at the office and cut salaries.
5      Q.    Okay, but when you are saying that the
6  threatening language is, what, like "The Board of
7  Supervisors is going to cut positions at the sheriff's
8  office"?  Just tell me what the threat is, specifically,
9  if you could.
10     A.    Well, he comes out of his vehicle in
11 uniform working and saying, things are going to get bad
12 between me and Morgan.  That sets the tone for it right
13 there.  Then once he said things are going to get bad and
14 the Board of Supervisors are, as he said, pissed, and the
15 Attorney General is going to be brought in to investigate
16 the sheriff's office, and the sheriff's office has been
17 guilty of misappropriation of funds, embezzlement, and
18 other things, and they are going to cut positions.
19     Q.    Let's go to the next page.  All right, did
20 you write this, Number 6, dated September 27, 2013?
21     A.    I did.
22     Q.    All right, and this is just memorializing
23 your decision to demote Scott Dunn?
24     A.    It is.

Page 167

1      Q.    Okay.  Let's move on.  August 27, 2013, did
2  you write he this letter?
3      A.    I did.
4      Q.    And I will refer for the Record's purpose
5  that this is Bates labeled 7.  I believe you testified
6  earlier about this situation, didn't you?
7      A.    I don't know.
8      Q.    I think that you said about how he said
9  that he didn't want to go out there on the road?
10     A.    Yes.
11     Q.    And I think you said something along the
12 lines of it's everybody's -- every deputy's duty to do the
13 work, and I'm paraphrasing.
14     A.    That's right.
15     Q.    Why -- is there such a thing called a road
16 deputy at the sheriff's office?
17     A.    There is.
18     Q.    What is a road deputy; how is that deputy
19 different?
20     A.    You have a road deputy and you have an
21 investigator and you have court security.
22     Q.    And what is --
23     A.    A road deputy is somebody that wears a
24 uniform and works the road every day.

Page 168

1      Q.    Okay.
2      A.    That is in uniform.
3      Q.    Okay.  And at this time, August 27th, Mr.
4  Dunn was a lieutenant at that time; is that right?
5      A.    Yes.
6      Q.    And so he would have the authority to
7  direct others such as a deputy to perform work; isn't that
8  right?
9      A.    Yes, that is true.
10     Q.    So wouldn't he have the authority to make
11 this decision for that -- that this call be given to a
12 deputy?
13     A.    When the others are busy, you don't say, I
14 don't work the road.
15     Q.    Would you agree with me that this letter
16 has absolutely no information about the others being busy?
17     A.    It probably doesn't.
18     Q.    When did you write this?
19     A.    August 27th.
20     Q.    And did you write this other letter,
21 previous Bates labeled 7, labeled 6, on September 27th?
22 The date that I mentioned was September 27, 2013.  Is that
23 when you said that you wrote this?
24     A.    This one here, yes.

Page 169

1      Q.    Okay.  Okay.  Let's look at the next one,
2  Number 8.  It's got a date of September 12, 2013.
3      A.    They are not in order?
4      Q.    No, sir, I am sorry about that.  I'm going
5  by the order in which they were produced to me, the 1, 2,
6  3, 4, 5, 6, 7, 8, sort of thing.
7      A.    Okay.
8      Q.    Is that your signature?
9      A.    It is.
10     Q.    Do you recall writing this letter?
11     A.    I did.
12     Q.    And --
13     A.    We just went over that.
14     Q.    Yes, this looks like a duplicate.
15     A.    That is the -- let's see here.  That is a
16 duplicate.
17     Q.    Yes, it is, okay.  All right, then we will
18 just pass through Number 8 and move on to Number 9.
19     A.    Okay, wait a minute here.
20     Q.    And I will let you know, the document --
21 the letter for Number 9 goes on to Number 10, so Page 9
22 and ten.
23     A.    Okay.
24     Q.    Is that your signature on Page 10?

Page 170

1     A.     Yes, it is.

2     Q.     All right.  And the date of this document
3  is September 9, 2013.  Do you recall writing this?

4     A.     Yes.

5     Q.     Did you write it on that date?

6     A.     Yes, yes, probably, I guess, because it
7  is -- yes.

8     Q.     And after you review the letter, I
9  basically want you to tell me what it is that Dunn did
10 wrong.

11    A.     This is a case where he was dispatched with
12 some others on Lebanon Road in Pembroke.  He -- he got a
13 Bailey boy and a stepson of John Collins and Scott got the
14 confession about this gun, and Bailey was a convicted
15 felon, and he was told to get a warrant, and --

16    Q.     Scott Dunn was told to get a warrant?

17    A.     Scott Dunn was told to get a warrant and he
18 never did.

19    Q.     Do you know why?

20    A.     No.

21    Q.     All right.

22    A.     He was -- he was told to get a warrant by
23 Eric Thwaites because he was the one -- I mean, he did all
24 the hard part here on this case.

Page 171

1     Q.     Hmm-hmm.

2     A.     He just didn't get any charges on it.  He
3  said, it's not my job.

4     Q.     And are you aware of whether or not Mr.
5  Dunn ever requested any other law enforcement official to
6  go and collect some of the evidence that had been, you
7  know, scattered here?  You know, he was talking about
8  evidence being in pawn shops, this property.  Did you ever
9  have -- were you aware that Scott Dunn had ever requested
10 that?

11    A.     I don't know, but I think that there was a
12 case or two where some of the pawn shops got some of the
13 stuff in West Virginia.

14    Q.     Okay.

15    A.     I believe.  I'm not sure.

16    Q.     All right, and is it -- is it proper
17 procedure to obtain a warrant prior to the collection of
18 the stolen property if you know where it is?

19    A.     If you know where -- if you don't know
20 where it's at?

21    Q.     Hmm-hmm, no, if you do know where it is.

22    A.     Well, you go get it.

23    Q.     Okay, do you know --

24    A.     And when -- I mean, once you get it, I

Page 172

1  don't know why you don't get the warrant.

2     Q.     Well, I'm sure that you had a discussion
3  with Scott Dunn about this issue, or maybe you didn't?

4     A.     I don't know.

5     Q.     Do you, sitting here now, do you recall any
6  of Scott Dunn's, you know, rebuttal to this, his two cents
7  on this whole situation?

8     A.     No.

9     Q.     Was there any -- were there any
10 difficulties in, other than this issue with the warrant,
11 prosecuting this Bailey mentioned here?

12    A.     No, I think that this was the one that
13 Chad -- I'm not -- don't quote me on this, but I think
14 that this is the one that Chad Tickle ended up finishing,
15 taking before a grand jury and getting a conviction on.

16    Q.     That is because Mr. Dunn was no longer
17 working there?

18    A.     Yes.

19    Q.     So --

20    A.     I'm thinking now this is the one.  I'm
21 really not sure.

22    Q.     Okay.  We'll go back to that in a little
23 bit.  Let's go to Number 11.  This is dated July 27th,
24 2013.  I'd like you to take a moment to read this and let

Page 173

1  me know if that is your signature.

2     A.     It is.

3     Q.     So do you recall writing this?

4     A.     I do.

5     Q.     So what happened here?

6     A.     I come into work the next morning, after --
7  I think that it was on the 27th of July, there was an
8  email sent to me from Jackie Martin.

9     Q.     Who is Jackie Martin?

10    A.     He is the chief of police in Pearisburg.

11    Q.     Okay.

12    A.     He said that -- well, you should have a
13 copy of that.

14    Q.     I can read this letter, but --

15    A.     That stated that Scott had caused some
16 controversy with the Pearisburg Police Department.

17    Q.     This was about capability of the radios?

18    A.     Yes.

19    Q.     Whether all of the radios could work
20 together or not, something along those lines?

21    A.     Yes.

22    Q.     And why was it a violation of policy for
23 Scott Dunn to have that discussion with Chad Journell of
24 the Pearisburg Police Department?

**Page 174**

1    A.    Well, it is not that he had a discussion
2  with them; it's when he told them, if they get that radio
3  system, they are going to have to hire their own
4  dispatchers.
5    Q.    And why was that a violation of policy?
6    A.    Well, he was speaking for me.
7    Q.    Okay.
8    A.    The sheriff.
9    Q.    Now, are you saying that you believe that
10 Officer Dunn was speaking as if he had your authority but
11 he didn't?
12   A.    I don't know what he was speaking as.
13   Q.    Okay.
14   A.    But he was speaking to them as a Board
15 member, and he said that if they go with this type of
16 radio, I don't know if it was Kenwood, Motorola, or
17 whatever, but he did tell them, you know, if they did
18 that, they were going to have to hire their own
19 dispatchers, and, you know, it's not up to us to tell them
20 what they can or cannot purchase.
21   Q.    Okay.
22   A.    And --
23   Q.    Okay, so this one paragraph here,
24 "Lieutenant Scott Dunn, you are a member of the Giles

**Page 175**

1  County Board of Supervisors and an employee of the Giles
2  County sheriff's office.  We've discussed this before,
3  Lieutenant Dunn, you are at no time to speak for me in the
4  capacity of a Board of Supevisors member," so at what
5  other times has there been an issue about this?
6    A.    I'm not sure.
7    Q.    Sitting here today, you can't recall any
8  others?
9    A.    No, I can't.
10   Q.    You don't recall the incident but do you
11 recall having discussions with Mr. Dunn about this before,
12 as it says so in the letter?
13   A.    I don't know.  I know that we had a
14 discussion before he decided to run for Board of
15 Supervisors.
16   Q.    Sure.  What makes you think that Mr. Dunn
17 was speaking at this time to Chad Journell in his capacity
18 as a Board of Supervisors member?
19   A.    Well, he told him, he said, you know, we're
20 buying a new radio system, and you all will not be
21 compatible to ours.  I forget now the correct terminology
22 that he used.
23   Q.    From your perspective, was Mr. Dunn being
24 less than truthful?

**Page 176**

1    A.    I'm going to say yes, because we haven't
2  bought any new radios.
3    Q.    Okay.  Do you know if the Pearisburg Police
4  Department ultimately purchased the radios that Mr. Dunn
5  had recommended?
6    A.    I have no idea.
7    Q.    All right, let's go to the next page, still
8  on that same issue, do you recall receiving this email
9  from Jackie Martin?
10   A.    Yes.
11   Q.    And is this about that radio?
12   A.    Hmm-hmm.
13   Q.    Is that a yes?
14   A.    Yes, it is, yes, I'm sorry.
15   Q.    That is all right.  And did you -- do you
16 recall sending that email back up top, "I just received
17 your email, you and I need to get together this morning."
18   A.    Yes.
19   Q.    And did you get together with him?
20   A.    I think we did, yes.
21   Q.    And was that over the phone or in person?
22   A.    I think that we talked in person.
23   Q.    You talked about this event?
24   A.    We did.

**Page 177**

1    Q.    Did you know about this conversation at all
2  until you had been notified by Jackie Martin?
3    A.    No.
4    Q.    So Chad Journell never notified you?
5    A.    No.
6    Q.    Okay, the bottom, it says, before Jackie
7  signs his name there, he says, "Don't come to my home
8  asking for my support in the upcoming election.  You will
9  not get it.  He is killing you, Morgan, and you are
10 allowing it to continue."  I guess that he is referring to
11 Scott Dunn?
12   A.    I think so.
13   Q.    Did you ever have any discussion with Mr.
14 Martin about why he would say that?
15   A.    Well, it was evident.
16   Q.    How so?
17   A.    They didn't like one another.
18   Q.    Martin and Dunn?
19   A.    No.
20   Q.    Why?
21   A.    They just didn't.
22   Q.    All right.
23   A.    It was like oil or vinegar, or oil and
24 water, yes.

**Page 178**

1    Q.    All right.  So there have been some sparks
2  or tension between these two before, is what you are
3  saying?
4    A.    Yes.
5    Q.    Okay.  Do you recall any particular issue
6  that had been brought up between the two of them before,
7  not these radios but some other issues?
8    A.    There was something a year or so before; I
9  don't know, something about a radio system or something,
10 but I don't exactly remember what it was.
11   Q.    Okay.
12   A.    You would have to ask him about that.
13   Q.    All right.  So let's go -- let's go to Page
14 13, and we're going backwards in history here, so now
15 we're at March 15, 2013.  Do you recall writing this?
16   A.    I do.
17   Q.    And did you write it on March 15, 2013?
18   A.    I think so.
19   Q.    And earlier, you had mentioned an issue
20 regarding Mr. Dunn not getting his summonses in time?
21   A.    Yes.
22   Q.    And is this one of those, does that note or
23 letter refer to that?
24   A.    This is one of those, yes.

**Page 179**

1    Q.    And the bottom there, you say, "You are an
2  excellent deputy and you represent our department well and
3  you do excellent work."  I'm assuming that on March 15,
4  2013, that is a statement that you believed to be
5  truthful?
6    A.    Yes.
7    Q.    At some point, though, is it fair to say
8  that you felt that that statement was no longer true with
9  regard to Mr. Dunn?
10   A.    That is exactly right.
11   Q.    Okay.  But at this time, as of March 15,
12 2013, other than this issue, would you say that he was
13 doing his job okay?
14   A.    He was doing his job pretty good.
15   Q.    Okay.  Now we're jumping around.  Next up
16 is 14; this is July 2, 2012.  This is another issue with
17 summonses; is that right?
18   A.    Yes.
19   Q.    Have you ever written up anyone else for
20 this type of thing?
21   A.    I don't know.
22   Q.    Okay.  But you do recall writing this?
23   A.    I do.
24   Q.    All right.  I will say that 15 does not

**Page 180**

1  need to be there?
2    A.    Do what.
3    Q.    Nothing, just skip 15, please, and go to
4  16.  Now, this is in April, April 6, 2009.  Do you recall
5  receiving this letter from lieutenant Thomas Gautier
6  regarding Scott Dunn?
7    A.    I do, but -- would that have been Bo or
8  Carson?
9    Q.    It says Bo here.
10   A.    Did we have Bo in 2009?
11   Q.    You can't ask him any questions, and if you
12 don't know, that is the answer.
13   A.    I don't know.  I remember getting it, but I
14 don't remember the dog's name.
15   Q.    You have no reason to doubt the
16 truthfulness of this document?
17   A.    No, but I remember the Slusher.
18   Q.    Sure.
19         THE WITNESS:  Can we take a quick rest room
20 break?  Could we go off the Record for just a
21 minute?
22         MR. STRELKA:  Yes.
23         (A recess was taken.)
24 BY MR. STRELKA:

**Page 181**

1    Q.    Are you ready?
2    A.    I am.
3         MR. STRELKA:  All right.  I'd like this to
4  be marked as Exhibit Number 28.
5
6         (The above-mentioned document was marked as
7         Deposition Exhibit Number 28 and entered into the
8         Deposition.)
9
10 BY MR. STRELKA:
11   Q.    Have you ever seen this document before?
12   A.    I have.
13   Q.    What are you looking at?
14   A.    This is something from Dave Hunt and
15 Greenbrier Contract Services for the employee payment for
16 the dog pound.
17   Q.    And is this for payment of Chastity
18 Perkins; is that right?
19   A.    Yes, huh-huh.
20   Q.    Okay, and you see there looks to be a stamp
21 in the middle of the page that appears to have your
22 signature in there?
23   A.    Yes, sir.
24   Q.    And do you apply that stamp; do you put

## Page 182

1   that stamp on there?
2       A.      This stamp here (indicating)?
3       Q.      Yes, sir.
4       A.      No, my secretary does that.
5       Q.      Okay, so it is done at your office?
6       A.      It is, and it is her signature above.
7       Q.      Okay, and the other writing there, for
8   instance, the 100, what is Fund 100; what does that mean?
9       A.      I have no idea.
10      Q.      Is she writing this?
11      A.      I guess that she is.
12      Q.      Okay, what is her name?
13      A.      Kelly McCroskey.
14      Q.      Okay, that is right, okay, and I will
15  represent to you that we got a whole bunch of these
16  invoices --
17      A.      You probably did.
18      Q.      -- okay, and I didn't want to print out a
19  bizillion invoices --
20      A.      Thank you.
21      Q.      -- but I will represent to you that all of
22  the invoices indicate that, do you see where it says next
23  to her name, 184 regular hours at the rate of $9.06; do
24  you see that?

## Page 183

1       A.      Yes.
2       Q.      And I will represent to you that all of the
3   ones that I've seen say the exact same thing, 184 hours,
4   $9.06?
5       A.      Okay.
6       Q.      Is that -- would you -- would you agree
7   that that -- is that your understanding of the invoices
8   or --
9       A.      It is.
10      Q.      Okay.
11      A.      I think that -- I think that they pay her
12  $7 point something an hour, and Dave Hunt gets charged $9
13  and something an hour.
14      Q.      Okay.
15      A.      If that is --
16      Q.      Okay.
17      A.      I don't know that to be true or not.
18      Q.      Right. Okay.
19      A.      I think that is -- I think that that is
20  insurance and things like that.
21          MR. STRELKA:  Okay. All right.  I would
22      like the following document to be labeled as
23      Exhibit Number 29.
24

## Page 184

1           (The above-mentioned document was marked as
2       Deposition Exhibit Number 29 and entered into the
3       Deposition.)
4
5   BY MR. STRELKA:
6       Q.      All right.  I will represent to you that I
7   asked for, in the course of this case, an accounting of
8   adoption fees received and related reimbursements
9   regarding the animal shelter, and this is what was
10  produced.
11      A.      Okay.
12      Q.      Have you ever seen this before?
13      A.      No.
14      Q.      Do you know -- do you know who -- you've
15  never seen this before, but do you know who produced this?
16      A.      No, but I'm sure it's probably the
17  treasurer's office.
18      Q.      Okay.
19          MR. GUYNN:  Well, if you don't know, how
20      are you sure?
21          THE WITNESS:  Well, I don't know.  I guess
22      that it is the treasurer's office.
23          MR. STRELKA:  But you don't know?
24          MR. GUYNN:  Just out of curiosity.

## Page 185

1           THE WITNESS:  Okay.
2   BY MR. STRELKA:
3       Q.      So you are not in a position right now to
4   be able to tell me what all of these numbers are?
5       A.      No, I'm not.
6       Q.      Okay.  I know that you don't know for sure,
7   okay, because you've never seen it, and I'm not holding
8   you to the knowledge that you do now --
9       A.      Okay.
10      Q.      -- but if I was going to go around asking,
11  hey, man, what does this mean; what do these numbers mean,
12  who would you think would be a good person to ask?
13      A.      I would start with Rhonda Tickle.
14      Q.      What is her title?
15      A.      She is the County bookkeeper, and if she
16  doesn't know, she can direct you to who does.
17      Q.      Okay, fair enough.  All right.
18      A.      Are we finished with this one?
19      Q.      Yes, sir.  Also, while I'm at it, I was
20  given a big section of the County budget.  Who would be
21  the person to talk to if I wanted to --
22      A.      Rhonda Tickle.
23      Q.      Okay.
24          MR. GUYNN:  I will tell you, she is the one

Page 186

1    that gave us all of the documents.  We didn't have
2    it.
3         THE WITNESS:  I will give you her telephone
4    number shortly.
5    BY MR. STRELKA:
6         Q.    And she works for the County?
7         A.    She does.
8         MR. GUYNN:  Yes.
9         MR. STRELKA: Okay.  All right.  I'd like
10   this to be Exhibit Number 30.
11
12        (The above-mentioned document was marked as
13   Deposition Exhibit Number 30 and entered into the
14   Deposition.)
15
16   BY MR. STRELKA:
17        Q.    Right, have you ever seen this before?
18        A.    No, sir.
19        Q.    This was not in place at the time that you
20   were in the shelter, was it?
21        A.    I don't think so.
22        Q.    All right.  Did you have at the time that
23   the sheriff's office managed the shelter a standard
24   operating procedure for the shelter?

Page 187

1         A.    No.
2         Q.    So this -- so there were no written
3    procedures for the shelter prior to the County taking over
4    the shelter?
5         A.    No.
6         MR. GUYNN:  I think the answer is correct.
7    BY MR. STRELKA:
8         Q.    My understanding of your last answer --
9         MR. GUYNN:  You said that there were no
10        written procedures in place, and he said no.
11        MR. STRELKA:  Meaning that there were?
12        MR. GUYNN:  I think that he means correct,
13        but you get a double negative when you read it.
14   BY MR. STRELKA:
15        Q.    My understanding was that -- let us do it
16   this way.  Is this a truthful statement, okay, when the
17   sheriff's office was managing the shelter, there was no
18   operating procedure or manual in place?
19        A.    Correct.
20        Q.    Okay.  In the course of your job as
21   sheriff, when these issues in 2013 came up regarding the
22   animal shelter, were you ever presented or shown
23   photographs of the animals at the shelter?
24        A.    I think I was, yes.

Page 188

1         Q.    I believe that they were incorporated into
2    the Department of Agriculture's report, but did you
3    any discussion about those photos with anyone on the
4    Board?
5         A.    I don't know; I don't think so.  Maybe with
6    Mr. McKlarney.
7         Q.    Okay.  Okay.  I would like to show you a
8    document that was previously labeled as Exhibit Number 1
9    in your deposition, okay?
10        A.    Okay.
11        Q.    Excuse me, Mr. Dunn's deposition; today is
12   your deposition.  I'm sorry, I misspoke.
13        A.    Okay.
14        Q.    Do you recognize that?
15        A.    I do.
16        Q.    Okay, and is that the CAD entry before it
17   was altered by you that Mr. Dunn made?
18        A.    Yes.
19        Q.    Okay.  And so that is the one that
20   incorporates the comment regarding fantasy football?
21        A.    Yes.
22        Q.    Did you ever discuss any of the other
23   matters contained within this report, and I'm not talking
24   about the fantasy football; I'm talking about the other

Page 189

1    facts that are contained within this narrative with
2    Officer Dunn?
3         A.    No.
4         Q.    Okay.
5         A.    I don't think so.
6         Q.    Okay.  All right.  Let's look at what was
7    previously labeled, and I will take this one back because
8    these were already entered, Exhibit Number 2.
9         A.    Okay.
10        Q.    Do you recognize that?
11        A.    This is the same thing, basically.
12        Q.    Is that a -- could I see that.  I have it
13   right here.
14        A.    Here is the IBR.
15        Q.    Okay, let me see what I gave you.  Sorry.
16   I meant to give you Exhibit Number 3; that is what I meant
17   to do.  Okay, here is just Exhibit Number 3.  That is what
18   I want to show you.  I'm sorry about that.
19        A.    Okay.
20        Q.    Okay, so do you recognize this Exhibit
21   Number 3?
22        A.    I do.
23        Q.    Okay, and if you go to the narrative, this
24   is regarding -- this IBR was created regarding the firearm

**Page 190**

1  with Mr. Bailey; is that right?

2      A.    Yes, that's right.

3      Q.    Okay.  And now, on the second page of that,

4  where it says "Narratives"?

5      A.    (Indicating).

6      Q.    Right, right there at the bottom, usually

7  isn't there a name of an individual who enters that

8  narrative there, right there on that page?

9      A.    I'm not sure.

10     Q.    Okay.  Was there ever any indication that

11  Mr. Dunn had written this narrative and you deleted that?

12     A.    No, it wasn't because I deleted it.

13     Q.    Okay.  Did you ever make any changes to

14  this?

15     A.    No.

16     Q.    You didn't touch it?

17     A.    No.

18     Q.    Okay.  All right, so let's look at Page 3

19  of that document.

20     A.    Okay.

21     Q.    Do you see at the bottom where it says

22  "Narrative, 2013," and spouts out a number?

23     A.    Yes.

24     Q.    And then it says "Officer" and it gives a

**Page 191**

1  letter and some numbers and then it says "Boggess, M.C.,"

2  and what does that information tell you on this document?

3      A.    It tells you that the following document

4  was --

5      Q.    The following information?

6      A.    Yes, the following information was entered

7  by Mason Boggess.

8      Q.    Okay.  So wouldn't there have typically

9  been, in this previous narrative, the same thing?

10     A.    You would think so.

11     Q.    And a time stamp with a name of the

12  individual who wrote this?

13     A.    You would think so.

14     Q.    And let's look at the first page of this

15  Exhibit Number 3.  You see where it says, "Assignment;" do

16  you see that?

17     A.    Yes.

18     Q.    And you see in the first line there at the

19  end of it, it says, "Reported by Tickle."

20     A.    Yes.

21     Q.    Is -- your understanding is that that is an

22  accurate record there, that that was reported by Tickle?

23     A.    He may have been the one to do the report.

24     Q.    What about beneath that where it says

**Page 192**

1  "Investigated by Thwaites"?

2      A.    Yes.

3      Q.    Is that accurate?

4      A.    Yes.

5      Q.    All right.

6      A.    This is the one where Thwaites told Scott

7  to get the warrant, I believe.

8      Q.    Hmm-hmm, that's right; we were talking

9  about this earlier, that's right, and in Mr. Dunn's

10  deposition, he indicated at length that he was the one who

11  wrote the narrative that appears, the long narrative, that

12  appears all in capital letters?

13     A.    Okay.

14     Q.    And do you ever remember having any

15  discussion with anyone about the fact that he wrote that?

16     A.    No.

17     Q.    Okay.  Do you have any knowledge of why, if

18  he wrote that, why his name is not on this IBR?

19     A.    I have no idea.

20     Q.    All right.

21     A.    You know, sometimes my computer won't put

22  my name on them, but that is probably user error.

23         MR. STRELKA:  All right.  All right.  I

24  only have just a few more questions.  Let's go off

**Page 193**

1  the Record for a second.

2         (Discussion off the Record.)

3         (A recess was taken.)

4  BY MR. STRELKA:

5      Q.    I would like to show you Exhibit Number 5

6  that was entered at Scott Dunn's deposition.  Do you

7  recognize that vehicle?

8      A.    I think that that is the one that sits

9  behind the sheriff's office.

10     Q.    Was that a vehicle that was -- we talked

11  earlier about vehicles that were going to be surplused.

12  Was that one of those vehicles?

13     A.    No.

14     Q.    Was it a completely separate vehicle?

15     A.    Yes.

16     Q.    And what does that vehicle -- what is the

17  function of that vehicle now?

18     A.    Well, right now, today, it's at the school

19  bus garage, the County garage, with no tags on it.  It's

20  going to be surplused.

21     Q.    Okay.  Did you ever have any discussions

22  with any Board members about the firing or terminating of

23  Scott Dunn?

24         MR. GUYNN:  Before or after?

**Page 194**

1      MR. STRELKA:  Before.

2      THE WITNESS:  No.

3  BY MR. STRELKA:

4      Q.     You don't -- did you have any conversation

5  with Chris McKlarney in which you indicated that you

6  wanted to terminate Scott Dunn?

7      A.     No.

8      Q.     That never happened?

9      A.     No.

10      Q.     Jay -- what is his name?

11      MR. DUNN:  Williams.

12  BY MR. STRELKA:

13      Q.     Did you ever talk to Jay Williams?

14      A.     Yes, I talked to Jay, yes.

15      Q.     And did you say that you wanted to

16  terminate Scott Dunn?

17      A.     No, I was -- I wanted it to work out.

18      Q.     So your testimony is that prior to your

19  decision to terminate Scott Dunn, you never had any single

20  conversation with any member of the Board, including the

21  County administrator, Chris McKlarney, about your

22  intention to terminate Scott Dunn?

23      A.     I know that I didn't with Chris McKlarney.

24      Q.     But you are unsure of the other people?

**Page 195**

1      A.     I'm unsure about Jay Williams because Jay

2  and I, we used to talk about every week, and I don't know

3  what we talked about.

4      Q.     What about Ms. Hobbs; did you ever talk to

5  her about terminating Scott Dunn?

6      A.     I don't know.

7      Q.     So it's possible you could have?

8      A.     It's possible.

9      Q.     All right.

10      A.     We talk about a lot of things.

11      Q.     The last thing --

12      A.     Jay did talk to me one time after I

13  terminated him.  He asked me --

14      MR. GUYNN:  That wasn't the question.

15      THE WITNESS:  Okay.

16      MR. STRELKA:  Hold on.  I don't have any

17  further questions.  Thank you, sir, you are free

18  to leave.

19      MR. GUYNN:  Actually, I just have -- no, I

20  don't have any questions, either.  We'll read.

21

22      (The deposition concluded at 2:44 p.m.)

23

24

**Page 196**

1      WITNESS SIGNATURE PAGE

2      I hereby certify that I have read my

3  deposition, and made those changes and/or

4  corrections I deem necessary, and approve the same

5  as now written.

6      Executed this _____ day of _____,

7  2015.

8

9

10  By:

11  _____

12  MORGAN MILLIRONS

13  Witness

14

15

16

17

18

19

20

21

22

23

24

**Page 197**

1      C E R T I F I C A T E

2  COMMONWEALTH OF VIRGINIA

3  COUNTY OF ROANOKE

4      I, Lisa M. Hooker, Notary Public in and for

5  the Commonwealth of Virginia, at Large, do hereby certify

6  that the Deposition of MORGAN MILLIRONS was by me reduced

7  to machine shorthand in the presence of the witness,

8  afterwards transcribed under my direction by means of

9  Computer, and that to the best of my ability the foregoing

10  is a true and correct transcript of the Deposition as

11  aforesaid.

12      I further certify that this Deposition was

13  taken at the time and place in the foregoing caption

14  specified.

15      I further certify that I am not a relative,

16  counsel or attorney for either party or otherwise

17  interested in the outcome of this action.

18      IN WITNESS WHEREOF, I have hereunto set my

19  hand at Roanoke, Virginia, on this the 20th day of

20  April, 2015.

        *Lisa M. Hooker RPR*

21

22      Lisa M. Hooker

        Notary Public

23

    My commission expires October 31, 2015.

24  Notary Registration Number:  165043

**Page 198**

```
1                    ERRATA SHEET
2   DEPOSITION OF:  MORGAN MILLIRONS
    CASE: DUNN v. MILLIRONS
3   DATE TAKEN:  APRIL 7, 2015
    REPORTER:  LISA M. HOOKER, RPR
4
    I have read the foregoing deposition and I wish to
5   make the following changes:
6
7   PAGE    LINE        CHANGE          REASON
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21
22      _____
23                  WITNESS NAME
24
```

---
**$**
---

**$25,000**
  104:24
  105:4

**$7**  183:12

**$7.50**  29:7

**$9**  183:12

**$9.06**  182:23
  183:4

---
**0**
---

**0003**  150:17

---
**1**
---

**1**  5:20  7:11
  161:23
  169:5
  188:8

**1's**  101:19

**10**  118:1,4
  169:21,24

**100**  182:8

**11**  119:2,5,
  18  172:23

**12**  120:17,
  20  152:6
  169:2

**13**  113:5
  122:15,18
  141:24
  178:14

**14**  123:17,
  20  179:16

**15**  39:4
  114:17
  127:12,16
  178:15,17
  179:3,11,
  24  180:3

**16**  128:2,5
  149:13
  180:4

**17**  128:18,
  21  129:3

**18**  131:7,10

**184**  182:23
  183:3

**19**  132:10,
  13,16

---
**2**
---

**2**  102:18,19
  149:13
  169:5
  179:16
  189:8

**20**  9:16,17,
  20  134:2,6

**2005**  30:2

**2006**  30:2

**2008**  7:11
  8:5  51:4
  126:10,19
  127:2

**2009**  180:4,
  10

**2012**  179:16

**2013**  8:21,
  24  9:7
  10:24
  11:14,19
  13:5,9,13
  14:23
  17:11  21:9
  33:2,6,14
  45:3
  51:10,13
  59:14,21
  60:24  61:7
  63:1
  69:13,16
  70:24  79:4
  82:5  85:21
  94:24
  98:20
  102:18,19
  129:24
  132:22
  135:1
  141:24
  146:10
  152:6
  166:20
  167:1
  168:22
  169:2
  170:3
  172:24
  178:15,17
  179:4,12
  187:21

  190:22

**2014**  126:17

**201500**
  147:23

**21**  98:20
  134:17,20

**22**  132:22
  133:1,4
  135:11,15

**23**  94:24
  141:13,16,
  22  152:19,
  22  153:8
  155:10
  156:11
  157:5,8

**24**  61:18
  118:20
  143:13,16

**24-hour**
  61:17

**25**  145:13,
  16

**26**  146:2,5

**27**  149:10,
  14,17
  166:20
  167:1
  168:22

**27th**  168:3,
  19,21
  172:23
  173:7

**28**  61:2
  181:4,7

**28th**  165:23

**29**  62:24
  183:23
  184:2

**29th**  161:23

**2:44**  195:22

---

**3**

**3**  17:3
  150:21,22
  151:14
  169:6
  189:16,17,
  21  190:18
  191:15

**30**  186:10,
  13

**31**  129:24

**39**  71:21

---

**4**

**4**  18:5
  135:1
  152:18
  169:6

**460**  19:11

**48**  60:16

**4:22**  133:1

**4th**  131:16

---

**5**

**5**  161:18
  169:6
  193:5

---

**6**

**6**  102:4,7
  104:6
  166:20
  168:21
  169:6
  180:4

---

**7**

**7**  114:23
  115:2
  146:10
  167:5
  168:21
  169:6

**7th**  146:23

---

**8**

**8**  116:1,4
  169:2,6,18

---

**9**

**9**  117:10,13
  169:18,21
  170:3

**911**  44:20

**9:27**  133:5

---

**A**

**a-half**  44:18
  91:14

**ability**
  12:18,21
  88:5

**above-
mentioned**
  115:1
  116:3
  117:12
  118:3
  119:4
  120:19
  122:17
  123:19
  127:15
  128:4,20
  131:9
  132:12
  134:5,19
  135:14
  145:15
  146:4
  149:16
  181:6
  184:1
  186:12

**absolutely**
  59:1
  168:16

**accepting**
  132:1

**access**  44:12
  45:4  53:3

**57:22**
  87:11
  130:20
  138:24
  153:6

**accessed**
  148:20

**accessible**
  60:11

**accessing**
  56:16
  57:10,
  58:19

**accident**
  5:16  16:4
  157:11

**account**
  99:22

**accounting**
  184:7

**accurate**
  191:22
  192:3

**acknowledged**
  70:7

**Act**  100:16

**action**  5:12,
  63:14  74:6
  86:23
  136:20

**addition**
  56:10

**additional**
  17:18

82:19
83:14
85:20
155:5
160:2

address 75:9
137:23
142:20
144:23

addressed
113:24
115:7
138:10

adequately
63:8

adjectives
154:8

Adkins 96:22

Admin 36:20

administrator
74:14
83:21
143:7
194:21

administrator'
s 29:4
85:10

admitted
132:9

adopt 48:5
50:11

adopted
130:24

adoption

27:2 184:8

adverbs
154:8

affect 92:20

aforementioned
23:14

afternoon
11:7

age 44:10

agency 81:22

agent 112:14

agents 53:23

agree 16:19,
22,23
17:8,9
18:2,8,12,
17,20
20:17
21:20,22,
24 22:1,3,
4 23:13,
17,19 25:7
30:12 39:1
51:7,
59:12
60:22 61:1
62:22
63:9,21
64:1 69:10
70:6,9
71:20
72:1,2
73:5 82:3,
9 85:23,24
86:3

91:10,11
94:23
95:3,5,6,9
104:23
114:9
124:5
136:19
137:22
140:12
168:15
183:6

agreed 40:14
62:15
125:4

agreement
112:5

Agriculture
77:21 78:1
79:15
85:21
119:11

Agriculture's
120:3
188:2

ahead 19:6
23:24
144:1
154:23

Aided 86:19
148:3

air 21:10

alcohol
155:18,21,
22

alleged

157:15

allegedly
136:6

Alleghany
96:15

allocated
38:19
39:5,11
54:2 72:19

allocation
37:9

allowed 42:2
54:11
130:7

allowing
75:5
177:10

alter 13:9
148:17,19

altered
188:17

ambulance
44:19

amend 88:5,
9,19
160:21

Amended 17:3

amount 27:14
30:9 37:21
121:22

Andy 109:3

Angels 131:4

animal  9:20
 24:18,21
 25:10,18,
 21 26:6,7,
 13 27:1,
 12,13,14,
 22 29:20
 32:24
 33:2,4,8,
 16,23
 34:2,5,12,
 14 35:1,7,
 13 36:4,
 16,18
 38:21
 39:6,12,
 17,20,24
 40:6,17,21
 41:5,7,10,
 17 42:12,
 17 47:5
 50:13
 51:11,14
 56:20
 57:6,9
 58:15
 59:6,21
 60:9 61:7,
 9, 64:13,
 14 73:16
 75:14 77:4
 78:8,9
 100:6
 114:14,16
 124:4,21,
 23 125:5,
 14,19
 126:23

 127:4
 129:23
 131:24
 133:10
 136:7
 138:12
 139:1,6,
 12,15
 140:14
 142:19
 184:9
 187:22

animals
 26:12 27:5
 29:23
 34:20
 39:21,22
 44:12
 47:23
 50:10 52:9
 58:15
 59:23
 60:6,13,15
 61:17
 118:20
 130:19
 132:1
 137:11
 187:23

annual
 68:15,16

answers  99:5

apparently
 131:19
 144:20

appealed

 160:22

Appeals
 160:19

appearing
 102:18
 103:2

appears
 181:21
 192:11,12

apply  181:24

approached
 59:17
 60:24

approve  42:5

April
 132:22,24
 133:4,8
 135:1
 142:21
 180:4

area  13:18
 60:13,15,
 17 96:13

areas  13:15,
 17 14:21

arose  100:6

arrest  6:17

arrests  97:3

arrived
 96:19

artificial
 60:19

assign  25:8

assigned
 19:19 54:6
 55:14

assignment
 66:19
 191:15

Assisi  131:4

assist
 154:21

assumed
 114:16

assuming
 27:20
 139:23
 179:3

attached
 109:11

attempting
 154:19

attend  78:12
 79:9

attended
 79:3,7,10,
 12,15

attention
 49:1,13
 107:21

attorney
 162:19,23
 165:24
 166:15

attorney's

93:9
160:18

**audit** 50:15

**auditor**
50:16

**August** 79:4
82:5
114:17
167:1
168:3,19

**authority**
12:15
13:4,9
17:18
18:11,19
20:16
21:19 22:2
25:4,8
32:22
34:15
35:12 36:9
101:7
111:2,7
126:4
127:5
168:6,
174:10

**authorization**
46:1

**automobile**
80:16,17
157:11

**aware** 8:18,
21,23 29:6
40:5 47:1
48:22 49:9

52:1,5
53:6
57:17,20,
24 64:14
77:23 78:5
107:2,18
108:14,19
139:5,8
146:15
164:12,16
171:4,9

---

### B

**BAC** 157:11

**back** 11:13
16:1 32:9
38:5 40:20
42:16,18
44:9
47:10,12
48:7
50:14,20
58:4,11
59:5 66:6
74:19,20
76:7,9
79:2 83:6
98:2,14,18
103:11
117:2
135:9
137:12
148:2
151:4
157:3
160:4,21
172:22

176:16
189:7

**backwards**
178:14

**bad** 48:1
129:17
162:15
165:18
166:11,13

**Bailey**
170:13,14
172:11
190:1

**bailiffs**
65:16,21

**bank** 49:19

**Barbara**
163:9
164:6

**base** 137:1

**based** 91:5
147:16

**basic** 5:12

**basically**
170:9
189:11

**basis** 20:12

**basket** 65:21

**Bates** 149:11
150:15,21
151:13
167:5
168:21

**bathroom**
6:24

**bearing**
93:10

**bears** 49:19

**beat** 16:5

**bedding**
47:11

**began** 8:3,7
51:11,14

**begin** 124:21

**behalf** 122:9
164:22

**behavior**
157:6

**belief** 46:3

**believed**
179:4

**belonged**
54:22

**beneath**
11:20,23
33:20
191:24

**big** 19:13
75:24
185:20

**bill** 28:12,
13 29:10
37:11,12,
14,18
38:2,6,10

bills  28:19
  37:16

bit  32:2
  114:4
  172:23

bizillion
  182:19

Blacksburg
  16:3

blank  66:13
  148:7

block  44:17
  91:14
  110:16

blower  74:6

blue  54:19
  55:21

Bo  180:7,9,
  10

Board  22:6,
  7,9,15,20
  23:16
  24:3,9,11,
  15 25:4,8
  36:2
  37:16,19
  38:20
  53:15
  54:23
  57:20
  58:1,20
  62:2
  63:14,19,
  23 64:17,
  20 71:6

74:9 75:8,
14,17,23
81:2 83:18
85:2 86:5,
8 100:10
102:8,19,
23 103:2
114:1,8
116:15
118:14
119:10,12,
24 121:17
122:4,6,8
123:10,14
125:10
126:6
127:3,5
162:17,18,
23 163:3,
14,19
164:3
165:5,22,
23 166:3,
6, 174:14
175:1,4,
14,18
188:4
193:22
194:20

Bobby  93:8

Boggess
  157:17
  158:15,16
  159:4,14,
  19 160:3,6
  161:11
  191:1,7

book  27:21

bookkeeper
  84:2
  185:15

bottom  19:10
  129:22
  131:15
  132:21
  133:4
  140:6
  144:2
  146:9
  150:8,15
  177:6
  179:1
  190:6,21

bought
  108:20
  176:2

box  45:12

boy  170:13

break  6:18
  12:17
  58:24
  98:11
  138:6
  139:1
  147:8
  180:20

breaking
  96:12
  136:7

Brian
  146:15,20

brick  110:16

briefly
  26:17 99:1

bringing
  165:16

broke  40:16
  47:18 58:6

broken  47:21
  48:23
  59:8,23
  136:18
  138:12

brought  48:7
  49:1,13
  86:24
  107:21
  166:15
  178:6

Buck  29:21
  30:23 31:6

buckets
  40:15
  47:4,9
  138:18,24

budget  124:3
  125:5,9,19
  126:14,19
  185:20

building
  44:19

bunch  98:23
  99:5
  182:15

bus  18:24
  19:8 83:15

84:16
193:19

**bushes**
110:18

**business**
93:23

**busy**
168:13,16

**buy** 105:11,
12

**buying** 47:8
175:20

---

**C**

---

**c.c.** 142:20

**CAD** 86:17
87:1,5,7,
8,11 88:2,
6,9 89:1,
5,15
90:17,19
91:5,21
92:17,23
93:6,9
96:7,8
97:5,10
148:2
152:20
153:19
188:16

**cages** 26:18,
23 64:9

**cake** 58:6

**call** 15:14

26:19
34:3,7
35:4 38:1
66:4 78:15
82:10
84:11
86:22
96:7,8,20,
22 138:8
139:23
140:3
147:22
148:2
159:14,16
161:24
168:11

**called** 14:22
40:5 82:6,
19 94:4
167:15

**calls** 97:2
98:6

**camera** 61:19
71:15
118:16
120:9

**cameras**
140:8,18
141:9

**capability**
173:17

**capacity**
175:4,17

**capital**
192:12

**captain**
10:19,20
11:1 35:16
90:7

**captains**
10:21

**car** 16:5
80:22
108:24
109:3,11

**carbon**
142:20

**card** 31:24
93:6

**cards** 68:9
71:24
92:17

**care** 15:7
21:3 34:24
72:17 85:8
96:20
116:13
130:24

**carry** 65:16

**carrying**
49:14
133:21

**cars** 13:24
43:9

**Carson** 180:8

**case** 6:5
16:7,15
90:18 91:4
121:1

149:2
170:11,24
171:12
184:7

**cases** 65:11
101:23
160:15,21

**cat** 26:22,
23 50:20

**cats** 131:4

**caught** 78:16

**caused**
173:15

**causing**
40:13

**ceased** 17:5

**cell** 139:9
140:1

**cellular**
139:12,24

**cents** 172:6

**Chad**
172:13,14
173:23
175:17
177:4

**chance**
135:23

**change** 13:9
90:6 95:1,
10,15
126:20
148:17,19

changed
  45:23
  56:18
  95:8,11
  105:1,6
  149:4

charge  14:18
  21:16
  25:18
  27:12 41:3
  43:2 56:21
  90:18
  96:11

charged
  183:12

charges
  171:2

Charlie
  56:24
  129:10
  142:22,24
  143:3

Chastity
  26:10
  34:15
  39:22,23
  40:16 41:4
  47:2 50:10
  52:11 53:4
  54:18,21
  55:1 58:16
  61:11
  74:23
  121:3
  133:18,21
  144:14

  145:21
  181:17

cheaper
  61:20,23
  71:18

checked  38:9
  107:23
  147:1

Chevrolet
  54:19
  55:21

chief  11:2,3
  82:5 83:23
  96:1
  113:12,13,
  17 162:8
  173:10

choose  30:10

Chris  62:1
  74:14 76:6
  79:7 80:2
  83:13,20
  85:14
  115:21
  116:18
  119:24
  125:3
  131:15
  132:21
  133:5
  141:23
  142:13,21,
  24 143:3
  145:20
  146:10
  163:9

164:8
  194:5,21,
  23

Christine
  56:24 57:2
  142:4,14
  143:22
  144:3

chunks  99:6

Circuit
  15:14

circumstances
  160:1

cited  85:22

citizen  48:4

citizens
  105:19

civil  5:14
  15:8 16:1

civilian
  48:4 55:1

claim  77:24

clean  29:22
  42:23 60:8

cleaned
  26:12

clear  70:19

Clemons
  29:21,22
  31:6

clerk  65:11
  66:1,4

clerk's
  65:17,22

clipboard
  137:17

clock  31:17,
  20,21
  32:6,14
  61:21,24
  71:1,7,8
  118:16
  120:9
  140:22

closed  126:7

code  7:19
  60:4,6
  152:24
  153:9,22

collar  60:9

colleagues
  100:23
  101:2

collect
  171:6

collected
  155:1
  160:2

collection
  149:10
  154:21
  159:6
  171:17

collectively
  129:2
  141:21

college
43:10

Collins
170:13

combination
45:13

command
165:3

comment
89:15
91:22,23
92:2,3,19
96:8 132:2
153:19,20
159:1
188:20

comments
114:15

common   65:18

Commonwealth's
93:8

communication
44:20

company
28:20
29:10,11,
12

compatible
175:21

complaining
52:21

complaint
16:15 17:4
19:23

21:6,10
39:1,5,11
57:20 69:9
73:2 77:24
133:13
165:11,16,
17

complaints
57:18

complete
19:7 50:20

completed
66:20

completely
6:12 84:24
93:19
193:14

comply  63:20
64:1,6

computer
86:19,21
97:10
99:8,24
148:3
160:12
192:21

concerned
10:11 12:1
58:13
69:11
73:24
77:7,10
92:19
116:23
130:18

145:7

concluded
195:22

concrete
26:20,24
111:19

conditions
52:2
63:20,24

conduct
152:19,23,
24 153:9,
22 156:6

confession
96:10
170:14

confined
60:15

Conley
108:10

considered
33:17
159:14

consistently
68:21

constitutional
7:18

constructed
104:15

construction
104:19

contact
79:24

88:14
122:4
130:12

contacted
89:14
90:12
108:1,7
122:6,8
123:7

contained
150:1
188:23
189:1

container
51:11,15

continue
177:10

continuous
101:17

contract
29:17
61:13
62:6,9,11,
14 181:15

Contracting
28:8 30:17

control  9:20
25:9 29:21
32:24
33:2,4,8,
16,23
34:2,5,12,
14 35:13
38:22
39:7,13,

17,20,24
40:17,21
41:5,7,10,
17 58:15
73:16 85:6
114:14,16
124:4,21,
23 125:6,
14,20
126:24
127:4
136:7
138:12
139:1

**controversy**
173:16

**conversation**
6:8 23:3
30:22,23
31:11 61:6
75:12 83:2
97:8,20
121:19
162:22
177:1
194:4,20

**conversations**
75:13
132:7

**convicted**
96:10
170:14

**conviction**
172:15

**coons**   49:20

**coordinator**
90:14

**copies**   46:7

**copy**   66:1
101:14
104:9
115:18,19,
142:20
153:16
173:13

**corporate**
10:7,10,18
17:19
33:14
35:18,19

**correct**
47:16
140:4
162:1
175:21
187:6,12,
19

**corrected**
145:1

**correcting**
145:4

**correction**
112:24

**correctional**
112:16

**cosmetic**
117:3

**cost**   140:21

**counsel**   5:11

**counties**
24:2

**counting**
9:19

**County**   7:5,
7, 19:10
22:7,15
24:5,7,9,
18,21,24
25:4,10,
18,21 26:1
28:21,22
29:3 31:22
36:20
38:15,19,
22 40:6
43:17 44:9
50:19
53:16,20,
54:23
55:1,2,9
63:14
69:13
73:10,11,
15 74:14
75:19
76:12,13,
21 80:14,
19 81:11,
12,17,24
82:1 83:6,
7,8,17,20
85:5,9
96:15
102:9
103:10
104:18,23

105:4,20
110:12,15,
21 111:15
112:18
114:10,16
117:1,8
125:11,12,
13 129:23
131:24
140:14
141:3,4,8
142:19
143:7,9
145:10
159:5
162:20
175:1,2
185:15,20
186:6
187:3
193:19
194:21

**couple**   16:17
83:9 89:5
96:23
107:21

**court**   5:18
15:4,10,14
32:9 65:21
68:7 148:5
160:18,19
167:21

**courts**
15:11,13

**cover**   15:19

**covered**

15:15

created 95:1
  148:20
  189:24

creating
  105:1

Creek 96:13

crew 112:22

crews 111:23

crime 14:16,
  18 148:8,
  14 159:6
  161:8

criminal
  74:1

crutches
  11:8

curiosity
  184:24

curious
  118:10
  142:16

Curve 44:17

cut 29:12
  163:20,21
  166:3,4,7,
  18

cutoff 144:3

cutting 99:9

cycles 60:18

---

**D**

---

D-a-p-r-o
  89:19

dad 54:20

Dalton 26:10
  39:24
  47:20 50:9
  51:10,14
  52:18 53:5
  75:1 79:12
  100:22
  124:9
  129:4

Dapro 88:14
  89:7,11,
  14,18
  90:12 91:4

dash 147:23

date 8:18,
  20 15:9
  22:21 96:2
  102:17
  114:10
  144:3
  148:20
  161:23
  168:22
  170:2,5

dated 166:20
  172:23

Dave 28:8
  30:16 31:1
  62:8 70:13
  181:14

183:12

David 72:5,
  12,13
  108:7,10

day 15:14
  29:8,
  30:18,19,
  20 31:8,10
  43:8 62:9
  70:20
  78:10
  93:19
  129:13
  137:11
  161:8
  167:24

days 29:8,
  18 30:20
  31:10
  41:20
  49:16
  62:10 66:6
  70:20

dealings
  108:6

Dear 144:5

December
  38:7 85:21

decide 104:5

decided
  55:23
  61:18
  175:14

decision
  44:22 56:2

57:10,18,
  21 95:18,
  19,20,21
  97:13,16
  126:5,19
  137:8
  166:23
  168:11
  194:19

dedicate
  77:17

dedication
  77:17

deemed 157:4

defective
  66:2

Defendant's
  149:12

defense
  160:18

deficiencies
  68:4 85:22

deficiency
  66:9

definition
  80:9

deleted 89:5
  190:11,12

deletions
  91:20
  92:22

demand 86:9

demanded

86:6

**demonstrated**
67:11

**demote**
166:23

**demoted**
96:4,6
97:18,21,
22 151:21
162:9

**demotion**
97:19,22

**deny** 128:13

**department**
14:11
21:20
39:5,11
53:10,20
71:23
77:21 78:1
79:15
82:6,17
85:21 95:3
98:8 99:11
105:23
106:1
108:15
119:11
120:3
147:5
173:16,24
176:4
188:2

**deponent**
114:7

**deposed**
5:13,14

**deposit**
48:5,9
50:12

**deposition**
15:24
101:21
102:3,4
115:2,3
116:4,5
117:13,14
118:4,
119:5,6
120:20,21
122:18,19
123:20,21
127:16,17
128:5,6,
21,22
131:10,11
132:13,14
134:6,7,
20,21
135:15,
141:16,17
143:16,17
145:16,17
146:5,6
149:17,18
181:7,8
184:2,3
186:13,14
188:9,11,
12 192:10
193:6
195:22

**depositions**
101:17

**deputies**
9:10 84:11
87:14
111:11

**deputy** 8:8,
9,11 11:2,
3 14:14
24:2,4
33:10,18
67:5 87:6,
8 97:1
113:12,13,
17 124:19
125:1,22
126:2
127:7
152:19,21
153:7
157:6,10
159:18
161:5,14
165:4
167:16,18,
20,23
168:7,12
179:2

**deputy's**
96:1 162:9
167:12

**derogatory**
12:5 92:3
96:8
154:1,7,11

**describe**

26:17
34:10

**designated**
60:13

**desired** 94:3
140:18

**detailed**
23:22

**details** 14:8

**determine**
60:9

**determines**
35:24

**deviation**
164:21

**difficulties**
172:10

**difficulty**
139:12

**diffuse**
60:19

**digging**
110:16

**direct**
102:11
111:3
127:5
168:7
185:16

**directed**
63:19,24

**direction**
90:3 95:13

directions
  12:19 34:4

directives
  12:19 34:8

directly
  28:4,21

disagree
  18:8,12,
  18,20,21,
  22 20:18,
  19 21:21,
  24 22:3
  23:13,18
  39:2,16
  51:7,13
  59:12
  60:23
  61:3,4
  62:22
  63:21
  64:2,3
  69:10
  70:6,9,10
  71:20 72:1
  73:5,6
  82:3,9
  85:23
  91:10
  94:24
  95:3,9
  114:10

disappear
  47:17

disappeared
  48:2,9

disappearing

138:22

disappointed
  160:10

disarray
  138:13

disciplinary
  12:22

discontinue
  101:8

discovery
  121:1

discrepancies
  72:14

discrepancy
  72:12

discretionary
  18:11,18
  20:16

discuss
  58:18
  59:17
  60:24 61:9
  69:14
  72:19,21
  82:15 97:4
  103:3
  119:12
  141:5
  156:17
  164:5
  188:22

discussed
  61:10 85:1
  104:17

141:3,4
164:2,6,13
175:2

discussing
  64:20
  102:19

discussion
  23:23 59:2
  62:24 63:4
  64:12 65:1
  69:15,17,
  19,24 70:2
  71:24
  72:18
  73:8,14
  74:4 83:19
  92:9
  94:13,15
  97:7 102:1
  104:7
  113:6
  118:23
  135:20
  136:8
  142:13
  147:9
  157:1
  161:13
  163:2,21
  172:2
  173:23
  174:1
  175:14
  177:13
  188:3
  192:15
  193:2

discussions
  57:5,8
  78:6
  118:14
  119:24
  120:12
  141:8
  144:10
  175:11
  193:21

dispatch
  44:14,15
  58:8
  74:10,
  86:19 87:3
  91:2,14,
  17,18
  105:16
  148:3

dispatched
  170:11

dispatcher
  45:14,15
  96:21
  147:24

dispatchers
  86:22
  87:17
  174:4,19

dispose   81:9

disputed
  37:21

distributed
  99:13

District

15:14
22:20
65:17,21

**disturbed**
47:24 49:1

**ditches**
110:16

**divisions**
14:22

**document**
102:3,12,
18 104:10
114:6
115:1
116:3
117:12,17
118:3
119:4
120:19
122:17
123:19
127:15
128:4,14,
17,20
129:2
131:9
132:12
134:5,19
135:11,14
141:15,21
143:15,20
145:15
146:4
149:16
162:3
169:20
170:2

180:16
181:6,11
183:22
184:1
186:12
188:8
190:19
191:2,3

**documentation**
71:10

**documents**
36:16
98:23 99:7
149:11,13,
24 186:1

**dog** 14:1
21:19
40:15
47:5,6,8
48:5 49:14
50:20
78:16,
133:21
136:19
138:4,18,
24 181:16

**dog's** 180:14

**dogs** 42:23

**domestic**
96:19

**domesticated**
39:21

**donated**
49:24

**door** 47:17,

21 49:2
52:18 56:6
94:5 97:17
117:7
137:24
155:7

**doors** 49:2

**double**
187:13

**doubt** 144:21
180:15

**Doug** 85:3

**Douglas** 82:6

**drafting**
119:12

**drains** 26:24

**drinking**
155:19,20

**drive** 45:13
54:8,16
87:1 90:21

**driving** 53:7
54:18,21,
22 55:7,11

**dropped**
131:1

**drug** 14:1
18:7 47:22

**drugs** 14:1

**dry** 60:8

**Dublin**
110:24

**due** 27:8
63:14

**dump** 49:18

**dumpster**
49:22

**Dunn** 8:6,19
9:22
10:12,14,
15 11:16
13:14,18
15:20
17:14,22
19:2 20:1,
13 22:6,14
33:15,20,
21 34:3,7
54:4 59:15
66:8 67:11
68:3,24
72:8,19
73:9 74:5
81:1 83:22
84:5,8
85:16
92:5,10
93:12,14
94:2,9,14
96:3 97:4,
18,21
98:1,4,19
100:12
109:22
113:7
146:16,20
149:2
150:11
151:16,20

153:21
154:4
158:6
160:1
161:11
162:10,22
163:14,17,
22 164:14,
21,22
165:15
166:1,23
168:4
170:9,16,
17 171:5,9
172:3,16
173:23
174:10,24
175:3,11,
16,23
176:4
177:11,18
178:20
179:9
180:6
188:17
189:2
190:11
193:23
194:6,11,
16,19,22
195:5

**Dunn's**  65:5
66:11
68:14
113:7
150:1
162:4
165:8

172:6
188:11
192:9
193:6

**duplicate**
169:14,16

**duties**  13:15
14:14
17:7,22
18:2,6
24:4
53:11,12
87:6 106:3
110:15
148:18
159:5,8
160:3

**duty**  19:19
167:12

———————

**E**

———————

**earlier**  5:11
15:23,24
19:13
36:21
56:8,11
65:24
138:19
139:22
140:17,20
159:22,23
165:10,15
167:6
178:19
192:9
193:11

**early**  51:10,
72:13 91:4

**edit**  88:20
160:21

**edited**
148:24

**educate**
109:14

**effect**  38:9

**effort**  60:8,
10

**Eggleston**
162:10

**elected**  7:12
23:14
25:13,16
113:1,8,16

**election**
177:8

**electronic**
100:4
147:17

**email**  85:12
115:21
128:9,14
129:3,6,7,
22 131:14,
15 132:21
133:5
134:2,11,
24 135:23
136:17
141:22,23
142:3,7,

17,18,20
144:3,4,8,
11,15,17,
22,23
145:4,20
146:9,23
176:8,16,
17

**emailed**
115:19,20

**emails**  79:23
129:8,9
142:5

**embankment**
49:19

**embezzlement**
166:2,17

**employ**  111:9
125:16
127:4

**employed**  7:4
32:2,5
113:2

**employee**
20:17 21:5
29:16,17
30:7,8,12
34:13
35:11
45:8,15
99:14
155:9
156:3
157:4
175:1

181:15

**employees**
21:20
39:7,13
54:2,10
71:22
73:11
87:15,19
88:16
105:20

**employees'**
21:23

**employing**
125:19

**employment**
8:10 17:4
22:10
31:13 36:3
65:5 68:14
86:6 101:8

**enabling**
60:7

**end**  22:19
92:18
101:15
145:1,6
160:16
191:19

**ended**  172:14

**enforcement**
13:15
18:12,20
34:1 81:22
82:8
105:19

112:6,14
148:10
154:15,20
171:5

**enjoy**  67:11

**ensure**  103:7

**entered**  88:5
92:7 102:4
114:22
115:2
116:4
117:13
118:4
119:5
120:20
122:18
123:20
127:16
128:5,17,
21 131:10
132:13
134:6,20
135:15
145:16
146:5
149:17
156:21
181:7
184:2
186:13
189:8
193:6

**entering**
96:12
153:19

**enters**  190:7

**entire**
164:20

**entity**  40:5

**entry**  88:6,
9,20 97:5
152:20
188:16

**equipment**
46:21,22
47:3 48:10
56:3, 58:5
66:2 80:8
107:24
140:15

**Eric**  14:24
170:23

**error**  192:22

**ESQ**  5:6

**essentially**
16:6 19:14
153:18

**euthanization**
130:24

**euthanize**
47:22

**euthanized**
27:6,15

**evaluation**
68:16
69:2,5

**evening**
94:18
103:19,24

**event**  93:13
176:23

**events**
161:14

**everybody's**
167:12

**everyone's**
99:7

**evidence**
93:10,15
94:1,4,15
154:21
155:2,5
159:6,9,10
160:2
161:11
171:6,8

**evident**
177:15

**exact**  8:20
10:13 96:2
183:3

**EXAMINATION**
5:6

**examples**
66:24
67:10

**excellent**
179:2,3

**exchange**
79:23

**excuse**  11:15
28:19 29:5
44:2 65:1

98:14
115:13
131:14
188:11

**executed**
157:6

**exercised**
32:22
35:12

**exhibit** 65:6
101:15,18
102:4,7
104:4
114:22
115:2
116:1,4
117:10,13
118:1,4
119:5,18
120:20
122:15,18,
22 123:17,
20 127:16
128:1,5,
18,21
129:2
131:7,
132:10,13
134:2,6,
16,20
135:11,15
141:13,16,
21 143:13,
16 145:13,
16 146:2,5
149:10,14,
17 181:4,7

183:23
184:2
186:10,13
189:8,16,
17,20
191:15
193:5

**Exhibits**
101:17,21

**existed**
27:17
126:18

**exists** 124:5

**expectations**
69:1

**expensive**
140:22

**exposed**
63:14

**expressed**
57:16

**exterior**
48:23,24

**extra** 93:15
124:24

**eye** 32:19
35:2

**eyes** 84:8

_____

**F**
_____

**F'ing** 98:8

**face** 69:19
136:13

**Facebook**
155:23

**facility**
60:20
140:7

**fact** 17:16
154:10
158:6
192:15

**factor**
109:23

**facts**
154:10,15
189:1

**fair** 24:8
31:12,13
59:20
148:11
154:9
179:7
185:17

**Falls** 11:2,
10,11
84:15
95:14,15
97:14,15,
16,17
113:21
162:1
164:14,21
165:7

**falsified**
71:23

**familiar**
24:17

**fantasy** 92:1
93:13
153:21
154:2
157:16,19
158:5
188:20,24

**father** 40:4
55:17

**February** 8:4
126:9
131:16

**fed** 26:12
129:14
137:18

**feed** 42:23
47:4,10
52:8,9,14
54:20
55:9,22

**feeding**
52:16
137:11

**feel** 151:18

**fees** 184:8

**felon** 96:10
170:15

**felt** 156:6
179:8

**female** 79:17

**field** 21:2
22:3 84:11
125:21
127:7

| | | | |
|---|---|---|---|
| **fieldman** 33:18 | **finishing** 172:14 | **floor** 26:20 60:7 | 109:9 |
| **Fields** 72:5, 13 108:7 | **fire** 13:2,5 86:7,14 105:23 | **floors** 64:9 | **form** 55:5,6 |
| **figured** 49:21 | **firearm** 96:10 106:14,16, 23 189:24 | **Florida** 41:22 | **formal** 20:23 |
| **file** 33:19 35:20 36:13 74:5 150:1 151:23 152:2,3 156:14 162:5 | **firearms** 106:10 107:6 | **FOIA** 146:14,16, 19 | **formally** 40:6 |
| **filed** 16:15 77:24 91:3 146:14,16, 19 | **fireman** 106:3 | **follow** 103:7 | **forward** 23:24 |
| **files** 91:5 | **firing** 193:22 | **food** 49:14, 21,24 51:11,14, 21 52:2 53:3 65:2 133:18,21 136:6,18 137:7,24 | **found** 49:19, 20 93:15, 21 110:4 155:9 |
| **fill** 42:11 | **fit** 81:10, 20 | | **fourth** 136:2 |
| **find** 47:15, 16 72:12, 14 152:21 | **fix** 19:24 | **football** 92:1 93:13 153:21 154:2 157:16,20 158:5 188:20,24 | **France** 42:8 |
| **fine** 43:6 61:21 65:24 66:6 117:5 | **fixed** 19:1,3 20:8 64:11 116:22 117:1 | | **Frank** 40:24 52:12 74:24 124:17 |
| **finish** 111:19 | **flared** 96:21 | **footprint** 94:3 155:6 | **free** 195:17 |
| **finished** 6:13 19:2 102:14 152:16 185:18 | **fleet** 18:11, 19 20:10 | **forensic** 159:18 | **Freedom** 100:15 |
| | **flesh** 34:6, 11 | **forensics** 159:9,10 | **frequency** 44:1 |
| | **flip** 144:2 | **forget** 109:13 175:21 | **frequently** 24:9 41:16 |
| | **flipped** 6:5 | | **Friday** 47:9 65:19 |
| | **flipping** 152:17 | **forgetting** | **friends** 100:22,24 |
| | | | **front** 114:7 117:18 |
| | | | **Fuck** 65:2 |
| | | | **full-time** |

33:4 39:6,
12 41:5
124:4,8,9,
13,21,23
125:5,14,
19 126:1,
23 127:4

fun   11:9

function
  193:17

functions
  27:1

Fund   182:8

funding
  124:3
  125:5,8
  126:13

funds   27:24
  38:17,18,
  21 39:6,12
  69:13
  72:19
  124:20,22,
  24 166:2,
  17

furtherance
  145:4

_____

G

G.a.r   59:21

G.A.R.   60:3

game   157:16

garage   18:24
  19:10

80:14
83:15,17
84:16
193:19

Gautier   10:4
  15:16,20
  54:5
  151:15
  180:5

gave   23:20
  52:18
  89:21
  96:22
  97:21
  108:11
  121:12
  157:3
  186:1
  189:15

GCAR   140:8
  141:5,8

general
  15:14
  26:11
  65:17,20
  152:19,22
  153:8
  155:10
  156:11
  157:5,7
  162:19
  165:24
  166:15

General's
  162:23

generated

147:24

gentlemen
  164:17

get along
  74:21

gibberish
  11:16

gift   106:6

Giles   7:5,6,
  9:10 22:7,
  15 24:5,7,
  9,18,20
  25:1,4,10,
  18,21 26:1
  40:5,6
  43:17
  50:19
  54:22,24
  55:2 56:20
  59:6,21
  102:8
  110:12
  112:18
  129:23
  131:24
  133:10
  140:14
  142:19
  143:9
  159:5
  162:19
  174:24
  175:1

give   12:18
  17:17
  28:11,12,

14 34:3,7,
19 45:10,
14 48:8
50:14
59:19
66:8,24
67:10
81:19 83:5
97:1
105:24
106:1
108:8
114:3
136:5
137:7,12
155:13,17
186:3
189:16

giving   46:20

Glock   106:17
  107:10,12

god   139:24

goggles
  107:18,22
  108:3,9

good   5:10
  11:8 32:19
  34:11
  74:15,16
  75:4
  105:16
  179:14
  185:12

Gough   40:24
  52:12
  74:24

124:16,17

**governed**
117:6

**grand** 172:15

**grant** 108:21
109:19

**greatly**
69:11

**Greenbrier**
28:7,20
30:17
37:2,22
100:7
181:15

**grievance**
20:23

**grievances**
20:17,21

**groceries**
55:12

**group** 40:12

**guarantee**
138:2,3

**guaranteed**
30:9

**guard** 110:15

**guess** 28:2,
18 29:14
34:11
64:17
101:10
109:16
112:22

124:16,17
121:16
127:2,6,24
129:5
136:22
137:1,19
152:7
170:6
177:10
182:11
184:21

**guidance**
21:11

**guilty**
163:18
166:17

**gun** 106:20
107:2,10
170:14

**guts** 98:8

**guy** 108:1
124:15

**GUYNN** 30:24
32:17
37:15
101:20
104:4
132:16
141:2
151:6
153:3
154:22
156:21
184:19,
185:24
186:8
187:6,9,12

193:24
195:14,19

**guys** 19:6,
23

---
**H**
---

**Hahnlen**
161:5,14

**half** 86:8

**hand** 104:10
140:8

**handed**
143:13

**handle** 13:14
34:1

**handled** 34:2

**hands** 104:10

**hanging**
43:10

**hangout**
43:10

**happened**
21:7 82:20
92:14
106:22
112:1,3
138:19
151:20
155:22
173:5
194:8

**happy** 21:15

**hard** 66:20

87:1 90:21
153:16
170:24

**hates** 98:8

**hats** 17:7

**haul** 54:20
55:21

**hauling** 55:8

**head** 99:9

**headed** 18:7

**health** 27:8
41:11,12
42:1

**hear** 163:5

**heard** 42:7
139:11
163:24

**Herbert**
56:24
129:10
142:22
143:1

**hey** 93:3
185:11

**hierarchy**
35:18

**higher** 29:10

**highlighted**
14:19 60:3
63:5

**highway**
65:15

hire  174:3,
  18

hired  30:2
  39:22
  101:4

hiring  39:6,
  12

history
  178:14

hit  16:5

hmm-hmm
  5:19,21
  9:23 46:17
  130:1,4
  131:2
  140:10,11
  146:21
  171:1,21
  176:12
  192:8

Hobbs  103:5
  163:9
  164:6
  195:4

hold  59:18
  91:7
  195:16

holding
  114:6
  185:7

Hollie  43:22
  52:12 53:5
  74:24
  144:14

home  162:12
  177:7

Hooker  5:3

hope
  104:20,21
  142:11

hour  29:7
  31:9 96:23
  183:12,13

hourly
  29:11,16
  30:7,12

hours  29:8,
  17 30:8,
  10,18,19,
  20 31:8,9,
  10,14 37:9
  60:12,16
  61:12,18
  62:9 69:12
  70:8,16,20
  73:1 96:24
  117:6
  118:21
  123:11
  182:23
  183:3

house  162:9,
  10 165:2

housing
  60:17
  64:10

huh-huh  6:3
  181:19

human  6:7

Hunt  28:8
  29:18
  30:16,24
  31:1 62:8
  101:13
  123:5
  181:14
  183:12

Hutchinson
  10:5 15:3,
  21,22

_____

**I**

IBR  147:14,
  20 148:4,
  9,13,17,
  19,24
  149:1
  189:14,24
  192:18

icing  58:5

icon  100:2

idea  42:24
  130:15
  131:1
  176:6
  182:9
  192:19

identified
  5:10

identify
  60:10

ignore
  143:24

ill  60:14,
  15

illegality
  63:15

illustrated
  27:21

image  92:20
  145:8,9

imagine
  35:14

imaging
  108:14
  109:3

immediately
  13:19

impacting
  116:24

implement
  44:5 68:15

implicated
  73:24

important
  154:3,5

improperly
  49:10

improve
  63:20,24

inappropriate
  88:10
  91:22
  92:2,15

incident
  106:13

131:23
147:16,21,
23 163:6
175:10

**included**
164:13

**including**
194:20

**incoming**
60:13

**incorporated**
188:1

**incorporates**
188:20

**increase**
44:1

**indicating**
59:6,22
73:23 94:9
95:1
115:10
136:14,17
160:1
182:2
190:5

**indication**
190:10

**individual**
20:12 26:4
50:22 54:3
65:23 74:5
78:15 92:4
93:12,14
99:19,21
190:7

**individualized**
87:19 88:1

**individuals**
129:8
142:23

**information**
59:20
90:16,20
91:5,6,9
92:7,10
100:16
107:11
137:6
151:9
162:23
168:16
191:2,5,6

**informed**
91:6

**inherited**
26:4

**initially**
107:3

**inmate**  110:8

**inmates**
110:13,20
111:4,22
112:6

**inputs**  90:17

**inquire**  82:7

**inquiries**
130:8

**inside**
26:13,18
49:2 69:23

**inspect**  84:2

**inspection**
115:17
116:11

**inspections**
61:15

**inspector**
64:8 71:13

**instance**
72:21 81:1
111:4
182:8

**instigated**
76:15

**instruct**
121:24

**instructions**
88:19
89:21,24

**insurance**
183:20

**intended**
50:4 84:22
95:1

**intention**
194:22

**interact**
24:8

**interdiction**
13:21,22

18:7

**interested**
17:3 22:19

**interfere**
24:4

**intersection**
44:16

**intoxicated**
156:1,5

**investigate**
162:19,
165:24
166:15

**investigated**
14:17
192:1

**investigating**
16:8 78:7

**investigation**
96:9 149:3
154:16,18

**investigations**
15:1

**investigator**
15:17
77:20,21
79:14 89:1
91:24
93:18
155:1
167:21

**investigator's**
95:2

investigators
 96:14,19
 153:20
 154:1

invoice  28:7
 37:8,22

invoices
 28:19
 37:1,2
 38:14
 100:7
 182:16,19,
 22 183:7

involved
 155:24
 157:11
 160:15

involving
 77:3

isolation
 60:13

issue  52:22
 65:14
 67:17
 76:22 84:7
 85:16
 100:5
 109:22
 120:12
 129:9
 132:7
 136:4
 137:15,16,
 23 145:1,
 158:4
 172:3,10

175:5
176:8
178:5,19
179:12,16

issued  66:1
 85:22
 135:4

issues  34:2
 41:11,12
 42:1 46:15
 56:12
 59:18,19
 61:1 63:5
 64:14 65:7
 66:11 67:6
 68:8 69:14
 72:24 75:9
 102:19
 103:3
 106:9
 114:1
 116:24
 133:14
 136:9
 156:17
 163:22
 178:7
 187:21

issuing
 134:13

item  81:7

items  49:10
 140:7,9

————————
J
————————

Jackie
 173:8,
 176:9
 177:2,6

jail  110:24
 112:6,21,
 23

jailers
 110:23
 111:6,9

January  7:11
 38:4
 129:24

Jay  71:5,7
 194:10,13,
 14 195:1,
 12

Jeff  33:5
 34:7 75:1
 124:10

Jim  6:21,24

Jimmy  62:3

Jo  142:21

job  18:6
 20:2,3
 101:5
 112:11
 121:22
 154:14
 155:19,20
 159:19
 171:3

179:13,14
187:20

Joe  10:19
 90:7
 113:15

John  62:2
 170:13

join  70:2

Journell
 173:23
 175:17
 177:4

July  69:13,
 16 70:24
 143:9
 172:23
 173:7
 179:16

jump  149:7

jumping
 179:15

jury  15:9
 172:15

————————
K
————————

K-9  17:6,
 10,11,16

Kelly  147:2
 182:13

kennels
 26:19,
 29:23

Kenwood

174:16

**key** 44:14,
22 45:5,
18,19
48:16 53:3
58:7
74:10,19
138:5

**keys** 45:21
46:1,4,7,
12 53:3
54:8

**Kidd**
142:21,24

**kids** 43:11

**killing**
177:9

**kind** 17:22
20:9 25:17
34:6 35:10
46:14,20
106:16

**knew** 48:19
70:7 71:22

**knowledge**
43:18
58:13
114:9
185:8
192:17

**Kroger** 55:12

――――――――
**L**
――――――――

**labeled**

129:2
149:11
150:15,21
151:14
167:5
168:21
183:22
188:8
189:7

**lack** 10:7
35:18,19

**ladder** 10:7,
10,18,24
11:10,13
17:19 21:4
33:14
35:19

**lady** 61:15

**Lake** 44:17

**language**
65:1 166:6

**larceny** 96:9

**late** 67:18
72:14

**lateral**
10:13

**law** 13:15
18:12,19
34:1 81:22
82:8
105:19
112:6,14
148:10
154:15,20
171:5

**lawnmower**
108:4

**laws** 59:7,
22 63:21
64:1,7

**lawsuit**
16:2,3,13
75:24 77:3

**laying**
110:16

**leads** 40:15
47:5,6,8
138:18,24

**learned**
22:14

**leave** 21:24
80:4
137:10
195:18

**leaving** 58:5

**Lebanon**
170:12

**led** 56:2,13

**left** 61:17
71:9
106:19
107:2
118:20
124:24
125:2,18
162:10

**leftover**
126:13

**legal** 63:14
157:12

**length**
192:10

**letter** 21:18
31:4
56:18,19
59:6,22
80:5
114:22
115:6,14
117:20
118:8,14,
23 119:10,
13,21
120:10
121:1,5,11
122:1
123:3,6,9,
13,14,24
126:18
127:20,21,
22 128:1
150:5,10,
14 151:13
164:14
167:2
168:15,20
169:10,21
170:8
173:14
175:12
178:23
180:5
191:1

**letters**
192:12

liability
  74:1 77:8,
  10

license
  109:6,10,
  15,16

licensing
  61:15

lie  158:5

lieutenant
  8:17 9:22
  10:4,5,11
  11:16
  12:18,21
  13:1,8,16
  14:2,12,
  13,20,24
  15:3,16
  17:6
  21:13,14,
  15 22:22
  33:7,15,21
  34:7 54:4
  95:22
  109:3
  168:4
  174:24
  175:3
  180:5

lieutenants
  9:24 10:12
  11:14,20
  12:14
  13:12,13
  14:21 20:4

lift  94:4

light  60:19

lights  60:18

liking  68:9

Lilly  93:8

limit  157:12

Line-owens
  144:4

lined  149:8

lines  89:5
  158:19
  167:12
  173:20

Link-owens
  57:2 130:8
  142:4,8,14
  144:17

Lisa  5:3

list  17:22
  18:6

local  144:5

located
  108:21
  152:22

location
  93:16
  96:22

lock  45:12,
  23 48:14,
  17 52:2,8,
  18 95:8,11
  97:14,17

locked
  51:11,14

87:1
136:5,7,18
137:8,10
138:7
139:19,20
140:2

locker  138:5

locking
  137:23

locks  49:1
  56:18
  64:10 95:2

log  86:22
  87:20 88:2
  100:1

long  7:9
  24:4 65:20
  103:10,12
  113:4
  142:3
  192:11

longer  61:18
  95:22
  106:6
  172:16
  179:8

looked  19:21
  34:20 35:7
  108:4
  162:16

lose  47:6,7

loss  105:1

lost  107:20

lot  23:8

40:10
73:15,21
80:24
96:21
131:3
136:12
195:10

lowest  12:6,
  9,10

Lowry  133:8
  135:1
  136:14,15,
  17 142:21

lucky  47:22
  48:1

lunch  147:8,
  11

---

**M**

M.c  191:1

mad  84:20
  160:8

made  15:8,
  9,10 19:23
  44:10,22
  46:1,6
  48:5 49:9
  52:1,4
  53:6 57:20
  60:9,10
  70:19
  92:22
  95:18,19,
  20,21
  97:18

126:19
132:4
148:21
188:17

**mailed**  59:21

**main**  60:16

**maintained**
21:23
36:17
147:6

**maintenance**
18:11,19
19:7

**major**  35:16
97:14
161:24

**majority**
32:5,13

**make**  15:15
44:9 48:21
75:7 76:10
97:2 126:5
130:23
138:11
145:24
160:8
168:10
190:13

**makes**  175:16

**making**  46:4
57:10,18
152:20

**man**  16:4
185:11

**manage**  25:21
72:20

**managed**  27:5
63:8
186:23

**management**
25:10 63:7
75:20

**manages**
25:24

**managing**
42:19
187:17

**mandate**
56:16

**manned**  117:8

**manual**  27:21
99:10
100:1
153:10,11
187:18

**March**  8:5
135:1
178:15,17
179:3,11

**Marilyn**
43:22
52:12 53:5
74:23
144:14

**mark**  71:8,9
72:7,14
88:24
119:1

127:12
134:2
149:10

**marked**  60:13
101:20
102:3
115:1
116:3
117:12
118:3
119:4
120:19
122:14,
123:17,19
127:15
128:4,20
131:7,9
132:12,16
134:5,19
135:11,14
141:15,21
145:15
146:4
149:16
181:4,6
184:1
186:12

**marking**
72:15

**Martin**
173:8,
176:9
177:2,14,
18

**Mason**  157:17
158:15
159:4,14,

19 160:3,6
161:11
191:7

**mat**  47:11

**matter**  7:22
16:1

**matters**
188:23

**mayor**  82:19
83:1

**Mccroskey**
62:3 147:2
182:13

**Mckarney**
145:21
146:10

**Mcklarney**
62:1 74:14
75:13 76:6
79:7 80:3
83:13,20
85:14
114:13
115:21
116:18
119:24
120:12
125:3
128:10
129:4
131:16
132:21
133:6
141:23
142:13

146:19
163:10
164:8
188:6
194:5,21,
23

Meaning
187:11

means 80:11
187:12

meant 189:16

medication
139:4

meeting
58:20
64:18
69:15 70:6
71:21
75:8,17
78:9,12
79:3 92:1
102:8,19
126:7,18
129:14
153:21
154:2
157:20
158:6,
162:18
165:23

meetings
24:12,15
81:2

Melvin 39:24
40:17

47:20 50:9
52:6 53:5
75:1
100:22
124:8

member 22:7,
9 63:19,23
116:15
119:12
131:23
140:14
163:3
164:2
174:15,24
175:4,18
194:20

members 62:2
75:14
105:23
114:13
118:14
193:22

memorializing
166:22

memory
108:20
132:6

mentioned
10:13
15:24 62:6
87:19
139:22
141:11
168:22
172:11
178:19

met 57:3
69:13
79:18
83:22 84:1

metal 26:20

Metro's
109:4

middle
142:18
181:21

Mike 11:2
84:15
95:14,
97:15,16,
17 113:21,
22 162:16
164:21
165:7

military
107:24
108:12

Millirons
5:1,9,10
23:17
101:21
115:6
129:23
146:10

Mills 62:2

mind 66:13
98:3
105:1,6
148:7
157:10
162:21

mine 108:11

minimum
60:16

minute
119:14
122:12
135:8
153:3
169:19
180:21

minutes 81:2
114:8
149:7

mis-typing
6:4

misappropriati
ng 166:2

misappropriati
on 166:17

mismanagement
63:13

missed
161:11

missing
40:15
46:21,22
47:5,11
106:10,15
107:17,20,
23 108:16
110:7
139:4

misspoke
188:12

misunderstanding 6:4

miswording
6:4

moment
150:14
172:24

Monday 47:10
135:1

money 35:24
48:2,3,9
50:4,14
73:9,16
114:4
121:7,17,
20,23
122:10
125:14,18
126:2
127:3

month 38:4
42:14

monthly
28:12,13

months
28:14,15
41:23
42:3,
103:14,15

Morgan 5:1,9
30:18
129:23
146:10
162:15
165:19

166:12
177:9

morning
47:10
65:17
103:19
104:1
133:5
173:6
176:17

Motorola
174:16

Mountain
44:17

mouth 162:14

move 5:23
23:24
150:13
163:18
167:1
169:18

moving 99:7,
9

mowing
110:16

multi-page
141:20

multiple
17:7 45:21
82:16

_____

**N**
_____

names 87:19
88:1

narcotics
15:16

narrative
96:18
189:1,23
190:8,11,
22 191:9
192:11

Narratives
190:4

natural
60:19

needed
14:10,12
15:17
18:23
20:11 30:1
33:23
34:17,20,
24 50:18
53:24
64:6,9,10
72:16 87:4
93:14
96:15
116:21
159:15

negative
145:6
187:13

neutered
48:7 50:13

Newport 28:8

newspaper
143:9

144:5

nice 6:8
101:23

night 65:19
107:18,22
108:3,9
109:2

no's 6:1

nonexhaustive
18:6

nonsense
35:23

normal 6:7

note 89:17
151:14
178:22

notice 66:8
68:4

notified
177:2,4

notify 60:10

nourishment
138:4,6

November
146:10,23

number 5:20
15:4 16:18
43:12 59:7
85:22
98:24 99:4
101:19
102:4,7
104:4

114:23
115:2
116:1,4
117:10,13
118:1,4
119:2,5,18
120:20
122:18
123:17,20
127:16
128:2,5,
18,21
129:3
131:7,
132:10,13
134:2,6,
16,20
135:11,15
141:13,16,
22 143:13,
16 145:13,
16 146:2,5
147:22,23
149:10,14,
17 150:21,
22 162:8
163:18
166:20
169:2,18,
21 172:23
181:4,7
183:23
184:2
186:4,10,
13 189:8,
16,17,21
190:22
191:15

193:5

**numbers**  85:9
185:4,11
191:1

**numerous**
21:19 63:5

─────────
O
─────────

**Oath**  156:18

**object**
154:22

**obtain**
171:17

**occasionally**
14:4

**occupied**
71:11
103:23
118:18

**occur**  82:9
105:2
154:16

**occurred**
44:3 73:2
152:6
159:13

**October**  8:23
9:7 10:24
11:14,19
13:5,9,13
14:23
17:11 21:9
33:2,6,14
45:3 98:20

102:18,19
161:23

**office**  7:5
8:19 9:3,
10 10:1,8,
11 13:5,6
17:5 19:13
20:23 21:6
22:10 24:5
25:9,17,20
27:5,11,20
28:4,21,23
29:4 31:20
32:22
35:12
36:13,17
40:16 41:3
43:19
44:5,18,21
45:6,9,16
47:18,20
48:4,6,8,
12,14 50:2
53:11,12
54:2,10,
15,23 56:6
57:18 58:6
62:15
65:6,16,
18,22
68:14,15
69:21,23
72:20
73:10 74:1
80:8 82:9
85:10
86:23
87:3,15

89:4,12
90:22
91:2,10,
15,16,19
92:20
95:2,9
96:1 98:20
99:14
100:16
101:4
104:15,24
105:5,10
106:6,10
107:3,5,19
108:2,7,18
110:19
111:2,5,6,
8 112:19
125:14,
126:15
136:7
138:12
139:2,19,
20 145:8,9
147:6,19
153:17,22
155:10
159:5
160:18
162:20,24
163:17,21
165:4
166:1,2,4,
8, 167:16
175:2
182:5
184:17,22
186:23

187:17
193:9

**officer**   7:19
16:8  17:6,
17  19:18
29:21
32:24
33:4,8,16
34:13,14
35:13
38:22
40:1,17,21
17  87:2,3,
4  90:16
106:20
108:1,10
109:14
112:16,
126:24
147:21
154:14
159:17
174:10
189:2
190:24

**officer's**
136:7
138:12
139:2

**officers**
9:20
17:10,11
33:2
39:17,20
58:15  73:2
124:4,22,

23  125:6,
15,20
127:4

**official**
104:10
154:15
171:5

**officials**
105:20
148:10
154:20

**oil**   177:23

**okayed**   42:14

**older**   105:13

**opened**   56:6

**operate**   55:2
60:17

**operated**
27:22

**operating**
74:2
186:24
187:18

**operations**
22:3
153:10

**opportunity**
16:13

**order**   34:4
67:8
138:24
149:9
152:19,22
153:8

155:10,15
156:11,22
157:5,7
169:3,5

**ordered**
162:11

**orders**   15:7

**organization**
56:22

**outline**
99:3,6

**overcrowding**
27:9

**oversaw**
31:20

**overseeing**
50:2

**oversees**
110:19

**oversight**
18:10,18
20:10,16
26:5

**overtime**
14:6

**Owens**   56:24

**owned**   24:24
28:8

**owner**   30:16
60:11
93:23
94:11,15

**owners**   50:5

**owns**   53:14

_____

**P**
_____

**p.m.**   133:1
195:22

**pages**   150:15

**paid**   29:3,6
30:8,20
31:9  36:1
37:16,19
38:18  62:9
66:3  67:9
69:12
70:8,20
104:23
105:4

**paint**   110:17

**painted**
26:20

**pair**   107:22

**pans**   47:10
138:18
139:1

**paper**   137:17

**papers**   15:8,
9  47:21
138:13

**paperwork**
48:7,10
50:12,21
67:19,23
107:6,9

**paragraph**
17:3,22

18:5
21:18,23
23:12,13,
15 38:24
39:4 51:6
59:11,20
61:2
62:22,24
69:9 71:21
72:23 82:3
85:20 86:5
94:23
102:13,15,
20 136:2
163:16
174:23

**paragraphs**
16:18
143:21

**paraphrasing**
167:13

**Pardon**  31:3

**parking**  23:8

**part**  13:20
20:1,3
51:6 53:11
66:21
76:3,22
91:18,19
94:23
143:21
149:2
170:24

**part-time**
40:17,20
41:7,10,

16,17
124:15

**participate**
40:14

**party**  155:23

**pass**  169:18

**passwords**
87:20 88:2

**past**  99:7

**patrol**  13:20
53:7 84:13

**patrols**
29:24

**pause**  137:7

**pawn**  171:8,
12

**pay**  27:24
28:4,16,18
37:5,11
38:21
50:11
65:23
73:10
114:1,3
183:11

**payment**
181:15,17

**pays**  110:21

**Pearisburg**
19:11
173:10,16,
24 176:3

**peers**  10:13

**Pembroke**
78:15
82:6,16
84:2
170:12

**pencil**
137:17

**people**  9:3
15:15
19:14 43:1
58:14
66:17 67:1
74:16,20,
21 75:4
96:13
103:24
136:12
194:24

**perfectly**
5:21

**perform**
12:19
14:13
42:20
110:15
168:7

**performance**
65:7 66:9,
12 67:17
68:16 69:2

**performed**
43:18 69:1
111:2,3,22

**performing**
110:20

**period**  41:2,
12 42:18
47:8 61:17
130:7

**periodically**
110:13

**Perkins**
26:10 28:4
29:6,16
30:7
31:14,23
32:13,23
34:15
35:13,24
36:12 37:9
38:18
39:23 40:3
41:4 44:12
49:6,9
51:10,13,
20 53:7
54:15,18,
21 55:1,14
58:16 62:7
69:11 70:7
79:10
86:7,9
100:6
101:4
113:24
121:3,20,
24 122:9
145:21
147:7
181:18

**Perkins'**
27:24

36:3,22
73:1

**permission**
23:17,20
93:9
127:11

**person**   6:10
13:6 21:16
26:3 74:17
77:11
127:7
156:1,10,
13,16
176:21,22
185:12,21

**person's**
129:19

**personal**
54:11 92:9

**personally**
78:17

**personnel**
36:12
150:1
151:23
152:2,3
156:14,17,
19 162:4

**perspective**
116:24
158:7
175:23

**pertinent**
39:4,10
63:21 64:1

**pet**  50:4,11
60:8

**phone**  23:9,
10 79:21
139:15
140:2
161:24
176:21

**photograph**
93:19

**photographs**
133:24
155:2
187:23

**photos**   188:3

**physically**
38:14
88:13
90:21
139:6

**pick**  29:23
39:21
42:12 45:7
65:21

**picked**
113:22

**picking**
50:10

**pictures**
26:16

**piece**  137:17

**pissed**
162:18
166:14

**pistol**
106:17

**place**  27:13
33:20 71:1
97:16
103:6
151:23
162:4
186:19
187:10,18

**plaguing**
59:18 61:1
63:5 69:14

**Plaintiff**
5:12 7:22,
24 17:5
18:7 23:16
59:14
60:24 61:7
63:4,6,12,
19,23
64:13,24
69:11,13,
16 71:22
73:23
95:21
118:23

**Plaintiff's**
16:14 17:6
95:8
149:12

**plans**  158:23

**plate**  109:6,
10,15

**plates**

109:16

**point**  25:9
55:23 59:7
87:4 96:3
110:2
138:23
151:18
153:6
179:7
183:12

**poison**
129:15

**police**  82:6,
16 108:24
109:3,14
113:3
154:14
173:10,16,
24 176:3

**policies**
81:6

**policy**  12:23
21:10
27:13,17,
21 36:5
44:9
54:13,17
55:1
81:16,18
99:10
100:1
164:21,22,
23 173:22
174:5

**portable**
105:9

position
  7:12  11:17
  12:6  124:5
  126:1
  155:5
  185:3

positions
  11:22
  163:20
  166:4,7,18

positive
  76:20

possess
  21:19  91:7

possessed
  18:10,14,
  18  20:16
  91:9

possesses
  13:4

possession
  107:3,7,
  13,19
  108:15

possibility
  82:7

possibly
  53:5
  113:12

possums
  49:20

posted  156:6

Poteet  82:24

pound  181:16

practice
  65:18
  160:20

practices
  63:15

preceding
  32:9

preliminary
  104:24
  105:5

presence
  94:10

present
  24:11,14
  81:16  83:6
  102:23
  108:6
  161:7

presented
  37:7,8
  120:13
  142:3
  187:22

preserve
  94:4

pretty  14:17
  82:11  91:1
  179:14

prevent
  56:15
  57:10,19,
  21  58:19

prevented

130:20

preventing
  57:9

previous
  23:15
  59:20
  168:21
  191:9

previously
  88:5  188:8
  189:7

primarily
  17:5

print  182:18

prior  9:21
  13:19
  23:14  57:9
  113:1
  130:8
  171:17
  187:3
  194:18

priority
  15:4

private
  105:19
  106:7

problem  21:3
  32:18  64:7
  72:17
  140:21

problems
  40:13
  46:15,20

77:12

procedure
  20:24
  50:19
  99:10
  104:9
  160:20
  171:17
  186:24
  187:18

procedures
  114:14
  153:11
  187:3,10

proceed
  11:10

proceeding
  10:23

process  15:8
  20:23
  37:18
  93:19

procure
  154:19

produced
  169:5
  184:10,15

product  68:4

Production
  149:12

profanity
  85:18

professional
  5:2  100:22

101:2
106:3

**program**
13:21 18:7
86:21
110:8,11

**progress**
5:24

**promoted**
8:14,15
11:16

**promotion**
8:12

**proof** 93:24
118:17

**proper**
171:16

**property**
81:10
162:11
171:8,18

**prosecuting**
172:11

**prosecution**
90:18
148:14

**prosecutor's**
160:17

**Protective**
156:22

**prove** 108:5

**provide** 27:2
60:18

114:15
136:18
138:6

**provided**
53:19 60:7
75:22
123:14
148:9
149:3

**providing**
58:14

**prune** 110:17

**public** 60:11
111:4

**publication**
143:9

**publicity**
145:6

**Pulaski**
75:24
76:21 77:1

**pull** 99:24

**punch** 31:23

**puppy** 136:5

**purchase**
141:9
174:20

**purchased**
105:9
176:4

**purchasing**
108:13
140:14

**purport**
118:9

**purpose**
65:23
77:18
152:5
153:24
162:7
167:4

**put** 9:6
33:13
39:20
44:19,22
47:9,11
52:8,18
58:5,11
61:18
71:1,7,15
84:17 93:3
97:10,13
103:6
109:24
136:13
160:8,12
181:24
192:21

**puts** 73:15

**putting** 96:8
118:15
153:24

―――――――――
**Q**
―――――――――

**question**
5:21 6:13,
20,23
32:10

42:17 80:5
131:23
155:8
195:14

**questioned**
49:15

**questions**
73:21 99:5
104:11
122:24
144:1
180:11
192:24
195:17,20

**quick** 180:19

**quo** 25:17

**quote** 172:13

―――――――――
**R**
―――――――――

**Radford**
43:15 77:5

**radio** 106:5
174:2,16
175:20
176:11
178:9

**radios**
105:9,11,
13,19
173:17,19
176:2,4
178:7

**rained** 94:17

**raise** 85:15

121:23

**ran** 23:15

**rank** 8:14
11:24
12:1,9,10
33:19
35:20

**ranking**
35:19

**rate** 29:11
131:1
182:23

**re-fed** 138:2

**re-feed**
137:12

**read** 16:14,
19 18:1,14
20:15
21:17
23:12
24:20
32:9,18
38:24 39:9
51:5 59:11
60:21,22
62:21,24
63:18 69:8
70:5 72:23
82:2 85:20
86:1,5
94:22 95:7
102:13,14
104:22
114:8
115:9,14

119:20
135:23
144:4,5
150:14
153:7
172:24
173:14
187:13
195:20

**reader**
109:6,10,
15

**reading**
142:2

**reads** 109:16

**ready** 181:1

**reason** 52:17
75:22 96:1
128:13
144:21
155:7
180:15

**reasonable**
60:8,10,12

**reasons** 27:9

**rebuttal**
172:6

**recall** 22:14
52:20,21
53:1 54:21
58:22
61:6,10
63:2,15
64:19,23
68:3 69:15

73:8,13,
19,23
75:19 77:1
94:6,9
97:20,24
98:7,11
100:15,19
102:17,18,
22 104:14
105:7,8,
12,13
106:12
107:9
118:13,22
121:19
123:24
128:9
129:3,9
130:6
131:15,21,
23 132:20
133:13,16
134:10,11,
13,24
135:1,4,7
141:22
142:2,3
144:8,13,
16 145:20
146:12
149:1
150:22
155:4
157:5
161:13
169:10
170:3
172:5

173:3
175:7,10,
11 176:8,
16 178:5,
15 179:22
180:4

**receipt**
137:6

**receive** 59:6
115:18
121:23

**received**
38:2,6
68:3 130:8
176:16
184:8

**receiving**
82:7
123:24
132:20
134:10,11,
24 135:2
141:22
144:8
146:12
176:8
180:5

**recess** 59:3
98:16
135:21
147:11
180:23
193:3

**recognize**
117:17
150:6

188:14
189:10,20
193:7

**recommended**
176:5

**reconsider**
137:8

**record** 5:8
50:17
59:1,2,5
76:12
78:22,24
79:2 87:23
98:18
102:1
104:7
135:18,20
147:9,14,
17 150:20
151:22
154:15
156:13,24
157:1,3
180:20
191:22
193:1,2

**Record's**
167:4

**records**
36:17 38:9
98:18
107:23
108:13
148:6
160:21

**redone** 64:9

126:14

**refer**
150:14,19
167:4
178:23

**referencing**
63:1

**referring**
107:10
109:6
146:20
152:11
177:10

**refers** 148:2

**refresh**
108:20

**refund** 48:8

**refused**
86:7,14

**regard**
156:19
179:9

**Regional**
110:23

**Registered**
5:2

**regular**
60:18
182:23

**regulations**
103:6

**reimburse**
50:21

**reimbursements**
184:8

**related**
36:16 40:3
114:15
184:8

**relation**
159:5

**relationship**
34:12

**relied**
148:10

**remain** 8:9

**remark** 154:1

**remember** 8:2
22:18,21
60:2 61:5
63:1,11
64:5 69:17
73:7,15,
18,20,21,
22 74:13
76:18,24
94:16,21
96:2
100:20
103:13,18,
21 104:16
109:8
120:6,16
128:11
129:5,6
131:19,22
132:2,4,5
133:17

142:6
155:5
157:24
178:10
180:13,14,
17 192:14

**remind** 5:24

**remove** 58:7
89:15 93:9

**removed**
58:12
110:1

**repair** 19:8
20:11

**repaired**
19:1

**replace**
101:13

**replaced**
105:14

**report** 85:22
86:1 93:2
96:16,17
116:14
147:15,16,
20 148:4,
8,10,13,
18,19
149:1,3
188:2,
191:23

**reported**
191:19,22

**Reporter** 5:2

32:9

Reporting
  147:16

reports   87:9
  148:24

represent
  60:4  91:3
  114:6,7
  119:9
  120:24
  179:2
  182:15,21
  183:2
  184:6

representative
  89:14

representing
  112:18

request
  100:16
  101:22
  146:15,16,
  19  149:12

requested
  111:21
  114:13
  123:8
  171:5,9

requesting
  159:17

requests
  21:24

required
  17:7  107:6

requirement
  44:10

requirements
  44:6

rescue   40:6
  42:17
  56:20
  59:6,
  105:21
  106:3
  129:23
  131:24
  133:11
  140:14
  142:19

residence
  96:12

resource
  9:19

respond
  91:24
  120:1
  130:13,16
  142:7
  146:22
  153:20

responded
  96:20
  135:9

responding
  145:3

response
  73:17
  96:24
  119:10

132:24
  134:13
  135:5
  144:17
  149:12
  161:24

responses
  20:17

responsibility
  54:7
  114:16

responsible
  18:13  63:6

rest   180:19

resting   60:7

Retained
  22:2

retire
  106:14,18

retired
  88:24
  106:19
  107:1

return   74:9,
  18  96:22

returned
  50:4
  107:14

review   68:15
  114:13
  170:8

revision
  97:5

Rhonda
  185:13,22

rid   80:11
  81:5,12
  83:13  85:5

River   110:23

road   15:17,
  18  16:5
  23:11
  44:17
  96:24
  112:11
  124:19
  125:1
  126:2
  167:9,15,
  18,20,23,
  24  168:14
  170:12

role   23:23,
  24  113:7

roles   23:23

room   6:8
  26:22
  44:21
  51:22  52:9
  53:3
  136:5,8,18
  137:7
  138:5,7
  180:19

roughly
  41:17
  104:23
  105:4

route   71:19

routine
  29:24

ruin   74:17

Rule   5:20

rules   5:12
  103:6

rumors
  129:17

run   24:2
  175:14

rung   10:17

running
  15:13
  22:19
  23:14
  25:18
  96:13

runs   26:20

_____

S

Sadler   82:6
  83:3,23
  85:2,3

sake   99:7

salaried
  30:7

salaries
  163:21
  166:4

salary   114:1

Saturday

65:20

scattered
  171:7

scene   14:16,
  18 94:15
  96:18
  159:6,18,
  19 161:8
  164:20

schedule
  13:10

schedules
  21:24

school   9:19
  18:24
  19:8,9
  83:15
  84:16
  110:17
  193:18

scope   108:15

Scott   19:2
  20:12 58:2
  73:9 74:4
  83:22
  85:16
  96:17
  98:1,4
  113:7,22
  146:14,15,
  19,20
  150:11
  151:16
  161:11
  162:10,12,

13,22
163:17,22
164:21,22
165:15
166:23
170:13,16,
17 171:9
172:3,6
173:15,23
174:24
177:11
193:6,23
194:6,16,
19,22
195:5

seat   22:15
  23:14,16

seconds
  101:16

secretary
  143:5
  182:4

section   14:3
  114:8
  152:20
  156:11
  157:8
  185:20

sections
  14:22
  60:4,6

secured
  96:18

securing
  140:7

security
  15:4,11
  167:21

seek   22:15

send   38:15
  56:19
  133:5
  152:1

sending
  100:8,15
  129:6
  176:16

sends   37:15

sentence
  21:18 51:6
  86:8 93:3
  104:22

sentences
  69:9

separate
  33:9 85:1
  193:14

separately
  60:15

September
  38:6 94:24
  152:6
  161:22
  166:20
  168:21,22
  169:2
  170:3

sequentially
  101:18

149:11

**sergeant**
8:16,
11:17,23
12:8,11,
12,18,22
13:2,10
20:7 21:2,
10 33:7

**sergeants**
11:20
12:15 20:5

**served** 7:14

**server**
90:23,24
91:2,12,
13,16

**service**
139:9,12
140:1

**services**
27:2 28:20
37:3,22
42:20
43:18
58:14
73:10
154:20
181:15

**set** 29:20
30:19 31:6
74:18 78:9
93:22
94:10,16
108:9

155:6

**sets** 166:12

**sex** 78:16

**Shanks**
10:19,20
11:1 90:7
113:15

**share** 89:24

**shared** 54:5

**shares**
164:22

**sheet** 67:9
72:16

**sheets** 36:22
67:8,24
68:1 72:9,
22 73:1
147:3

**shelter**
24:18,21,
24 25:10,
18,21
26:6,7,14
27:2,5,12,
14,22 30:1
31:15,17,
20 32:6,14
34:13,16
36:4,16,18
39:7,13,
18,22,23
40:13 41:4
42:20,21
44:2,6,12,
13 46:23

47:6
48:12,23,
24 49:10,
18 50:2,3
51:12 53:7
54:16,20
55:7,8,9,
24 56:5,
12,16
57:6,9,11,
19,22
58:4,13,19
59:8,18,24
60:17
61:1,7,9,
13 62:20
63:5,7,13,
20 64:1,6,
13,14
69:15
70:17
71:8,11
72:20
73:1,
74:16
75:10,14,
20 76:13,
14 77:4
78:2,8,10
85:23
100:6
114:11,14
117:1,6,7
118:17
130:19
132:1
133:14
139:6,13,

16 140:15,
18 143:10
184:9
186:20,23,
24 187:3,
4,17,22,23

**shelter's**
63:15

**Shelters**
60:11

**sheriff** 7:6,
9,18 8:8,
10,11 13:7
14:14
23:17
24:5,7
25:14,16
27:20 30:4
33:10,18
43:17 44:3
50:9 54:24
59:17,22
60:24
63:6,19,24
69:14 70:6
82:7 86:6,
7 88:4
95:1,8
97:1 98:19
101:8
105:1,6
113:1,
115:8
141:20
144:5
147:15
148:18

152:19,21
153:7
165:4
174:8
187:21

**sheriff's**
7:5 8:19
9:10 10:1,
8,11 13:5,
6 17:5
20:23
21:6,20
22:10 24:5
25:9,17,20
27:5,11,19
28:3
31:15,20
32:22
35:12
36:13,17
39:5,11
41:3 42:19
43:18
44:2,5,18,
21 45:6,9,
16 50:2
53:10,11,
12,19
54:2,10,
15,23
55:2,15
57:18 65:6
68:14,15
71:23
72:20
73:10 74:1
80:7 81:9
82:8 86:23

87:3,15
89:4,12
90:22
91:2,10,
15,16,19
92:20 95:2
98:20
99:11,14
100:16
101:4,5
104:15,24
105:5,10
106:6,10
107:3,5,19
108:2,7,
15,18
110:19
111:5,6,8
112:18
125:14,
126:15
145:8,9
147:5,6,19
153:22
155:10
159:5
162:20,24
163:17,20
165:4
166:1,7,
167:16
175:2
186:23
187:17
193:9

**sheriffs**
24:3

**shift** 125:24

**shop** 19:8

**shops** 20:11
171:8,12

**shortly**
186:4

**shouted**
164:17

**show** 188:7
189:18
193:5

**showing**
50:12

**shown** 187:22

**shuffled**
48:10
138:13

**sick** 35:5

**sickly** 35:2

**side** 23:11

**sign** 29:1
38:14
153:15

**signature**
117:22
150:8
151:1
152:13
169:8,24
173:1
181:22
182:6

**signed** 36:21

37:1

**signs** 177:7

**silence**
130:7

**simple** 17:16

**single**
194:19

**sir** 7:4,8,
48:13
115:11
122:22
139:7
140:16
142:5
145:13
146:21
150:12,16,
18 152:17
156:9
161:15
169:4
181:23
182:3
185:19
186:18
195:17

**sits** 193:8

**sitting** 22:5
99:8
130:15
172:5
175:7

**situation**
167:6
172:7

Skidmore
  88:24

skip  180:3

skipping
  99:6

slight  6:3

Slusher
  180:17

small  14:11

smaller
  62:23

smooth  62:17

Sokol
  142:21,24

solid  60:7

solved
  137:16

sort  19:19
  34:14,21
  74:6 111:2
  152:21
  159:4
  169:6

sought  23:16

sound  98:21
  114:17

space  99:8

sparks  178:1

spayed  48:7
  50:13

speak  6:18
  79:21

175:3

speaking
  11:15
  174:6,10,
  12,14
  175:17

special  14:8
  34:24
  159:4
  162:18
  165:23

specialist
  159:18

specific
  52:22
  77:18
  163:22

specifically
  39:6,12
  60:3 75:9
  90:5
  142:13
  166:8

specifics
  109:9

speeding
  66:2

spending
  29:24

Spicer  33:5
  34:7 75:2
  124:11,12,
  13

split  111:22

spoke  151:15

spouting
  165:5

spouts
  190:22

squad  106:3

squads
  105:21

staff  39:7,
  13,17,22,
  23

staffing
  28:20
  29:10,11,
  12

stamp  144:3
  181:20,24
  182:1,2
  191:11

standard
  186:23

start  72:16
  86:7 131:3
  185:13

started  43:5
  46:14
  110:11

starts  144:4

state  5:7
  64:8 71:13
  77:19 78:7
  160:19

stated  147:2

163:17
173:15

statement
  28:11,12,
  14 32:12,
  15,16 61:2
  63:9 80:10
  124:6
  125:4
  147:1,3
  148:11
  154:9
  158:5,10
  179:4,8
  187:16

statements
  16:10

static  94:4

stating
  125:4
  166:1

status  25:17

stay  72:13

stealing
  65:2

steps  145:3

stepson
  170:13

stick  104:12

stolen
  171:18

stone  74:18

stop  56:13

63:8
162:21

stopped
  40:18

Stopping
  13:24

storage
  51:11,14

store  94:11

stored  51:20
  90:21
  153:4

storing
  51:11,14

streets  48:1

Strelka  5:6,
  11 31:2
  32:11,19,
  20 37:17
  59:1,4
  78:22 79:1
  89:17,20
  98:17
  101:22
  104:6,8
  114:21
  115:5,24
  116:7
  117:9,16,
  24 118:7
  119:1,8
  120:17,23
  122:14,21
  123:16,23
  127:12,19

128:8,16,
24 131:6,
13 132:9,
17,19
134:1,9,
16,23
135:10,18,
22 141:6,
12, 145:19
146:2,8
147:13
149:20
151:7
153:5
155:3
156:23
157:2
180:22,24
181:3,10
183:21
184:5,23
185:2
186:5,9,16
187:7,11,
14 192:23
193:4
194:1,3,12
195:16

strike  22:13
  25:8 31:12
  35:23
  57:17
  58:22
  155:9

stripes
  84:12,16

structure

9:3

stuff  11:8
  62:23 99:9
  149:8
  171:13

subject  72:4

subordinate
  10:15

subpoena
  91:4
  156:18

suggested
  103:5

summons
  65:14,16
  66:1

summonses
  67:20 68:7
  178:20
  179:17

Sunday  65:20

supervised
  66:24
  67:12,15
  112:13,23

supervision
  66:15
  101:9
  112:7

supervisor
  19:22 20:3
  21:12
  35:15
  165:8,12,

16

supervisor's
  165:2

Supervisors
  22:20 24:3
  36:2
  37:16,19
  38:20
  53:15
  54:23
  57:21
  119:11
  125:10
  126:6
  162:17
  163:20
  165:5,22
  166:7,14
  175:1,15,
  18

supervisory
  12:14
  17:18
  21:19 22:2
  32:22
  33:15

Supevisors
  175:4

supplement
  114:3

support
  177:8

supposed
  28:12
  30:17
  45:19

61:12
65:13
66:21

supposedly
  108:2,3

Supreme
  160:19

surface  60:7

surplus
  80:8,10,
  21,24 81:7
  82:8 83:5,
  10 84:22

surplused
  193:11,20

surplusing
  82:16

surveillance
  120:9
  140:15

Susan
  142:21,24
  143:5

suspected
  60:14

sworn  5:2

system  33:19
  44:20
  87:1,5,7,8
  88:2,14,20
  89:2,4,6,
  16 90:12,
  17,19
  91:21

92:23 96:9
97:10
152:20
160:13
174:3
175:20
178:9

systems
  110:17

─────────────
      T
─────────────

T.J.  96:22

tag  60:9

tags  80:14
  193:19

takes  77:11
  80:18

taking  42:8
  49:10
  84:12
  133:18
  172:15
  187:3

talk  6:21,
  24 17:2,10
  23:15
  46:14 54:1
  60:2,23
  72:3,24
  94:2
  113:15
  136:12
  156:19
  158:14
  162:13

185:21
194:13
195:2,4,
  10,12

talked  61:14
  66:5 67:20
  70:13 72:5
  83:8 93:22
  97:17
  104:16
  113:11
  116:18
  140:22
  155:6
  161:17
  165:10
  176:22,23
  193:10
  194:14
  195:3

talking  6:9
  19:13 63:2
  72:22
  74:14
  77:20
  80:15
  91:21
  103:13
  118:15
  120:8
  125:2
  149:5
  162:17
  165:19
  171:7
  188:23,24
  192:8

tasks  12:19
  13:15
  14:20 34:4

tech  43:13,
  15 113:3
  159:9,11

telephone
  136:13
  186:3

telling
  22:18
  61:11 64:5
  66:17 67:1
  83:13
  111:19
  131:24
  133:20

tells  111:15
  191:3

ten  9:14,15
  26:21 43:8
  169:22

tension
  178:2

tenure  44:3

term  7:14,
  15,16,17
  10:7 34:11
  35:18,19
  80:24
  109:5

terminate
  86:6,9
  194:6,16,
  19,22

terminated
 98:19
 100:17
 157:10,14
 195:13

terminating
 150:11
 193:22
 195:5

termination
 9:22 13:19

terminology
 175:21

testified
 5:4,17
 15:24
 38:18
 56:7,11
 60:1
 158:8,14
 167:5

testimony
 50:3 61:22
 101:3
 194:18

thermal
 108:14
 109:3

thing  5:12
 6:7 50:9,
 10 66:23
 67:14,16
 73:19
 74:15
 111:18

162:14
167:15
169:6
179:20
183:3
189:11
191:9
195:11

things  19:15
 20:11
 21:6,8
 40:14,15
 47:17 56:7
 60:5 64:11
 80:21
 111:19
 138:21
 148:15
 155:24
 160:16
 162:15
 163:18
 165:5,11,
 18 166:3,
 11,13,18
 183:20
 195:10

thinking
 32:2 66:10
 76:5,20
 77:22 79:5
 82:18
 121:14,18
 122:6,13
 129:10
 135:3
 144:12,14

172:20

Thomas  5:6
 180:5

Thomason
 142:22

thought
 76:22
 114:19
 151:4

thoughts
 129:20

threat
 165:17,19,
 21 166:8

threatening
 166:6

threatens
 165:3

three-month
 42:8

throw  105:17

thrown  54:8

Thursday
 146:23

Thwaites
 10:4 14:24
 15:20
 170:23
 192:1,6

ticket  65:19

tickets
 65:10,15
 67:7

Tickle
 172:14
 185:13,22
 191:19,22

tile  110:17

time  6:20
 9:7,9
 10:12,18,
 21,24
 14:23 16:7
 17:4 19:1
 22:11,21,
 22 27:4,14
 28:16 29:2
 30:1 31:5,
 19,24
 32:2,5,
 36:13,22
 41:1,3,12,
 23 42:19
 44:21 45:3
 47:9 49:16
 50:1,8
 53:3 57:17
 61:21,24
 64:7 65:10
 66:20
 67:8,9,24
 68:1,9
 70:13
 71:1,6,7,
 8,23 72:9,
 16,22
 73:1,3
 77:16 81:1
 82:14,21
 86:24 89:8

93:14
101:8,16
102:23
103:1
104:14
105:9
112:2
114:4
115:14
117:1
118:16
120:9,10
124:7,10,
17 126:12
140:22
147:3,6
148:7
157:10
159:13
164:11
168:3,4
175:3,17
178:20
179:11
186:19,22
191:11
195:12

**times**  5:18
27:5 39:4,
10 66:3
68:17
70:12
112:7
121:21
136:12
175:5

**Timmy**  15:3

**tire**  93:22
94:10
155:6

**tires**  84:18

**title**  8:6
185:14

**today**  6:18
16:13 22:6
25:20
165:15
175:7
188:11
193:18

**today's**
144:5

**told**  24:1,3
38:5 46:12
47:2,20
50:18
52:6,8
61:21 62:8
72:16
74:15,20,
23,24 75:4
76:1 82:13
83:8 85:3
89:5,15
90:5,7,
94:14
96:15,17
98:1
103:18
109:5
121:21
123:10
129:13

137:10
145:5
151:15
162:9,12
170:15,16,
17,22
174:2
175:19
192:6

**Tommy**  5:11
151:15

**tone**  166:12

**top**  131:14
141:23
143:21
146:23
176:16

**topic**  163:3

**topics**
164:13

**totally**
18:13

**touch**  190:16

**touched**
137:1

**Town**  84:2

**tracks**  93:22
94:10,16
155:6

**traded**  108:3

**transaction**
50:17

**transcript**

32:18

**transmission**
84:17

**transport**
15:7

**treasurer**
50:19,21

**treasurer's**
48:3,6,8
184:17,22

**treatment**
59:23

**trees**  110:18

**trim**  110:18

**truck**  54:19
55:21

**true**
136:20,21,
23 168:9
179:8
183:17

**truth**  5:3,4
128:13

**truthful**
32:12,15,
16 39:8,15
147:3
175:24
179:5
187:16

**truthfulness**
180:16

**turn**  50:18

65:15
129:21

**turned**  60:18
65:10
67:7,9
107:20

**twelve**  26:22

**two-page**
128:16
129:2
135:10
143:20

**type**  6:10
47:11
71:10
151:19
174:15
179:20

**typed**  6:14

**typically**
191:8

─────────────

         U

─────────────

**UCR**  148:7

**uh-huh**  6:3

**ultimately**
79:18
176:4

**unacceptable**
97:12

**unbecoming**
152:19

**undernourished**

136:19

**understand**
6:5,6,11,
15,16,22
12:7 14:9
19:12 26:5
76:10
101:18
136:4,16

**understanding**
7:18 11:4
25:3,23
29:15
30:6,11
32:4 53:2,
18 81:3
146:18
183:7
187:8,15
191:21

**undertaking**
53:11

**uniform**
13:16
166:11
167:24
168:2

**uniformly**
60:19

**Universal**
148:8

**University**
43:15

**unlike**  6:7

**unprofessional**

154:13
155:16
158:7
161:4

**unsure**
194:24
195:1

**untruthful**
158:11

**unwanted**
39:21

**unwritten**
81:18

**upcoming**
177:8

**upset**  84:5
92:4 97:5
103:3

**USDA**  116:11

**user**  87:19
88:1
192:22

**utilize**
87:4,6,8
127:3,7

**utilized**
125:1

**utilizing**
124:23
125:21

─────────────

         V

─────────────

**vacation**

41:23 42:2

**vacations**
42:9

**Valley**
110:23

**vehicle**  5:16
16:4 19:23
42:12 53:8
54:3,4,5,
7,8,16,21,
22 55:2,15
81:21
82:8,12,19
84:12,17,
21,24 85:1
108:22
109:4,12,
13,24
110:1
162:14
166:10
193:7,10,
14,16,17

**vehicles**
18:12,
19:20,21
53:10,14,
24 54:2,5,
6,11 82:16
83:3,9,14,
23 84:3,6,
7 193:11,
12

**verification**
61:16

**verify**  61:19

Verizon
  140:1

vet   35:5

VFS   147:22

victim   148:6

video   120:9

videoed
  156:1,5

view   59:7

VIN   85:9

vinegar
  177:23

violated
  153:22
  155:10,14
  157:5

violating
  160:3

violation
  36:5
  54:13,17
  55:13
  156:11
  157:7
  173:22
  174:5

violations
  12:22
  155:14

Virginia
  7:19 28:9
  43:13,14
  78:1,7

113:3
171:13

vision
  107:18,22
  108:3,9
  109:2

voice   85:15

volunteer
  45:2,4
  52:11,12
  133:10

volunteers
  42:18,20
  43:1,12,17
  44:1,7,11
  46:3,
  48:16
  52:13
  55:24
  56:13,15,
  17 57:9,
  10,19,21
  58:3,12,19
  65:2 75:9,
  15 103:6
  114:15
  130:7,19
  136:20
  138:4
  143:2

---
**W**
---

wait   6:12
  19:2 28:13
  87:22
  119:14

122:12
135:8
153:3
169:19

walk   42:22

walking   56:3

walls   64:9

Walmart
  54:20
  55:12

wanted   30:10
  40:14 48:4
  50:11
  65:23
  74:15
  83:9,13
  91:5,6
  98:1,5
  103:19,23
  104:1
  117:6,8
  121:16,20
  130:23
  131:3
  145:24
  151:23
  162:4,13
  185:21
  194:6,15,
  17

wanting
  121:7

warrant
  170:15,16,
  17,22
  171:17

172:1,10
192:7

watch   106:10

water   6:18
  40:15
  47:4,9
  177:24

ways   137:23
  138:1

wearing   17:7

wears   167:23

website
  99:19

week   29:8,
  18 30:21
  31:10
  41:17,20
  60:12
  62:10
  70:20
  110:14
  195:2

weekend   47:7
  136:6

weekends
  49:7
  110:14

welded   64:10

well-being
  130:18

West   19:11
  171:13

Western

22:19

**whatsoever**
93:11

**whistle**  74:6

**Wilburn**
72:7,14

**William**
29:21

**Williams**
71:5
194:11,13
195:1

**wished**  22:14

**Wolf**  96:13

**woman**  136:8
137:2

**word**  35:22
81:4 86:17

**words**  10:14
54:4 76:14
87:5
142:18
154:4

**work**  8:1,3,
7 13:10
19:14 21:8
28:6 30:11
31:8,24
41:11,18
65:6 66:12
67:16
68:4,16
69:1,12
72:13,15

75:7 85:4
96:24 98:6
104:24
105:5
108:1
110:8,17,
20 111:1,
3,4,13,16
113:4,11
154:3
167:13
168:7,14
173:6,19
179:3
194:17

**worked**  13:6
14:21
15:18 16:4
17:5 18:23
30:9,19
32:13
34:16
35:10 37:9
41:19
70:22 89:1
101:12
110:13

**worker**  35:13
106:3

**working**  9:10
10:1
13:14,18
14:3 30:18
31:15 32:5
36:14 42:8
51:20
69:12,20

70:7,17
84:6 89:7,
11 103:24
111:6,22
112:9
123:11
125:24
166:11
172:17

**works**  167:24
186:6

**worms**  49:17

**worry**  62:23
77:14

**write**  12:21
36:4 80:5
96:17
122:1
123:8
137:18
151:11,13
166:20
167:2
168:18,20
170:5
178:17

**write-up**
152:6,10

**writing**
150:23
169:10
173:3
178:15
179:22
182:7,10

**written**
50:15 66:8
68:4,11,15
69:1 115:8
118:9
121:6
151:18
156:10
159:1
160:6
162:3
179:19
187:2,10
190:11

**wrong**  19:22
20:8 150:5
165:1
170:10

**wrote**  21:1,2
31:4 65:18
121:2
123:5,13
127:21,22
145:24
154:10
156:2
158:6
161:22,
168:23
191:12
192:11,15,
18

---

**Y**

---

**year**  68:21,
22 82:11

```
 126:16
 127:2
 147:22
 178:8
```

**years**  5:14
```
 105:8
 107:22
 113:5
```

**yes's**  6:1

**yesterday**
```
 165:23
```

**young**  16:4