```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                    WESTERN DISTRICT OF VIRGINIA

 3                         ROANOKE DIVISION

 4

 5

 6     - - - - - - - - - - - - - - - - - -
       BRIAN SCOTT DUNN,                )
 7                                      )
                     Plaintiff          )
 8     -vs-                             )         CASE NO.:
                                        )         7:14cv00429
 9     SHERIFF MORGAN MILLIRONS,        )
                                        )
10                   Defendant          )
       - - - - - - - - - - - - - - - - - -
11

12

13

14

15     DEPOSITION OF:  CHASTITY M. JONES

16

17     DATE:          APRIL 10, 2015 (Friday)

18     TIME:          10:05 a.m.

19     LOCATION:      Giles County Administration Building
                      315 North Main Street
20                    Pearisburg, Virginia 24134

21

22     REPORTER:      Lisa M. Hooker, RPR
                      Registered Professional Reporter #29505
23

24
```

***Central Virginia Reporters***          **www.huseby.com**
**3155 W. Main St. , Salem, VA 24153**          **(540) 380-5017**
Case 7:14-cv-00429-GEC   Document 52-13   Filed 08/19/15   Page 1 of 32   Pageid#: 902

**Page 2**

```
 1              I N D E X

 2

 3   EXAMINATION BY:                                      PAGE

 4   Thomas E. Strelka, Esq.                                 4

 5   Jim H. Guynn, Jr., Esq.                                53

 6   Thomas E. Strelka, Esq.                                56

 7

 8   Appearance Page  ...............................      3

 9   Exhibit Page  ..................................      3

10   Witness Signature Page  .........................     58

11   Witness Signature Waiver  .......................    ---

12   Reporter's Certificate  .........................     59

13   Errata Sheet  ...................................     60
```

```
14

15

16

17

18

19

20

21

22

23

24
```

**Page 3**

```
 1              A P P E A R A N C E S
 2   FOR THE PLAINTIFF:   STRELKA LAW OFFICE, PC
                          Attorneys at Law
 3                        119 Norfolk Avenue, SW
                          Suite 330
 4                        Roanoke, Virginia 24011
 5                        (540) 283-0802
                          (no fax available)
 6                        thomas@strelkalaw.com
 7                        BY:  THOMAS E. STRELKA, ESQ.
 8
 9   FOR THE DEFENDANT:   GUYNN and WADDELL, PC
                          Attorneys at Law
10                        415 South College Avenue
                          Salem, Virginia 24153
11
                          (540) 387-2320
12                        (540) 389-2350
                          jim.guynn@gmdlawfirm.com
13
                          BY:  JIM H. GUYNN, JR., ESQ.
14
     ALSO PRESENT:        Brian Scott Dunn
15                        Morgan Millirons
16
                E X H I B I T S
17
     NUMBER           DESCRIPTION               PAGE
18
     Exhibit 41    Adoption Record dated 4-5-13.    51
19
20
21
22
23
24
```

**Page 4**

```
 1                   CHASTITY M. JONES

 2   having been sworn by the Registered Professional Reporter,

 3   Lisa M. Hooker, to tell the truth, the whole truth, and

 4   nothing but the truth, testified as follows:

 5

 6            EXAMINATION BY THOMAS E. STRELKA, ESQ.

 7       Q.    Good morning, ma'am.  As I indicated to you

 8   earlier, I'm Tommy Strelka and I represent Mr. Dunn, the

 9   Plaintiff in this matter, and bear with me as I continue

10   to set up.  The -- would you please state your name for

11   the Record.

12       A.    Chastity Michelle Jones.

13       Q.    And Ms. Jones, I'm sorry, I thought that

14   your last name was Perkins.  I assume that has been

15   changed at some point?

16       A.    Yes.

17       Q.    You got married?

18       A.    Yes.

19       Q.    Congratulations; when did you get married?

20       A.    February.

21       Q.    Okay, very recently.  Okay, Ms. Jones, this

22   is a deposition; have you ever been deposed before?

23       A.    No, sir.

24       Q.    All right, and well, it is pretty easy.
```

**Page 5**

```
 1   All you have to do is answer the questions that I ask you,

 2   or Mr. Guynn next to you asks; you are under Oath, and I

 3   will try to get you out of here as quick as possible,

 4   okay.

 5       A.    Yes.

 6       Q.    Just a few little rules.  If I ask you a

 7   yes or no question, I'd ask that you provide a yes or no

 8   answer and try to stay away from the hmm-hmm's and the

 9   uh-huh's and -- you know, because it could be misconstrued

10   on the transcript.  She's typing up everything that we're

11   saying and your huh-huh could be hmm-hmm in your ear or

12   her ear and then we have a goofed up case, so do you

13   understand?

14       A.    Yes, sir.

15       Q.    All right.  Thank you, and the other thing

16   is that if, and normally in human conversation, people are

17   talking all over each other all of the time, but because

18   she can only type up what one person is saying at a time

19   easily, I would ask that you completely wait -- wait until

20   I'm completely done speaking until you provide an answer,

21   even if you know exactly what it is that I'm getting at.

22   The whole question has to be presented in the transcript;

23   do you understand?

24       A.    Yes, sir.
```

**Central Virginia Reporters**          **www.huseby.com**
**3155 W. Main St. , Salem, VA 24153**
Case 7:14-cv-00429-GEC   Document 52-13   Filed 08/19/15   Page 2 of 32   Pageid#: 903          **(540) 380-5017**

Page 6

1    Q.    All right.

2          MR. GUYNN:  Could I interrupt for just a

3    second?  How do you spell your first name?

4          THE WITNESS:  C-H-A-S-T-I-T-Y.

5          MR. GUYNN:  I've just seen it several

6    different ways, thank you.

7    BY MR. STRELKA:

8    Q.    Ms. Jones, where are you currently

9    employed?

10   A.    Federal Mogul.

11   Q.    Okay, and prior to that, where were you

12   employed?

13   A.    At the animal shelter.

14   Q.    Giles County Animal Shelter?

15   A.    Yes, sir.

16   Q.    And it is my understanding that you started

17   working there before Sheriff Millirons was elected?

18   A.    Yes, sir.

19   Q.    All right.  And when did you begin working

20   there?

21   A.    Can I get my dates?

22   Q.    Is that what you have there?  Is that that

23   letter from Greenbrier?

24   A.    Yes.

Page 7

1    Q.    Okay.  Is that -- I have a copy of that,

2    too.

3    A.    Okay.

4    Q.    All right.

5    A.    Yes, it was around June of '05.

6    Q.    Okay.

7    A.    June of '05.

8    Q.    June of 2005?

9    A.    Yes, somewhere around there.

10   Q.    And how did you hear about this opening or

11   how did you know about this job in 2005?

12   A.    I previously worked for Dave Hunt with

13   Greenbrier, and the job ended at Celanese and he called

14   and offered me the job at the animal shelter and I

15   accepted.

16   Q.    Okay.  And do you know if anyone -- do you

17   know if Greenbrier Services had provided staffing for the

18   animal shelter before you?

19   A.    Yes, sir, they did.

20   Q.    Okay, do you know who was the previous

21   worker?

22   A.    I don't know.

23   Q.    You don't know?

24   A.    No.

Page 8

1    Q.    Okay.  Well, who told you what the job

2    would entail?

3    A.    Dave Hunt.

4    Q.    Dave Hunt?

5    A.    Yes.

6    Q.    And what did he tell you it would entail?

7    A.    That I was hired as a salary employee, and

8    I work six hours a day, seven days a week, and that I

9    would be on call at all times; if I was needed, I was

10   called back out.

11   Q.    Okay, but as far as your duties, did you go

12   over like what you were supposed to be doing?

13   A.    I cleaned the shelter and fed the animals.

14   Q.    Okay, anything else other than that?

15   A.    Not on my job description, no, sir.

16   Q.    Didn't you also have to process adoptions

17   if someone came in and wanted to adopt an animal, or was

18   that somebody else?

19   A.    I don't know if nobody else was there.

20   Q.    Was there any person whose role it was to

21   do that?

22   A.    No, sir.  Whoever was there at the time

23   done it, whether it was a volunteer, whether it was animal

24   control or myself.

Page 9

1    Q.    Okay, so adoptions would be processed by

2    any of those individuals that you just named, but I guess

3    that if no one else would be there, it would be your duty

4    to process the adoption, then?

5    A.    Yes, sir.

6    Q.    Okay.  And you were still working at the

7    shelter in 2008 when Sheriff Millirons was elected, right?

8    A.    Yes, sir.

9    Q.    Okay, and at that time, you -- well, you

10   mentioned earlier volunteers.  Were there volunteers

11   attending an participating in shelter activities in 2008?

12   A.    Yes, sir.

13   Q.    Okay.  And were these volunteers members of

14   Giles County Animal Rescue?

15   A.    Yes, sir.

16   Q.    Were there other organizations, too?

17   A.    They would bring Tech students in

18   sometimes.

19   Q.    Okay, and can you just kind of outline for

20   me what it is these volunteers would do when they would

21   come to the shelter?

22   A.    They would hold open hours on Saturdays and

23   Sundays from 2:00 to 4:00, walk the animals or do

24   adoptions in that time.

**Central Virginia Reporters**                    www.huseby.com
**3155 W. Main St. , Salem, VA 24153**
(540) 380-5017
Case 7:14-cv-00429-GEC   Document 52-13   Filed 08/19/15   Page 3 of 32   Pageid#: 904

| Page 10 |
|---|

1    Q.      Okay.

2    A.      They would pull animals for rescue.

3    Q.      All right.  And when was your last day that

4 you worked at the shelter?

5    A.      I don't remember the exact date, but it was

6 January of 2014.

7    Q.      Okay, and how did it come about that your

8 job ended at that time, and was it -- I mean, did you

9 resign or were you told that your job was terminated?

10   A.      No, I quit on my own.

11   Q.      You quit on your own?

12   A.      Yes.

13   Q.      Okay.  How did you communicate the fact

14 that you were quitting?

15   A.      I called Dave Hunt, which is who I worked

16 for, and told him, and then I notified Sheriff Morgan that

17 I was quitting.

18   Q.      Okay.  And -- all right, and during the

19 entire time that you were working there when Sheriff

20 Millirons was elected, did -- were you ever there when the

21 Sheriff was also at the animal shelter?

22   A.      Yes, sir, I was there.

23   Q.      Okay.  And my point is, do you recall how

24 many times the Sheriff visited the shelter?

| Page 11 |
|---|

1    A.      No, sir, I didn't keep track of it.

2    Q.      Okay, and did he come by once a week?

3    A.      I don't think that it was that frequently,

4 no.

5    Q.      Okay, and I know that -- I'm not trying

6 to -- I don't want you to pull a number out of thin air; I

7 don't want you to speculate, but I do want to see if we

8 can come to a more narrow focused understanding of how

9 many times you went out there.  Can you give me any more

10 information about how many times you think the Sheriff

11 might have appeared at the shelter?

12   A.      Sir, I don't remember.

13   Q.      Okay.  All right.  So could you describe to

14 me again, I think that you already mentioned this but I

15 just want to be sure that I have an understanding, what

16 your hours were day-to-day when were you at the shelter?

17 What were your expected hours?

18   A.      I had no specific time to be there.

19   Q.      Okay.

20   A.      I was required to be there up to six hours

21 a day, seven days a week.

22   Q.      Okay.

23   A.      I was hired as a salary person.  When I

24 completed my job, I was allowed to leave, but I was also

| Page 12 |
|---|

1 on call that if anybody arose or animal control needed me,

2 I would go back out, or if animals needed medication, I

3 had to go back out.

4    Q.      Okay, and this schedule that you talked

5 about, that was all worked out with Mr. Hunt; is that

6 right?

7    A.      Mr. Hunt and Sheriff Altizer.

8    Q.      And Sheriff Altizer?

9    A.      Hmm-hmm.

10   Q.      Okay, and in 2008 when the Sheriff was

11 elected, Sheriff Millirons, did he ever have a discussion

12 with you around that time about your hours or your salary?

13   A.      No, sir.  That was between me and Dave

14 Hunt.

15   Q.      Okay.  And so is it -- would it be fair to

16 say from your perspective that when Sheriff Millirons was

17 elected, that you just kind of continued on as you had

18 been?

19   A.      Yes, sir.

20   Q.      All right.  All right.  Has there ever been

21 any issues or difficulties between yourself and any of the

22 volunteers that would come to the shelter?

23   A.      Yes, sir.

24   Q.      All right.  Can you describe some of those?

| Page 13 |
|---|

1    A.      There was several instances that the

2 offices had been broken into.  Things were disappearing;

3 supplies were disappearing.  They used foul language in

4 front of the public during my open hours, and I brought it

5 to the attention of animal control officer and Sheriff

6 Morgan.

7    Q.      Okay.  And who used -- do you know who used

8 foul language?

9    A.      I don't remember his name.

10   Q.      Okay.  And -- and was he a Tech student; do

11 you recall, or was he a --

12   A.      No, sir, he wasn't a Tech student.  He was

13 a member of GCAR.

14   Q.      All right, I'm not asking you to sit here

15 and curse a blue streak, but I would like to know a little

16 bit about what happened, so can you describe what happened

17 in that incident?

18   A.      Him, and I'm assuming that it was his wife;

19 it was a lady, that came in, wanting to pull a cat.  The

20 cat had already been spoken for another rescue out of

21 Blacksburg, and I told him that.  The lady was there to

22 get it, and he got furious with me, and he started cussing

23 that -- do I say the word?

24   Q.      Go ahead and say it.

**Central Virginia Reporters**          **www.huseby.com**
**3155 W. Main St. , Salem, VA 24153**
Case 7:14-cv-00429-GEC   Document 52-13   Filed 08/19/15   Page 4 of 32   Pageid#: 905                    **(540) 380-5017**

**Page 14**

1    A.    That he could fucking take any animal he
2  wanted out there, and that the group that was getting it
3  wasn't a legit group, and I asked him to please do not use
4  that language, that we had the public there with small
5  children, and he continued to go back into the kennel area
6  where children was present and started cussing that he
7  could pull the damn animal if he wanted to and that he was
8  going to call his group, so I asked him politely to leave
9  the premises out there and notified animal control.  They
10 were standing in the office when I was on the phone with
11 animal control, and I told him that animal control asked
12 you to leave the property, if you can't leave on your own,
13 I will call for an officer to come and make you leave.
14    Q.    Okay.  And then you said that you reported
15 that to the Sheriff and Mr. Millirons and to Mr. Hunt?
16    A.    No, sir, animal control.
17    Q.    Okay, animal control?
18    A.    And Mr. Millirons.
19    Q.    Okay.  Was there any other incidents in
20 which a volunteer cursed in front of the public that you
21 felt was inappropriate, or was that the only time that you
22 saw that?
23    A.    No, the only time while I was present.
24    Q.    Okay.  All right, and when was that; do you

**Page 15**

1  recall?
2    A.    It was the summer of last year.  I don't --
3  or the year before.  I don't remember the exact date.
4    Q.    Okay, so if you left in January of 2014, it
5  might have been the summer --
6    A.    Summer of 2013, yes.
7    Q.    Okay.  And you said that things were being
8  taken.  What things were being taken, or what things were
9  missing?
10    A.    Well, our supplies, bleach would get gone;
11 cat litter would get gone.  Our towels that we used for
12 bedding would disappear.  My collars would disappear.
13    Q.    Okay.  It is my understanding that the --
14 in the shelter, there is a -- there is a private office
15 for the animal control office?
16    A.    Yes, sir.
17    Q.    And also a lock on that, isn't there?
18    A.    Yes, sir.
19    Q.    And it is a lock with a key; is it a key
20 lock?
21    A.    No, sir.
22    Q.    How do you access that?
23    A.    Oh, yes, it does have a key lock.
24    Q.    Oh, okay, who has that; does only the

**Page 16**

1  animal control officers have that key, or when you worked
2  there, did you have access to that key?
3    A.    Yes.
4    Q.    Do any volunteers have access to that key?
5    A.    Not that I knew of, no.
6    Q.    And was it your father that had discovered
7  that the office had been broken into?
8    A.    I had come into that morning and noticed
9  that the office had been broken into, and I called him.
10    Q.    So you discovered that the office had been
11 broken into?
12    A.    Hmm-hmm.
13    Q.    And you contacted your dad?
14    A.    Hmm-hmm.
15    Q.    Is that a yes?
16    A.    Yes.
17    Q.    Just walk me through the scene where you
18 noticed that it had been broken into.  I want to know what
19 you saw.
20    A.    The door was open, things were in disarray
21 in the office, the chairs were moved.
22    Q.    Okay, when was the last time that you had
23 been in the office prior to that?
24    A.    I don't remember.

**Page 17**

1    Q.    Okay.  It is my understanding that nothing
2  was taken; is that right?
3    A.    Not to my knowledge, no, sir.
4    Q.    Okay.  And -- all right, and at some point,
5  the volunteers were no longer granted access to the
6  shelter; is that right?
7    A.    Yes, sir.
8    Q.    Okay.  And how -- how did you hear about
9  that?
10    A.    Animal control.
11    Q.    Okay, and who?  I mean, was it your dad?
12    A.    Officer Dalton, yes.
13    Q.    He said it is your decision; you are not
14 going to let them in anymore?
15    A.    It was a decision between him and the
16 Sheriff; it had nothing to do to me, but they brought it
17 to my attention.
18    Q.    How was it brought to your attention?
19    A.    They told me that they agreed that GCAR
20 could not come in and open hours for volunteers or
21 adoptions, but they were still allowed to come and pull an
22 animal for a rescue group as long as someone was there.
23    Q.    Okay.  And did your -- did your father
24 indicate -- I think that you said that he had discussed

**Central Virginia Reporters**          **www.huseby.com**
**3155 W. Main St. , Salem, VA 24153**          **(540) 380-5017**
Case 7:14-cv-00429-GEC   Document 52-13   Filed 08/19/15   Page 5 of 32   Pageid#: 906

Page 18

1  this with the Sheriff?
2          A.     Yes, that was a decision between them.
3          Q.     Okay, and did he -- when he told you about
4  it, did he indicate whether he and the Sheriff had talked
5  to anyone else about this in making their decision?
6          A.     No, sir, that had nothing to do with me.
7          Q.     Okay.  And did you ever -- and after this
8  happened and the volunteers were no longer allowed, or had
9  limited access as you described to the shelter, did any
10  member of GCAR complain to you personally about what was
11  going on?
12          A.     Not to me personally, no.
13          Q.     Okay.  And -- all right, and at some point,
14  someone complained -- made a complaint to the Virginia
15  Department of Agriculture; is that right?
16          A.     Yes, sir.
17          Q.     And do you know who complained?
18          A.     Christine Link.
19          Q.     Okay, and did she ever tell you, like, you
20  know, something along the lines of I'm going to complain,
21  or you better clean up this place or I'm going to
22  complain?
23          A.     No, sir.
24          Q.     She didn't give you any heads-up that that

Page 19

1  was going to happen?
2          A.     No, sir.
3          Q.     So -- the -- she may not have told you that
4  she was going to complain to the department, but did she
5  ever, prior to the Department of Agriculture getting
6  involved in this, did she ever just complain to you
7  personally about some of her observations at the shelter?
8          A.     No, sir, she did not.
9          Q.     Not once?
10          A.     No.
11          Q.     All right.  Do you know if any members of
12  GCAR had every complained to the Sheriff?
13          A.     I don't know.  I have no idea.
14          Q.     Okay.  I was just wondering if anyone ever
15  talked about it to you or you ever heard about it.  Are
16  you aware of whether any members of GCAR ever complained
17  about what was going on to Officer Dalton?
18          A.     Again, that would have nothing to do with
19  me.  That would be between them.  I don't know.
20          Q.     Okay.
21          A.     I mean, I went out and done my cleaning and
22  feeding before they got there, and I was gone before they
23  got there.
24          Q.     Okay.

Page 20

1          A.     I didn't see Christine or have to --
2          Q.     Are you aware that at some point, you were
3  accused of not working the number of hours that you were
4  supposed to be working?
5          A.     Yes, sir, I'm aware of that.
6          Q.     Okay, do you know who accused you of that?
7          A.     Christine Link.
8          Q.     And do you admit or -- I mean, how do
9  you -- what is your response to that accusation?
10          A.     Again, if I was -- it goes back to my job.
11  When I was hired, I was hired as a salary person.  When I
12  completed my job duties I was allowed to leave, but I was
13  always on call.
14          Q.     Okay.  And you were also required to be
15  there six hours a day; isn't that right, didn't you say
16  that earlier?
17          A.     That is what was -- I wasn't required to
18  stay six hours.  When I completed my duties, I was able to
19  leave, but I was on call.
20          Q.     Okay, and did you sign a contract with
21  Greenbrier Services?
22          A.     No, sir, I didn't.
23          Q.     All right.  Did you ever speak with the
24  investigator for the Department of Agriculture?

Page 21

1          A.     Yes, sir.
2          Q.     Okay.  And she -- she interviewed you?
3          A.     Yes, sir.
4          Q.     Okay.  And were you forthright and honest
5  with your responses to the Department of Agriculture?
6          A.     Yes, sir, everything was founded as lies
7  against me.
8          Q.     Okay.
9                 MR. GUYNN:  I'm sorry, I didn't understand
10          what you just said.  I apologize, could you repeat
11          that?
12                 THE WITNESS:  The accusations that were
13          made against me was unfounded.  They were all
14          found to be lies.
15  BY MR. STRELKA:
16          Q.     Okay.  Did you ever speak to any members of
17  the Board of Giles County about what was happening at the
18  animal shelter?
19          A.     Yes, sir, I did.
20          Q.     Okay.  And do you recall when that might
21  have been?
22          A.     No, sir, I don't remember the exact date.
23          Q.     Okay.  But it was a Board meeting; is that
24  right?

**Central Virginia Reporters**          **www.huseby.com**
**3155 W. Main St. , Salem, VA 24153**
Case 7:14-cv-00429-GEC   Document 52-13   Filed 08/19/15   Page 6 of 32   Pageid#: 907          **(540) 380-5017**

Page 22

1    A.    Yes, sir, I was at a Board meeting.

2    Q.    Okay, and if I indicated to you that our

3 records indicate that it was January 8th, 2014, does that

4 sound about right?

5    A.    I don't recall the exact date.

6    Q.    All right.

7    A.    I don't.

8    Q.    But you have no reason to think that that

9 isn't the date, do you?

10    A.    No, sir.

11    Q.    Okay.  All right.  And do you recall what

12 you said to the Board?

13    A.    No, sir, I don't.

14    Q.    Nothing at all?  Sitting here today, you

15 have no memory of anything that you said to the Board?

16    A.    I don't remember, no.

17    Q.    You don't remember any question that they

18 asked you?

19    A.    No, sir, I don't.

20    Q.    I mean, you don't remember -- do you

21 remember any of the issues that you talked about?

22    A.    Volunteers, I think was maybe some of the

23 issues.  I don't remember exactly, no, sir, I don't.

24    Q.    Did anyone ask you whether you were working

Page 23

1 the hours that you were supposed to be working or how many

2 hours were you working, did anyone ask you about hours?

3    A.    They may have.  It may have been brought

4 up.  I don't remember.

5    Q.    What time would you typically get to the

6 shelter?  Well, was there a typical time that you got to

7 the shelter, is maybe a better question.

8    A.    Usually I was there by 8:30.

9    Q.    In the morning?

10    A.    Hmm-hmm.

11    Q.    Is that a yes?

12    A.    Yes, sir.

13    Q.    And is there -- would there also be a

14 typical time when you would leave the shelter?

15    A.    Usually around 11:00.  It depends on how

16 full the shelter was.  Some days I was there until 2:00 or

17 3:00.

18    Q.    Okay, and typically -- after you left

19 around the times that you just indicated, typically, you

20 would not come back in that particular day, would you?

21    A.    Not unless I was called out.

22    Q.    Okay.  All right, unless you were called

23 out?

24    A.    Or I had to give medication to an animal.

Page 24

1    Q.    And those were on the weekdays; is that

2 right, or was that every day that you did that?

3    A.    That was every day.

4    Q.    Every day?

5    A.    Yes.

6    Q.    All right.

7    A.    Seven days a week.

8    Q.    All right.  And so from what you are saying

9 about these accusations, I take it that your position is

10 that if members of GCAR are saying that you weren't there

11 as much as you are indicating now that you were, that they

12 are lying?

13    A.    Yes, they are lying.

14    Q.    Why would they be lying?

15    A.    They wasn't out there during the week, so

16 they didn't know when I was there and when I wasn't.  They

17 were only there on the weekends.

18    Q.    All right.  Did you ever have to write a

19 letter describing your working relationship with

20 Greenbrier and the animal shelter because of these

21 accusations?

22    A.    I had to list -- I had to write a list of

23 my job duties, what my job required, or what I done.  This is

24    Q.    Okay, is this what you wrote, and this is

Page 25

1 Exhibit Number 12 that was previously admitted?

2    A.    Yes, hmm-hmm, yes, sir.

3    Q.    Okay.  Hold on to that.  I might want to

4 ask you a few questions about it.  Who -- who told you to

5 write that?

6    A.    I wrote it on my own.

7    Q.    Okay.  And so you weren't directed to write

8 this by anybody?

9    A.    No.

10    Q.    Okay, why did you write it?

11    A.    Because my name had been slandered in the

12 newspapers, and that I wasn't working the time that I was

13 required, that I was stealing dog food, and I wanted it to

14 stop.

15    Q.    Okay.  And let's talk about the stealing of

16 the dog food.  Did you ever steal dog food from the pound?

17    A.    No, sir.

18    Q.    All right.  And I think that it was

19 reported that you were seen putting food into the back of

20 a vehicle and leaving the pound, or leaving the shelter?

21    A.    No, sir, I didn't.

22    Q.    Has that ever happened?

23    A.    No, sir, I have a five pound yorkie; I

24 don't need to steal no dog food.

**Central Virginia Reporters**          **www.huseby.com**
**3155 W. Main St . , Salem, VA 24153**
**(540) 380-5017**
Case 7:14-cv-00429-GEC   Document 52-13   Filed 08/19/15   Page 7 of 32   Pageid#: 908

**Page 26**

1    Q.    So you have never taken any bags of food

2 out of a shelter and put them in the truck and driven it

3 away?

4    A.    No.  I've put some on the back of it and

5 drove it over to the field that was out of date and had

6 worms on it and dumped it for the birds, because

7 physically, I could not carry it.

8    Q.    All right, did you ever travel to work from

9 home in a Giles County sheriff vehicle?

10    A.    No, sir, I traveled from home in my

11 personal vehicle, and there was times that I used an old

12 blue truck, unmarked, to pick up supplies or donations

13 from Walmart.

14    Q.    Okay.

15    A.    And take to the shelter.

16    Q.    All right.  And -- but you never used a

17 sheriff's vehicle during the course of your duties at the

18 animal shelter; is that what you are saying?

19    A.    No, sir, I did not.

20    Q.    All right.  All right, and so when you

21 wrote this letter in November, November 15th, 2015, is

22 that the date that you wrote it?

23    A.    Yes, sir.

24    Q.    So you wrote this to collect your thoughts

**Page 27**

1 to defend yourself against the accusations?

2    A.    Yes, sir.

3    Q.    And who did you give the letter to?

4    A.    I don't remember if I gave it to the

5 Sheriff or the Board or who I gave it to.

6    Q.    Okay.  At any time while you were working

7 at the shelter, did you ever take a stick and poke and

8 poke and poke at an animal?

9    A.    No, sir, I did not.

10    Q.    Are you aware that someone accused you of

11 doing that?

12    A.    Yes, sir, and that was unfounded.

13    Q.    Okay.  How do you know that it was

14 unfounded?

15    A.    It is in the report.

16    Q.    Okay.  And is there any incident that you

17 can recall in which someone might have been confused about

18 the scenario I just described?

19    A.    No, sir.  I've never been cruel to an

20 animal.  I was never there when volunteers were there,

21 very seldom.  My job duties and my cleaning and my feeding

22 were done before the GCAR arrived to open hours at 2:00

23 p.m.

24    Q.    Okay.  Do you recall anyone ever discussing

**Page 28**

1 with you the placement of any cameras at the shelter?

2    A.    Yes, sir.

3    Q.    And who discussed the placement of cameras

4 at the shelter with you?

5    A.    Sheriff Morgan and my father.

6    Q.    Okay.  And was that -- they did that

7 together, or were those two separate incidents that you

8 were talking about?

9    A.    No, it was separate.

10    Q.    Okay, well, why don't we talk about what

11 you discussed with the Sheriff.  What did you guys talk

12 about?

13    A.    He had informed me that they would be

14 putting cameras out at the shelter to monitor, and a time

15 clock.

16    Q.    Did he come out to the shelter to tell you

17 that or was this over the phone?

18    A.    No, it was at his office.  I had come by.

19    Q.    Okay.  And do you recall around when that

20 might have been?

21    A.    It was before -- right before I quit, it

22 all happened.

23    Q.    Okay.  All right.  And when did you speak

24 with your dad about cameras being placed out there?

**Page 29**

1    A.    I do not remember the exact date.

2    Q.    Was it before or after your discussion with

3 Mr. Millirons?

4    A.    It was after.

5    Q.    Okay.  And did anyone ever indicate to you

6 that there was a problem with funding to get cameras out

7 there?

8    A.    No, sir, that had nothing to do with me.

9    Q.    Okay.  All right, and when you got to work,

10 there wasn't a time sheet where you signed in, was there?

11    A.    No, sir.

12    Q.    And as you just said, there wasn't a time

13 clock, either, was there?

14    A.    No, sir.

15    Q.    So there wasn't any record at all kept

16 about what hours you were actually working?

17    A.    No, sir, because I was salary.

18    Q.    Okay, and again, you weren't told to keep a

19 record by anyone?

20    A.    No, sir, I was not.

21    Q.    Okay.  How would you get paid?  Would

22 you have -- did you submit any paperwork at the end of any

23 time period to get payment?

24    A.    No, sir, Dave paid me straight, 42 hours a

**Central Virginia Reporters**                    **www.huseby.com**
**3155 W. Main St. , Salem, VA 24153**
Case 7:14-cv-00429-GEC   Document 52-13   Filed 08/19/15   Page 8 of 32   Pageid#: 909                    **(540) 380-5017**

**Page 30**

1  week salary.

2          Q.     So the checks just kept coming and you kept

3  working?

4          A.     Yes, sir.

5          Q.     Okay.  And so you never had to handle any,

6  for instance, invoice regarding your services?

7          A.     No, sir.

8          Q.     Okay.  And did you ever work more than 40

9  hours a week?

10         A.     Yes, sir.

11         Q.     And did you ever get paid overtime for

12 that?

13         A.     No, sir, because I was salary.

14         Q.     Would you be interested to know that you

15 don't -- just because you are salary, that does not mean

16 that you are entitled to overtime?

17         A.     I don't know.

18         Q.     So it is the Fair Labor Standards Act; I'm

19 an employment lawyer, and one of my favorite things,

20 people always get that one confused.  You said that you

21 never got paid overtime?

22         A.     No, sir.

23         Q.     You never made a claim for it?

24         A.     No, sir.

**Page 31**

1          Q.     You never talked to Mr. Hunt about it?

2          A.     No, sir.

3          Q.     Did you ever talk to the Sheriff about it?

4          A.     No, sir.

5          Q.     Do you know an April Lowry?

6          A.     Yes, sir.

7          Q.     And who is that?

8          A.     She is a GCAR member.

9          Q.     Did she ever approach you with any issues

10 of difficulties about the shelter?

11         A.     Not to my knowledge, that I can remember,

12 no.

13         Q.     Okay.  Did she ever discuss with you

14 cameras at the shelter?

15         A.     No, sir.

16         Q.     Did any member of GCAR ever discuss with

17 you cameras at the shelter?

18         A.     No, sir.

19         Q.     Are you aware of a time when the area in

20 which the food was stored at the shelter was kept under

21 lock and key?

22         A.     Yes, sir.

23         Q.     Okay.  And that was in 2013, wasn't it?

24         A.     That was after the offices had been broken

**Page 32**

1  into and our supplies went missing.

2          Q.     Okay, so you put the food -- was it in a

3  closet or separate room?

4          A.     It was a separate room, I guess that you

5  would kind of say like a closet --

6          Q.     Okay.

7          A.     -- area.

8          Q.     And when that was done, who had a key to

9  have access to that room?

10         A.     Both animal control officers and myself.

11         Q.     Okay, and it was understood that no member

12 of GCAR was to have a key?

13         A.     Not to our food room, no.

14         Q.     Okay.  All right, and are you aware of any

15 occasion in which volunteers broke in to get food out of

16 the food room?

17         A.     Not the food room, not that I am aware of.

18         Q.     Not that you are aware of, okay.  So prior

19 to the break-in into the animal control office, the food

20 was not under lock and key?

21         A.     No, sir.

22         MR. GUYNN:  I'm sorry, that is not going to

23 come out.

24         MR. STRELKA:  You are right.  Okay.

**Page 33**

1          MR. GUYNN:  Do you mind rephrasing?

2          MR. STRELKA:  You are good on that,

3          catching it.  I will just rephrase the question a

4          little bit.

5  BY MR. STRELKA:

6          Q.     Would you agree with me that prior to the

7  animal control office being broken into, that the food was

8  accessible by any volunteer?

9          A.     Yes.

10         Q.     Okay.  I think I got it.

11         MR. GUYNN:  Yes, it is the same answer you

12         gave before, but when we go back and read the

13         transcript, when you said no, we will be confused,

14         but you cleared it up, thank you.

15 BY MR. STRELKA:

16         Q.     Do you remember any occasion in which food

17 was kept under lock and key prior to the animal control

18 office being broken into?

19         A.     Not our food room.  Our supplies, our

20 bleach, cleaning stuff was under --

21         Q.     Lock and key?

22         A.     Yes.

23         Q.     Okay.  And were those always kept under

24 lock and key?

**Central Virginia Reporters**            **www.huseby.com**
**3155 W. Main St. , Salem, VA 24153**
**(540) 380-5017**
Case 7:14-cv-00429-GEC   Document 52-13   Filed 08/19/15   Page 9 of 32   Pageid#: 910

Page 34

1      A.    Not always.

2      Q.    And when did they -- when did that start?

3      A.    I don't remember the exact date, but when

4   our supplies started to go missing.

5      Q.    Okay.  Did you ever post up anything on

6   social media about what was going on with the animal

7   shelter?

8      A.    No, sir, I didn't.

9      Q.    Okay, did anyone post up anything about the

10  animal shelter on your social media page about what was

11  going on?

12     A.    Not that I remember.  My name was posted

13  and slandered all over the place.

14     Q.    But you didn't have anything to do with

15  that?

16     A.    No, sir.

17     Q.    Did anyone send you email messages accusing

18  you of bad conduct in relation to the shelter?

19     A.    I don't think they approached me

20  personally, no.

21     Q.    Okay.  How do you know these people were

22  slandering your name?

23     A.    Because I read it.

24     Q.    Just in the paper?

Page 35

1      A.    The paper, Internet.

2      Q.    What was on the Internet, the news article,

3   or was there anything else that you were reading?

4      A.    No, there were different things.

5      Q.    Such as?

6      A.    They slandered my name that I sold food, I

7   mistreated animals, I was a whore.

8      Q.    Okay, where were these comments posted?

9   You said on the Internet.  I'm just wondering what website

10  were you looking at where you were seeing this stuff?

11     A.    I don't remember the --

12     Q.    Were you reading it in a news story that

13  was published on line?

14     A.    No, it was a --

15     Q.    Was it a message board?

16     A.    Yes, I guess that is what you could call

17  it.  Topics.

18     Q.    Topics?

19     A.    Yes.

20     Q.    Okay.  And do you know who these people

21  were or were they posted anonymously?

22     A.    They identified themselves as GCAR members.

23     Q.    So GCAR members were posting, from what you

24  could tell, were posting up accusations about your work

Page 36

1   performance at the shelter, for lack of a better term?

2      A.    Yes, sir.

3      Q.    Okay.  Did you ever address that issue,

4   those accusations, with any member of GCAR?

5      A.    No, I didn't, not -- not personally with

6   them, no.

7      Q.    Did you ever send them any messages over

8   the Internet about that?

9      A.    No, I didn't, no, sir.

10     Q.    Okay.  Did you ever post anything up on

11  that page, that topics page?

12     A.    No, sir.  I didn't.

13     Q.    Okay.  All right, I'm going to read to you

14  an email.  You didn't write this email, okay, and I will

15  let you know that from what it says on the email, it says

16  that Christine Link-Owens wrote the email, okay, but I'm

17  going to read to you this brief paragraph, and I want you

18  to tell me if you agree or disagree with what is said in

19  this paragraph, okay?

20     A.    Hmm-hmm.

21     Q.    All right.  "Chastity, kennel worker,

22  arrived on March 30th while her volunteers were still

23  there.  We go in and take photographs of pets to list them

24  on the Internet for adoption. She had two young boys in

Page 37

1   there which she turned loose in the shelter so they could

2   help her.  They began letting dogs out of the kennels,

3   letting them mix, putting two and three at a time in the

4   outdoor runs together.  This is a dangerous game for some,

5   if there is one, and the boys have no idea whether the

6   dogs get along or not and just randomly putting two or

7   three dogs together to run outside so they can hose the

8   runs.  The dogs can get hurt and disease can be spread,

9   not to mention they may have been mixed males and females

10  together."  Did this situation ever occur?

11     A.    No, sir.  I don't have small children.

12     Q.    Well, I didn't ask if you had small

13  children, but did you ever bring small children to the

14  shelter?

15     A.    No, sir.

16     Q.    There is no other kennel worker that was

17  working in 2013 other than you; is that right?

18     A.    Yes, sir, just me.

19     Q.    Okay.  And so if Ms. Link-Owens wrote this,

20  she was either highly confused or making it up?

21     A.    Exactly.

22     Q.    Okay.  And she further indicates that

23  "During this incident that a cat escaped, and were it not

24  for our volunteer would have been outside while the kids

**Central Virginia Reporters**                **www.huseby.com**
**3155 W. Main St. , Salem, VA 24153**
**(540) 380-5017**
Case 7:14-cv-00429-GEC   Document 52-13   Filed 08/19/15   Page 10 of 32   Pageid#: 911

Page 38

1  ran to find Chastity;" do you recall that occurring?

2       A.    No, sir I don't.

3       Q.    And there's another paragraph, "On

4  Saturday, April 20, because Chastity had plans, the

5  shelter was closed.  Please note this is not a way to run

6  a business."  Do you recall ever not appearing on a

7  Saturday?

8       A.    No, sir, the only time that the shelter was

9  closed was during holidays.

10      Q.    Okay, so other than holidays, you are

11 telling me that you were there every day of the weekend?

12      A.    Yes, sir, because the shelter was always

13 open except for holidays.

14      Q.    All right.

15      A.    It was closed to the public, but I still

16 had to go.

17      Q.    All right, so if Ms. Link-Owens wrote this,

18 she must have been confused or making it up, is what you

19 are saying?

20      A.    Yes, sir.

21      Q.    Okay.  And do you recall in 2013

22 individuals contacting the shelter trying to -- well, no,

23 strike that.  Okay, I said a stick earlier.  Let me just

24 read this, I think that I know what your response will

Page 39

1  be.  I will purport to you this is what looks to be an

2  email, and it states From: Christine Link-Owens.

3            "On April 20, two volunteers watched in

4  horror as the kennel help took a broom handle and poked at

5  a little Chihuahua mix.  She came in as a stray and was

6  labeled as aggressive and no one was allowed to adopt her.

7  She had been painted pink; she was well cared for.  The

8  doing growled at everyone that approached the kennel, and

9  the kennel helper was getting it to bite at the stick.

10 She bragged how mean it was and that her dad was going to

11 put it to sleep."  Does this refresh your memory about

12 whether this occurred?

13      A.    No, it never occurred.

14      Q.    All right.  And as you testified earlier,

15 there was no other situation that anyone could reasonably

16 believe that this happened?

17      A.    No, sir, I never abused any animal.

18      Q.    Did the Sheriff or Mr. Hunt ever approach

19 you in 2013 to discuss the complaints that they were

20 receiving from members of GCAR?

21      A.    Yes, sir.  I met Mr. Millirons several

22 times.

23      Q.    And what did you all talk about?

24      A.    The accusations that was made towards me.

Page 40

1       Q.    All right.

2       A.    And that was reported to the --

3       Q.    Right.  Prior to anything being reported in

4  the newspaper, did you ever have a meeting with the

5  Sheriff about any complaints that were being made about

6  the shelter?

7       A.    I don't remember, no.

8       Q.    Okay.  Okay.  There was a part-time animal

9  control officer, too, Mr. Gough?

10      A.    Yes, sir.

11      Q.    And my understanding is that he took -- he

12 took off for some pretty long vacations; is that your

13 understanding?

14      A.    I don't know where he went.  I mean, he had

15 nothing to do with me.

16      Q.    Okay, how often would you see Mr. Gough

17 when you worked at the shelter?

18      A.    I would see him at least once a day.

19      Q.    Once a day, every day?

20      A.    If he was on duty.

21      Q.    Okay, do you know how many hours a week he

22 worked?

23      A.    No, sir, that had nothing to do with me.

24      Q.    But you were there from time to time; I'm

Page 41

1  just wondering if, from your powers of observation, you

2  had any idea from your perspective how many hours this man

3  might be working there per week?

4       A.    No, he would bring an animal in and do his

5  paperwork and leave.

6       Q.    Did you ever include cats to be kept with

7  dogs at the shelter?

8       A.    No, sir.

9       Q.    And are you aware of any GCAR member

10 accusing you of doing that?

11      A.    No, sir.

12      Q.    Would the shelter ever receive free food

13 from any source?

14      A.    Walmart donated.

15      Q.    Animal food?

16      A.    Hmm-hmm.

17      Q.    Is that a yes?

18      A.    Yes.

19      Q.    And at some point during the course of your

20 employment, did you request a raise?

21      A.    Several times, yes.

22      Q.    Several times, you did?

23      A.    Yes.

24      Q.    Okay.  And you did get one at some point,

**Central Virginia Reporters**          **www.huseby.com**
**3155 W. Main St. , Salem, VA 24153**
**(540) 380-5017**
Case 7:14-cv-00429-GEC   Document 52-13   Filed 08/19/15   Page 11 of 32   Pageid#: 912

**Page 42**

1  right, or no?

2      A.    When minimum wage went up to $7.25; it went

3  from $7 to $7.25.

4      Q.    Did you ever get a raise after that?

5      A.    No, sir, I didn't.

6      Q.    Did you ever talk to the Sheriff about

7  getting a raise?

8      A.    Yes, sir.

9      Q.    And what was his response?

10     A.    It would be up to the Board.

11     Q.    Okay.  And did he say that he would support

12  your request?

13     A.    Yes, yes, sir.

14     Q.    Okay.  And do you recall when that might

15  have been?

16     A.    No, sir, I don't.

17     Q.    During the course of your employment at the

18  shelter, there was no manual or employee handbook for you

19  to know the policies and procedures of the shelter, was

20  there?

21     A.    No, sir.

22     Q.    Okay.  And I guess that there wasn't

23  anything written anywhere for you showing your job

24  description?

**Page 43**

1      A.    No, sir.

2      Q.    Did you ever ask for that?

3      A.    No, sir.

4      Q.    And at any time did you ever see any of the

5  photographs that were submitted to the Department of

6  Agriculture?

7      A.    Yes, sir, I did.

8      Q.    And at what point did you see those

9  photographs?

10     A.    When she interviewed me at the shelter.

11     Q.    Okay, and did she indicate to you who took

12  the photographs?

13     A.    No, sir, she didn't.

14     Q.    Okay.  And did you ever see any members of

15  GCAR taking pictures of the animals?

16     A.    Not unless they came when I wasn't there.

17     Q.    Okay.  And if a GCAR member -- prior to the

18  Sheriff determining that they should have limited access

19  to the shelter, if a GCAR member wanted to go into the

20  shelter and you weren't there, how would a GCAR member

21  have done that?

22     A.    Starting out, they had their own key.

23     Q.    Okay.  Well, at some point, weren't the

24  keys collected?

**Page 44**

1      A.    They were collected and locks were changed

2  and they had to check them out at dispatch.

3      Q.    Okay.  And was that the only place that the

4  key was located?  Was that dispatch, as far as you know?

5      A.    To my knowledge.

6      Q.    Okay, there wasn't a lock box on a gate

7  somewhere that also had a key, a combination box?

8      A.    At one point.

9      Q.    Okay.

10     A.    GCAR did that.

11     Q.    Okay.  They put a combination box?

12     A.    Yes.

13     Q.    At the shelter with a key in it?

14     A.    On the gate, yes.

15     Q.    Okay.  And was that after the key had been

16  -- the other key had been put at dispatch for access?

17     A.    No, I believe that that was before.

18     Q.    Okay.  And when the key was put at

19  dispatch, was that combination box removed?

20     A.    Yes.

21     Q.    Okay.  All right.  And did you ever hear

22  about any member of GCAR having difficulty obtaining the

23  key from dispatch?

24     A.    No, sir.

**Page 45**

1      Q.    Can you just briefly walk me through a

2  little bit of what you did when you got to work at 8:00 or

3  8:30 in the morning?  I he just want to know a little bit

4  about your day.  I know that you are cleaning and feeding

5  the animals, but walk me through what you do when you get

6  there.

7      A.    The first thing I do is check the messages;

8  I would check those and return those.  I would go into the

9  kennel area; we had four outside kennels, so I would take

10  four dogs out and let them run in the run area while I

11  clean and sanitize kennels.  I would put them in clean

12  kennels, put the food and water in, and then I would bring

13  the animals in, and that is the way that I done it until I

14  got all of animals done, and then I would start in the cat

15  room, clean their cages, feed them.

16     Q.    Okay.  What would happen if an animal, by

17  your observation, needed medical treatment?

18     A.    I would call and get the okay and

19  permission from Sheriff Morgan, and I contacted animal

20  control and animal control would come and take the

21  animal.  If they weren't available, I would take it

22  myself.

23     Q.    And where would the animal be taken?

24     A.    To the vet out here in town.

Case 7:14-cv-00429-GEC   Document 52-13   Filed 08/19/15   Page 12 of 32   Pageid#: 913

---

**Page 46**

```
 1        Q.    Okay.  But you would have to get
 2  authorization from Sheriff -- from the Sheriff before you
 3  would take this animal to seek medical treatment; is that
 4  what you are saying?
 5        A.    Yes.
 6        Q.    Okay.  Did you ever have any difficulty
 7  getting in contact with the Sheriff to do that?
 8        A.    No, sir, I didn't.
 9        Q.    Okay.  And how were animals put down at the
10  shelter?
11        A.    Euthanized.
12        Q.    Was that by injection?
13        A.    Yes.
14        Q.    A toxin?
15        A.    Hmm-hmm.
16        Q.    Is that a yes?
17        A.    Yes.
18        Q.    And who would perform those services?
19        A.    Animal control.
20        Q.    You never did that?
21        A.    No, sir.
22        Q.    And do you know if the euthanizations of
23  the animals increased after the volunteers were prevented
24  access to the shelter?
```

---

**Page 47**

```
 1        A.    No.  Our euthanization rate went down and
 2  the adoption rate went up.
 3        Q.    Okay.  Bear with me just a second.
 4        A.    Our adoption and rescue rate.
 5        Q.    Did you ever have any issues with animals
 6  receiving burns to their skin because of laying in excess
 7  waste on the floor of the shelter?
 8        A.    No, sir.
 9        Q.    That never happened?
10        A.    No, sir.
11              MR. GUYNN:  Ask another question because
12        that is not right.
13  BY MR. STRELKA:
14        Q.    Are you aware of whether or not any animals
15  at the shelter --
16              (Off the Record.)
17  BY MR. STRELKA:
18        Q.    Are you aware of whether or not any animals
19  at the shelter received burns because of laying in excess
20  waste?
21        A.    No, sir.
22        Q.    So that never happened?  Well, as far as
23  from what you knew, that never happened; is that right?
24        A.    Correct.
```

---

**Page 48**

```
 1        Q.    Okay.  All right, and did you ever examine
 2  the animals to see if they had any sort of health issues,
 3  and I know that you are not a veterinarian, and neither am
 4  I; I know that you are not a nurse, but did you ever look
 5  at the animals to see if they were having any sort of
 6  health issues?
 7        A.    Yes, I was in contact with the animals
 8  every day.
 9        Q.    All right.
10        A.    If they needed -- you know, I examined them
11  when I bathed them.  If they needed bathed, I gave them a
12  bath.  They were always looked over, nails checked.
13        Q.    Okay.  And I want to read another paragraph
14  here, and I will represent to you that this is from
15  another email that is purported to be written by Christine
16  Link-Owens, and I want to see if you know anything about
17  what she's talking about here, okay.
18        A.    Okay.
19        Q.    "Cassidy is a large white American bulldog
20  mix.  She suffered a spider bite on her front leg while
21  housed at the shelter.  Volunteers visited the shelter on
22  Sunday.  She was fine.  Then on Monday, they noticed that
23  she had a swollen area on her leg near the elbow and she
24  was limping.  On Tuesday, her entire leg was swollen and
```

---

**Page 49**

```
 1  she could barely walk.  She is lethargic, her entire body
 2  was limp, she had a high fever.  It took two volunteers to
 3  pick her up and encourage her to walk outside for a
 4  bathroom break.  No medical treatment was sought for her.
 5  Finally on Wednesday we convinced animal control to let us
 6  take her to a vet." Do you recall any situation in which
 7  that occurred?
 8        A.    No, sir.
 9        Q.    Did anyone ever talk to you about a
10  situation like that?
11        A.    No, sir.
12        Q.    And would you have noticed if a dog was
13  exhibiting signs of poor health as I just indicated?
14        A.    Yes, sir, I would have known it.
15        Q.    Is it possible that you did not show up for
16  a couple of days?
17        A.    No, sir.
18        Q.    Okay.
19        Q.    Have you ever -- are you aware of any
20  member of GCAR complaining about it taking too long for
21  suffering animals to be euthanized?
22        A.    No, sir.
23        Q.    Okay.  I understand that -- I know that you
24  didn't do the euthanization, but I just wondered if you
```

---

Case 7:14-cv-00429-GEC   Document 52-13   Filed 08/19/15   Page 13 of 32   Pageid#: 914

Page 50

1  had ever heard anything about it.  Our next witness is
2  here.  Let me just say hi to her real quick.  I will be
3  right back.  Off the Record.
4              MR. GUYNN:  Sure.
5              (Off the Record.)
6  BY MR. STRELKA:
7      Q.    Are you aware of a requirement at the
8  shelter for a deposit to be paid that could be returned if
9  there was evidence of the dog being spayed or neutered was
10  presented?
11     A.    Yes, sir.
12     Q.    What is your understanding of that policy
13  as it was when you were working there?
14     A.    You would go to the vet and bring your
15  prepaid slip that you had prepaid to have them spayed or
16  neutered, pay your adoption fee, and you could take the
17  animal.  If you didn't have the slip from the vet, you
18  paid a $150 deposit, and when you returned the slip from
19  the vet, then you would get your refund back.
20     Q.    Okay, and so you would take this money at
21  the shelter?
22     A.    If I was there.
23     Q.    You were there?
24     A.    Yes.

Page 51

1      Q.    And did you ever process an adoption and
2  not collect that deposit fee?
3      A.    If they had a prepaid slip from the vet,
4  you didn't collect that fee.
5      Q.    Okay.  And Ms. Link is out there, and she
6  just handed me this document that I have -- I mean, I
7  wanted to ask her a question about it.  Will you take a
8  look at it?  Ms. Link can certainly talk about it.
9              MR. GUYNN:  Let me see it.
10             MR. STRELKA:  Would you object if I made
11     that an Exhibit and asked her some questions about
12     it?
13             MR. GUYNN:  No.
14             MR. STRELKA:  All right, I would like this
15     marked as an Exhibit.
16
17             (The above-mentioned document was marked as
18     Deposition Exhibit Number 41 and entered into the
19     Deposition.)
20  BY MR. STRELKA:
21     Q.    Ms. Jones, I've just handed you a document
22  labeled 41, and I would like to ask you if you've seen
23  that type of form before.
24     A.    Yes, sir.

Page 52

1      Q.    What is that form?
2      A.    It is an adoption form.
3      Q.    Okay, and is that your handwriting on the
4  form?
5      A.    It looks like it.
6      Q.    Okay, and do you see at the bottom where
7  there is a -- it looks to be like a big loop at the very
8  bottom, the bottom third of the page, a pen mark?
9      A.    Yes.
10     Q.    Okay, and do you recall making that mark?
11     A.    I don't remember.
12     Q.    Okay.  Does that -- does the part of that
13  ink mark that is -- is the text that that ink mark is
14  resting upon, does that regard the deposit fee?
15     A.    It is -- it regards -- this would not have
16  been filled out because the animal was already neutered,
17  so if the animal is already spayed or neutered, they
18  didn't have to bring in a vet form and they didn't have to
19  pay the deposit if the animal was already spayed or
20  neutered.
21     Q.    Are you remembering the situation from your
22  memory or are you just indicating what it says on the
23  form?
24     A.    No, it's marked that he's neutered.

Page 53

1      Q.    Okay, so under your -- under awareness of
2  the policy, you didn't have to collect any further funds?
3      A.    Just the adoption fee.
4      Q.    Which was how much?
5      A.    $20.
6      Q.    All right, will you please turn the page?
7      A.    Yes.
8      Q.    So that would be a typical receipt that you
9  might produce to a member of the public?
10     A.    Yes.
11             MR. STRELKA:  That is fine, that is all
12     that I had to ask about.  Okay.  Let me take a
13     quick one minute with him.
14             (A recess was taken.)
15             MR. STRELKA:  I don't have any further
16     questions for you.  Please answer any questions
17     that Mr. Guynn may have.
18
19             EXAMINATION BY JIM H. GUYNN, JR., ESQ.:
20     Q.    Ms. Jones, just a couple of things to make
21  sure that I understand.  When Dave Hunt hired you, he told
22  you that your two responsibilities were to clean and
23  feed.
24     A.    Yes, sir.

**Central Virginia Reporters**                    **www.huseby.com**
**3155 W. Main St., Salem, VA 24153**
**(540) 380-5017**
Case 7:14-cv-00429-GEC   Document 52-13   Filed 08/19/15   Page 14 of 32   Pageid#: 915

Page 54

1    Q.    And then how was it that you came to handle
2  adoptions?
3    A.    Well, I just -- it was just something that
4  I agreed to do when I was there, and I done it.
5    Q.    Okay, and did you talk to Dave Hunt about
6  doing it?
7    A.    No, sir.
8    Q.    Did you talk to the Sheriff about doing it?
9    A.    No, sir, not that I recall.
10   Q.    Was it something that you saw a need for
11  and you did?
12   A.    Yes, it was part of the routine out there,
13  and if I was there, I done it.
14   Q.    Okay.  All right, now, was there a set time
15  for the volunteers to be at the shelter?
16   A.    It was from Saturday to Sunday, 2:00 to
17  4:00.
18   Q.    And so from Monday through Friday, the
19  volunteers were not at the shelter?
20   A.    I mean, when they had the key, they could
21  come out there and do pictures for the rescue or pull an
22  animal.
23   Q.    Okay, so the shelter was open from 2:00 to
24  4:00 on Saturday and Sunday and the volunteers were

Page 55

1  operating the shelter at that time?
2    A.    As far as open to adoptions, yes, sir.
3    Q.    And they will handle the adoptions from
4  2:00 to 4:00 on Saturdays and Sundays?
5    A.    Yes, sir.
6    Q.    As far as your experience is concerned,
7  were there volunteers there when you would come in at 8:30
8  in the morning?
9    A.    No, sir.
10   Q.    Did your paycheck come from Greenbrier?
11   A.    Yes, sir.
12   Q.    You indicated that you might have to go
13  back out to the shelter if an animal needed medication?
14   A.    Yes, sir.
15   Q.    How far do you live from the shelter?
16   A.    At that time, I lived about --
17   Q.    Time wise?
18   A.    Twenty minutes.
19   Q.    Okay.  Was there -- were there other
20  reasons why you would have to go back to the shelter at
21  night or after you had fed and cleaned -- fed animals and
22  cleaned the pens?
23   A.    Do what now?
24   Q.    That was an awkward question, wasn't it.

Page 56

1  Were there other reasons that you would go back to the
2  shelter after you had cleaned and fed the animals?
3    A.    If an animal needed medication, you know, I
4  would have to go out and give it, or, you know, if someone
5  had called and said, hey, I found this animal, I would get
6  it and take it out there in my personal vehicle and put it
7  in a shelter.
8         MR. GUYNN:  Okay.  I don't have any other
9      questions.
10
11        EXAMINATION BY THOMAS E. STRELKA, ESQ.
12   Q.    Are you aware of when Dave Hunt was aware
13  of any of these issues in 2013 at the shelter?
14   A.    Do what now?
15   Q.    Are you aware of when Mr. Hunt became aware
16  of any of these issues at the shelter?
17   A.    I don't remember when he was -- the exact
18  date that he was aware of it, no.  You would have to ask
19  him.
20   Q.    Did you ever discuss with him any of the
21  accusations?
22   A.    Yes, I did.
23   Q.    Okay.  What was his response?
24   A.    He was shocked.

Page 57

1         MR. STRELKA:  Okay.  I don't have any
2  further questions.
3         MR. GUYNN:  Ms. Jones, we need to get a
4  signature on the transcript of the deposition that
5  the court reporter is going to prepare, your
6  signature, and we can do that in one of two ways.
7  She will prepare it, she will send it to you along
8  with an errata sheet, and you will have what, is
9  21 days, 30 days, to read it, sign it, send it
10  back to her, or you can waive your right to sign
11  it and authorize her as a notary public to sign
12  your name to it, and then if you want a copy of
13  it, we'll send it to you later.
14        MR. MILLIRONS:  Some of them have been
15  saying sign it for me and some of them are saying
16  that they want to read it.
17        MR. GUYNN:  I'm not your attorney, so I
18  can't advise you one way or the other.
19        MR. MILLIRONS:  I would go ahead and read
20  it and then you sign it and send it back.
21        THE WITNESS:  Okay.
22        MR. GUYNN:  You are free to go.
23        THE WITNESS:  Thank you.
24        (The deposition concluded at 11:10 a.m.)

**Central Virginia Reporters**          **www.huseby.com**
**3155 W. Main St. , Salem, VA 24153**
**(540) 380-5017**
Case 7:14-cv-00429-GEC   Document 52-13   Filed 08/19/15   Page 15 of 32   Pageid#: 916

Page 58

```
1                    WITNESS SIGNATURE PAGE
2            I hereby certify that I have read my
3      deposition, and made those changes and/or
4      corrections I deem necessary, and approve the same
5      as now written.
6            Executed this _____ day of _____,
7      2015.
8
9
10     By:
11     _____
12     CHASTITY M. JONES
13     Witness
14
15
16
17
18
19
20
21
22
23
24
```

Page 60

```
1                         ERRATA SHEET
2      DEPOSITION OF:  CHASTITY M. JONES
       CASE: DUNN v. MILLIRONS
3      DATE TAKEN:  APRIL 10, 2015
       REPORTER:  LISA M. HOOKER, RPR
4
       I have read the foregoing deposition and I wish to
5      make the following changes:
6
7      PAGE    LINE        CHANGE          REASON
8      _____
9      _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19     _____
20     _____
21
22                       _____
23                            WITNESS NAME
24
```

Page 59

```
1               C E R T I F I C A T E
2      COMMONWEALTH OF VIRGINIA
3      COUNTY OF ROANOKE
4            I, Lisa M. Hooker, Notary Public in and for
5      the Commonwealth of Virginia, at Large, do hereby certify
6      that the Deposition of CHASTITY M. JONES was by me reduced
7      to machine shorthand in the presence of the witness,
8      afterwards transcribed under my direction by means of
9      Computer, and that to the best of my ability the foregoing
10     is a true and correct transcript of the Deposition as
11     aforesaid.
12            I further certify that this Deposition was
13     taken at the time and place in the foregoing caption
14     specified.
15            I further certify that I am not a relative,
16     counsel or attorney for either party or otherwise
17     interested in the outcome of this action.
18            IN WITNESS WHEREOF, I have hereunto set my
19     hand at Roanoke, Virginia, on this the 24th day of
20     April, 2015.
21                        Lisa M. Hooker RPR
22                        Lisa M. Hooker
                          Notary Public
23
       My commission expires October 31, 2015.
24     Notary Registration Number:  165043
```

**Central Virginia Reporters**                **www.huseby.com**
**3155 W. Main St. , Salem, VA 24153**              **(540) 380-5017**
Case 7:14-cv-00429-GEC   Document 52-13   Filed 08/19/15   Page 16 of 32   Pageid#: 917

**$**

$150   50:18

$20   53:5

$7   42:3

$7.25   42:2,3

**0**

05   7:5,7

**1**

11:00   23:15

11:10   57:24

12   25:1

15th   26:21

**2**

20   38:4
 39:3

2005   7:8,11

2008   9:7,11
 12:10

2013   15:6
 31:23
 37:17
 38:21
 39:19
 56:13

2014   10:6
 15:4 22:3

2015   26:21

**21**   57:9

**2:00**   9:23
 23:16
 27:22
 54:16,23
 55:4

**3**

30   57:9

30th   36:22

3:00   23:17

**4**

40   30:8

41   51:18,22

42   29:24

4:00   9:23
 54:17,24
 55:4

**8**

8:00   45:2

8:30   23:8
 45:3 55:7

8th   22:3

**A**

a.m.   57:24

above-
mentioned
 51:17

abused   39:17

accepted
 7:15

access   15:22
 16:2,4
 17:5 18:9
 32:9 43:18
 44:16
 46:24

accessible
 33:8

accusation
 20:9

accusations
 21:12
 24:9,21
 27:1 35:24
 36:4 39:24
 56:21

accused
 20:3,6
 27:10

accusing
 34:17
 41:10

Act   30:18

activities
 9:11

address   36:3

admit   20:8

admitted
 25:1

adopt   8:17

39:6

adoption   9:4
 36:24
 47:2,4
 50:16 51:1
 52:2 53:3

adoptions
 8:16 9:1,
 24 17:21
 54:2 55:2,
 3

advise   57:18

aggressive
 39:6

agree   33:6
 36:18

agreed   17:19
 54:4

Agriculture
 18:15 19:5
 20:24 21:5
 43:6

ahead   13:24
 57:19

air   11:6

allowed
 11:24
 17:21 18:8
 20:12 39:6

Altizer
 12:7,8

American
 48:19

Central Virginia Reporters          www.huseby.com
3155 W. Main St. , Salem, VA 24153          (540) 380-5017
Case 7:14-cv-00429-GEC   Document 52-13   Filed 08/19/15   Page 17 of 32   Pageid#: 918

animal  6:13,
  14 7:14,18
  8:17,23
  9:14 10:21
  12:1 13:5
  14:1,7,9,
  11,16,17
  15:15 16:1
  17:10,22
  21:18
  23:24
  24:20
  26:18
  27:8,20
  32:10,19
  33:7,17
  34:6,10
  39:17 40:8
  41:4,15
  45:16,19,
  20,21,23
  46:3,19
  49:5 50:17
  52:16,17,
  19 54:22
  55:13
  56:3,5

animals  8:13
  9:23 10:2
  12:2 35:7
  43:15
  45:5,13,14
  46:9,23
  47:5,14,18
  48:2,5,7
  49:21
  55:21 56:2

anonymously
  35:21

anymore
  17:14

apologize
  21:10

appeared
  11:11

appearing
  38:6

approach
  31:9 39:18

approached
  34:19 39:8

April  31:5
  38:4 39:3

area  14:5
  31:19 32:7
  45:9,10
  48:23

arose  12:1

arrived
  27:22
  36:22

article  35:2

asks  5:2

assume  4:14

assuming
  13:18

attending
  9:11

attention

13:5
17:17,18

attorney
  57:17

authorization
  46:2

authorize
  57:11

aware  19:16
  20:2,5
  27:10
  31:19
  32:14,17,
  18 41:9
  47:14,18
  49:19 50:7
  56:12,15,
  18

awareness
  53:1

awkward
  55:24

_____

B
_____

back  8:10
  12:2,3
  14:5 20:10
  23:20
  25:19 26:4
  33:12
  50:3,19
  55:13,20
  56:1
  57:10,20

bad  34:18

bags  26:1

barely  49:1

bath  48:12

bathed  48:11

bathroom
  49:4

bear  4:9
  47:3

bedding
  15:12

began  37:2

begin  6:19

big  52:7

birds  26:6

bit  13:16
  33:4 45:2,
  3

bite  39:9
  48:20

Blacksburg
  13:21

bleach  15:10
  33:20

blue  13:15
  26:12

board  21:17,
  23 22:1,
  12,15 27:5
  35:15
  42:10

Central Virginia Reporters          www.huseby.com
3155 W. Main St. , Salem, VA 24153          (540) 380-5017
Case 7:14-cv-00429-GEC   Document 52-13   Filed 08/19/15   Page 18 of 32   Pageid#: 919

body  49:1

bottom  52:6,
   8

box  44:6,7,
   11,19

boys  36:24
   37:5

bragged
   39:10

break  49:4

break-in
   32:19

briefly  45:1

bring  9:17
   37:13 41:4
   45:12
   50:14
   52:18

broke  32:15

broken  13:2
   16:7,9,11,
   18 31:24
   33:7,18

broom  39:4

brought  13:4
   17:16,18
   23:3

bulldog
   48:19

burns  47:6,
   19

business
   38:6

---
**C**
---

C-h-a-s-t-i-t-
   y  6:4

cages  45:15

call  8:9
   12:1 14:8,
   13 20:13,
   19 35:16
   45:18

called  7:13
   8:10 10:15
   16:9
   23:21,22
   56:5

cameras
   28:1,3,14,
   24 29:6
   31:14,17

cared  39:7

carry  26:7

case  5:12

Cassidy
   48:19

cat  13:19,
   20 15:11
   37:23
   45:14

catching
   33:3

cats  41:6

Celanese
   7:13

chairs  16:21

changed  4:15
   44:1

Chastity
   4:1,12
   36:21
   38:1,4

check  44:2
   45:7,8

checked
   48:12

checks  30:2

Chihuahua
   39:5

children
   14:5,6
   37:11,13

Christine
   18:18
   20:1,7
   36:16 39:2
   48:15

claim  30:23

clean  18:21
   45:11,15
   53:22

cleaned  8:13
   55:21,22
   56:2

cleaning
   19:21
   27:21
   33:20 45:4

cleared
   33:14

clock  28:15
   29:13

closed  38:5,
   9,15

closet  32:3,
   5

collars
   15:12

collect
   26:24
   51:2,4
   53:2

collected
   43:24 44:1

combination
   44:7,11,19

comments
   35:8

communicate
   10:13

complain
   18:10,20,
   22 19:4,6

complained
   18:14,17
   19:12,16

complaining
   49:20

complaint
   18:14

complaints

**Central Virginia Reporters**        www.huseby.com
**3155 W. Main St. , Salem, VA 24153**        **(540) 380-5017**
Case 7:14-cv-00429-GEC    Document 52-13    Filed 08/19/15    Page 19 of 32    Pageid#: 920

39:19 40:5

completed
  11:24
  20:12,18

completely
  5:19,20

concerned
  55:6

concluded
  57:24

conduct
  34:18

confused
  27:17
  30:20
  33:13
  37:20
  38:18

Congratulation
s   4:19

contact   46:7
  48:7

contacted
  16:13
  45:19

contacting
  38:22

continue   4:9

continued
  12:17 14:5

contract
  20:20

control   8:24

12:1 13:5
14:9,11,
16,17
15:15 16:1
17:10
32:10,19
33:7,17
40:9 45:20
46:19 49:5

conversation
  5:16

convinced
  49:5

copy   7:1
  57:12

Correct
  47:24

County   6:14
  9:14 21:17
  26:9

couple   49:16
  53:20

court   57:5

cruel   27:19

curse   13:15

cursed   14:20

cussing
  13:22 14:6

———————
        D
———————

dad   16:13
  17:11
  28:24

39:10

Dalton   17:12
  19:17

damn   14:7

dangerous
  37:4

date   10:5
  15:3 21:22
  22:5,9
  26:5,22
  29:1 34:3
  56:18

dates   6:21

Dave   7:12
  8:3,4
  10:15
  12:13
  29:24
  53:21 54:5
  56:12

day   8:8
  10:3 11:21
  20:15
  23:20
  24:2,3,4
  38:11
  40:18,19
  45:4 48:8

day-to-day
  11:16

days   8:8
  11:21
  23:16 24:7
  49:16 57:9

decision
  17:13,15
  18:2,5

defend   27:1

department
  18:15
  19:4,5
  20:24 21:5
  43:5

depends
  23:15

deposed   4:22

deposit
  50:8,18
  51:2
  52:14,19

deposition
  4:22
  51:18,19
  57:4,24

describe
  11:13
  12:24
  13:16

describing
  24:19

description
  8:15 42:24

determining
  43:18

difficulties
  12:21
  31:10

Central Virginia Reporters          www.huseby.com
3155 W. Main St., Salem, VA 24153        (540) 380-5017
Case 7:14-cv-00429-GEC   Document 52-13   Filed 08/19/15   Page 20 of 32   Pageid#: 921

difficulty
  44:22 46:6
directed
  25:7
disagree
  36:18
disappear
  15:12
disappearing
  13:2,3
disarray
  16:20
discovered
  16:6,10
discuss
  31:13,16
  39:19
  56:20
discussed
  17:24
  28:3,11
discussing
  27:24
discussion
  12:11 29:2
disease  37:8
dispatch
  44:2,4,16,
  19,23
document
  51:6,17,21
dog  25:13,
  16,24

49:12 50:9
dogs  37:2,
  6,7,8 41:7
  45:10
donated
  41:14
donations
  26:12
door  16:20
driven  26:2
drove  26:5
dumped  26:6
Dunn  4:8
duties  8:11
  20:12,18
  24:23
  26:17
  27:21
duty  9:3
  40:20

_____
            E
_____

ear  5:11,12
earlier  4:8
  9:10 20:16
  38:23
  39:14
easily  5:19
easy  4:24
elbow  48:23
elected  6:17
  9:7 10:20

12:11,17
email  34:17
  36:14,15,
  16 39:2
  48:15
employed
  6:9,12
employee  8:7
  42:18
employment
  30:19
  41:20
  42:17
encourage
  49:3
end  29:22
ended  7:13
  10:8
entail  8:2,6
entered
  51:18
entire  10:19
  48:24 49:1
entitled
  30:16
errata  57:8
escaped
  37:23
ESQ  4:6
  53:19
  56:11
euthanization
  47:1 49:24

euthanizations
  46:22
euthanized
  46:11
  49:21
evidence
  50:9
exact  10:5
  15:3 21:22
  22:5 29:1
  34:3 56:17
EXAMINATION
  4:6 53:19
  56:11
examine  48:1
examined
  48:10
excess  47:6,
  19
Exhibit  25:1
  51:11,15,
  18
exhibiting
  49:13
expected
  11:17
experience
  55:6

_____
            F
_____

fact  10:13
fair  12:15
  30:18

Central Virginia Reporters          www.huseby.com
3155 W. Main St., Salem, VA 24153
(540) 380-5017
Case 7:14-cv-00429-GEC   Document 52-13   Filed 08/19/15   Page 21 of 32   Pageid#: 922

father  16:6
  17:23 28:5

favorite
  30:19

February
  4:20

fed  8:13
  55:21 56:2

Federal  6:10

fee  50:16
  51:2,4
  52:14 53:3

feed  45:15
  53:23

feeding
  19:22
  27:21 45:4

felt  14:21

females  37:9

fever  49:2

field  26:5

filled  52:16

Finally  49:5

find  38:1

fine  48:22
  53:11

floor  47:7

focused  11:8

food  25:13,
  16,19,24
  26:1 31:20
  32:2,13,

15,16,17,
19 33:7,
16,19 35:6
41:12,15
45:12

form  51:23
  52:1,2,4,
  18,23

forthright
  21:4

foul  13:3,8

found  21:14
  56:5

founded  21:6

free  41:12
  57:22

frequently
  11:3

Friday  54:18

front  13:4
  14:20
  48:20

fucking  14:1

full  23:16

funding  29:6

funds  53:2

furious
  13:22

_____
            G
_____

game  37:4

gate  44:6,
  14

gave  27:4,5
  33:12
  48:11

GCAR  13:13
  17:19
  18:10
  19:12,16
  24:10
  27:22
  31:8,16
  32:12
  35:22,23
  36:4 39:20
  41:9
  43:15,17,
  19,20
  44:10,22
  49:20

get along
  37:6

Giles  6:14
  9:14 21:17
  26:9

give  11:9
  18:24
  23:24 27:3
  56:4

good  4:7
  33:2

goofed  5:12

Gough  40:9,
  16

granted  17:5

Greenbrier
  6:23 7:13,
  17 20:21
  24:20
  55:10

group  14:2,
  3,8 17:22

growled  39:8

guess  9:2
  32:4 35:16
  42:22

Guynn  5:2
  6:2,5 21:9
  32:22
  33:1,11
  47:11 50:4
  51:9,13
  53:17,19
  56:8 57:3,
  17,22

guys  28:11

_____
            H
_____

handbook
  42:18

handed  51:6,
  21

handle  30:5
  39:4 54:1
  55:3

handwriting
  52:3

happen  19:1
  45:16

Central Virginia Reporters          www.huseby.com
3155 W. Main St., Salem, VA 24153
(540) 380-5017
Case 7:14-cv-00429-GEC   Document 52-13   Filed 08/19/15   Page 22 of 32   Pageid#: 923

**happened**
   13:16  18:8
   25:22
   28:22
   39:16
   47:9,22,23
**happening**
   21:17
**heads-up**
   18:24
**health**  48:2,
   6  49:13
**hear**  7:10
   17:8  44:21
**heard**  19:15
   50:1
**helper**  39:9
**hey**  56:5
**high**  49:2
**highly**  37:20
**hired**  8:7
   11:23
   20:11
   53:21
**hmm-hmm**  5:11
   12:9
   16:12,14
   23:10  25:2
   36:20
   41:16
   46:15
**hmm-hmm's**
   5:8

**hold**  9:22
   25:3
**holidays**
   38:9,10,13
**home**  26:9,
   10
**honest**  21:4
**Hooker**  4:3
**horror**  39:4
**hose**  37:7
**hours**  8:8
   9:22
   11:16,17,
   20  12:12
   13:4  17:20
   20:3,15,18
   23:1,2
   27:22
   29:16,24
   30:9  40:21
   41:2
**housed**  48:21
**huh-huh**  5:11
**human**  5:16
**Hunt**  7:12
   8:3,4
   10:15
   12:5,7,14
   14:15  31:1
   39:18
   53:21  54:5
   56:12,15
**hurt**  37:8

——————————
        **I**
——————————

**idea**  19:13
   37:5  41:2
**identified**
   35:22
**inappropriate**
   14:21
**incident**
   13:17
   27:16
   37:23
**incidents**
   14:19  28:7
**include**  41:6
**increased**
   46:23
**indicating**
   24:11
   52:22
**individuals**
   9:2  38:22
**information**
   11:10
**informed**
   28:13
**injection**
   46:12
**ink**  52:13
**instance**
   30:6
**instances**

   13:1
**interested**
   30:14
**Internet**
   35:1,2,9
   36:8,24
**interrupt**
   6:2
**interviewed**
   21:2  43:10
**investigator**
   20:24
**invoice**  30:6
**involved**
   19:6
**issue**  36:3
**issues**  12:21
   22:21,23
   31:9  47:5
   48:2,6
   56:13,16

——————————
        **J**
——————————

**January**  10:6
   15:4  22:3
**JIM**  53:19
**job**  7:11,
   13,14  8:1,
   15  10:8,9
   11:24
   20:10,12
   24:23
   27:21

**Central Virginia Reporters**          www.huseby.com
3155 W. Main St., Salem, VA 24153          (540) 380-5017
Case 7:14-cv-00429-GEC  Document 52-13  Filed 08/19/15  Page 23 of 32  Pageid#: 924

42:23

Jones 4:1,
12,13,21
6:8 51:21
53:20 57:3

JR 53:19

June 7:5,7,
8

### K

kennel 14:5
36:21
37:16
39:4,8,9
45:9

kennels 37:2
45:9,11,12

key 15:19,
23 16:1,2,
4 31:21
32:8,12,20
33:17,21,
24 43:22
44:4,7,13,
15,16,18,
23 54:20

keys 43:24

kids 37:24

kind 9:19
12:17 32:5

knew 16:5
47:23

knowledge
17:3 31:11

44:5

### L

labeled 39:6
51:22

Labor 30:18

lack 36:1

lady 13:19,
21

language
13:3,8
14:4

large 48:19

lawyer 30:19

laying 47:6,
19

leave 11:24
14:8,12,13
20:12,19
23:14 41:5

leaving
25:20

left 15:4
23:18

leg 48:20,
23,24

legit 14:3

lethargic
49:1

letter 6:23
24:19
26:21 27:3

letting
37:2,3

lies 21:6,
14

limited 18:9
43:18

limp 49:2

limping
48:24

lines 18:20

Link 18:18
20:7 51:5,
8

Link-owens
36:16
37:19
38:17 39:2
48:16

Lisa 4:3

list 24:22
36:23

litter 15:11

live 55:15

lived 55:16

located 44:4

lock 15:17,
19,20,23
31:21
32:20
33:17,21,
24 44:6

locks 44:1

long 17:22
40:12
49:20

longer 17:5
18:8

looked 48:12

loop 52:7

loose 37:1

Lowry 31:5

lying 24:12,
13,14

### M

made 18:14
21:13
30:23
39:24 40:5
51:10

make 14:13
53:20

making 18:5
37:20
38:18
52:10

males 37:9

man 41:2

manual 42:18

March 36:22

mark 52:8,
10,13

marked
51:15,17

Central Virginia Reporters          www.huseby.com
3155 W. Main St., Salem, VA 24153          (540) 380-5017
Case 7:14-cv-00429-GEC   Document 52-13   Filed 08/19/15   Page 24 of 32   Pageid#: 925

52:24

**married**
  4:17,19

**matter**  4:9

**media**  34:6,
  10

**medical**
  45:17  46:3
  49:4

**medication**
  12:2  23:24
  55:13  56:3

**meeting**
  21:23  22:1
  40:4

**member**  13:13
  18:10
  31:8,16
  32:11  36:4
  41:9
  43:17,19,
  20  44:22
  49:20  53:9

**members**  9:13
  19:11,16
  21:16
  24:10
  35:22,23
  39:20
  43:14

**memory**  22:15
  39:11
  52:22

**mention**  37:9

**mentioned**
  9:10  11:14

**message**
  35:15

**messages**
  34:17  36:7
  45:7

**met**  39:21

**Michelle**
  4:12

**Millirons**
  6:17  9:7
  10:20
  12:11,16
  14:15,18
  29:3  39:21
  57:14,19

**mind**  33:1

**minimum**  42:2

**minute**  53:13

**minutes**
  55:18

**misconstrued**
  5:9

**missing**  15:9
  32:1  34:4

**mistreated**
  35:7

**mix**  37:3
  39:5  48:20

**mixed**  37:9

**Mogul**  6:10

**Monday**  48:22
  54:18

**money**  50:20

**monitor**
  28:14

**Morgan**  10:16
  13:6  28:5
  45:19

**morning**  4:7
  16:8  23:9
  45:3  55:8

**moved**  16:21

---

**N**

**nails**  48:12

**named**  9:2

**narrow**  11:8

**needed**  8:9
  12:1,2
  45:17
  48:10,11
  55:13  56:3

**neutered**
  50:9,16
  52:16,17,
  20,24

**news**  35:2,
  12

**newspaper**
  40:4

**newspapers**
  25:12

**night**  55:21

**notary**  57:11

**note**  38:5

**noticed**
  16:8,18
  48:22
  49:12

**notified**
  10:16  14:9

**November**
  26:21

**number**  11:6
  20:3  25:1
  51:18

**nurse**  48:4

---

**O**

**Oath**  5:2

**object**  51:10

**observation**
  41:1  45:17

**observations**
  19:7

**obtaining**
  44:22

**occasion**
  32:15
  33:16

**occur**  37:10

**occurred**
  39:12,13
  49:7

**Central Virginia Reporters**          **www.huseby.com**
3155 W. Main St., Salem, VA 24153          **(540) 380-5017**
Case 7:14-cv-00429-GEC   Document 52-13   Filed 08/19/15   Page 25 of 32   Pageid#: 926

occurring
   38:1

offered   7:14

office   14:10
   15:14,15
   16:7,9,10,
   21,23
   28:18
   32:19
   33:7,18

officer   13:5
   14:13
   17:12
   19:17 40:9

officers
   16:1 32:10

offices   13:2
   31:24

open   9:22
   13:4 16:20
   17:20
   27:22
   38:13
   54:23 55:2

opening   7:10

operating
   55:1

organizations
   9:16

outdoor   37:4

outline   9:19

overtime
   30:11,16,
   21

---
P
---

p.m.   27:23

paid   29:21,
   24 30:11,
   21 50:8,18

painted   39:7

paper   34:24
   35:1

paperwork
   29:22 41:5

paragraph
   36:17,19
   38:3 48:13

part   52:12
   54:12

part-time
   40:8

participating
   9:11

pay   50:16
   52:19

paycheck
   55:10

payment
   29:23

pen   52:8

pens   55:22

people   5:16
   30:20
   34:21
   35:20

perform
   46:18

performance
   36:1

period   29:23

Perkins   4:14

permission
   45:19

person   5:18
   8:20 11:23
   20:11

personal
   26:11 56:6

personally
   18:10,12
   19:7 34:20
   36:5

perspective
   12:16 41:2

pets   36:23

phone   14:10
   28:17

photographs
   36:23
   43:5,9,12

physically
   26:7

pick   26:12
   49:3

pictures
   43:15
   54:21

pink   39:7

place   18:21
   34:13 44:3

placement
   28:1,3

Plaintiff
   4:9

plans   38:4

point   4:15
   10:23 17:4
   18:13 20:2
   41:19,24
   43:8,23
   44:8

poke   27:7,8

poked   39:4

policies
   42:19

policy   50:12
   53:2

politely
   14:8

poor   49:13

position
   24:9

post   34:5,9
   36:10

posted   34:12
   35:8,21

posting
   35:23,24

pound   25:16,

Central Virginia Reporters          www.huseby.com
3155 W. Main St., Salem, VA 24153          (540) 380-5017
Case 7:14-cv-00429-GEC   Document 52-13   Filed 08/19/15   Page 26 of 32   Pageid#: 927

20,23

powers   41:1

premises
  14:9

prepaid
  50:15  51:3

prepare
  57:5,7

present
  14:6,23

presented
  5:22  50:10

pretty   4:24
  40:12

prevented
  46:23

previous
  7:20

previously
  7:12  25:1

prior   6:11
  16:23  19:5
  32:18
  33:6,17
  40:3  43:17

private
  15:14

problem   29:6

procedures
  42:19

process   8:16
  9:4  51:1

processed
  9:1

produce   53:9

Professional
  4:2

property
  14:12

provide   5:7,
  20

provided
  7:17

public   13:4
  14:4,20
  38:15  53:9
  57:11

published
  35:13

pull   10:2
  11:6  13:19
  14:7  17:21
  54:21

purport   39:1

purported
  48:15

put   26:2,4
  32:2  39:11
  44:11,16,
  18  45:11,
  12  46:9
  56:6

putting
  25:19
  28:14
  37:3,6

—————————
        Q
—————————

question
  5:7,22
  22:17  23:7
  33:3  47:11
  51:7  55:24

questions
  5:1  25:4
  51:11
  53:16  56:9
  57:2

quick   5:3
  50:2  53:13

quit   10:10,
  11  28:21

quitting
  10:14,17

—————————
        R
—————————

raise   41:20
  42:4,7

ran   38:1

randomly
  37:6

rate   47:1,
  2,4

read   33:12
  34:23
  36:13,17
  38:24
  48:13
  57:9,16,19

reading
  35:3,12

real   50:2

reason   22:8

reasons
  55:20  56:1

recall   10:23
  13:11  15:1
  21:20
  22:5,11
  27:17,24
  28:19
  38:1,6,21
  42:14  49:6
  52:10  54:9

receipt   53:8

receive
  41:12

received
  47:19

receiving
  39:20  47:6

recently
  4:21

recess   53:14

record   4:11
  29:15,19
  47:16
  50:3,5

records   22:3

refresh
  39:11

refund   50:19

**Central Virginia Reporters**          www.huseby.com
**3155 W. Main St. , Salem, VA 24153**          (540) 380-5017
Case 7:14-cv-00429-GEC   Document 52-13   Filed 08/19/15   Page 27 of 32   Pageid#: 928

regard   52:14

Registered
   4:2

relation
   34:18

relationship
   24:19

remember
   10:5 11:12
   13:9 15:3
   16:24
   21:22
   22:16,17,
   20,21,23
   23:4 27:4
   29:1 31:11
   33:16
   34:3,12
   35:11 40:7
   52:11
   56:17

remembering
   52:21

removed
   44:19

repeat   21:10

rephrase
   33:3

rephrasing
   33:1

report   27:15

reported
   14:14
   25:19

40:2,3

reporter   4:2
   57:5

represent
   4:8 48:14

request
   41:20
   42:12

required
   11:20
   20:14,17
   24:23
   25:13

requirement
   50:7

rescue   9:14
   10:2 13:20
   17:22 47:4
   54:21

resign   10:9

response
   20:9 38:24
   42:9 56:23

responses
   21:5

responsibiliti
es   53:22

resting
   52:14

return   45:8

returned
   50:8,18

role   8:20

room   32:3,
   4,9,13,16,
   17 33:19
   45:15

routine
   54:12

rules   5:6

run   37:7
   38:5 45:10

runs   37:4,8

_____

           S
_____

salary   8:7
   11:23
   12:12
   20:11
   29:17
   30:1,13,15

sanitize
   45:11

Saturday
   38:4,7
   54:16,24

Saturdays
   9:22 55:4

scenario
   27:18

scene   16:17

schedule
   12:4

seek   46:3

seldom   27:21

send   34:17
   36:7 57:7,
   9,13,20

separate
   28:7,9
   32:3,4

services
   7:17 20:21
   30:6 46:18

set   4:10
   54:14

sheet   29:10
   57:8

shelter
   6:13,14
   7:14,18
   8:13 9:7,
   11,21
   10:4,21,24
   11:11,16
   12:22
   15:14 17:6
   18:9 19:7
   21:18
   23:6,7,14,
   16 24:20
   25:20
   26:2,15,18
   27:7 28:1,
   4,14,16
   31:10,14,
   17,20
   34:7,10,18
   36:1 37:1,
   14 38:5,8,
   12,22

Central Virginia Reporters          www.huseby.com
3155 W. Main St. , Salem, VA 24153          (540) 380-5017
Case 7:14-cv-00429-GEC   Document 52-13   Filed 08/19/15   Page 28 of 32   Pageid#: 929

40:6,17
41:7,12
42:18,19
43:10,19,
20 44:13
46:10,24
47:7,15,19
48:21
50:8,21
54:15,19,
23 55:1,
13,15,20
56:2,7,13,
16

**sheriff**  6:17
9:7 10:16,
19,21,24
11:10
12:7,8,10,
11,16 13:5
14:15
17:16
18:1,4
19:12 26:9
27:5 28:5,
11 31:3
39:18 40:5
42:6 43:18
45:19
46:2,7
54:8

**sheriff's**
26:17

**shocked**
56:24

**show**  49:15

**showing**
42:23

**sign**  20:20
57:9,10,
11,15,20

**signature**
57:4,6

**signed**  29:10

**signs**  49:13

**sir**  4:23
5:14,24
6:15,18
7:19 8:15,
22 9:5,8,
12,15
10:22
11:1,12
12:13,19,
23 13:12
14:16
15:16,18,
21 17:3,7
18:6,16,23
19:2,8
20:5,22
21:1,3,6,
19,22
22:1,10,
13,19,23
23:12
25:2,17,
21,23
26:10,19,
23 27:2,9,
12,19 28:2
29:8,11,

14,17,20,
24 30:4,7,
10,13,22,
24 31:2,4,
6,15,18,22
32:21
34:8,16
36:2,9,12
37:11,15,
18 38:2,8,
12,20
39:17,21
40:10,23
41:8,11
42:5,8,13,
16,21
43:1,3,7,
13 44:24
46:8,21
47:8,10,21
49:8,11,
14,17,22
50:11
51:24
53:24
54:7,9
55:2,5,9,
11,14

**sit**  13:14

**Sitting**
22:14

**situation**
37:10
39:15
49:6,10
52:21

**skin**  47:6

**slandered**
25:11
34:13 35:6

**slandering**
34:22

**sleep**  39:11

**slip**  50:15,
17,18 51:3

**small**  14:4
37:11,12,
13

**social**  34:6,
10

**sold**  35:6

**sort**  48:2,5

**sought**  49:4

**sound**  22:4

**source**  41:13

**spayed**  50:9,
15 52:17,
19

**speak**  20:23
21:16
28:23

**speaking**
5:20

**specific**
11:18

**speculate**
11:7

**spell**  6:3

**Central Virginia Reporters**          www.huseby.com
3155 W. Main St. , Salem, VA 24153     (540) 380-5017
Case 7:14-cv-00429-GEC   Document 52-13   Filed 08/19/15   Page 29 of 32   Pageid#: 930

spider  48:20

spoken  13:20

spread  37:8

staffing
 7:17

Standards
 30:18

standing
 14:10

start  34:2
 45:14

started  6:16
 13:22 14:6
 34:4

Starting
 43:22

state  4:10

states  39:2

stay  5:8
 20:18

steal  25:16,
 24

stealing
 25:13,15

stick  27:7
 38:23 39:9

stop  25:14

stored  31:20

story  35:12

straight
 29:24

stray  39:5

streak  13:15

Strelka  4:6,
 8 6:7
 21:15
 32:24
 33:2,5,15
 47:13,17
 50:6
 51:10,14,
 20 53:11,
 15 56:11
 57:1

strike  38:23

student
 13:10,12

students
 9:17

stuff  33:20
 35:10

submit  29:22

submitted
 43:5

suffered
 48:20

suffering
 49:21

summer  15:2,
 5,6

Sunday  48:22
 54:16,24

Sundays  9:23
 55:4

supplies
 13:3 15:10
 26:12 32:1
 33:19 34:4

support
 42:11

supposed
 8:12 20:4
 23:1

swollen
 48:23,24

sworn  4:2

_____

T

taking  43:15
 49:20

talk  25:15
 28:10,11
 31:3 39:23
 42:6 49:9
 51:8 54:5,
 8

talked  12:4
 18:4 19:15
 22:21 31:1

talking  5:17
 28:8 48:17

Tech  9:17
 13:10,12

telling
 38:11

term  36:1

terminated

10:9

testified
 4:4 39:14

text  52:13

thin  11:6

thing  5:15
 45:7

things  13:2
 15:7,8
 16:20
 30:19 35:4
 53:20

THOMAS  4:6
 56:11

thought  4:13

thoughts
 26:24

time  5:17,
 18 8:22
 9:9,24
 10:8,19
 11:18
 12:12
 14:21,23
 16:22
 23:5,6,14
 25:12 27:6
 28:14
 29:10,12,
 23 31:19
 37:3 38:8
 40:24 43:4
 54:14
 55:1,16,17

Central Virginia Reporters          www.huseby.com
3155 W. Main St., Salem, VA 24153          (540) 380-5017
Case 7:14-cv-00429-GEC   Document 52-13   Filed 08/19/15   Page 30 of 32   Pageid#: 931

times   8:9
  10:24
  11:9,10
  23:19
  26:11
  39:22
  41:21,22

today   22:14

told   8:1
  10:9,16
  13:21
  14:11
  17:19 18:3
  19:3 25:4
  29:18
  53:21

Tommy   4:8

topics
  35:17,18
  36:11

towels   15:11

town   45:24

toxin   46:14

track   11:1

transcript
  5:10,22
  33:13 57:4

travel   26:8

traveled
  26:10

treatment
  45:17 46:3
  49:4

truck   26:2,
  12

truth   4:3,4

Tuesday
  48:24

turn   53:6

turned   37:1

Twenty   55:18

type   5:18
  51:23

typical
  23:6,14
  53:8

typically
  23:5,18,19

typing   5:10

—————————
           U
—————————

uh-huh's   5:9

understand
  5:13,23
  21:9 49:23
  53:21

understanding
  6:16 11:8,
  15 15:13
  17:1
  40:11,13
  50:12

understood
  32:11

unfounded

21:13
  27:12,14

unmarked
  26:12

—————————
           V
—————————

vacations
  40:12

vehicle
  25:20
  26:9,11,17
  56:6

vet   45:24
  49:6
  50:14,17,
  19 51:3
  52:18

veterinarian
  48:3

Virginia
  18:14

visited
  10:24
  48:21

volunteer
  8:23 14:20
  33:8 37:24

volunteers
  9:10,13,20
  12:22 16:4
  17:5,20
  18:8 22:22
  27:20
  32:15

36:22 39:3
  46:23
  48:21 49:2
  54:15,19,
  24 55:7

—————————
           W
—————————

wage   42:2

wait   5:19

waive   57:10

walk   9:23
  16:17
  45:1,5
  49:1,3

Walmart
  26:13
  41:14

wanted   8:17
  14:2,7
  25:13
  43:19 51:7

wanting
  13:19

waste   47:7,
  20

watched   39:3

water   45:12

ways   6:6
  57:6

website   35:9

Wednesday
  49:5

Central Virginia Reporters          www.huseby.com
3155 W. Main St., Salem, VA 24153
(540) 380-5017
Case 7:14-cv-00429-GEC   Document 52-13   Filed 08/19/15   Page 31 of 32   Pageid#: 932

week  8:8
  11:2,21
  24:7,15
  30:1,9
  40:21 41:3

weekdays
  24:1

weekend
  38:11

weekends
  24:17

white  48:19

whore  35:7

wife  13:18

wise  55:17

wondered
  49:24

wondering
  19:14 35:9
  41:1

word  13:23

work  8:8
  26:8 29:9
  30:8 35:24
  45:2

worked  7:12
  10:4,15
  12:5 16:1
  40:17,22

worker  7:21
  36:21
  37:16

working

6:17,19
9:6 10:19
20:3,4
22:24
23:1,2
24:19
25:12 27:6
29:16 30:3
37:17 41:3
50:13

worms  26:6

write  24:18,
  22 25:5,7,
  10 36:14

written
  42:23
  48:15

wrote  24:24
  25:6
  26:21,22,
  24 36:16
  37:19
  38:17

─────────────
        **Y**
─────────────

year  15:2,3

yorkie  25:23

young  36:24

***Central Virginia Reporters***          **www.huseby.com**
**3155 W. Main St. , Salem, VA 24153**          **(540) 380-5017**
Case 7:14-cv-00429-GEC   Document 52-13   Filed 08/19/15   Page 32 of 32   Pageid#: 933