```
 1                IN THE UNITED STATES DISTRICT COURT

 2                  WESTERN DISTRICT OF VIRGINIA

 3                       ROANOKE DIVISION

 4

 5

 6   - - - - - - - - - - - - - - - - - -
     BRIAN SCOTT DUNN,               )
 7                                   )
                   Plaintiff         )
 8   -vs-                            )       CASE NO.:
                                     )       7:14cv00429
 9   SHERIFF MORGAN MILLIRONS,       )
                                     )
10                 Defendant         )
     - - - - - - - - - - - - - - - - - -
11

12

13

14

15   DEPOSITION OF:  CHRISTINE LINK-OWENS

16

17   DATE:           APRIL 10, 2015 (Friday)

18   TIME:           11:15 a.m.

19   LOCATION:       Giles County Administration Building
                     315 North Main Street
20                   Pearisburg, Virginia 24134

21

22   REPORTER:       Lisa M. Hooker, RPR
                     Registered Professional Reporter #29505
23

24
```

***Central Virginia Reporters***          www.huseby.com
**3155 W. Main St. , Salem, VA 24153          (540) 380-5017**
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 1 of 45   Pageid#: 934

**Page 2**

```
 1                I N D E X

 2

 3   EXAMINATION BY:                               PAGE

 4   Thomas E. Strelka, Esq.                          4

 5   Jim H. Guynn, Jr., Esq.                         65

 6

 7   Appearance Page  .............................   3

 8   Exhibit Page  ................................   3

 9   Witness Signature Page  ...................... ---

10   Witness Signature Waiver  .................... 82

11   Reporter's Certificate  ...................... 83

12   Errata Sheet  ................................ ---

13

14

15

16

17

18

19

20

21

22

23

24
```

**Page 3**

```
 1                A P P E A R A N C E S
 2   FOR THE PLAINTIFF:    STRELKA LAW OFFICE, PC
                           Attorneys at Law
 3                         119 Norfolk Avenue, SW
                           Suite 330
 4                         Roanoke, Virginia 24011
 5                         (540) 283-0802
                           (no fax available)
 6                         thomas@strelkalaw.com
 7                         BY:  THOMAS E. STRELKA, ESQ.
 8
 9   FOR THE DEFENDANT:    GUYNN and WADDELL, PC
                           Attorneys at Law
10                         415 South College Avenue
                           Salem, Virginia 24153
11
                           (540) 387-2320
12                         (540) 389-2350
                           jim.guynn@gmdlawfirm.com
13
                           BY:  JIM H. GUYNN, JR., ESQ.
14
     ALSO PRESENT:         Brian Scott Dunn
15                         Morgan Millirons
16
                     E X H I B I T S
17
     NUMBER               DESCRIPTION            PAGE
18
     Exhibit 42      Letter dated 2-6-11.          16
19   Exhibit 43      Email Chain.                  31
     Exhibit 44      Email Chain.                  34
20   Exhibit 45      Email from Link to Helsel.    46
     Exhibit 46      Email from Link to Helsel.    49
21   Exhibit 47      Email from Link to Helsel.    51
     Exhibit 48      Email from Link to McKlarney. 54
22   Exhibit 49      Copies of Photographs.        59
     Exhibit 50      Email from Link to Helsel.    63
23
24
```

**Page 4**

```
 1              CHRISTINE M. LINK-OWENS

 2   having been sworn by the Registered Professional Reporter,

 3   Lisa M. Hooker, to tell the truth, the whole truth, and

 4   nothing but the truth, testified as follows:

 5

 6              EXAMINATION BY THOMAS E. STRELKA, ESQ.

 7        Q.    Good morning, ma'am.

 8        A.    Good morning.

 9        Q.    As I indicated to you earlier, I'm Tommy

10   Strelka and I represent Mr. Dunn, and here you are in a

11   deposition.  Have you ever been deposed before?

12        A.    No.

13        Q.    Okay, and it's really easy.  You don't win

14   it, you don't lose it; you just get through it and go

15   home, okay?

16        A.    All right.

17        Q.    Okay, and I'm going to ask you questions

18   and you just provide truthful answers; that is all that

19   you have to do.

20        A.    All right.

21        Q.    Two little ground rules.  Our lovely court

22   reporter can only type up what one person is saying at a

23   time, so please wait to respond until I'm completely done

24   speaking.
```

**Page 5**

```
 1        A.    Okay.

 2        Q.    And the other thing is, if I ask you a yes

 3   or no question, I would ask that you verbally respond with

 4   a yes or no and try to stay away from the dreaded huh-huh

 5   and the hmm-hmm's, okay?

 6        A.    Okay.

 7        Q.    And state your full legal name, please.

 8        A.    Christine Marie Link-Owens.

 9        Q.    All right, Ms. Link-Owens, and where are

10   you currently employed?

11        A.    At Virginia Tech, Transportation

12   Institute.

13        Q.    Okay, and you are also affiliated with an

14   organization previously known as the Giles County Animal

15   Rescue; is that right?

16        A.    Yes.

17        Q.    And now it's known as the Giles Animal

18   Rescue?

19        A.    Yes.

20        Q.    And what services does that organization

21   provide?

22        A.    It was founded in 1999 to primarily address

23   shelter issues, to help a County become compliant with

24   shelter regulations, and to raise awareness in the
```

**Central Virginia Reporters**          **www.huseby.com**
**3155 W. Main St. , Salem, VA 24153**
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 2 of 45   Pageid#: 935          **(540) 380-5017**

Page 6

1  community about overpopulation, that there is a shelter
2  and pets need to be adopted, encouraging adoption,
3  encouraging spay and neuter, and animal welfare issues
4  within the County, and -- but primarily, it was actually
5  starting to help improve shelter conditions and adoption
6  rates.
7          Q.      Okay.
8          A.      At that time, in 1999, and we still are
9  doing the same work.
10         Q.      Okay.
11         A.      And we are incorporated.
12         Q.      And you are the president of this
13 organization?
14         A.      I was for the past four years.  I have
15 stepped back as of January 1 of 2015, and I am now still
16 very active in the volunteerism and rescue coordinator
17 still.
18         Q.      You were the president in 2013; is that
19 right?
20         A.      Yes.
21         Q.      Okay, and did -- did -- in 2013, did your
22 organization facilitate volunteers working at the shelter
23 in Giles?
24         A.      Yes.

Page 7

1          Q.      Okay.
2          A.      Since 1999, when we first started this
3  organization, the County has allowed volunteers to come to
4  the shelter to help keep the shelter open hours for the
5  public.
6          Q.      Okay.
7          A.      Because before that, there really was not
8  set open hours; therefore, the -- therefore, it is very
9  unlikely that adoptions can occur if the public cannot
10 come out there, so yes, one of our primary duties was to
11 hold open hours so that the public could come and
12 hopefully adopt or reclaim animals.  When we -- the more
13 involved we became, the higher reclaims; the reclaim rate
14 actually also went up when people were able to come up and
15 say, oh, yes, my pet is here and we were able to reclaim
16 them, and then we also do what we can to pull animals and
17 send them to rescues and other facilities where there is a
18 no kill situation to avoid euthanasia, where at the
19 pound, of course, they can only keep the pets for a
20 certain period of time and then they have to make a
21 decision to euthanize if no one comes to adopt or claim
22 them, so we are very active and were, actually, until
23 2013.
24         Q.      Okay.  And at some point, the volunteers

Page 8

1  were prevented access to the shelter in 2013?
2          A.      Correct.
3          Q.      Okay, prior to that happening, can you give
4  me a sense of how often volunteers would be at the
5  shelter?
6          A.      Any time that we could find volunteers
7  willing to go, we were given basically free reign that we
8  could go any time, day or night.  We could go and get a
9  key.  Some volunteers had keys of their own, and then some
10 volunteers were asked to go and to check out a key from
11 the sheriff's department at the dispatch office.
12         Q.      Okay.
13         A.      And I believe that it was in 2012, we had
14 so many volunteers and we had run into some issues where
15 sometimes the key would not be available when we would go
16 to dispatch; for instance, one time they had loaned that
17 particular key to a person who was supposed -- it was not
18 one of our volunteers, not a volunteer situation; it was
19 someone that needed to do repairs to the shelter, and I
20 can't remember the exact situation, but the key was not
21 available when we went to get a key and we really needed
22 to get to a shelter to pull an animal to get it to a vet,
23 so after that incident, we asked the animal control
24 officer if we could use a real estate lock box and hang on

Page 9

1  the gate, and only certain volunteers, not even all
2  volunteers but certain volunteers would use this code and
3  open up the lock box and get the key, so therefore we
4  could bypass having to go and check out a key and the
5  people would not need to have a personal copy of the key,
6  that we could just use one shared key, and the only person
7  that would need it at the time would be the one at the
8  shelter and then they would put it back in the lock box
9  when they left, and that was actually very helpful.  The
10 volunteers actually volunteered more once we started that,
11 having that process, because it made their time, which was
12 so valuable already and they only had an hour window, and
13 it saved -- may save the volunteer that extra 30 minutes
14 of having to drive all the way from dispatch to the
15 shelter which was already a long drive for people anyway,
16 so that was a great system; it was great that the animal
17 control officer allowed us to do that, but however the
18 complaints arose that volunteers were there too much, I'm
19 not sure how that could be a problem.
20         Q.      Let me pause you there, if that is okay.
21         A.      Okay.
22         Q.      Thank you; you are doing great, but how are
23 you aware of any complaints about volunteers being there
24 too much?

**Central Virginia Reporters**                    **www.huseby.com**
**3155 W. Main St. , Salem, VA 24153**
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 3 of 45   Pageid#: 936                    (540) 380-5017

Page 10

1    A.    Well, we asked the Sheriff for a meeting so
2    we could discuss some problems that we had found at the
3    shelter.
4        Q.    Okay.  Do you recall -- do you recall what
5    time frame we are talking about right now?
6        A.    In the spring.
7        Q.    Okay of 2013?
8        A.    Yes.
9        Q.    Okay.
10       A.    Probably, I mean, we started requesting
11   meetings in February.
12       Q.    Okay.
13       A.    Of that year.
14       Q.    And how would you request a meeting with
15   the Sheriff?
16       A.    Actually, technically in February of 2011,
17   I hand delivered a letter to the Sheriff outlining
18   problems.
19       Q.    Okay.
20       A.    And so those same problems that we brought
21   up multiple times, beginning in 2011 through 2013.
22       Q.    Okay, and after you hand delivered this
23   letter in February of 2011 to the Sheriff, did he ever
24   respond to the letter?

Page 11

1        A.    No.
2        Q.    Did you ever have a meeting with him?
3        A.    No.
4        Q.    He never called you?
5        A.    No.
6        Q.    Okay.  And any -- and I think that you said
7    again in, what was it, January of 2013, or when was your
8    next --
9        A.    At least February of 2013, we started -- I
10   mean, we were continually trying to keep bringing those
11   same problems that were in the initial letter in 2011. We
12   continued periodically trying to get those problems
13   addressed.
14       Q.    Okay.  And sitting here today, without the
15   letter here in front of you, and I have some documentation
16   that we can go through in a minute, what were some of the
17   issues that you remember?
18       A.    Do you want to see a copy of it?
19       Q.    Yes, sure, bring it out.  I probably have
20   it.
21       A.    So this is a copy of the letter, the first,
22   and even prior to this document, the president before me
23   had brought many of the issues to the Sheriff even before
24   me.

Page 12

1        Q.    Okay.
2        A.    But this is when I became president, so
3    this is what I --
4            MR. STRELKA:  I don't know if I have a copy
5        of this, because this is earlier than the other
6        things that we -- do you mind if we enter this as
7        an Exhibit?
8            MR. GUYNN:  Well, I think that we ought to
9        make copies of it.
10           THE WITNESS:  You can have that one.
11           MR. STRELKA:  We'll make copies of
12       everything before we go.
13           MR. GUYNN:  Well, we will need one for all
14       of us during the deposition.
15           MR. STRELKA:  Sure, go and get some copies
16       of that.
17   BY MR. STRELKA:
18       Q.    While he is getting copies, I will go to a
19   different area of questioning real quick if that is all
20   right.  Prior to there being limited access to volunteers
21   at the shelter, I think that you've outlined how you would
22   go and get the key and get access to the shelter, where
23   was the food stored at the shelter to feed the animals?
24       A.    There is one room in the shelter where food

Page 13

1    was stored.  Well, actually, there were -- one room where
2    primarily most of the food was stored but for cats;
3    sometimes they would have food in another room for cats,
4    and that room was rarely locked.
5        Q.    Okay.
6        A.    I don't know all of the details, other than
7    people kept -- volunteers kept coming to know and saying
8    when we went to the shelter, the food room was locked, and
9    so that -- I mean, as far as the time frame, that was in
10   2012 that this began, and often times, our volunteers were
11   the only people there for the day, so we would feed the
12   animals if we knew that we needed to, because staff had
13   the day off, and -- or if we had -- it was commonplace
14   that animals would be surrendered while we were there, and
15   sometimes those animals looked starved and we would want
16   to give them a bowl of food, so that did become an issue
17   when the food was staying locked.  We were told -- so when
18   we asked, why is the food room locked, he said it was
19   because food was disappearing.
20       Q.    And who told you that?
21       A.    The animal control officer told volunteers
22   who asked.
23       Q.    Okay.  And did you ask personally?
24       A.    I'm not sure if I ever asked the question,

**Central Virginia Reporters**          www.huseby.com
**3155 W. Main St. , Salem, VA 24153**
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 4 of 45   Pageid#: 937          (540) 380-5017

Page 14

1  but at one of the meetings with the Sheriff, he stated
2  that to me.
3        Q.    Okay, and the shelter staff, that would
4  have been Ms. Chastity Perkins; is that right?
5        A.    Yes, and Melvin Dalton.
6        Q.    Dalton?
7        A.    The animal control officer.
8        Q.    Okay, and just before this deposition, Ms.
9  Perkins, although she's been married, her last name is now
10 Jones, testified that she was at the shelter every day
11 during the week with the exception of holidays; would you
12 agree or disagree with that?
13              MR. GUYNN:  I'm going to object to the
14       characterization.
15              MR. STRELKA:  Do you mind telling me --
16              MR. GUYNN:  She said that she was there
17       holidays, too.
18              MR. STRELKA:  Okay.
19              MR. GUYNN:  She said the shelter wasn't
20       open, but she was there.
21              MR. STRELKA:  But she was there, all
22       right.
23 BY MR. STRELKA:
24       Q.    Mr. Guynn may have clarified my point.  Ms.

Page 15

1  Jones testified that she was there every day of the week;
2  would you agree or disagree with that?
3        A.    I find it hard to believe, because when
4  volunteers would go to the shelter, there would be so much
5  feces in their run; I mean, I have worked in facilities
6  for 20 years, and I've cleaned a lot of kennels in my 20
7  years of taking care of pets that are boarded in a kennel
8  situation, and I know how much 24 hours worth of food,
9  what it looks like, so when I go there and I see that
10 there is so much feces and urine that the dog is covered
11 from head to toe because the only place to lay down is in
12 the piles and piles and piles of feces, and they have no
13 water, they are so thirsty, that as soon as you turn on
14 the water hose, they attack the hose and are trying to
15 drink out of the hose.
16              You fill their bowl and the whole entire
17 large bowl disappears because they are so thirsty, this
18 tells me as someone who has worked 20 years in this
19 profession, that pet did not have care the day before,
20 maybe two days before, and when I worked in the facility
21 where we took care of up to 50 dogs in a very similar
22 situation, very similar size and type of kennels, we would
23 pooper scoop every day, make sure the water bowl was
24 filled every day and I've never, never in all of those

Page 16

1  years working in that type of environment, never seen a
2  dog so thirty when you arrive, even if they turned over
3  their water bowl since you were there the day before, they
4  would not be attacking the water when you filled it up.
5        Q.    Okay.  And did you ever address any of
6  those issues that you just described with Ms. Perkins?
7        A.    No.
8        Q.    All right.
9        A.    I didn't feel that it was my place.
10       Q.    Okay.  What about Mr. Dalton?
11       A.    No.
12       Q.    Okay.  But I believe that we're going to
13 get into it; you attempted to address some of these issues
14 with the Sheriff?
15       A.    Yes.
16              MR. STRELKA:  All right.  Well, I'd like to
17       enter this as an Exhibit, the letter.
18
19              (The above-mentioned document was marked as
20       Deposition Exhibit Number 42 and entered into the
21       Deposition.)
22
23 BY MR. STRELKA:
24       Q.    I'd like you to take a look at Exhibit

Page 17

1  Number 42, which just has been placed in front of you.
2        A.    Do you want me to hold this one?
3        Q.    Yes, you can pick it up.  What is Exhibit
4  Number 42?
5        A.    This is a letter that the volunteers and
6  myself put together to -- these are the issues that all of
7  the volunteers, we all sat down together, and as a group,
8  when I became president, this is -- these are issues that
9  they had worked on previous to me even becoming
10 president.  I've been a volunteer even prior to becoming
11 president, and they asked me to address these items with
12 the County, and at the time, the County was telling us
13 that the Sheriff is the person that we should relay these
14 concerns to, so we all sat down as a group and made this
15 letter and then I took it to him.
16       Q.    And who at the County informed you that the
17 Sheriff was the person to whom you should send the letter?
18       A.    The Board of -- we were getting that
19 information from the Board of Supervisors, but I can't be
20 exact on those details.
21       Q.    Okay.  And was this letter written on
22 February 6, 2011?
23       A.    I'm sorry, so the president prior to me had
24 had these similar discussions with the Sheriff and Board

**Central Virginia Reporters**                    **www.huseby.com**
**3155 W. Main St. , Salem, VA 24153**
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 5 of 45   Pageid#: 938                    **(540) 380-5017**

| Page 18 | Page 20 |
|---|---|
| 1  of Supervisors. | 1   A.   No. |

**Page 18**

1   of Supervisors.

2        Q.        Okay.

3        A.        And that prior president gave me that

4   information.

5        Q.        I understand, okay.  But this letter was

6   written on February 6, 2011; is that right?

7        A.        Yes.

8        Q.        Okay, and did you consult an attorney when

9   you drafted this letter?

10        A.        No, I didn't.

11        Q.        But apparently, you must have done some

12   research because it looks like you are citing statutes or

13   Code Sections?

14        A.        Yes; as I said before, I've worked in

15   veterinary medicine for 20 years, and I understand the

16   protocols and laws that are put forth and governs a

17   shelter or any facility that shelters animals, that there

18   are those laws and governing bodies.

19        Q.        What is your experience in veterinary

20   medicine?

21        A.        I've done a lot of different things, but I

22   think that, for a shelter, I volunteered at a lot of

23   shelters.  I volunteered at Montgomery County Humane

24   Society, which is a no kill facility; I've been involved

**Page 19**

1   with the Montgomery County pound and a lot of their

2   volunteers, and that is where I learned a lot of

3   information, before becoming a volunteer with Giles Animal

4   Rescue.

5        Q.        So your experience is a lot of hands-on --

6        A.        Hands-on.

7        Q.        Hold on a second.

8        A.        Sorry.

9        Q.        A lot of hands-on experience at various

10   shelters; is that what you are saying?

11        A.        Yes, and working at veterinary clinics and

12   primarily at Virginia Tech, the veterinary teaching

13   hospital and school, and at the veterinary school, they

14   have up to -- I was on a team where we took care of up to

15   50 dogs and cats, and they were housed in a very similar

16   situation like a shelter, and I was involved with writing

17   process for the protocols, the laws, and any time the laws

18   would change, you know, what would have to be updated to

19   the way that we would take care of the animals.

20        Q.        Okay, did you receive any education in this

21   area, not work experience, and let me just say the great

22   caveat here is work experience is an education, but aside

23   from that, did you receive any education in the area of

24   veterinary medicine or care?

**Page 20**

1        A.        No.

2        Q.        Okay.  You are not a licensed veterinarian?

3        A.        No.

4        Q.        Okay, and you never attended vet school?

5        A.        No.

6        Q.        Okay.  And you've never worked at a vet's

7   office?

8        A.        Yes.

9        Q.        You have?

10        A.        Yes.

11        Q.        At the clinic?

12        A.        At private practices.

13        Q.        Okay.

14        A.        And also at Virginia Tech Veterinary

15   Hospital.

16        Q.        Okay.

17        A.        And at the veterinary school which is

18   within the veterinary hospital.

19        Q.        Can you describe for me what it is that you

20   did, what your title was, for instance, when you worked at

21   these various places?

22        A.        Over the years, I had different jobs.  I

23   worked in the business office, I've worked in the

24   laboratory.  My exact -- one of the jobs, I will call it a

**Page 21**

1   glorified kennel helper, but I was a lab technician was my

2   title, and that is when I was on the team that we took

3   care of all of the teaching dogs and the research dogs and

4   we made sure that their kennels were properly cleaned

5   every day and that they had proper bedding.

6        Q.        Okay.

7        A.        And that is where I learned where the

8   space -- what the space requirements are for a shelter,

9   for the space that the dog is housed, and all of those

10   types of things.

11        Q.        Okay.  Looking at the issues that you

12   highlighted in this 2011 letter --

13        A.        Yes.

14        Q.        -- do these issues persist into the Year

15   2013?

16        A.        The situation with the lights being on a

17   timer, that was resolved.

18        Q.        Okay.

19        A.        But other than that, I would say no, they

20   were not resolved.

21        Q.        Okay.  And that these issues persisted in

22   2013, other than the timer?

23        A.        Yes.

24        Q.        Okay.  And -- all right, and so let's move

**Central Virginia Reporters**                **www.huseby.com**
**3155 W. Main St. , Salem, VA 24153**
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 6 of 45   Pageid#: 939          **(540) 380-5017**

**Page 22**

1  back into 2013, I think that you said that you were
2  sending emails to the Sheriff at that time, or letters in
3  February?
4       A.    Primarily communicating by email at that
5  time.
6       Q.    Okay.  And did the Sheriff ever respond to
7  your emails?
8       A.    Once that I remember, and that was when I
9  brought to his attention that an adoption had occurred
10  where they did not collect a spay/neuter deposit from the
11  person adopting.
12       Q.    Okay.
13       A.    And he did respond; he responded, but not
14  that it was resolved in response, but his response was
15  that --
16       Q.    What was your understanding?
17       A.    I knew that he received the email, let's
18  say.
19       Q.    Okay, thank you.  What is your
20  understanding of the proper policy for the spay/neuter
21  refund policy?
22       A.    It is if you look in the Giles County
23  laws -- laws is not the right word.
24       Q.    Ordinance?

**Page 23**

1       A.    Ordinances, thank you, the Giles County
2  ordinances, that if a pet is not known to be spayed and
3  neutered, then the person adopting must pay the $150
4  deposit.
5       Q.    Okay.
6       A.    And then once they have the pet spayed or
7  neutered and they provide proof from a veterinarian that
8  this was done, then the County will refund the $150
9  deposit.
10       Q.    Okay.
11       A.    Plus, plus, the person has to pay a $20
12  adoption fee.
13       Q.    All right, and something occurred that made
14  you think that that wasn't happening; is that right?
15       A.    Yes.
16       Q.    Okay.
17       A.    So as I said before, our group advocates
18  spaying and neutering, and we do what we can in the
19  community to a provide assistance to people who can't
20  afford spay/neuter, so I believe on April 6th --
21       Q.    Here, let me show you, does this document
22  help you?
23       A.    Yes, it does.
24       Q.    What is this document?

**Page 24**

1       A.    This is a photocopy of the form that is
2  given to people when they adopt a pet from the shelter,
3  and this bottom portion is what they are supposed to.
4  When they go to have the pet spayed or neutered, they are
5  to take this form to the vet's office and ask the vet to
6  complete the bottom portion and to mail it in to the
7  officer, the animal control officer, who then will
8  authorize that their $150 deposit be returned.
9       Q.    Okay.  And now, I will let you know that
10  Ms. Jones looked at this document earlier and testified
11  that, I believe, that from the information on this form,
12  it indicated that the pet that was being adopted was
13  already neutered?
14       A.    It was not, and I have veterinary records
15  to back that up, so what happened is this Nance family
16  came to me the very next day and they said that we've
17  adopted this dog, and we can't afford to neuter it but we
18  want to get it neutered, can you help us, and I said yes,
19  ma'am, and I gave them a free spay and neuter certificate,
20  which I have authorization to do with Virginia Tech
21  because I work with the program there at Virginia Tech, so
22  I gave them the certificate, and they did go and have the
23  dog neutered and then brought me the paperwork that it had
24  been spayed and neutered, and I also spoke with the staff

**Page 25**

1  that also verified that it was done.
2       Q.    Okay.  And you say that you spoke with --
3  is that a Sammy Nance?
4       A.    Yes, Mr. Nance and his wife, Mrs. Nance.
5       Q.    Okay.  And they indicated to you that the
6  dog was not neutered when they adopted the animal?
7       A.    Correct, and so Mrs. Nance said to me, I
8  asked her, I said, so they let you adopt the dog, so I
9  wanted to make sure that I was very clear that I got all
10  of the proper details, because I knew that this was very
11  serious, I said to her, so they allowed you to adopt the
12  dog and it was -- and you, even though you stated that you
13  could not afford to spay and neuter, she -- her response
14  was, Chastity told us to just promise to make sure that we
15  did get it done.
16       Q.    Okay.
17       A.    That this time, she -- that Chastity said
18  to them, she understood that they could not afford it, but
19  she wanted to save the dog.  Chastity was so worried about
20  saving the dog that she let -- she allowed it.
21       Q.    Okay.  All right.  And what is on the
22  second page of this document?
23       A.    The second page is the receipt where the
24  people did pay the $20 adoption fee.

**Central Virginia Reporters**          **www.huseby.com**
**3155 W. Main St. , Salem, VA 24153**          **(540) 380-5017**
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 7 of 45   Pageid#: 940

Page 26

1    Q.    Okay.  And have you ever seen -- well, let
2  me ask you this:  Did you ever process adoptions at the
3  shelter?
4    A.    Oh, yes.
5    Q.    Would you fill out these receipts yourself?
6    A.    Yes, there was a standard receipt book that
7  we were required to fill out and we did so.
8    Q.    And the amount indicated on this receipt so
9  how much?
10   A.    $20 cash.
11   Q.    Okay.
12   A.    A spay/neuter deposit is taken in, and if
13  it's taken in, it is on a separate receipt.  Would you
14  like to see an example?
15   Q.    I would.
16   A.    And they purposely -- I'm not sure why, but
17  they actually had separate receipt books for that
18  situation.  I guess because they wanted to make sure that
19  they were tracking it and they gave the person their
20  deposit back, perhaps.
21   Q.    Okay.
22   A.    So yes, so this is a situation where this
23  person adopted a dog and they actually wrote the two
24  separate receipts, the $20 for the adoption and the $150

Page 27

1  for the spay and neuter deposit.
2        MR. STRELKA:  Okay, I'm not going to make
3        this a separate Exhibit; I will just go by her
4        testimony that two receipts were made, unless you
5        have an objection that you want it included.
6        MR. GUYNN:  No, that is okay.
7  BY MR. STRELKA:
8    Q.    So you can take this back, so this is your
9  testimony that two receipts were created.  How do we know
10  that there was not a separate receipt for $150 for this?
11   A.    I'm not aware; I'm just going by the people
12  who adopted the dog and came to me and asked for
13  spay/neuter assistance.
14   Q.    Okay, had you ever encountered any other
15  issue similar to this specific issue at the shelter
16  regarding adoption fees?
17   A.    We were suspicious that certain people were
18  allowed to adopt without doing the $150 spay/neuter
19  deposit, but this is the first time that I was able to
20  actually get the proof.
21   Q.    Okay, I understand.  Okay.  And --
22   A.    It seemed to me like when there were
23  friends who wanted to adopt certain dogs, that it was
24  often waived.

Page 28

1    Q.    Do you know an April Lowry?
2    A.    Yes.
3    Q.    Who is April Lowry?
4    A.    She's one of the long-term volunteers of
5  our group.  I believe that she was in the original group
6  that founded in 1999.  She's been a volunteer since then.
7  She's been -- I think that she served as the president at
8  one point in time, and she's been a rescue coordinator for
9  the group for a long time.
10   Q.    Okay.  Did you ever have any discussion
11  with Ms. Lowry or any other members of GCAR about what
12  could be done at the shelter to remedy some of these
13  issues?
14   A.    Our primary focus was to try to replace the
15  employee that we felt was not doing their job.
16   Q.    And who was that?
17   A.    Chastity.
18   Q.    Okay, and was there ever any discussion
19  about putting in new devices at the shelter, such as a
20  time clock or cameras?
21   A.    Yes, we strongly encouraged the County to
22  do that and offered to pay for that, because we felt so
23  passionate about having that documentation and
24  accountability for the staff.

Page 29

1    Q.    Okay, and to whom did you actually
2  physically offer, make this offer to?
3    A.    It was in a meeting with the Sheriff, and I
4  believe that it was Chris McKlarney that was there, yes.
5    Q.    And did you speak and make this offer or
6  did someone else from GCAR?
7    A.    I was there offering that the vice
8  president, Mr. Herbert, was also at the same meeting.
9    Q.    Okay.  All right.  And did anyone ever take
10  you up on that ever?
11   A.    No, they did not.
12   Q.    Did you ever hear at any time that cameras
13  cannot be put at the shelter because of financial reasons?
14   A.    Well, no -- well, I'm not sure if they said
15  that or not.  I do know that we offered to pay to install
16  the cameras because we felt also passionate about that.
17   Q.    Okay, I understand.  Were you ever
18  physically present when Ms. Perkins was working?
19   A.    Yes.
20   Q.    And did you ever have any concerns about
21  the way in which she conducted her affairs at the
22  office -- at the shelter?
23   A.    Yes, one particular instance, she -- I went
24  to the shelter, and normally the volunteers would not

**Central Virginia Reporters**          **www.huseby.com**
**3155 W. Main St. , Salem, VA 24153**
**(540) 380-5017**
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 8 of 45   Pageid#: 941

Page 30

1   arrive at the shelter until around 2:00, and so it was
2   typical that Ms. Perkins would come just prior to us to
3   clean, water, feed, so that the shelter would be ready for
4   the public and the volunteers to arrive, but on that
5   particular day, I had to go early to get a lot of things
6   done, and I will spare you the details, but I had to
7   return a lot of crates and wash them out, and so Chastity
8   arrived; there were only three dogs in the shelter at that
9   time, because we had just done a large transport.  We had
10  rescued and pulled a lot of dogs and taken them to a no
11  kill sanctuary, so she was there to feed and water and
12  clean the kennels, maybe 20 minutes tops, and then she
13  left, and that is when I observed that she was not
14  changing out dirty water bowls.
15      Q.    Okay.
16      A.    And the water bowls, it was obvious to me,
17  because again, I'm worked 20 years and I've cleaned a lot
18  of water bowls, and if you are cleaning them properly,
19  they get a buildup from the saliva of the dog.  There is a
20  lot of buildup around the edge of the water bowl.
21      Q.    Like a film?
22      A.    Like a thick film, and once it dries, I
23  mean, you can hardly chisel that stuff out of there for
24  soaking for a long time and properly brush cleaning it,

Page 31

1   but if you just properly wash, and like you would your
2   glass before you drink out of it, if you just washed it
3   every day, you would not get that buildup, and at that
4   time, it was my observation that all of the water bowls,
5   buckets, food bowls, were all -- all had this residue
6   because they were not being properly cleaned, and from
7   from that particular day, when I was there, when she came
8   to clean, it was quite obvious why; she was just hosing
9   out the bowl and refilling it.  It was never cleaning,
10  proper cleaning of the bowls which is also a disease
11  control issue.
12          MR. STRELKA:  Okay.  I'd like to mark this
13      as the next Exhibit, please.
14
15          (The above-mentioned document was marked as
16      Deposition Exhibit Number 43 and entered into the
17      Deposition.)
18
19  BY MR. STRELKA:
20      Q.    Before we get to Exhibit Number 43, I want
21  to take a look at the back of Exhibit Number 41, because
22  there is some handwritten notes there.
23      A.    Hmm-hmm.
24      Q.    Is this your handwriting?

Page 32

1   A.    This is my handwriting.
2       Q.    You wrote this?
3       A.    Yes.
4       Q.    And when did you write this?
5       A.    When did I write this?
6       Q.    Yes, ma'am.
7       A.    I don't remember.  It's whenever I made
8   this photocopy, because I knew that I was going to be
9   having a meeting with the Sheriff, but then he didn't want
10  to see documentation.
11      Q.    Okay.  Was this in 2013?
12      A.    Yes.
13      Q.    Okay.  Thank you.  I just wanted to make
14  sure that I could identify who wrote that.
15      A.    Okay.
16      Q.    All right.  Now, I would like you to take a
17  look at Exhibit Number 43.
18      A.    Okay.
19      Q.    I will represent to you that this is a
20  three-page document with emails on it.  Let's look at the
21  bottom email, on the first page, it says From Giles County
22  Animal Rescue to Chris McKlarney on Sunday, January 27,
23  2013.
24      A.    Okay.

Page 33

1       Q.    And the third page says, "Thank you,
2   Christine."  So may I assume that you wrote this email?
3       A.    Yes.
4       Q.    Okay.  And the second line of your email,
5   it says, "I am pleading today to engage your help in
6   setting up a second meeting."  Do you recall the first
7   meeting?
8       A.    Yes.
9       Q.    And when was the first meeting?
10      A.    A week or two before this.
11      Q.    Okay.  And who was at this meeting?
12      A.    The Sheriff.
13      Q.    Okay.
14      A.    And Melvin Dalton and Chris McKlarney and
15  Charlie, I believe.
16      Q.    And what was discussed at the meeting?
17      A.    I think that that is when we -- we really
18  didn't have a chance to speak much.  We were just kind of
19  being told at that meeting that we were probably not going
20  to be allowed to volunteer there, that we were not going
21  to have access to the key and not have a key hanging on
22  the gate anymore, and they wanted volunteers to come and
23  check out a key at the dispatch office, and we were
24  basically accused of things that were being stolen, that

**Central Virginia Reporters**                    **www.huseby.com**
**3155 W. Main St. , Salem, VA 24153**
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 9 of 45   Pageid#: 942        **(540) 380-5017**

Page 34

1   we were using the place as a hang out, and that the actual
2   issues that we wanted to talk about were not discussed.
3       Q.   I understand.  Okay.  All right.  I'm going
4   to say this, I believe that I marked this particular email
5   as an Exhibit earlier.
6          MR. GUYNN:  It looks familiar, but...
7          MR. STRELKA:  But rather than chasing it
8       down, do you mind if we stick another sticker on
9       it?
10         MR. GUYNN:  No, that is okay.
11
12         (The above-mentioned document was marked as
13      Deposition Exhibit Number 44 and entered into the
14      Deposition.)
15
16         MR. STRELKA:  Off the Record.
17
18         (Off the Record.)
19
20  BY MR. STRELKA:
21      Q.   All right, please take a look at Exhibit
22  Number 44.  Do you recall sending the second email dated
23  January 31, 2013 at 4:27 p.m.?
24      A.   Which one are we look at?

Page 35

1       Q.   Exhibit Number 44, the email on the bottom
2   half of the page; I just want to know if you recall
3   sending that email.
4       A.   Yes.
5       Q.   Okay.  And I'd like to show you what was
6   been previously marked as Exhibit Number 23, okay, and why
7   don't we put this one back in the pile, and put the other
8   one in the pile, too.
9       A.   Okay.
10      Q.   And do you recall sending out the long
11  email that begins in the bottom of that first page and
12  extends throughout the rest of the document?
13      A.   Yes.
14      Q.   Okay.  And do you recall the circumstances
15  surrounding your issuance of that email?
16      A.   Yes.
17      Q.   Can you describe the circumstances?
18      A.   So --
19         MR. GUYNN:  I'm sorry, I'm confused now.
20      This is a one-page --
21         MR. STRELKA:  Well, we moved on.  I just
22      wanted had he to authenticate and identify that
23      that was an email that she sent, Exhibit Number
24      44, now I've just handed her Exhibit Number 23.

Page 36

1          MR. GUYNN:  Right, but -- were you asking
2       if there was a long email on Exhibit Number 23.
3          MR. STRELKA:  Yes.
4          MR. GUYNN:  This is -- okay, so this is
5       23.
6          MR. STRELKA:  23, I gave you a copy of
7       whenever we admitted 23, is that 23?  This is 23.
8       Okay, 23 was admitted the other day.
9          MR. GUYNN:  Okay.  I didn't bring it.
10      Okay.  I guess that is where our system is
11      different.  I don't bring every deposition exhibit
12      from a week ago with me.
13         MR. STRELKA:  Right, okay.
14         MR. GUYNN:  That is fine.
15         (Off the Record.)
16  BY MR. STRELKA:
17      Q.   I will let you take a moment and review
18  Exhibit Number 23.  This is the email on the bottom half
19  of Exhibit Number 23, on the first page, you wrote this
20  email that extends to the next couple of pages; is that a
21  yes?
22      A.   Yes.
23      Q.   And do you remember the circumstances
24  surrounding that?

Page 37

1       A.   Yes.
2       Q.   And what were the circumstances surrounding
3   the time where you wrote that letter?
4       A.   So the Giles Animal Rescue, the Board
5   members, after many attempts to work with the County to
6   resolve matters at the shelter, we felt that, very
7   strongly, and because of the accusations against the
8   volunteers, that we weren't doing thing correctly, that we
9   were actually stealing, doing things we weren't supposed
10  to be doing, we decided in the best interests of the
11  volunteers that we should basically pull away and no
12  longer volunteer at the shelter, because it was obvious
13  that the County did not want to work with us; they wanted
14  to do -- we felt like this was the only way to get help
15  for the animals was to sort of pull back.
16         It was a very tough decision.  I cried
17  tears over this decision.  Our members wholeheartedly
18  agreed that this was the best decision at the time,
19  though, and that because the Sheriff was refusing to work
20  with us, that we needed to pull back and not volunteer at
21  the shelter, and -- because they were -- the staff were
22  just making it impossible and too stressful for the
23  volunteers.
24      Q.   Okay.  And did you ever have -- did you

**Central Virginia Reporters**                **www.huseby.com**
**3155 W. Main St. , Salem, VA 24153**
**(540) 380-5017**
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 10 of 45   Pageid#: 943

1  ever have any issues with Ms. Perkins allegedly posting
2  some things on the Internet that you found to be
3  inappropriate about the shelter or about GCAR?
4      A.     You know, stuff like that, I don't really
5  get into things on social media.
6      Q.     Okay.
7      A.     If that happened, I don't even remember
8  it.  I put it out of my mind.
9      Q.     Okay.  And the Giles County -- let me see,
10  the Giles shelter, did they have a Facebook page?
11      A.     They do.  Well, they still do, yes.
12      Q.     Okay.  And do you recall making a complaint
13  about there being unprofessional posts from Chastity on
14  that Facebook page?
15      A.     It is possible.
16      Q.     Okay.
17      A.     It's possible.  I remember addressing
18  several unprofessional posts by -- that occurred several
19  different times, but I don't remember who actually posted
20  those things.  I just remember bringing them to the
21  attention of the County that they need to be careful what
22  they are allowing their employees to post.
23      Q.     Do you recall some of the messages that
24  were posted?

1      A.     Not off the top of my head.  I would have
2  to go back through records to look.
3      Q.     All right.  All right, this is a previous
4  Exhibit Number 24, a two-page document.  That is the last
5  of old Exhibits.  Okay.  All right.  Ma'am, I would like
6  you to take a look at what has been previously been
7  identified, excuse me, as Exhibit Number 24.  Let's look
8  at the email that begins on the very bottom of the first
9  page and extends to the second page.
10      A.     Okay.
11      Q.     Do you recall sending this email?
12      A.     Yes.
13      Q.     Okay.
14      A.     Hmm-hmm.
15      Q.     And I want you now to focus your attention
16  on, unfortunately, the -- what appears to be the body of
17  an email on the top half of the first page.
18      A.     Hmm-hmm.
19      Q.     I would like you to read the text here to
20  yourself.
21      A.     Okay.
22      Q.     And do you recall sending an email with
23  that text?
24      A.     Yes, yes.

1      Q.     Does that refresh your memory in any way?
2      A.     Yes, it does.
3      Q.     Okay.
4      A.     So they -- I believe that one of the
5  comments was that we were refusing to help, and at that
6  time, that was not the truth, that we were not allowed to
7  go to the shelter at the time.
8      Q.     Okay.
9      A.     But yet, they were trying to make it in the
10  press look like we -- it's complicated.
11      Q.     Okay.  Who is "they"?  When you say they
12  were trying to make it look like something in the press,
13  who are you talking about?
14      A.     The people who put this in the paper and
15  on Facebook, and I don't know who did those, because I'm
16  not on the other side?  I don't know who submitted those
17  things to the paper, I'm just saying that these are things
18  that I observed happened, so I brought them to the
19  attention of the County, that we didn't really appreciate
20  that they were slandering, that we no longer help --
21  we felt that this was slander against our group because we
22  were no longer helping at the shelter.
23      Q.     And that wasn't true?
24      A.     That was correct.

1      Q.     Okay.  And -- all right.  Do you know a
2  Sheryl Helsel?  Maybe I'm saying it wrong.  She may be an
3  investigator for the Department of Agriculture?
4      A.     Yes.
5      Q.     Okay, at some point, you made a, for lack
6  of a better term, complaint to the Department of
7  Agriculture; is that right, about the shelter?
8      A.     Yes.
9      Q.     And why did you do that?
10      A.     To be honest with you, I had a very long
11  discussion with the animal control officer of another
12  facility and I said, these are some concerns that I have,
13  because I wanted to know, you know, how -- I actually went
14  to their shelter so I could learn how, because I knew that
15  shelter was run properly, and I wanted to learn all that I
16  could, and in conversation with that animal control
17  officer, and he was also the person who was the manager of
18  that particular shelter, after a long conversation with
19  him about the concerns that I had seen in the Giles
20  shelter, he actually gave me her business card and he
21  said, this is who you need to take your concerns to if you
22  are not getting anywhere with the people who are supposed
23  to be running that shelter.
24      Q.     Okay, and what -- where was this other

**Central Virginia Reporters**          **www.huseby.com**
**3155 W. Main St . , Salem, VA 24153**      **(540) 380-5017**
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 11 of 45   Pageid#: 944

Page 42

1  shelter?

2       A.    It was Salem.

3       Q.    The Salem shelter?

4       A.    Yes.

5       Q.    And who was the animal control officer that

6  you were speaking with?

7       A.    I have his business card at home but I

8  didn't bring it with me, but he's now retired.

9       Q.    You can't recall his name?

10       A.    Not off the top of my head, but I do have

11  his business card.

12       Q.    That is okay.  All right, so at that point

13  you determined that you would do this?

14       A.    Yes, and -- yes, and all of the information

15  is information that for three years, in the time that

16  volunteers would come to me and say, this is something

17  that I have a concern about, my answer would always be

18  Number One, I need documentation, it can't be just your

19  word, I have to have documentation.  If you want me it to

20  address a situation, I can't do it without documentation,

21  so for years, every time that a volunteer brought anything

22  to me with concerns, and documentation of it, I would file

23  it away, and so what I did, once I was encouraged to

24  contact Ms. --

Page 43

1       Q.    Sheryl, her name is written here.

2       A.    I have trouble with it every day.

3       Q.    Her name is written there on the email.

4       A.    So I took it to the Department of

5  Agriculture.

6       Q.    I just wanted you to see her name.

7       A.    Yes, Ms. Helsel, so he basically went back

8  to my records of things that I had been compiling for over

9  three years and sent her everything that I had, and I

10  didn't -- and when I did that, I actually thought that it

11  would be anonymous.  I didn't know how things worked like

12  this; I had never done had before, and not a single person

13  knew I was doing it.  I did it on my own; I didn't tell

14  anyone in our animal rescue group that I was doing it, I

15  did it as a concerned citizen, not as a person who was a

16  member of the animal rescue group, so I want to make that

17  very clear.

18       Q.    And what happened after you did that?  Did

19  someone from the department reach out to you, right?

20       A.    No, not really.

21       Q.    Okay.

22       A.    Basically, the first thing that happened is

23  I received a letter from the sheriff's department saying

24  that the animal rescue group needed to come to the shelter

Page 44

1  and retrieve all of their items.  We weren't told why; of

2  course, we knew that we had already told them that we

3  didn't want to volunteer there until changes were made, so

4  my assumption was, oh, they want us to come and get their

5  things because we told them that we would not volunteer

6  there until things changed, so I went to the shelter with

7  Charlie Herbert who retrieved the volunteer things, and

8  the animal control officer was obviously irate with me,

9  and again, I had no idea that any -- that anything that I

10  sent to Ms. Helsel had been -- I didn't even know if she

11  received it; I didn't know what she was doing with the

12  information, I did not know that she had even been to the

13  shelter.

14       All I know is I needed to come to the

15  shelter and retrieve our volunteer things and that is what

16  I did, with a very friendly manner, and it was quite

17  obvious as soon as I got there, something happened,

18  because the animal control officer was irate with me, and

19  very unprofessional, and when I asked, what is wrong, why

20  are you so angry with me, they basically just told me I

21  needed to leave, I had hurt a lot of people and I needed

22  to leave and never come back, that no one in our group

23  should ever come back to the shelter.

24       Q.    Okay.

Page 45

1       A.    And we had -- sorry, and so we had a locked

2  cabinet that we kept our supplies in, and we had our own

3  supply cabinet that we kept locked because of the problem

4  where things would constantly disappear, and the irony,

5  things in our locked cabinet that we had a key to never

6  disappeared, and this is something that we brought up in

7  meeting where we had accusations about things

8  disappearing, but nothing in our own locked cabinet was

9  disappearing, so we had dog food and cat foot in the

10  cabinet because of the reason that we weren't allowed to

11  have access to the shelter supplies and we wanted to have

12  access to food, and if a person would surrender an animal

13  or they found astray, we needed to feed it and I tried to

14  offer that food to the animal control officer and he

15  refused it and I said, what is going on, why are you

16  refusing a donation of food, it's just food, take it, keep

17  it, and that is when the angry statement came that I

18  should leave and never come back.

19       Q.    Is that Mr. Dalton who said that?

20       A.    No, that was from Frank.

21       Q.    Frank Gough?

22       A.    Yes.

23       Q.    Okay.  And you said that he was irate.  Do

24  you recall any other statements that he made that

**Central Virginia Reporters**              **www.huseby.com**
**3155 W. Main St . , Salem, VA 24153**
**(540) 380-5017**
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 12 of 45   Pageid#: 945

1  you've -- that you thought might be inappropriate?

2      A.    Well, it was just his whole entire body

3  language and the fact that he was -- he had his hand on

4  his guns the whole time in a very scary aggressive body

5  language towards me, which was very frightful.

6      Q.    Okay.  And -- all right.  So if this was a

7  time line of events, what happened after that?

8      A.    So again, I still have no idea what is

9  really going on; I'm just trying -- I'm assuming that

10  something must have happened, and honestly, I don't even

11  remember how I eventually found out -- oh, I do know.  So

12  the next thing, this is how I found out that the person

13  had come and done the inspection at the shelter, is a

14  reporter called me and she said, oh, yes, I have all of

15  the information that you sent to Ms. Helsel, the State,

16  about the shelter, and that is when I realized that the

17  inspection had been done, because a reporter provided a

18  copy of the report to me.

19          MR. STRELKA:  Okay.  All right.  And I'd

20      like to have this admitted as the next Exhibit,

21      please.

22

23          (The above-mentioned document was marked as

24      Deposition Exhibit Number 45 and entered into the

1      Deposition.)

2

3  BY MR. STRELKA:

4      Q.    I'd like you to take a moment and look at

5  what has been labeled as Exhibit Number 45.

6      A.    Okay.

7      Q.    And do you recall sending this email?

8      A.    Yes.

9      Q.    Okay.  And why did you send this email?

10      A.    Because I felt it was the right thing to

11  do, that animals were not being taken care of.

12      Q.    Okay.  And had -- did the -- and I know

13  that you are sending this to the investigator for the

14  Virginia Department of Agriculture, did she request that

15  you send her this email; do you recall?

16      A.    No.

17      Q.    Okay.  So you did it just to provide her

18  with this information?

19      A.    I just basically -- the very first email

20  that I sent her, I may have stated, I have information

21  about the shelter and the care of the animals there that I

22  would like to share with you, and I'm going to be sending

23  you several emails, and that was the first email that I

24  sent her.  That was basically how I approached the

1  first subject, and I was trying to clarify with her, are

2  you the person that I need to give information to, and she

3  did clarify yes, send it to me.

4      Q.    Okay.  And I notice on the email heading up

5  top, it says "Attachments."

6      A.    Yes.

7      Q.    And then it looks to be the file names of

8  digital pictures or photographs, so you attached

9  photographs this?

10      A.    Yes.

11      Q.    These photographs, did you take them

12  yourself or were they taken by other members of GCAR?

13      A.    I took some of the photographs; most of

14  them were taken by other volunteers.  Again, as she said,

15  over the years, whenever someone would come to me with a

16  concern, I would ask for documentation, and they were very

17  good to provide it.

18      Q.    Okay.  And so these -- these animals that

19  you that you are describing here, and each paragraph kind

20  of describes a different animal, Dixie, Spike, Chastity,

21  Crystal, the incidents described regarding these

22  particular animals, do we know when these incidents

23  occurred?

24      A.    So for each of these I sent her their case

1  numbers for each one, but I don't -- but I don't see the

2  email where I provided the case numbers, and so if you had

3  the case number, then you could look up the shelter

4  records and it would give you the dates, and the case

5  number for any animal that came in, if it was in the Year

6  2011, the case number would usually be an 11 and then the

7  number, so you would know which year just by that.

8      Q.    Okay.  But were all of these animals that

9  were identified, that you were identifying here for the

10  Department of Agriculture, were these animals that were

11  housed at the shelter at the time that Sheriff Millirons

12  was elected?

13      A.    Yes, these are all pets within the past

14  three years.

15      Q.    Okay.

16      A.    I'm sorry, three years prior to 2013.

17          MR. STRELKA:  Okay.  I'd like to have this

18      marked as the next Exhibit.

19

20          (The above-mentioned document was marked as

21      Deposition Exhibit Number 46 and entered into the

22      Deposition.)

23

24  BY MR. STRELKA:

Page 50

1      Q.    I would like you to take a moment and look
2  at Exhibit Number 46.  Did you write this email?
3      A.    Yes.
4      Q.    Okay.  And do you see the third paragraph?
5      A.    Yes.
6      Q.    I read this paragraph to Ms. Jones,
7  formerly Ms. Perkins, and she denied all of the incidences
8  contained within this paragraph.  Did you personally
9  witness this?
10     A.    I was not there that particular day.  There
11 were two volunteers that were there, and they called me
12 from the shelter because they were so shocked at the
13 conditions, because they had been there many times and
14 they never had seen it that way.  When they came, arrived
15 that day and they said, what do we need to do, and I said,
16 you need to take some pictures because we need to document
17 this.
18     Q.    Okay.
19     A.    And that is what happened.  They took
20 pictures, and this was the day when the dogs were just
21 coated.  I mean, and the pictures cannot justify how bad
22 it was that their hair coat was just caked with feces
23 because their kennels had not been cleaned in so long and
24 they were just having to -- when they needed to rest, they

Page 51

1  were just laying in feces.
2      Q.    And just so we have this accurate, you
3  yourself have seen the animals at the shelter at the time
4  that Sheriff Millirons was elected sheriff in which the
5  animals were covered in feces, as you have just indicated?
6      A.    Once.
7      Q.    Once?
8      A.    Yes.
9      Q.    Okay, and you have heard about that
10 condition occurring?
11     A.    Yes.
12     Q.    From other volunteers?
13     A.    Yes.
14     Q.    Okay.  And do you recall an incident in
15 which it came to your attention that Ms. Perkins, now Ms.
16 Jones, was using a broom stick inappropriately with an
17 animal?
18     A.    Yes.
19           MR. STRELKA:  Okay.  Let's mark this as the
20     next Exhibit.
21
22           (The above-mentioned document was marked as
23     Deposition Exhibit Number 47 and entered into the
24     Deposition.)

Page 52

1
2  BY MR. STRELKA:
3      Q.    Did you send this email?
4      A.    Yes.
5      Q.    And do you recall who the volunteers who
6  witnessed this were?
7      A.    Yes.
8      Q.    Who were they?
9      A.    It was Angie -- I'm trying to remember her
10 last name because it's changed, but her first name was
11 Angie.  I could look it up for you if you needed it, and
12 Amanda; they were the two volunteers that went that day,
13 and they were just very upset because Chastity just
14 continued to provoke this dog and thought that it was so
15 funny to get it to be afraid, and it would aggressively
16 try to attack the broom handle or the people who
17 approached the cage, and it was like a dog that weighed
18 maybe ten pounds, a little Chihuahua mix, and she was
19 bragging, and our job was to go and to assess pets for
20 adoption, so if it has aggressive issues, we needed to
21 know that, and again, I've worked in veterinary medicine a
22 very long time; I've worked side by side with people whose
23 PhD is in behavior, so I understand a lot about pet
24 behavior, and some dogs just do, when they are afraid,

Page 53

1  they will guard their cage because that is their space,
2  and they may attack someone who approaches the cage, but
3  once you pull the dog out of its cage, the space that it's
4  protecting, it -- the aggressive behavior may go away
5  completely, and so the volunteers were trying to ask
6  Chastity, can we pull this dog out and see if it still has
7  the same behavior, and she refused to let them, and that
8  is when she pulled out the broom and said, see how mean
9  this thing is; as soon as my daddy comes in, he's putting
10 this thing to sleep, we're not letting anybody adopt this
11 dog or rescue this dog, it's too mean.
12     Q.    Okay.  And while I'm on the subject of some
13 identification here, the previous Exhibit regarding the --
14 these individuals that came to the shelter, saw that the
15 animals were covered in feces and noted that Ms. Perkins,
16 now Ms. Jones, had allegedly brought two young boys to the
17 shelter, who were those volunteers?
18     A.    For that particular day?
19     Q.    Yes, ma'am.
20     A.    I would have to go back through my records
21 and check.
22     Q.    Okay.
23     A.    But it happened multiple times with
24 multiple volunteers.

Central Virginia Reporters                    www.huseby.com
3155 W. Main St . , Salem, VA 24153            (540) 380-5017
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 14 of 45   Pageid#: 947

Page 54

1     Q.     What happened multiple times with multiple
2  volunteers?
3     A.     That we would have volunteers there, and
4  Chastity would be there with her children or her son or
5  her son and a friend.  We weren't even sure.  I mean,
6  volunteers don't know who Chastity is.  We don't know --
7  they don't know who her son is, if she has children, who
8  those people are, but they would just observe, they were
9  young boys, and this is what they were doing.
10    Q.     For what it's worth, I will let you know
11 that Ms. Jones testified that she didn't have any
12 children, for what it's worth.  This is a little out of
13 the order, but I will introduce it now for identification
14 purposes.  Let's mark that as the next Exhibit.
15
16              (The above-mentioned document was marked as
17         Deposition Exhibit Number 48 and entered into the
18         Deposition.)
19
20 BY MR. STRELKA:
21    Q.     I just want to know if you recall sending
22 this email.
23    A.     Yes.
24    Q.     Do you recall, do you see the middle

Page 55

1  paragraph, it says, "I am an eye witness, that she," she
2  being Chastity, "came in around 1:30 right as I was
3  leaving.  The volunteer who came in at 2:00 reported the
4  shelter employee was not there when they arrived."
5     A.     Yes.
6     Q.     Did that occur; did situations like that
7  occur more than once?
8     A.     Yes.
9              MR. STRELKA:  Okay.  Jim, I'm going to hand
10        to you -- I will have her -- we're not going to
11        walk through each and every one of these pictures,
12        but I just want to see if these are the ones that
13        she sent to the department.  I would like her to
14        verify that what I'm giving you was actually a
15        whole printout of a Freedom of Information Act
16        request that we sent to the Department of
17        Agriculture, and it actually includes a couple of
18        extra documents, some of the emails that we shared
19        in there.  I haven't culled them out, but most of
20        this is just pictures.
21             MR. GUYNN:  Okay.
22 BY MR. STRELKA:
23    Q.     If we go to court, I will pay for some
24 color ones, but all I have today are the black and whites,

Page 56

1  so some of these pictures may have been taken by you or
2  other members of GCAR, and some of the pictures may have
3  been taken by the investigator herself, okay?
4     A.     Okay.
5     Q.     And so I'm going to give you a big stack of
6  these pictures, all right, and what I'm going to ask you
7  is, see if you can identify what pictures you sent to the
8  department, and what might help you.
9              MR. GUYNN:  There are a bunch of
10        duplicates.
11             MR. STRELKA:  Well, blame the Department of
12        Agriculture for sending me a bunch of duplicates.
13             MR. GUYNN:  Well, I don't know if that
14        meant --
15             MR. STRELKA:  I will try to pull out the
16        duplicates and just admit the others for the
17        Exhibit.
18             MR. GUYNN:  I didn't know if that meant
19        that these were extra copies of same Exhibit.
20             MR. STRELKA:  No, they gave me all of that,
21        and I just hit "print" this morning.
22             MR. GUYNN:  Okay.
23 BY MR. STRELKA:
24    Q.     So I would like you to take a look at these

Page 57

1  pictures here.
2     A.     Okay.
3     Q.     And --
4              MR. GUYNN:  Are you going to label them?
5              MR. STRELKA:  And the ones that you -- what
6        I'm going to do, the ones that she can identify as
7        the ones that she submitted are the ones that I
8        will make an Exhibit, so what I would like you to
9        do is look through these pictures.  It might help
10        you to even refer to some of the other emails that
11        identified some of the dogs, but I want you to see
12        if you can tell me which of those pictures you
13        sent.
14             THE WITNESS:  Okay.
15 BY MR. STRELKA:
16    Q.     All right.
17    A.     I sent those.
18    Q.     I will take that.
19    A.     These.
20    Q.     Okay.
21    A.     These.  These.  These.  These
22 (indicating).
23    Q.     I believe that those might have been taken
24 by the investigator?

Central Virginia Reporters                 www.huseby.com
3155 W. Main St. , Salem, VA 24153
(540) 380-5017
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 15 of 45   Pageid#: 948

Page 58

1    A.    Yes, these are investigator photographs.

2    Q.    Okay.

3    A.    And these (indicating).

4    Q.    Okay.  So why don't you give me the ones
5  that you didn't send, okay, and let me see if I have any
6  other photographs that we might be able to separate real
7  quick, okay, and then we will make that an Exhibit.  Did
8  you take this?

9    A.    Yes.

10   Q.    Okay.  Why did you take that?  Well, I will
11  wait and ask until we make this an Exhibit.  Let me see if
12  there is anything else.  Okay, that is all that I wanted.
13  So what we will do, we will get a little paper clip, and
14  mark those.

15   A.    I think that there is a picture missing.

16   A.    There is a picture missing?

17   A.    This dog that is outlined in this report.
18  That is not here.

19   Q.    Okay.  What is the dog outlined in that
20  report?

21   A.    That one (indicating).

22   Q.    That is the dog?

23   A.    Yes.

24   Q.    A sad looking Snoopy there?

Page 59

1    A.    Yes.

2    Q.    Okay.  And you sent all of these pictures
3  that you have here?

4    A.    Yes.

5    Q.    To the department?

6    A.    Yes.

7    Q.    Yes?

8    A.    Yes.

9    Q.    Okay.  And I would like to have -- thank
10  you for doing that.  I would like to have these pictures
11  collectively identified as the next Exhibit, and here is a
12  paper clip.

13

14         (The above-mentioned photographs were
15         marked as Deposition Exhibit Number 49 and entered
16         into the Deposition.)

17

18         THE WITNESS:  Are there other copies of
19         these?

20

21  BY MR. STRELKA:

22   Q.    Let's wait.  Now we'll talk about that.
23  You've just been handed Exhibit Number 49.  What is that
24  top picture?  Collectively it is a number of photographs,

Page 60

1  and what is that top photograph?

2    A.    This is a photograph of an animal custody
3  record, and in particular, a female dog that had a
4  severely injured paw.

5    Q.    Okay.

6    A.    That came in.

7    Q.    Okay.

8    A.    In June of 2012.

9    Q.    And why did you take the picture, or why
10  did -- did you take this picture physically, or did
11  someone else take that picture?

12   A.    This is again an incidence where a
13  volunteer saw something that she was concerned about, and
14  I asked her to send me documentation, and she provided
15  this documentation to me from the shelter.  This is a
16  photocopy of shelter records, this page.

17   Q.    Okay.

18   A.    And this is a photograph of the dog.

19   Q.    All right, and the next page on that
20  exhibit seems to be a single picture; let's go back so I
21  can describe that for the Record, and there is a single
22  picture of a white dog on the second page?

23   A.    Yes.

24   Q.    Okay.  And let's see.

Page 61

1    A.    Described as a Dalmatian mix.

2    Q.    Okay, and what was your question to me a
3  minute ago?  You asked me if I had more of these forms.

4    A.    Yes, because for several of these other
5  dogs --

6    Q.    Hmm-hmm.

7    A.    -- I had one of these photocopies to go
8  with it, to show the time frame and the shelter intake
9  number.

10   Q.    Okay.  This does not look like a
11  photograph; this looked like a xeroxed copy, and that
12  should be in your pack, Jim, is that what you referring to
13  or is that something different, and let me reflect to you
14  that we send a Freedom of Information Act request to the
15  Department of Agriculture, kind of asking for the whole
16  shebang, and this is what they gave me.

17   A.    This is prior -- this is like after.

18   Q.    Okay.

19   A.    Well, I only have what I just provided you.

20   Q.    Let me take this away, but you have
21  identified the other pictures there as pictures that you
22  did send to the Department of Agriculture?

23   A.    Yes.

24   Q.    And these were pictures taken either by you

**Central Virginia Reporters**          **www.huseby.com**
**3155 W. Main St. , Salem, VA 24153**
**(540) 380-5017**
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 16 of 45   Pageid#: 949

Page 62

1  or by other members of your organization while you were
2  present at the time?
3        A.    Yes, sorry, there is still some missing.
4        Q.    Okay.
5        A.    Go ahead.
6        Q.    Well, I will tell you what, I thought that
7  I had everything, but today, or this weekend, if you want
8  to go home and see if there is anything else --
9        A.    Okay.
10       Q.    -- any pictures, I would be happy to take
11 them and you can email them to me.
12       A.    Okay.
13       Q.    All right.
14             MR. GUYNN:  To be clear, you are going to
15       provide that to us as an Exhibit?
16             MR. STRELKA:  Yes, that is the Exhibit
17       right here.  I just wanted her to pick from there
18       and help me to identify, and now this is 49, and
19       we will make a copy of that and get it spread
20       around.
21             MR. GUYNN:  All right.
22             MR. STRELKA:  Why don't you put 49 back
23       over here with 48, thank you.  I would like this
24       to be Number 50.

Page 63

1
2             (The above-mentioned document was marked as
3       Deposition Exhibit Number 50 and entered into the
4       Deposition.)
5
6  BY MR. STRELKA:
7        Q.    Do you recall sending this email?
8        A.    Yes.
9        Q.    And why did you send this email?
10       A.    Again, these are cases that we had seen
11 come into the shelter where proper care was not being
12 provided.
13       Q.    Okay.
14       A.    And this was documentation of what we
15 witnessed as a group of volunteers.
16       Q.    Okay.
17       A.    And some of these photographs are what I'm
18 describing in this email.
19       Q.    Okay.  And given your observations and the
20 reported observations of your members of your
21 organization, sitting here today, can you tell me how many
22 hours Ms. Perkins was working per week at the shelter?
23 You may not be able to tell me; you may have no clue, but
24 I was just asking.

Page 64

1        A.    On average, an hour per day or less, if she
2  even came in.
3        Q.    Okay.  And you understand that she has
4  accused members of your organization and you yourself
5  about lying about all of this?
6        A.    I haven't --
7        Q.    I will represent to you that she just
8  testified to that.
9        A.    Okay.
10       Q.    Did you ever have any conversations with
11 the investigator?
12       A.    No.
13       Q.    Are you aware of -- well, strike that.  The
14 sheriff is no longer in control of the shelter; is that
15 right?
16       A.    That is my understanding, yes.
17       Q.    Okay.  And are volunteers currently from
18 GCAR or G.A.R. now assisting with the shelter as they had
19 been prior to their limited access that was enacted in
20 2013?
21       A.    Our volunteers have been informed that we
22 can contact the County administration office and go
23 through and complete paperwork and become volunteers at
24 the shelter again, as of 2014.

Page 65

1        Q.    Okay.
2        A.    Volunteers are quite aware of that.
3        Q.    Okay.
4        A.    However, none who have been previously
5  through this experience of false accusations care to go
6  and put themselves in that position again.
7              MR. STRELKA:  Okay.  I don't have any
8        further questions.  Jim?
9
10             EXAMINATION BY JIM H. GUYNN, JR., ESQ.
11       Q.    You mentioned earlier that you had
12 volunteered at other shelters, and I think you mentioned
13 Montgomery?
14       A.    Yes.
15       Q.    Why did you stop volunteering there?
16       A.    Because I realized that Giles County had a
17 need, and I live in Giles, so why am I not helping Giles
18 County pets, and that is what I felt moved to do.
19       Q.    And if I suggested to you that they don't
20 want you back at the Montgomery County shelter, what would
21 you say?
22       A.    I would say that is not true.
23       Q.    Okay.  You -- and I'm trying to keep all of
24 it together, but you indicated that prior to sending

**Central Virginia Reporters**          **www.huseby.com**
**3155 W. Main St. , Salem, VA 24153**
**(540) 380-5017**
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 17 of 45   Pageid#: 950

**Page 66**

1 emails to the Department of Agriculture, you had told the
2 volunteers that they needed to document these things?

3      A      Yes.

4      Q.      Did I understand that correctly?

5      A.      Yes.

6      Q.      Now, what kind of documentation are you
7 talking about?

8      A.      I asked them to write down exactly what
9 they observed, the date that they said were there, what
10 they observed, and any pictures that they had.

11      Q.      Okay. And so your -- okay, so the pictures
12 would be to verify what they saw?

13      A.      Correct.

14      Q.      But the fact that they wrote something down
15 does not verify what they saw, does it?

16      A.      I can't answer that.

17      Q.      Okay. Well, do you accept everything that
18 is written as true?

19      A.      I have worked with the volunteers, and I
20 trusted them and I did take their word for it, that they
21 were telling the truth.

22      Q.      But you needed documentation?

23      A.      Yes, because I think that that is what is
24 the most helpful, and you can always have -- anything that

**Page 67**

1 you can have in writing, because I -- three years from now
2 when you have to have a conversation about what happened
3 three years ago, it helps if you have that documentation
4 to help you remember, that the facts are kept straight.

5      Q.      And you indicated that -- let me make sure
6 of my note. I think you said that many of your volunteers
7 did not know who Chastity was?

8      A.      They recognized her face as she is the
9 kennel helper hired by the County; they didn't actually
10 know what her name was or who she was as a person, that is
11 what I was referring to, or anything about her personally.

12      Q.      On the -- on the example that you gave, and
13 I can't tell you what Exhibit it was, about not collecting
14 the deposit?

15      A.      Yes.

16      Q.      The folks then called you and said, we
17 don't have the money to get this dog spayed?

18      A.      Correct.

19      Q.      All right.

20      A.      Actually, it was in person, not a phone
21 call.

22      Q.      Okay, so would you agree with me that they
23 wouldn't have had $150 to make a deposit, either?

24      A.      That is correct. They told me so.

**Page 68**

1      Q.      Okay.

2      A.      And I know the family, and I know their
3 finances, and they are -- they already had a female that
4 they were not getting spayed and neutered because they
5 could not afford it, so I gave them a certificate to get
6 the newly adopted dog and the female that they had for
7 eight years spayed.

8      Q.      Had you had any contact with them prior to
9 that instance about making certificates available to them?

10      A.      Never.

11      Q.      Okay. Do you know how it is that they came
12 to contact you?

13      A.      It's known in the community that I do this
14 work, and we advertise throughout the community to contact
15 us if you need spay and neuter assistance, and they --
16 friends of friends, they knew that I was president of the
17 animal rescue, so that is why they sought me out to see --
18 they had heard that animal rescue could help provide spay
19 and neuter assistance, and knowing that I was president of
20 the group, that is why they sought me and asked me that
21 personally, if I would help them.

22      Q.      Okay.

23      A.      And then he said, where did you get the
24 dog, and that is when the conversation started.

**Page 69**

1      Q.      All right. If I understand correctly, dogs
2 that are not adopted at shelters or not rescued are
3 euthanized?

4      A.      Correct.

5      Q.      Isn't it better that this dog was adopted
6 out, even though the family didn't have $150, in a
7 situation where they could get the dog spayed by the
8 certificate than to be euthanized?

9      A.      I would disagree with that, and one of the
10 reasons why our volunteers wholeheartedly uphold the Giles
11 County regulation is because we understand that when they
12 take this pet home, if they can't afford spay and neuter,
13 it's going to reproduce, and then when -- there is already
14 a pet overpopulation problem; we would rather see a pet
15 humanely euthanized than to continue this overpopulation
16 problem where dogs are just going to die because there is
17 lack of food, lack of care, because of overpopulation.

18      Q.      Okay.

19      A.      I have personally assisted with euthanizing
20 many dogs because there is no place for them. I feel very
21 passionate about this.

22      Q.      Okay. I know nothing about it, so I'm
23 not -- I'm not, you know, I'm just curious about the
24 concept.

Page 70

1     A.     Yes.

2     Q.     Now, you indicated that people had, in your
3  group, had suggested that these adoptions without paying
4  the deposit were done for friends of folks that worked at
5  the dog shelter?

6     A.     No, not people that worked there; the
7  staff, we felt, were letting certain animals be adopted by
8  their friends and family without the -- the friends and
9  family of the staff were being allowed to adopt without
10 doing the spay and neuter deposit.

11    Q.     I'm confused.  I thought that that is what
12 I asked.

13    A.     Sorry, I must have misunderstood you.

14    Q.     I said employees, you said staff.  Are we
15 talking about the same thing?

16    A.     Yes, we are.

17    Q.     So who is the staff at the shelter?

18    A.     That would be animal control officers and
19 Chastity at that time period.

20    Q.     Okay, and what is the basis for that rumor?

21    A.     Because when the volunteers would go and we
22 would see that the dog had been adopted, we would go
23 through the paperwork, because all of the paperwork is in
24 a certain bin on the desk where we all have access to

Page 71

1  paperwork, and one reason why there is access to the
2  paperwork is because in case and owner would call and ask,
3  I lost a dog, we can flip through records and say, oh,
4  yes, I do see it came in three weeks ago, but that is what
5  has happened and we have those records.  We have them
6  available to us for 30 days from the time of intake.

7     Q.     Okay.

8     A.     And so volunteers were noticing, especially
9  certain purebred dogs that were highly more in demand, I
10 suppose is the right word, we would see that they were
11 being adopted and -- but we didn't see any receipt for the
12 spay and neuter deposit.

13    Q.     Okay.

14    A.     You could see that there was adoption
15 paperwork but not necessarily always a receipt for the
16 deposit.

17    Q.     And how does that get to them being friends
18 of the staff?

19    A.     Again, this is our belief of what was
20 happening.  I don't have proof for it.

21    Q.     You don't have any basis for it, that they
22 are friends of staff, do you?

23    A.     Of course not.

24    Q.     Isn't that a tad irresponsible to be making

Page 72

1  these statements under Oath and you have no basis for it?

2     A.     I'm telling you what we observed.

3     Q.     But what you testified today was that you
4  believe that friends of the staff were adopting without
5  making a deposit, and you just told me that you had no
6  basis for that whatsoever?

7     A.     This is the -- this is the volunteers over
8  many years who would come to us, who would come to -- it
9  was a common belief with the volunteers that this was a
10 common practice, but we could not prove it, and that is
11 what I stated.

12    Q.     Now, you were -- if I am reading this
13 correctly, and help me if I'm not, take a look at Exhibit
14 Number 44.  Do you recall testifying about these emails?

15    A.     Yes.

16    Q.     And I'm trying to make sure that I
17 understand.  As of these emails, when the decision -- or
18 had the Giles Animal Rescue been advised that they were no
19 longer going to be allowed to volunteer at the shelter?

20    A.     I'm trying to remember, because I don't see
21 the second page; I'm sorry, ask the question again,
22 please.

23    Q.     I'm trying to figure out if these are the
24 emails that indicate that this is about the time that the

Page 73

1  Giles Animal Rescue volunteers were no longer being
2  allowed to volunteer at the shelter.

3     A.     Okay, yes.

4     Q.     Okay.  And from that time until 2014 when
5  the County assumed the operational responsibility for the
6  shelter, were Giles Animal Rescue volunteers ever allowed
7  back in to volunteer?

8     A.     There was a short period of time where we
9  did work out, and this was because the volunteers
10 requested it, we asked that staff be present before we
11 send volunteers, and that way, there would be this
12 accountability that the -- for when the volunteers were
13 there, that we felt that there would be no more false
14 accusations if staff would be there while we were there
15 volunteering.

16    Q.     Can you give me the dates of that?

17    A.     Not without going back through emails to
18 make a time line for you.

19    Q.     Okay.  Now, when you talked about going --
20 you had to go and retrieve food and other items that
21 animal rescue, Giles Animal Rescue, had left at the
22 shelter?

23    A.     Yes.

24    Q.     That was pretty soon after you were told

**Central Virginia Reporters**                    www.huseby.com
**3155 W. Main St. , Salem, VA 24153**
                                                  **(540) 380-5017**
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 19 of 45   Pageid#: 952

Page 74

1  that you were no longer going to volunteer, right?

2        A.    Well, if you look at this documentation, I

3  believe, was it in May that we decided to pull back and

4  not send volunteers, even though staff would be there.

5        Q.    Okay.

6        A.    And then we were told to come and get our

7  things, not until September.

8        Q.    Okay.

9        A.    It was actually on September 11th, when I

10 went there.

11       Q.    Okay.  When you say that you remember the

12 date, because of September 11th?

13       A.    Yes.

14       Q.    The significance of September 11th?

15       A.    Yes.

16       Q.    And the Twin Towers?

17       A.    Yes.

18       Q.    Okay.  All right, you were asked about who

19 from the County told you to contact the Sheriff, and you

20 indicated that the previous president of G.A.R. had told

21 you that?

22       A.    Yes.

23       Q.    Okay.  And did you make any attempt other

24 than what is shown in the emails to talk with anybody at

Page 75

1  the County about the animal shelter?

2        A.    I had been to the Board of Supervisors'

3  meetings and shared information with various volunteers

4  had tried to speak with the Board of Supervisors members

5  one on one throughout the years also.

6        Q.    When you say "had tried to," did they

7  succeed?

8        A.    Yes.

9        Q.    And did you have any contact with

10 individual Board of Supervisors members?

11       A.    Just at meetings.

12       Q.    Okay.

13       A.    When I would go to meetings and discuss

14 things.

15       Q.    You spoke with them in the meeting as a

16 group?

17       A.    It was at the public meetings that they

18 have.

19       Q.    They have the opportunity for public

20 comment?

21       A.    Yes.

22       Q.    And you signed up and made comments to the

23 entire Board?

24       A.    Yes.

Page 76

1        Q.    And have you had any individual contact

2  with Mr. Dunn to discuss these issues?

3        A.    No.

4        Q.    Okay, do you know of anybody from your

5  group that has had individual contact with Mr. Dunn?

6        A.    No, not that I am aware of.

7        Q.    Okay.  In the course of your discussions --

8  well, let me scratch that.  Let me go back and put in a

9  foundation.  You had at least one meeting with Sheriff

10 Millirons, didn't you?

11       A.    Yes.

12       Q.    And was there more than one meeting?

13       A.    Yes.

14       Q.    How many were there?

15       A.    There were a couple of meetings where it

16 was just me in his office; that has been several years

17 ago.

18       Q.    Okay.

19       A.    And then our vice president also met with

20 him just one on one a couple of times.

21       Q.    Okay, I'm just asking about your meetings

22 with him.

23       A.    All right, and then a few times our group,

24 myself and the vice president, and on one occasion April

Page 77

1  Lowry, our coordinator, also was at a meeting, so we

2  had -- we've had several meetings over the last three

3  years.

4        Q.    Okay, so when you said "several years," you

5  meant the last three years?

6        A.    Yes.

7        Q.    Was there any older than that?

8        A.    Other volunteers before me had also met

9  with the Sheriff.

10       Q.    Okay.

11       A.    Concerning the staff and the things that

12 weren't being done, or were being done inappropriately,

13 yes.

14       Q.    And if I recall your testimony, the

15 organization was formed in 1999 because of that concern

16 that things weren't being done correctly at the pound -- I

17 mean the shelter, I'm sorry.

18       A.    Yes, yes, and at that time because of our

19 concerns, the community got together and we built a newer

20 and better shelter.

21       Q.    Is that the one being used now?

22       A.    That is the one we use now, yes.

23       Q.    And over the years, since the completion of

24 that shelter, when was it completed, I'm sorry?

Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 20 of 45   Pageid#: 953

Page 78

1     A.     I would have to go back through the
2   records.
3     Q.     Approximately.  Was it mid 2000's?
4     A.     Well, 2003, I can't remember.
5     Q.     Okay.
6     A.     To be honest, I would have to look it up.
7     Q.     Is it fair to say that it was well before
8   Sheriff Millirons became Sheriff?
9     A.     Honestly, I don't know how long he's been
10  Sheriff.
11    Q.     I will tell you he started in 2008?
12    A.     Okay, likely prior to that.
13    Q.     Did you ever meet with Sheriff Altizer?
14    A.     No.
15    Q.     Do you know if anybody from your group did?
16    A.     I do not.
17    Q.     Okay.  Other than your comments to the
18  Board of Supervisors in public comment, did you have
19  meetings with -- I will say non-elected officials in the
20  County, staff, Chris McKlarney, Kevin Belcher, someone
21  like that?
22    A.     Our volunteers did go to the manager of the
23  Greenbrier who was the person that actually -- that
24  Chastity actually did work for, who was the controller.

Page 79

1     Q.     Okay.
2     A.     They had -- our volunteers had gone to Mr.
3   Duncan and said, you know, you have an employee, we have
4   these concerns that they are not doing their job, they are
5   getting paid for work they are not doing.
6     Q.     Okay.  And when you met with the Sheriff in
7   his office, was anybody else there in the office, just you
8   and him?
9     A.     On two occasions, not -- it was just the
10  two of us.
11    Q.     Okay.
12    A.     There was one occasion when Chris McKlarney
13  was present, and Charlie Herbert.
14    Q.     All right.  I'm sorry, Charlie Herbert?
15  I'm just repeating that for the court reporter.
16    A.     Yes.
17           MR. GUYNN:  I don't have any other
18  questions.
19           MR. STRELKA:  Neither do I.  Thank you,
20  ma'am.
21           MR. GUYNN:  I guess since I have the speech
22  down, we have to get your signature on the
23  transcripts of your testimony --
24           THE WITNESS:  Okay.

Page 80

1           MR. GUYNN:  -- that the court reporter is
2   going to prepare, and after she prepares it, she
3   can send it to you along with a signature page and
4   errata sheet and you read it, and within 30 days,
5   you will have to return it, and you can fill out
6   the errata sheet and change things that you want
7   to change if you need to, or you can authorize the
8   court reporter as a notary public to just sign
9   your name to it, and if you want a copy of your
10  deposition testimony, one of us will get it for
11  you.
12           THE WITNESS:  Okay.
13           MR. GUYNN:  But you will save yourself a
14  lot of time and you don't have to sign it, is the
15  bottom line, so it's really up to you.
16           MR. STRELKA:  In my experience, most people
17  just waive.
18           THE WITNESS:  Okay.
19           MR. STRELKA:  Are you fine waiving?
20           MR. GUYNN:  I will send you a copy of the
21  transcript so you can have it and read it.
22           THE WITNESS:  I just want to make sure that
23  I understand.  Do I need to do anything else?
24           MR. STRELKA:  No.

Page 81

1           MR. GUYNN:  Not if you waive.
2           THE WITNESS:  So you are saying that I can
3   choose now to state that I want to waive?
4           MR. STRELKA:  Yes, ma'am.
5           THE WITNESS:  Yes.
6           MR. STRELKA:  Will you do that?
7           THE WITNESS:  Yes.
8           MR. STRELKA:  You are free to go.
9
10           (The deposition concluded at 12:45 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**Central Virginia Reporters**          **www.huseby.com**
**3155 W. Main St. , Salem, VA 24153**
**(540) 380-5017**
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 21 of 45   Pageid#: 954

**Page 82**

```
1                    WITNESS SIGNATURE WAIVER

2

3           The signing of the deposition by the

4       deponent was waived at the time of the taking of

5       the deposition.

6

7       Lisa M. Hooker RPR

8       _____

9       LISA M. HOOKER, RPR #29505

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

**Page 83**

```
1              C E R T I F I C A T E

2    COMMONWEALTH OF VIRGINIA

3    COUNTY OF ROANOKE

4              I, Lisa M. Hooker, Notary Public in and for

5    the Commonwealth of Virginia, at Large, do hereby certify

6    that the Deposition of CHRISTINE LINK-OWENS was by me

7    reduced to machine shorthand in the presence of the

8    witness, afterwards transcribed under my direction by

9    means of Computer, and that to the best of my ability the

10   foregoing is a true and correct transcript of the

11   Deposition as aforesaid.

12             I further certify that this Deposition was

13   taken at the time and place in the foregoing caption

14   specified.

15             I further certify that I am not a relative,

16   counsel or attorney for either party or otherwise

17   interested in the outcome of this action.

18             IN WITNESS WHEREOF, I have hereunto set my

19   hand at Roanoke, Virginia, on this the 24th day of

20   April, 2015.

21                      Lisa M. Hooker RPR

22                    Lisa M. Hooker

                        Notary Public

23

     My commission expires October 31, 2015.

24   Notary Registration Number:  165043
```

**Central Virginia Reporters**          **www.huseby.com**
**3155 W. Main St. , Salem, VA 24153**          **(540) 380-5017**
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 22 of 45   Pageid#: 955

---

**$**

**$150**  23:3,8
  24:8 26:24
  27:10,18
  67:23 69:6

**$20**  23:11
  25:24
  26:10,24

---

**1**

**1**  6:15

**11**  49:6

**11th**  74:9,
  12,14

**12:45**  81:10

**1999**  5:22
  6:8 7:2
  28:6 77:15

**1:30**  55:2

---

**2**

**20**  15:6,18
  18:15
  30:12,17

**2000's**  78:3

**2003**  78:4

**2008**  78:11

**2011**  10:16,
  21,23
  11:11
  17:22 18:6

21:12 49:6

**2012**  8:13
  13:10 60:8

**2013**  6:18,
  21 7:23
  8:1 10:7,
  21 11:7,9
  21:15,22
  22:1
  32:11,23
  34:23
  49:16
  64:20

**2014**  64:24
  73:4

**2015**  6:15

**23**  35:6,24
  36:2,5,6,
  7,8,18,19

**24**  15:8
  39:4,7

**27**  32:22

**2:00**  30:1
  55:3

---

**3**

**30**  9:13
  71:6 80:4

**31**  34:23

---

**4**

**41**  31:21

**42**  16:20
  17:1,4

**43**  31:16,20
  32:17

**44**  34:13,22
  35:1,24
  72:14

**45**  46:24
  47:5

**46**  49:21
  50:2

**47**  51:23

**48**  54:17
  62:23

**49**  59:15,23
  62:18,22

**4:27**  34:23

---

**5**

**50**  15:21
  19:15
  62:24 63:3

---

**6**

**6**  17:22
  18:6

**6th**  23:20

---

**A**

**above-
mentioned**
  16:19

31:15
34:12
46:23
49:20
51:22
54:16
59:14 63:2

**accept**  66:17

**access**  8:1
  12:20,22
  33:21
  45:11,12
  64:19
  70:24 71:1

**accountability**
  28:24
  73:12

**accurate**
  51:2

**accusations**
  37:7 45:7
  65:5 73:14

**accused**
  33:24 64:4

**Act**  55:15
  61:14

**active**  6:16
  7:22

**actual**  34:1

**address**  5:22
  16:5,13
  17:11
  42:20

**addressed**

**Central Virginia Reporters**    www.huseby.com
3155 W. Main St., Salem, VA 24153
(540) 380-5017
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 23 of 45   Pageid#: 956

11:13

**addressing**
38:17

**administration**
64:22

**admit**  56:16

**admitted**
36:7,8
46:20

**adopt**  7:12,
21 24:2
25:8,11
27:18,23
53:10 70:9

**adopted**  6:2
24:12,17
25:6 26:23
27:12 68:6
69:2,5
70:7,22
71:11

**adopting**
22:11 23:3
72:4

**adoption**
6:2,5 22:9
23:12
25:24
26:24
27:16
52:20
71:14

**adoptions**
7:9 26:2
70:3

**advertise**
68:14

**advised**
72:18

**advocates**
23:17

**affairs**
29:21

**affiliated**
5:13

**afford**  23:20
24:17
25:13,18
68:5 69:12

**afraid**
52:15,24

**aggressive**
46:4 52:20
53:4

**aggressively**
52:15

**agree**  14:12
15:2 67:22

**agreed**  37:18

**Agriculture**
41:3,7
43:5 47:14
49:10
55:17
56:12
61:15,22
66:1

**ahead**  62:5

**allegedly**
38:1 53:16

**allowed**  7:3
9:17
25:11,20
27:18
33:20 40:6
45:10 70:9
72:19
73:2,6

**allowing**
38:22

**Altizer**
78:13

**Amanda**  52:12

**amount**  26:8

**Angie**  52:9,
11

**angry**  44:20
45:17

**animal**  5:14,
17 6:3
8:22,23
9:16 13:21
14:7 19:3
24:7 25:6
32:22 37:4
41:11,16
42:5
43:14,16,
24 44:8,18
45:12,14
48:20 49:5
51:17 60:2
68:17,18

70:18
72:18
73:1,6,21
75:1

**animals**
7:12,16
12:23
13:12,14,
15 18:17
19:19
37:15
47:11,21
48:18,22
49:8,10
51:3,5
53:15 70:7

**anonymous**
43:11

**answers**  4:18

**anymore**
33:22

**apparently**
18:11

**appears**
39:16

**approached**
47:24
52:17

**approaches**
53:2

**Approximately**
78:3

**April**  23:20
28:1,3

**Central Virginia Reporters**        **www.huseby.com**
**3155 W. Main St. , Salem, VA 24153**        **(540) 380-5017**
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 24 of 45   Pageid#: 957

76:24

area  12:19
  19:21,23

arose  9:18

arrive  16:2
  30:1,4

arrived  30:8
  50:14 55:4

assess  52:19

assistance
  23:19
  27:13
  68:15,19

assisted
  69:19

assisting
  64:18

assume  33:2

assumed  73:5

assuming
  46:9

assumption
  44:4

astray  45:13

attached
  48:8

Attachments
  48:5

attack  15:14
  52:16 53:2

attacking
  16:4

attempt
  74:23

attempted
  16:13

attempts
  37:5

attended
  20:4

attention
  22:9 38:21
  39:15
  40:19
  51:15

attorney
  18:8

authenticate
  35:22

authorization
  24:20

authorize
  24:8 80:7

average  64:1

avoid  7:18

aware  9:23
  27:11
  64:13 65:2
  76:6

awareness
  5:24

_____
          B
_____

back  6:15
  9:8 22:1

24:15
26:20 27:8
31:21 35:7
37:15,20
39:2 43:7
44:22,23
45:18
53:20
60:20
62:22
65:20
73:7,17
74:3 76:8
78:1

bad  50:21

basically
  8:7 33:24
  37:11
  43:7,22
  44:20
  47:19,24

basis  70:20
  71:21
  72:1,6

bedding  21:5

began  13:10

beginning
  10:21

begins  35:11
  39:8

behavior
  52:23,24
  53:4,7

Belcher
  78:20

belief  71:19
  72:9

big  56:5

bin  70:24

black  55:24

blame  56:11

Board  17:18,
  19,24 37:4
  75:2,4,10,
  23 78:18

boarded  15:7

bodies  18:18

body  39:16
  46:2,4

book  26:6

books  26:17

bottom  24:3,
  6 32:21
  35:1,11
  36:18 39:8
  80:15

bowl  13:16
  15:16,17,
  23 16:3
  30:20 31:9

bowls  30:14,
  16,18
  31:4,5,10

box  8:24
  9:3,8

boys  53:16
  54:9

Central Virginia Reporters          www.huseby.com
3155 W. Main St. , Salem, VA 24153          (540) 380-5017
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 25 of 45   Pageid#: 958

bragging
  52:19

bring   11:19
  36:9,11
  42:8

bringing
  11:10
  38:20

broom   51:16
  52:16  53:8

brought
  10:20
  11:23  22:9
  24:23
  40:18
  42:21  45:6
  53:16

brush   30:24

buckets   31:5

buildup
  30:19,20
  31:3

built   77:19

bunch   56:9,
  12

business
  20:23
  41:20
  42:7,11

bypass   9:4

——————————
          **C**
——————————

cabinet

45:2,3,5,
  8,10

cage   52:17
  53:1,2,3

caked   50:22

call   20:24
  67:21  71:2

called   11:4
  46:14
  50:11
  67:16

cameras
  28:20
  29:12,16

card   41:20
  42:7,11

care   15:7,
  19,21
  19:14,19,
  24  21:3
  47:11,21
  63:11  65:5
  69:17

careful
  38:21

case   48:24
  49:2,3,4,6
  71:2

cases   63:10

cash   26:10

cat   45:9

cats   13:2,3
  19:15

caveat   19:22

certificate
  24:19,22
  68:5  69:8

certificates
  68:9

chance   33:18

change   19:18
  80:6,7

changed   44:6
  52:10

changing
  30:14

characterizati
  on   14:14

Charlie
  33:15  44:7
  79:13,14

chasing   34:7

Chastity
  14:4
  25:14,17,
  19  28:17
  30:7  38:13
  48:20
  52:13  53:6
  54:4,6
  55:2  67:7
  70:19
  78:24

check   8:10
  9:4  33:23
  53:21

Chihuahua

52:18

children
  54:4,7,12

chisel   30:23

choose   81:3

Chris   29:4
  32:22
  33:14
  78:20
  79:12

Christine
  4:1  5:8
  33:2

circumstances
  35:14,17
  36:23  37:2

citing   18:12

citizen
  43:15

claim   7:21

clarified
  14:24

clarify
  48:1,3

clean   30:3,
  12  31:8

cleaned   15:6
  21:4  30:17
  31:6  50:23

cleaning
  30:18,24
  31:9,10

**Central Virginia Reporters**          **www.huseby.com**
**3155 W. Main St. , Salem, VA 24153**       **(540) 380-5017**
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 26 of 45   Pageid#: 959

clear   25:9
   43:17
   62:14
clinic   20:11
clinics
   19:11
clip   58:13
   59:12
clock   28:20
clue   63:23
coat   50:22
coated   50:21
code   9:2
   18:13
collect
   22:10
collecting
   67:13
collectively
   59:11,24
color   55:24
comment
   75:20
   78:18
comments
   40:5 75:22
   78:17
common   72:9,
   10
commonplace
   13:13
communicating

22:4
community
   6:1 23:19
   68:13,14
   77:19
compiling
   43:8
complaint
   38:12 41:6
complaints
   9:18,23
complete
   24:6 64:23
completed
   77:24
completely
   4:23 53:5
completion
   77:23
compliant
   5:23
complicated
   40:10
concept
   69:24
concern
   42:17
   48:16
   77:15
concerned
   43:15
   60:13
concerns

17:14
   29:20
   41:12,19,
   21 42:22
   77:19 79:4
concluded
   81:10
condition
   51:10
conditions
   6:5 50:13
conducted
   29:21
confused
   35:19
   70:11
constantly
   45:4
consult   18:8
contact
   42:24
   64:22
   68:8,12,14
   74:19 75:9
   76:1,5
contained
   50:8
continually
   11:10
continue
   69:15
continued
   11:12
   52:14

control   8:23
   9:17 13:21
   14:7 24:7
   31:11
   41:11,16
   42:5 44:8,
   18 45:14
   64:14
   70:18
controller
   78:24
conversation
   41:16,18
   67:2 68:24
conversations
   64:10
coordinator
   6:16 28:8
   77:1
copies   12:9,
   11,15,18
   56:19
   59:18
copy   9:5
   11:18,21
   12:4 36:6
   46:18
   61:11
   62:19
   80:9,20
correct   8:2
   25:7 40:24
   66:13
   67:18,24
   69:4

**Central Virginia Reporters**          **www.huseby.com**
**3155 W. Main St. , Salem, VA 24153**          **(540) 380-5017**
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 27 of 45   Pageid#: 960

**correctly**
 37:8 66:4
 69:1 72:13
 77:16

**County** 5:14,
 23 6:4 7:3
 17:12,16
 18:23 19:1
 22:22
 23:1,8
 28:21
 32:21
 37:5,13
 38:9,21
 40:19
 64:22
 65:16,18,
 20 67:9
 69:11 73:5
 74:19 75:1
 78:20

**couple** 36:20
 55:17
 76:15,20

**court** 4:21
 55:23
 79:15
 80:1,8

**covered**
 15:10 51:5
 53:15

**crates** 30:7

**created** 27:9

**cried** 37:16

**Crystal**

 48:21

**culled** 55:19

**curious**
 69:23

**custody** 60:2

————————————
           **D**
————————————

**daddy** 53:9

**Dalmatian**
 61:1

**Dalton** 14:5,
 6 16:10
 33:14
 45:19

**date** 66:9
 74:12

**dated** 34:22

**dates** 49:4
 73:16

**day** 8:8
 13:11,13
 14:10
 15:1,19,
 23,24 16:3
 21:5 24:16
 30:5 31:3,
 7 36:8
 43:2
 50:10,15,
 20 52:12
 53:18 64:1

**days** 15:20
 71:6 80:4

**decided**
 37:10 74:3

**decision**
 7:21
 37:16,17,
 18 72:17

**delivered**
 10:17,22

**demand** 71:9

**denied** 50:7

**department**
 8:11 41:3,
 6 43:4,19,
 23 47:14
 49:10
 55:13,16
 56:8,11
 59:5
 61:15,22
 66:1

**deposed** 4:11

**deposit**
 22:10
 23:4,9
 24:8
 26:12,20
 27:1,19
 67:14,23
 70:4,10
 71:12,16
 72:5

**deposition**
 4:11 12:14
 14:8
 16:20,21

**decided**
31:16,17
 34:13,14
 36:11
 46:24 47:1
 49:21,22
 51:23,24
 54:17,18
 59:15,16
 63:3,4
 80:10
 81:10

**describe**
 20:19
 35:17
 60:21

**describes**
 48:20

**describing**
 48:19
 63:18

**desk** 70:24

**details** 13:6
 17:20
 25:10 30:6

**determined**
 42:13

**devices**
 28:19

**die** 69:16

**digital** 48:8

**dirty** 30:14

**disagree**
 14:12 15:2
 69:9

**Central Virginia Reporters**          **www.huseby.com**
**3155 W. Main St. , Salem, VA 24153**
**(540) 380-5017**
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 28 of 45   Pageid#: 961

disappear
  45:4

disappeared
  45:6

disappearing
  13:19
  45:8,9

disappears
  15:17

discuss  10:2
  75:13 76:2

discussed
  33:16 34:2

discussion
  28:10,18
  41:11

discussions
  17:24 76:7

disease
  31:10

dispatch
  8:11,16
  9:14 33:23

Dixie  48:20

document
  11:22
  16:19
  23:21,24
  24:10
  25:22
  31:15
  32:20
  34:12
  35:12 39:4

46:23
49:20
50:16
51:22
54:16 63:2
66:2

documentation
  11:15
  28:23
  32:10
  42:18,19,
  20,22
  48:16
  60:14,15
  63:14
  66:6,22
  67:3 74:2

documents
  55:18

dog  15:10
  16:2 21:9
  24:17,23
  25:6,8,12,
  19,20
  26:23
  27:12
  30:19 45:9
  52:14,17
  53:3,6,11
  58:17,19,
  22 60:3,
  18,22
  67:17
  68:6,24
  69:5,7
  70:5,22
  71:3

dogs  15:21
  19:15 21:3
  27:23
  30:8,10
  50:20
  52:24
  57:11 61:5
  69:1,16,20
  71:9

donation
  45:16

drafted  18:9

dreaded  5:4

dries  30:22

drink  15:15
  31:2

drive  9:14,
  15

Duncan  79:3

Dunn  4:10
  76:2,5

duplicates
  56:10,12,
  16

duties  7:10

_____

      E

earlier  4:9
  12:5 24:10
  34:5 65:11

early  30:5

easy  4:13

edge  30:20

education
  19:20,22,
  23

elected
  49:12 51:4

email  22:4,
  17 32:21
  33:2,4
  34:4,22
  35:1,3,11,
  15,23
  36:2,18,20
  39:8,11,
  17,22 43:3
  47:7,9,15,
  19,23 48:4
  49:2 50:2
  52:3 54:22
  62:11
  63:7,9,18

emails  22:2,
  7 32:20
  47:23
  55:18
  57:10 66:1
  72:14,17,
  24 73:17
  74:24

employed
  5:10

employee
  28:15 55:4
  79:3

employees
  38:22

Central Virginia Reporters          www.huseby.com
3155 W. Main St. , Salem, VA 24153
(540) 380-5017
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 29 of 45   Pageid#: 962

70:14

enacted
  64:19

encountered
  27:14

encouraged
  28:21
  42:23

encouraging
  6:2,3

engage  33:5

enter  12:6
  16:17

entered
  16:20
  31:16
  34:13
  46:24
  49:21
  51:23
  54:17
  59:15 63:3

entire  15:16
  46:2 75:23

environment
  16:1

errata  80:4,
  6

ESQ  4:6
  65:10

estate  8:24

euthanasia
  7:18

euthanize
  7:21

euthanized
  69:3,8,15

euthanizing
  69:19

events  46:7

eventually
  46:11

exact  8:20
  17:20
  20:24

EXAMINATION
  4:6 65:10

exception
  14:11

excuse  39:7

exhibit  12:7
  16:17,20,
  24 17:3
  27:3
  31:13,16,
  20,21
  32:17
  34:5,13,21
  35:1,6,23,
  24 36:2,
  11,18,19
  39:4,7
  46:20,24
  47:5
  49:18,21
  50:2
  51:20,23
  53:13

54:14,17
  56:17,19
  57:8 58:7,
  11 59:11,
  15,23
  60:20
  62:15,16
  63:3 67:13
  72:13

Exhibits
  39:5

experience
  18:19
  19:5,9,21,
  22 65:5
  80:16

extends
  35:12
  36:20 39:9

extra  9:13
  55:18
  56:19

eye  55:1

─────────────

        F

face  67:8

Facebook
  38:10,14
  40:15

facilitate
  6:22

facilities
  7:17 15:5

facility

15:20
  18:17,24
  41:12

fact  46:3
  66:14

facts  67:4

fair  78:7

false  65:5
  73:13

familiar
  34:6

family  24:15
  68:2 69:6
  70:8,9

February
  10:11,16,
  23 11:9
  17:22 18:6
  22:3

feces  15:5,
  10,12
  50:22
  51:1,5
  53:15

fee  23:12
  25:24

feed  12:23
  13:11
  30:3,11
  45:13

feel  16:9
  69:20

fees  27:16

**Central Virginia Reporters**        **www.huseby.com**
**3155 W. Main St., Salem, VA 24153**
**(540) 380-5017**
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 30 of 45   Pageid#: 963

felt  28:15,
  22 29:16
  37:6,14
  40:21
  47:10
  65:18 70:7
  73:13

female  60:3
  68:3,6

figure  72:23

file  42:22
  48:7

fill  15:16
  26:5,7
  80:5

filled  15:24
  16:4

film  30:21,
  22

finances
  68:3

financial
  29:13

find  8:6
  15:3

fine  36:14
  80:19

flip  71:3

focus  28:14
  39:15

folks  67:16
  70:4

food  12:23,

24 13:2,3,
  8,16,17,
  18,19 15:8
  31:5 45:9,
  12,14,16
  69:17
  73:20

foot  45:9

form  24:1,
  5,11

formed  77:15

forms  61:3

found  10:2
  38:2 45:13
  46:11,12

foundation
  76:9

founded  5:22
  28:6

frame  10:5
  13:9 61:8

Frank  45:20,
  21

free  8:7
  24:19 81:8

Freedom
  55:15
  61:14

friend  54:5

friendly
  44:16

friends
  27:23

68:16
  70:4,8
  71:17,22
  72:4

frightful
  46:5

front  11:15
  17:1

full  5:7

funny  52:15

_____

G

G.A.R.  64:18
  74:20

gate  9:1
  33:22

gave  18:3
  24:19,22
  26:19 36:6
  41:20
  56:20
  61:16
  67:12 68:5

GCAR  28:11
  29:6 38:3
  48:12 56:2
  64:18

Giles  5:14,
  17 6:23
  19:3 22:22
  23:1 32:21
  37:4 38:9,
  10 41:19
  65:16,17

69:10
  72:18
  73:1,6,21

give  8:3
  13:16 48:2
  49:4 56:5
  58:4 73:16

giving  55:14

glass  31:2

glorified
  21:1

good  4:7,8
  48:17

gooing  55:10

Gough  45:21

governing
  18:18

governs
  18:16

great  9:16,
  22 19:21

Greenbrier
  78:23

ground  4:21

group  17:7,
  14 23:17
  28:5,9
  40:21
  43:14,16,
  24 44:22
  63:15
  68:20 70:3
  75:16

Central Virginia Reporters          www.huseby.com
3155 W. Main St. , Salem, VA 24153          (540) 380-5017
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 31 of 45   Pageid#: 964

76:5,23
78:15

guard   53:1

guess   26:18
36:10
79:21

guns   46:4

Guynn   12:8,
13 14:13,
16,19,24
27:6 34:6,
10 35:19
36:1,4,9,
14 55:21
56:9,13,
18,22 57:4
62:14,21
65:10
79:17,21
80:1,13,20
81:1

_____
H
_____

hair   50:22

half   35:2
36:18
39:17

hand   10:17,
22 46:3
55:9

handed   35:24
59:23

handle   52:16

hands-on

19:5,6,9

handwriting
31:24 32:1

handwritten
31:22

hang   8:24
34:1

hanging
33:21

happened
24:15 38:7
40:18
43:18,22
44:17
46:7,10
50:19
53:23 54:1
67:2 71:5

happening
8:3 23:14
71:20

happy   62:10

hard   15:3

head   15:11
39:1 42:10

heading   48:4

hear   29:12

heard   51:9
68:18

helper   21:1
67:9

helpful   9:9
66:24

helping
40:22
65:17

helps   67:3

Helsel   41:2
43:7 44:10
46:15

Herbert   29:8
44:7
79:13,14

higher   7:13

highlighted
21:12

highly   71:9

hired   67:9

hit   56:21

Hmm-hmm
31:23
39:14,18
61:6

hmm-hmm's
5:5

hold   7:11
17:2 19:7

holidays
14:11,17

home   4:15
42:7 62:8
69:12

honest   41:10
78:6

honestly
46:10 78:9

Hooker   4:3

hose   15:14,
15

hosing   31:8

hospital
19:13
20:15,18

hour   9:12
64:1

hours   7:4,8,
11 15:8
63:22

housed   19:15
21:9 49:11

huh-huh   5:4

Humane   18:23

humanely
69:15

hurt   44:21

_____
I
_____

idea   44:9
46:8

identification
53:13
54:13

identified
39:7 49:9
57:11
59:11
61:21

identify

Central Virginia Reporters          www.huseby.com
3155 W. Main St. , Salem, VA 24153
(540) 380-5017
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 32 of 45   Pageid#: 965

32:14
35:22 56:7
57:6 62:18

identifying
49:9

impossible
37:22

improve   6:5

inappropriate
38:3 46:1

inappropriatel
y   51:16
77:12

incidence
60:12

incidences
50:7

incident
8:23 51:14

incidents
48:21,22

included
27:5

includes
55:17

incorporated
6:11

indicating
57:22
58:3,21

individual
75:10
76:1,5

individuals
53:14

information
17:19 18:4
19:3 24:11
42:14,15
44:12
46:15
47:18,20
48:2 55:15
61:14 75:3

informed
17:16
64:21

initial
11:11

injured   60:4

inspection
46:13,17

install
29:15

instance
8:16 20:20
29:23 68:9

Institute
5:12

intake   61:8
71:6

interests
37:10

Internet
38:2

introduce
54:13

investigator
41:3 47:13
56:3 57:24
58:1 64:11

involved
7:13 18:24
19:16

irate   44:8,
18 45:23

irony   45:4

irresponsible
71:24

issuance
35:15

issue   13:16
27:15
31:11

issues   5:23
6:3 8:14
11:17,23
16:6,13
17:6,8
21:11,14,
21 28:13
34:2 38:1
52:20 76:2

items   17:11
44:1 73:20


J

January   6:15
11:7 32:22
34:23

Jim   55:9

61:12
65:8,10

job   28:15
52:19 79:4

jobs   20:22,
24

Jones   14:10
15:1 24:10
50:6 51:16
53:16
54:11

JR   65:10

June   60:8

justify
50:21


K

kennel   15:7
21:1 67:9

kennels
15:6,22
21:4 30:12
50:23

Kevin   78:20

key   8:9,10,
15,17,20,
21 9:3,4,
5,6 12:22
33:21,23
45:5

keys   8:9

kill   7:18
18:24

Central Virginia Reporters          www.huseby.com
3155 W. Main St. , Salem, VA 24153          (540) 380-5017
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 33 of 45   Pageid#: 966

30:11

**kind** 33:18
48:19
61:15 66:6

**knew** 13:12
22:17
25:10 32:8
41:14
43:13 44:2
68:16

**knowing**
68:19

---

**L**

---

**lab** 21:1

**label** 57:4

**labeled** 47:5

**laboratory**
20:24

**lack** 41:5
69:17

**language**
46:3,5

**large** 15:17
30:9

**laws** 18:16,
18 19:17
22:23

**lay** 15:11

**laying** 51:1

**learn** 41:14,
15

**learned** 19:2
21:7

**leave** 44:21,
22 45:18

**leaving** 55:3

**left** 9:9
30:13
73:21

**legal** 5:7

**letter**
10:17,23,
24 11:11,
15,21
16:17
17:5,15,
17,21
18:5,9
21:12 37:3
43:23

**letters** 22:2

**letting**
53:10 70:7

**licensed**
20:2

**lights** 21:16

**limited**
12:20
64:19

**Link-owens**
4:1 5:8,9

**Lisa** 4:3

**live** 65:17

**loaned** 8:16

**lock** 8:24
9:3,8

**locked** 13:4,
8,17,18
45:1,3,5,8

**long** 9:15
28:9 30:24
35:10 36:2
41:10,18
50:23
52:22 78:9

**long-term**
28:4

**longer** 37:12
40:20,22
64:14
72:19 73:1
74:1

**looked** 13:15
24:10
61:11

**lose** 4:14

**lost** 71:3

**lot** 15:6
18:21,22
19:1,2,5,9
30:5,7,10,
17,20
44:21
52:23
80:14

**lovely** 4:21

**Lowry** 28:1,
3,11 77:1

**lying** 64:5

---

**M**

---

**made** 9:11
17:14 21:4
23:13 27:4
32:7 41:5
44:3 45:24
75:22

**mail** 24:6

**make** 7:20
12:9,11
15:23
25:9,14
26:18 27:2
29:2,5
32:13
40:9,12
43:16 57:8
58:7,11
62:19
67:5,23
72:16
73:18
74:23
80:22

**making** 37:22
38:12 68:9
71:24 72:5

**manager**
41:17
78:22

**manner** 44:16

**Marie** 5:8

**Central Virginia Reporters**          **www.huseby.com**
**3155 W. Main St. , Salem, VA 24153**
(540) 380-5017
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 34 of 45   Pageid#: 967

mark 31:12
  51:19
  54:14
  58:14

marked 16:19
  31:15
  34:4,12
  35:6 46:23
  49:18,20
  51:22
  54:16
  59:15 63:2

married 14:9

matters 37:6

Mcklarney
  29:4 32:22
  33:14
  78:20
  79:12

meant 56:14,
  18 77:5

media 38:5

medicine
  18:15,20
  19:24
  52:21

meet 78:13

meeting
  10:1,14
  11:2 29:3,
  8 32:9
  33:6,7,9,
  11,16,19
  45:7 75:15
  76:9,12

77:1

meetings
  10:11 14:1
  75:3,11,
  13,17
  76:15,21
  77:2 78:19

Melvin 14:5
  33:14

member 43:16

members
  28:11
  37:5,17
  48:12 56:2
  62:1 63:20
  64:4 75:4,
  10

memory 40:1

mentioned
  65:11,12

messages
  38:23

met 76:19
  77:8 79:6

mid 78:3

middle 54:24

Millirons
  49:11 51:4
  76:10 78:8

mind 12:6
  14:15 34:8
  38:8

minute 11:16

61:3

minutes 9:13
  30:12

missing
  58:15,16
  62:3

misunderstood
  70:13

mix 52:18
  61:1

moment 36:17
  47:4 50:1

money 67:17

Montgomery
  18:23 19:1
  65:13,20

morning 4:7,
  8 56:21

move 21:24

moved 35:21
  65:18

multiple
  10:21
  53:23,24
  54:1

---

**N**

names 48:7

Nance 24:15
  25:3,4,7

necessarily
  71:15

needed 8:19,
  21 13:12
  37:20
  43:24
  44:14,21
  45:13
  50:24
  52:11,20
  66:2,22

neuter 6:3
  24:17,19
  25:13 27:1
  68:15,19
  69:12
  70:10
  71:12

neutered
  23:3,7
  24:4,13,
  18,23,24
  25:6 68:4

neutering
  23:18

newer 77:19

newly 68:6

night 8:8

non-elected
  78:19

notary 80:8

note 67:6

noted 53:15

notes 31:22

notice 48:4

Central Virginia Reporters          www.huseby.com
3155 W. Main St. , Salem, VA 24153          (540) 380-5017
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 35 of 45   Pageid#: 968

noticing
  71:8

number   16:20
  17:1,4
  31:16,20,
  21 32:17
  34:13,22
  35:1,6,23,
  24 36:2,
  18,19
  39:4,7
  42:18
  46:24 47:5
  49:3,5,6,
  7,21 50:2
  51:23
  54:17
  59:15,23,
  24 61:9
  62:24 63:3
  72:14

numbers
  49:1,2

O

Oath   72:1

object   14:13

objection
  27:5

observation
  31:4

observations
  63:19,20

observe   54:8

observed
  30:13
  40:18
  66:9,10
  72:2

obvious
  30:16 31:8
  37:12
  44:17

occasion
  76:24
  79:12

occasions
  79:9

occur   7:9
  55:6,7

occurred
  22:9 23:13
  38:18
  48:23

occurring
  51:10

offer   29:2,5
  45:14

offered
  28:22
  29:15

offering
  29:7

office   8:11
  20:7,23
  24:5 29:22
  33:23
  64:22

76:16 79:7

officer   8:24
  9:17 13:21
  14:7 24:7
  41:11,17
  42:5 44:8,
  18 45:14

officers
  70:18

officials
  78:19

older   77:7

one-page
  35:20

open   7:4,8,
  11 9:3
  14:20

operational
  73:5

opportunity
  75:19

order   54:13

Ordinance
  22:24

ordinances
  23:1,2

organization
  5:14,20
  6:13,22
  7:3 62:1
  63:21 64:4
  77:15

original

28:5

outlined
  12:21
  58:17,19

outlining
  10:17

overpopulation
  6:1 69:14,
  15,17

owner   71:2

P

p.m.   34:23
  81:10

pack   61:12

pages   36:20

paid   79:5

paper   40:14,
  17 58:13
  59:12

paperwork
  24:23
  64:23
  70:23
  71:1,2,15

paragraph
  48:19
  50:4,6,8
  55:1

passionate
  28:23
  29:16
  69:21

**Central Virginia Reporters**          **www.huseby.com**
**3155 W. Main St. , Salem, VA 24153**
(540) 380-5017
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 36 of 45   Pageid#: 969

past   6:14
   49:13

pause   9:20

paw   60:4

pay   23:3,11
   25:24
   28:22
   29:15
   55:23

paying   70:3

people   7:14
   9:5,15
   13:7,11
   23:19 24:2
   25:24
   27:11,17
   40:14
   41:22
   44:21
   52:16,22
   54:8 70:2,
   6 80:16

period   7:20
   70:19 73:8

periodically
   11:12

Perkins
   14:4,9
   16:6 29:18
   30:2 38:1
   50:7 51:15
   53:15
   63:22

persist
   21:14

persisted
   21:21

person   4:22
   8:17 9:6
   17:13,17
   22:11
   23:3,11
   26:19,23
   41:17
   43:12,15
   45:12
   46:12 48:2
   67:10,20
   78:23

personal   9:5

personally
   13:23 50:8
   67:11
   68:21
   69:19

pet   7:15
   15:19
   23:2,6
   24:2,4,12
   52:23
   69:12,14

pets   6:2
   7:19 15:7
   49:13
   52:19
   65:18

Phd   52:23

phone   67:20

photocopies
   61:7

photocopy
   24:1 32:8
   60:16

photograph
   60:1,2,18
   61:11

photographs
   48:8,9,11,
   13 58:1,6
   59:14,24
   63:17

physically
   29:2,18
   60:10

pick   17:3
   62:17

picture
   58:15,16
   59:24
   60:9,10,
   11,20,22

pictures
   48:8
   50:16,20,
   21 55:11,
   20 56:1,2,
   6,7 57:1,
   9,12 59:2,
   10 61:21,
   24 62:10
   66:10,11

pile   35:7,8

piles   15:12

place   15:11
   16:9 34:1

69:20

places   20:21

pleading
   33:5

point   7:24
   14:24 28:8
   41:5 42:12

policy
   22:20,21

pooper   15:23

portion
   24:3,6

position
   65:6

post   38:22

posted
   38:19,24

posting   38:1

posts   38:13,
   18

pound   7:19
   19:1 77:16

pounds   52:18

practice
   72:10

practices
   20:12

prepare   80:2

prepares
   80:2

present
   29:18 62:2

Central Virginia Reporters          www.huseby.com
3155 W. Main St., Salem, VA 24153          (540) 380-5017
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 37 of 45   Pageid#: 970

73:10
79:13

**president**
6:12,18
11:22 12:2
17:8,10,
11,23 18:3
28:7 29:8
68:16,19
74:20
76:19,24

**press** 40:10,
12

**pretty** 73:24

**prevented**
8:1

**previous**
17:9 39:3
53:13
74:20

**previously**
5:14 35:6
39:6 65:4

**primarily**
5:22 6:4
13:2 19:12
22:4

**primary** 7:10
28:14

**print** 56:21

**printout**
55:15

**prior** 8:3
11:22

12:20
17:10,23
18:3 30:2
49:16
61:17
64:19
65:24 68:8
78:12

**private**
20:12

**problem** 9:19
45:3
69:14,16

**problems**
10:2,18,20
11:11,12

**process** 9:11
19:17 26:2

**profession**
15:19

**Professional**
4:2

**program**
24:21

**promise**
25:14

**proof** 23:7
27:20
71:20

**proper** 21:5
22:20
25:10
31:10
63:11

**properly**
21:4
30:18,24
31:1,6
41:15

**protecting**
53:4

**protocols**
18:16
19:17

**prove** 72:10

**provide** 4:18
5:21 23:7,
19 47:17
48:17
62:15
68:18

**provided**
46:17 49:2
60:14
61:19
63:12

**provoke**
52:14

**public** 7:5,
9,11 30:4
75:17,19
78:18 80:8

**pull** 7:16
8:22
37:11,15,
20 53:3,6
56:15 74:3

**pulled** 30:10
53:8

**purebred**
71:9

**purposely**
26:16

**purposes**
54:14

**put** 9:8
17:6 18:16
29:13 35:7
38:8 40:14
62:22 65:6
76:8

**putting**
28:19 53:9

---

**Q**

**question** 5:3
13:24 61:2
72:21

**questioning**
12:19

**questions**
4:17 65:8
79:18

**quick** 12:19
58:7

---

**R**

**raise** 5:24

**rarely** 13:4

**rate** 7:13

**rates** 6:6

**Central Virginia Reporters**          **www.huseby.com**
**3155 W. Main St. , Salem, VA 24153**          **(540) 380-5017**
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 38 of 45   Pageid#: 971

reach  43:19

read  39:19
 50:6 80:4,
 21

reading
 72:12

ready  30:3

real  8:24
 12:19 58:6

realized
 46:16
 65:16

reason  45:10
 71:1

reasons
 29:13
 69:10

recall  10:4
 33:6 34:22
 35:2,10,14
 38:12,23
 39:11,22
 42:9 45:24
 47:7,15
 51:14 52:5
 54:21,24
 63:7 72:14
 77:14

receipt
 25:23
 26:6,8,13,
 17 27:10
 71:11,15

receipts

26:5,24
27:4,9

receive
 19:20,23

received
 22:17
 43:23
 44:11

reclaim
 7:12,13,15

reclaims
 7:13

recognized
 67:8

record
 34:16,18
 36:15
 60:3,21

records
 24:14 39:2
 43:8 49:4
 53:20
 60:16
 71:3,5
 78:2

refer  57:10

referring
 61:12
 67:11

refilling
 31:9

reflect
 61:13

refresh  40:1

refund  22:21
 23:8

refused
 45:15 53:7

refusing
 37:19 40:5
 45:16

Registered
 4:2

regulation
 69:11

regulations
 5:24

reign  8:7

relay  17:13

remedy  28:12

remember
 8:20 11:17
 22:8 32:7
 36:23
 38:7,17,
 19,20
 46:11 52:9
 67:4 72:20
 74:11 78:4

repairs  8:19

repeating
 79:15

replace
 28:14

report  46:18
 58:17,20

reported
 55:3 63:20

reporter
 4:2,22
 46:14,17
 79:15
 80:1,8

represent
 4:10 32:19
 64:7

reproduce
 69:13

request
 10:14
 47:14
 55:16
 61:14

requested
 73:10

requesting
 10:10

required
 26:7

requirements
 21:8

rescue  5:15,
 18 6:16
 19:4 28:8
 32:22 37:4
 43:14,16,
 24 53:11
 68:17,18
 72:18
 73:1,6,21

**Central Virginia Reporters**     **www.huseby.com**
**3155 W. Main St., Salem, VA 24153**     **(540) 380-5017**
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 39 of 45   Pageid#: 972

**rescued**
  30:10 69:2

**rescues** 7:17

**research**
  18:12 21:3

**residue** 31:5

**resolve** 37:6

**resolved**
  21:17,20
  22:14

**respond** 4:23
  5:3 10:24
  22:6,13

**responded**
  22:13

**response**
  22:14
  25:13

**responsibility**
  73:5

**rest** 35:12
  50:24

**retired** 42:8

**retrieve**
  44:1,15
  73:20

**retrieved**
  44:7

**return** 30:7
  80:5

**returned**
  24:8

**review** 36:17

**room** 12:24
  13:1,3,4,
  8,18

**rules** 4:21

**rumor** 70:20

**run** 8:14
  15:5 41:15

**running**
  41:23

──────────

          **S**
──────────

**sad** 58:24

**Salem** 42:2,3

**saliva** 30:19

**Sammy** 25:3

**sanctuary**
  30:11

**sat** 17:7,14

**save** 9:13
  25:19
  80:13

**saved** 9:13

**saving** 25:20

**scary** 46:4

**school** 19:13
  20:4,17

**scoop** 15:23

**scratch** 76:8

**Sections**
  18:13

**send** 7:17
  17:17
  47:9,15
  48:3 52:3
  58:5 60:14
  61:14,22
  63:9 73:11
  74:4 80:3,
  20

**sending** 22:2
  34:22
  35:3,10
  39:11,22
  47:7,13,22
  54:21
  56:12 63:7
  65:24

**sense** 8:4

**separate**
  26:13,17,
  24 27:3,10
  58:6

**September**
  74:7,9,12,
  14

**served** 28:7

**services**
  5:20

**set** 7:8

**setting** 33:6

**severely**
  60:4

**share** 47:22

**shared** 9:6

55:18 75:3

**shebang**
  61:16

**sheet** 80:4,6

**shelter**
  5:23,24
  6:1,5,22
  7:4 8:1,5,
  19,22 9:8,
  15 10:3
  12:21,22,
  23,24 13:8
  14:3,10,19
  15:4
  18:17,22
  19:16 21:8
  24:2 26:3
  27:15
  28:12,19
  29:13,22,
  24 30:1,3,
  8 37:6,12,
  21 38:3,10
  40:7,22
  41:7,14,
  15,18,20,
  23 42:1,3
  43:24
  44:6,13,
  15,23
  45:11
  46:13,16
  47:21
  49:3,11
  50:12 51:3
  53:14,17
  55:4

**Central Virginia Reporters**        **www.huseby.com**
**3155 W. Main St. , Salem, VA 24153**        **(540) 380-5017**
Case 7:14-cv-00429-GEC    Document 52-14    Filed 08/19/15    Page 40 of 45    Pageid#: 973

60:15,16
61:8
63:11,22
64:14,18,
24 65:20
70:5,17
72:19
73:2,6,22
75:1
77:17,20,
24

**shelters**
18:17,23
19:10
65:12 69:2

**sheriff**
10:1,15,
17,23
11:23 14:1
16:14
17:13,17,
24 22:2,6
29:3 32:9
33:12
37:19
49:11 51:4
64:14
74:19 76:9
77:9 78:8,
10,13 79:6

**sheriff's**
8:11 43:23

**Sheryl** 41:2
43:1

**shocked**
50:12

**short** 73:8

**show** 23:21
35:5 61:8

**shown** 74:24

**side** 40:16
52:22

**sign** 80:8,
14

**signature**
79:22 80:3

**signed** 75:22

**significance**
74:14

**similar**
15:21,22
17:24
19:15
27:15

**single** 43:12
60:20,21

**sitting**
11:14
63:21

**situation**
7:18 8:18,
20 15:8,22
19:16
21:16
26:18,22
42:20 69:7

**situations**
55:6

**size** 15:22

**slander**
40:21

**slandering**
40:20

**sleep** 53:10

**Snoopy** 58:24

**soaking**
30:24

**social** 38:5

**Society**
18:24

**son** 54:4,5,
7

**sort** 37:15

**sought**
68:17,20

**space** 21:8,9
53:1,3

**spare** 30:6

**spay** 6:3
24:19
25:13 27:1
68:15,18
69:12
70:10
71:12

**spay/neuter**
22:10,20
23:20
26:12
27:13,18

**spayed** 23:2,
6 24:4,24

67:17
68:4,7
69:7

**spaying**
23:18

**speak** 29:5
33:18 75:4

**speaking**
4:24 42:6

**specific**
27:15

**speech** 79:21

**Spike** 48:20

**spoke** 24:24
25:2 75:15

**spread** 62:19

**spring** 10:6

**stack** 56:5

**staff** 13:12
14:3 24:24
28:24
37:21
70:7,9,14,
17 71:18,
22 72:4
73:10,14
74:4 77:11
78:20

**standard**
26:6

**started** 7:2
9:10 10:10
11:9 68:24

**Central Virginia Reporters**          **www.huseby.com**
**3155 W. Main St. , Salem, VA 24153**    **(540) 380-5017**
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 41 of 45   Pageid#: 974

78:11

starting  6:5

starved
  13:15

state  5:7
  46:15 81:3

stated  14:1
  25:12
  47:20
  72:11

statement
  45:17

statements
  45:24 72:1

statutes
  18:12

stay  5:4

staying
  13:17

stealing
  37:9

stepped  6:15

stick  34:8
  51:16

sticker  34:8

stolen  33:24

stop  65:15

stored  12:23
  13:1,2

straight
  67:4

Strelka  4:6,
  10 12:4,
  11,15,17
  14:15,18,
  21,23
  16:16,23
  27:2,7
  31:12,19
  34:7,16,20
  35:21
  36:3,6,13,
  16 46:19
  47:3
  49:17,24
  51:19 52:2
  54:20
  55:9,22
  56:11,15,
  20,23
  57:5,15
  59:21
  62:16,22
  63:6 65:7
  79:19
  80:16,19,
  24 81:4,6,
  8

stressful
  37:22

strike  64:13

strongly
  28:21 37:7

stuff  30:23
  38:4

subject  48:1
  53:12

submitted
  40:16 57:7

succeed  75:7

suggested
  65:19 70:3

Sunday  32:22

Supervisors
  17:19 18:1
  75:4,10
  78:18

Supervisors'
  75:2

supplies
  45:2,11

supply  45:3

suppose
  71:10

supposed
  8:17 24:3
  37:9 41:22

surrender
  45:12

surrendered
  13:14

surrounding
  35:15
  36:24 37:2

suspicious
  27:17

sworn  4:2

system  9:16
  36:10

_____

          T

tad  71:24

taking  15:7

talk  34:2
  59:22
  74:24

talked  73:19

talking  10:5
  40:13 66:7
  70:15

teaching
  19:12 21:3

team  19:14
  21:2

tears  37:17

Tech  5:11
  19:12
  20:14
  24:20,21

technically
  10:16

technician
  21:1

telling
  14:15
  17:12
  66:21 72:2

tells  15:18

ten  52:18

term  41:6

testified

**Central Virginia Reporters**          www.huseby.com
**3155 W. Main St. , Salem, VA 24153**          **(540) 380-5017**
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 42 of 45   Pageid#: 975

4:4 14:10
15:1 24:10
54:11 64:8
72:3

**testifying**
72:14

**testimony**
27:4,9
77:14
79:23
80:10

**text** 39:19,
23

**thick** 30:22

**thing** 5:2
37:8 43:22
46:12
47:10
53:9,10
70:15

**things** 12:6
18:21
21:10 30:5
33:24 37:9
38:2,5,20
40:17
43:8,11
44:5,6,7,
15 45:4,5,
7 66:2
74:7 75:14
77:11,16
80:6

**thirsty**
15:13,17

**thirty** 16:2

**THOMAS** 4:6

**thought**
43:10 46:1
52:14 62:6
70:11

**three-page**
32:20

**time** 4:23
6:8 7:20
8:6,8,16
9:7,11
10:5 13:9
17:12
19:17
22:2,5
25:17
27:19
28:8,9,20
29:12
30:9,24
31:4 37:3,
18 40:6,7
42:15,21
46:4,7
49:11 51:3
52:22 61:8
62:2 70:19
71:6 72:24
73:4,8,18
77:18
80:14

**timer** 21:17,
22

**times** 10:21
13:10

38:19
50:13
53:23 54:1
76:20,23

**title** 20:20
21:2

**today** 11:14
33:5 55:24
62:7 63:21
72:3

**toe** 15:11

**told** 13:17,
20,21
25:14
33:19
44:1,2,5,
20 66:1
67:24 72:5
73:24
74:6,19,20

**Tommy** 4:9

**top** 39:1,17
42:10 48:5
59:24 60:1

**tops** 30:12

**tough** 37:16

**Towers** 74:16

**tracking**
26:19

**transcript**
80:21

**transcripts**
79:23

**transport**
30:9

**Transportation**
5:11

**trouble** 43:2

**true** 40:23
65:22
66:18

**trusted**
66:20

**truth** 4:3,4
40:6 66:21

**truthful**
4:18

**turn** 15:13

**turned** 16:2

**Twin** 74:16

**two-page**
39:4

**type** 4:22
15:22 16:1

**types** 21:10

**typical** 30:2

———————————
U

**understand**
18:5,15
27:21
29:17 34:3
52:23 64:3
66:4 69:1,
11 72:17

**Central Virginia Reporters**        **www.huseby.com**
**3155 W. Main St. , Salem, VA 24153**
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 43 of 45   Pageid#: 976

80:23

understanding
22:16,20
64:16

understood
25:18

unprofessional
38:13,18
44:19

updated
19:18

uphold  69:10

upset  52:13

urine  15:10

——————————

V

valuable
9:12

verbally  5:3

verified
25:1

verify  55:14
66:12,15

vet  8:22
20:4 24:5

vet's  20:6
24:5

veterinarian
20:2 23:7

veterinary
18:15,19
19:11,12,

13,24
20:14,17,
18 24:14
52:21

vice  29:7
76:19,24

Virginia
5:11 19:12
20:14
24:20,21
47:14

volunteer
8:18 9:13
17:10 19:3
28:6 33:20
37:12,20
42:21
44:3,5,7,
15 55:3
60:13
72:19
73:2,7
74:1

volunteered
9:10
18:22,23
65:12

volunteering
65:15
73:15

volunteerism
6:16

volunteers
6:22 7:3,
24 8:4,6,
9,10,14,18

9:1,2,10,
18,23
12:20
13:7,10,21
15:4 17:5,
7 19:2
28:4 29:24
30:4 33:22
37:8,11,23
42:16
48:14
50:11
51:12
52:5,12
53:5,17,24
54:2,3,6
63:15
64:17,21,
23 65:2
66:2,19
67:6 69:10
70:21 71:8
72:7,9
73:1,6,9,
11,12 74:4
75:3 77:8
78:22 79:2

——————————

W

wait  4:23
58:11
59:22

waive  80:17
81:1,3

waived  27:24

waiving

80:19

walk  55:11

wanted  25:9,
19 26:18
27:23
32:13
33:22 34:2
35:22
37:13
41:13,15
43:6 45:11
58:12
62:17

wash  30:7
31:1

washed  31:2

water  15:13,
14,23
16:3,4
30:3,11,
14,16,18,
20 31:4

week  14:11
15:1 33:10
36:12
63:22

weekend  62:7

weeks  71:4

weighed
52:17

welfare  6:3

whatsoever
72:6

**Central Virginia Reporters**          www.huseby.com
**3155 W. Main St. , Salem, VA 24153**
(540) 380-5017
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 44 of 45   Pageid#: 977

white 60:22

whites 55:24

wholeheartedly
 37:17
 69:10

wife 25:4

win 4:13

window 9:12

witnessed
 52:6 63:15

word 22:23
 42:19
 66:20
 71:10

work 6:9
 19:21,22
 24:21
 37:5,13,19
 68:14 73:9
 78:24 79:5

worked 15:5,
 18,20 17:9
 18:14
 20:6,20,23
 30:17
 43:11
 52:21,22
 66:19
 70:4,6

working 6:22
 16:1 19:11
 29:18
 63:22

worried

25:19

worth 15:8
 54:10,12

write 32:4,5
 50:2 66:8

writing
 19:16 67:1

written
 17:21 18:6
 43:1,3
 66:18

wrong 41:2
 44:19

wrote 26:23
 32:2,14
 33:2 36:19
 37:3 66:14

_____

**X**
_____

xeroxed
 61:11

_____

**Y**
_____

year 10:13
 21:14
 49:5,7

years 6:14
 15:6,7,18
 16:1 18:15
 20:22
 30:17
 42:15,21
 43:9 48:15
 49:14,16

67:1,3
68:7 72:8
75:5 76:16
77:3,4,5,
23

young 53:16
 54:9

**Central Virginia Reporters**     **www.huseby.com**
**3155 W. Main St. , Salem, VA 24153**     **(540) 380-5017**
Case 7:14-cv-00429-GEC   Document 52-14   Filed 08/19/15   Page 45 of 45   Pageid#: 978