CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAR 3 1 2016

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

BRIAN SCOTT DUNN,               )
                                )        Civil Action No. 7:14CV00429
        Plaintiff,              )
                                )        **MEMORANDUM OPINION**
v.                              )
                                )        Hon. Glen E. Conrad
SHERIFF MORGAN MILLIRONS        )        Chief United States District Judge
                                )
        Defendant.              )

Brian Scott Dunn previously worked as a deputy sheriff in the office of Giles County

Sheriff Morgan Millirons.   This case arises from Sheriff Millirons' decision to terminate Dunn's

employment.   Dunn claims that the termination constituted a retaliatory discharge in violation of

the False Claims Act and the First Amendment.   Dunn also asserts a claim for wrongful

discharge under state law.   The case is presently before the court on Sheriff Millirons' motion for

summary judgment.   For the following reasons, the motion will be granted in part and denied in

part.

## Background

The following facts from the summary judgment record are either undisputed or, where

disputed, are presented in the light most favorable to the plaintiff.   See Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 255 (1986) (emphasizing that "[t]he evidence of the nonmovant is to be

believed, and all justifiable inferences are to be drawn in his favor," when ruling on a motion for

summary judgment).

Dunn was hired by Sheriff Millirons in 2008. At the time Dunn was hired, he held the rank of sergeant in Sheriff Millirons' chain of command. He eventually attained the rank of lieutenant.

During the course of his employment as a deputy, Dunn also served on the Board of Supervisors of Giles County. Prior to running for his elected seat on the board, Dunn received permission from Sheriff Millirons.

In early 2013, the Board of Supervisors received complaints regarding the county animal shelter from members of Giles Animal Rescue ("GAR"), a local volunteer organization. At that time, the animal shelter was managed by Sheriff Millirons, but funded by the county as directed by the Board of Supervisors. The GAR members complained about the physical conditions of the animal shelter and the level of care received by the animals. The concerns raised by the GAR members led to further questions regarding whether Chastity Perkins, the shelter's only employee, was actually working all of the hours for which she was being paid.

In July of 2013, members of the Board of Supervisors asked Dunn to speak to Sheriff Millirons about the issues raised by the GAR members. Of those issues, Dunn was most concerned with whether the county was paying for hours that Perkins did not actually work. See Dunn Dep. Tr. 91, Pl.'s Br. Opp'n Summ. J. Ex. A ("[T]he Perkins thing was more important . . . . [Y]ou just can't be paying somebody for hours they are not working."). Although Dunn had no supervisory control over Perkins or the animal shelter in his position with the sheriff's office, the county was responsible for paying the staffing agency that employed Perkins to work at the shelter. Sheriff Millirons "signed off" on the invoices from the staffing agency for hours allegedly worked by Perkins, and those invoices were then processed and paid by the Board of Supervisors.

2

Millirons Dep. Tr. 37, Pl.'s Br. Opp'n Summ. J. Ex. K. Dunn estimates that the county paid Perkins over $70,000 for work that she did not perform.

Dunn subsequently met with Sheriff Millirons in the sheriff's office during work hours. During the meeting, Dunn advised Sheriff Millirons that "the Board [of Supervisors was] upset," because "complaints [were] coming in about the animal shelter and how the animal shelter [was] being run." Dunn Dep. Tr. 65. Dunn emphasized that his "biggest concern was about Chastity [Perkins] being paid for hours that she wasn't working," and that it was "not going to be good" if her time records were audited. Id. Dunn suggested that Sheriff Millirons install a time clock or a camera at the animal shelter to keep track of the hours that Perkins actually worked. Id.

Sheriff Millirons became upset during the meeting, and threatened to kick out the GAR members who had been volunteering at the shelter. The sheriff also advised Dunn to "mind [his] own business," and indicated "that it would be in [Dunn's] best interest just not to worry about [the shelter]." Id. at 68.

Following the meeting, Sheriff Millirons "started acting differently" toward Dunn. Id. at 87. Dunn testified that the sheriff interacted with him in an "unprofessional and rude" manner, and implied that Dunn had initiated the complaints regarding the shelter, which were ultimately publicized in the local newspapers. Id. at 87-89.

In August of 2013, Douglas Sadler, the police chief in Pembroke, Virginia, contacted Dunn regarding the possibility of acquiring surplus vehicles from the sheriff's office for the town's police department. Dunn agreed to show Sadler the vehicles that he was interested in acquiring. Two or three days later, Sheriff Millirons accosted Dunn while he was on duty and "g[ot] in [Dunn's] face." Id. at 96. The sheriff emphasized that he was "the goddamn motherf---ing

3

sheriff around here," and that he was responsible for making decisions about the vehicles. Id. at 96.

On the morning of September 1, 2013, a convenience store burglary was reported to the sheriff's office. Dunn proceeded to the convenience store a few hours later, after he began his assigned shift. Upon his arrival, Dunn found evidence that had not been collected by the deputies responsible for processing the crime scene. When Dunn requested that certain deputies return to the convenience store, the deputies refused to return because they were engaged in a fantasy football meeting.

Dunn subsequently included this information in an entry that he made in the Computer Aided Dispatch ("CAD") system utilized by the sheriff's office. Dunn reported that he had attempted to contact other deputies regarding his findings at the convenience store, and that "there were no technicians or investigators [available] to assist" him. Pl.'s Br. Opp'n Summ. J. Ex. C. Dunn noted that "Unit 15 advised that he had plans and could not respond," and that "Unit 4 advised that Unit 15 was having his fantasy football meeting with Unit 9." Id.

That same month, Sheriff Millirons deleted the fantasy football comment from the CAD entry, and demoted Dunn to the rank of sergeant. During the course of advising Dunn of the demotion, Sheriff Millirons "angrily highlighted" the fact that Dunn had referenced the fantasy football meeting in the CAD entry, and told him that "everybody" in the office "hates his f---ing guts." Dunn Decl. ¶ 3, Pl.'s Br. Opp'n Summ. J. Ex. B; Dunn Dep. Tr. 138. Upon learning that his CAD entry had been modified, Dunn advised Sheriff Millirons that the modification could constitute a violation of Virginia law.

On September 29, 2013, Dunn visited the residence of Michael Falls, who held the rank of major under Sheriff Millirons. Dunn informed Falls that "the Board [was] going to have [Sheriff

4

Millirons] investigated by the Attorney General." Falls Dep. Tr. 15, Pl.'s Br. Opp'n Summ. J. Ex. D. Dunn used the term "embezzlement," and "indicated that it was something to do with the animal shelter." Id.

On October 21, 2013, Sheriff Millirons terminated Dunn's employment. During the course of discovery, the sheriff produced typewritten memoranda documenting alleged instances of insubordination and unbecoming conduct by Dunn, and indicated that Dunn's termination was based on the conduct outlined in the memoranda. The first memorandum was dated August 27, 2013, and the final memorandum was dated October 8, 2013. Sheriff Millirons testified that the memoranda were prepared on the dates listed therein.

Dunn had never seen the memoranda produced by Sheriff Millirons. Dunn subsequently retained a digital discovery consultant to examine data obtained from the sheriff's computer. The consultant determined that the documents were created on the sheriff's computer on November 7, 2013, after Dunn was terminated. Sheriff Millirons has since acknowledged in an affidavit that he testified incorrectly regarding the dates on which the memoranda were prepared. The sheriff now maintains that the memoranda were based on handwritten notes taken on the dates listed on the memoranda.

### Standard of Review

The case is presently before the court on Sheriff Millirons' motion for summary judgment. An award of summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To raise a genuine issue of material fact to avoid summary judgment, a party's evidence must be "such that a

5

reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. In deciding whether to grant a summary judgment motion, the court must view the record in the light most favorable to the non-moving party, and draw all reasonable inferences in his favor. Id. at 255; see also Libertarian Party of Va. v. Judd, 718 F.3d 308, 312 (4th Cir. Va. 2013)

### Discussion

Dunn asserts three claims against Sheriff Millirons. In Count I of his second amended complaint, Dunn claims that he was terminated in violation of the public policy of Virginia. In Count II, Dunn claims that he was terminated in violation of the federal False Claims Act. In Count III, Dunn claims that he was terminated in retaliation for exercising his rights under the First Amendment. Dunn has moved for summary judgment on all three claims.

### I.    State Law Wrongful Discharge Claim

The Commonwealth of Virginia generally adheres to the doctrine of at-will employment, meaning that employment lasts for an indefinite term and can be terminated for almost any reason. Weidman v. Exxon Mobil Corp., 776 F.3d 214, 221 (4th Cir. 2015). "However, there is an exception to this doctrine for at-will employees who claim to have been discharged in violation of public policy." Id. The Supreme Court of Virginia has recognized three situations in which an at-will employee may establish that his discharge violated public policy:

> (1) where an employer fired an employee for exercising a statutorily created right;
> (2) when the public policy is "explicitly expressed in the statute and the employee was clearly a member of that class of persons directly entitled to the protection enunciated by the public policy"; and (3) "where the discharge was based on the employee's refusal to engage in a criminal act."

Id. (quoting Rowan v. Tractor Supply Co., 559 S.E.2d 709, 711 (Va. 2012). Claims based on these scenarios are often referred to as "Bowman claims," after Bowman v. State Bank of

6

Keysville, 331 S.E.2d 797 (Va. 1985), the first case in which the Supreme Court of Virginia found that an at-will employee's termination could violate public policy.

In this case, Dunn argues that the evidence surrounding his termination supports a claim for wrongful discharge under all three scenarios recognized by the Supreme Court of Virginia. The court will address each in turn.

## A. Exercise of a Statutorily Created Right

The first scenario – where an employer discharged an employee for exercising a statutorily created right – was recognized in Bowman. In that case, several employees were discharged because they refused to vote shares of stock in the manner directed by the employer. Bowman, 331 S.E.2d at 799. Under an existing state statute, the employees, as shareholders, were guaranteed the right to one vote for each share of stock held, which, the Court observed, necessarily involved the right to exercise that vote "free of duress and intimidation imposed on individual stockholders by corporate management." Id. at 801. Because the right conferred by the statute was in furtherance of established public policy, the Court emphasized that "the employer may not lawfully use the threat of discharge of an at-will employee as a device to control the otherwise unfettered discretion of a shareholder to vote freely his or her stock in the corporation." Id. Accordingly, "applying a narrow exception to the employment-at-will rule," the Court held that the plaintiffs stated a cause of action for wrongful discharge from employment. Id.

In seeking to fall within this first exception under Bowman, Dunn argues that he was fired for exercising a statutory right of inquiry granted to him as a member of the Giles County Board of Supervisors. Specifically, Dunn cites to Virginia Code § 15.2-403, which sets forth various powers and duties of county boards of supervisors, and provides that "[t]he board may inquire into

7

the official conduct of any office or officer, whether elective or appointive, of the county or of any district thereof." Va. Code § 15.2-403(C).

Based on the plain language of § 15.2-403 and existing precedent, the court concludes that this statute did not give Dunn the right to inquire into Sheriff Millirons' official conduct. The statute confers rights and powers on the board of supervisors as a whole, and does not specifically authorize individual board members to inquire into the official conduct of county officers. Moreover, even if the statute did confer such right on individual board members, sheriffs are not county officers under Virginia law. Instead, they are "constitutional officers," whose offices and powers "are creations of the constitution itself." Roop v. Whitt, 768 S.E.2d 692, 695 (Va. 2015). While sheriffs and other constitutional officers may perform certain functions in conjunction with local government, "they are neither agents of nor subordinate to local government," and "[t]he local government has no control over their work performance." Id. at 696. Accordingly, the court concludes that sheriffs are not officers of the county for purposes of § 15.2-403 and, thus, that the statute provides no basis for an actionable Bowman claim in the instant case.

## B. Violation of a Public Policy Expressed in a State Statute

The second scenario in which an at-will employee may establish that his discharge violated public policy is when the public policy is "explicitly expressed in the statute and the employee was clearly a member of that class of persons directly entitled to the protection enunciated by the public policy." Rowan, 559 S.E.2d at 711. The Supreme Court of Virginia has found this scenario to exist in only two instances. City of Virginia Beach v. Harris, 523 S.E.2d 239, 245 (Va. 2000). "The first instance involves laws containing explicit statements of public policy (e.g. 'It is the public policy of the Commonwealth of Virginia [that] . . .')." Id. (quoting Lockhart v. Commonwealth Educ. Sys. Corp., 439 S.E.2d 328, 331 (Va. 1994). The second instance

8

"involves laws that do not explicitly state a public policy, but instead are designed to protect the 'property rights, personal freedoms, health, safety, or welfare of the people in general.'" Id. (quoting Miller v. SEVAMP, Inc., 362 S.E.2d 915, 918 (Va. 1987)). "Such laws must be in furtherance of 'an [underlying] established public policy' that the discharge from employment violates." Id. (quoting Bowman, 331 S.E.2d at 801). "Even if a specific statute falls within one of these categories, an employee must also be a member of the class of individuals that the specific public policy is intended to benefit in order to state a claim for wrongful termination in violation of public policy." Id. (citing Dray v. New Market Poultry Products, Inc., 518 S.E.2d 312, 313 (Va. 1999)).

Applying these principles, the court concludes that the second statute relied upon by Dunn – Virginia Code § 15.2-408 – does not fit within either of the instances in which the Supreme Court of Virginia has found public policies that support a Bowman claim. Section 15.2-408 provides, in pertinent part, that the sheriff "shall be accountable to the board in all matters affecting the county and shall perform such duties, not inconsistent with his office, as the board directs." Va. Code § 15.2-408(D). By its terms, the statute does not contain any explicit statement of public policy. Nor can it be said that the statute is designed to protect "property rights, personal freedoms, health, safety, or welfare of the people in general." Miller, 362 S.E.2d at 918; see also Harris, 523 S.E.2d at 246 (holding that a statute describing the powers and duties of a police force could not be used as a source of public policy to support a wrongful discharge claim). Accordingly, Dunn has no viable claim under the second Bowman scenario.

C.    **Refusal to Engage in Criminal Conduct**

The final scenario in which an at-will employee may establish that his discharge violated public policy is "where the discharge was based on the employee's refusal to engage in a criminal

9

act." Rowan, 559 S.E.2d at 711. To prove this type of Bowman claim, an employee "must show that he could have been prosecuted under Virginia criminal law had he engaged in the conduct encouraged by the employer." Twigg v. Triple Canopy, Inc., No. 10-CV-122, 2010 U.S. Dist. LEXIS 53750, at *11 (E.D. Va. June 2, 2010); see also Scates v. Shenandoah Mem'l Hosp., No. 5:15-cv-00032, 2015 U.S. Dist. LEXIS 141526, at *26 (W.D. Va. Oct. 19, 2015).

In his brief in opposition to the pending motion, Dunn argues that Sheriff Millirons engaged in criminal conduct by deleting Dunn's entry from the CAD record detailing another deputy's involvement with a fantasy football team, and by not properly supervising the animal shelter or the work performed by Perkins. While Dunn further argues that he complained about these "unlawful activities . . . on the part of the defendant," Dunn cites to no evidence suggesting that he was asked to participate in the alleged criminal conduct. Pl.'s Br. in Opp'n to Summ. J. 19. Without such evidence, Dunn is unable to prove that he was terminated for refusing to engage in a criminal act, as required for this particular type of Bowman claim. See Scates, 2015 U.S. Dist. LEXIS 141526, at *26-27 ("Because Scates fails to allege any facts to show that SMH asked or directed her to commit criminal acts, her termination could not be related to her refusal to commit a crime."); see also Swain v. Adventa Hospice, Inc., No. 7:03CV00505, 2003 U.S. Dist. LEXIS 22753, at *8 (W.D. Va. Dec. 12, 2003) ("In short, Swain does not allege that she refused an unlawful order – a necessary element of the public policy Swain advances.").

For these reasons, the court concludes that Dunn has failed to present sufficient evidence to establish that he was wrongfully discharged in violation of Virginia law. Accordingly, Sheriff Millirons' motion for summary judgment will be granted with respect to Count I.

10

## II.    FCA Retaliation Claim

In Count II of the second amended complaint, Dunn asserts a claim for retaliation in violation of the federal False Claims Act ("FCA"). "The FCA is designed to discourage contractor fraud against the federal government." Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). The statute "penalizes false claims for payment from the government," and "false statements to avoid payments owed to the government." United States ex rel. Doe v. Staples, Inc., 773 F.3d 83, 84 (D.C. Cir. 2014) (citing 31 U.S.C. § 3730(a) & (b)(1)). Under the FCA, private citizens can bring qui tam actions in the name of the United States to enforce the provisions of the statute. 31 U.S.C. § 3730(b). The FCA also contains a whistleblower provision, which prohibits retaliation "because of lawful acts done . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h).

To prevail on a claim for retaliation under the FCA, a plaintiff must establish three elements derived from the statutory text: (1) that he engaged in protected activity; (2) that his employer had knowledge of his acts; and (3) that his employer took adverse action against him as a result of these acts. Glynn, 710 F.3d at 214; see also Mann v. Heckler & Koch Defense, Inc., 630 F.3d 338, 343 (4th Cir. 2010). For the following reasons, the court concludes that Dunn's claim fails at the first element.

As set forth above, the FCA protects acts taken "in furtherance" of an FCA action, as well as "other efforts to stop 1 or more violations" of the FCA. 31 U.S.C. § 3730(h). To determine whether an employee engaged in protected activity, courts apply an objective, "distinct possibility" standard. Mann, 630 F.3d at 344. Under this standard, an employee's actions must "relate to company conduct that involves an objectively reasonable possibility of an FCA action." Id.

In the instant case, there is no evidence from which a reasonable jury could find that Dunn engaged in activity protected by the FCA. Although Dunn complained to Sheriff Millirons about Chastity Perkins being paid for work that she did not perform, there is no evidence or assertion that Perkins was paid with federal funds, or that she or anyone else filed a false claim for payment from the federal government. Instead, Dunn maintains that "Giles County paid [Perkins] for work she did not perform." Dunn Decl. ¶ 12. Because the FCA "covers only fraudulent claims against the United States," the court concludes that the conduct at issue in this case falls outside the scope of the FCA. Mann, 630 F.3d at 345. Accordingly, Sheriff Millirons is entitled to summary judgment on Count II.

### III.    First Amendment Retaliation Claim

In Count III of the second amended complaint, Dunn claims that he was terminated in retaliation for exercising his free speech rights under the First Amendment. In moving for summary judgment on this claim, Sheriff Millirons argues that there was no violation of Dunn's First Amendment rights, and that even if there was a violation, he is entitled to qualified immunity. The court will address each argument in turn.

### A.    First Amendment Violation

"The First Amendment protects not only the affirmative right to speak, but also the 'right to be free from retaliation by a public official for the exercise of that right.'" Adams v. Trs. of the Univ of N.C.-Wilmington, 640 F.3d 550, 560 (4th Cir. 2011) (quoting Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000)). While public employees "do not surrender all their First Amendment rights by reason of their employment," Garcetti v. Ceballos, 547 U.S. 410, 417 (2006), courts "evaluate the exercise of First Amendment rights by public employees differently from their exercise by other citizens." Durham v. Jones, 737 F.3d 291, 299 (4th Cir. 2013).

12

Specifically, courts "must balance the interests of an employee who, as a citizen, comments upon matters of public concern, on the one hand, and the interests of a governmental employer, which must maintain an effective workplace, on the other." Id. (citing Connick v. Myers, 461 U.S. 138, 142 (1983)).

In McVey v. Stacy, 157 F.3d 271 (4th Cir. 1998), the Fourth Circuit set forth a three-part test for determining whether a public employee has a cognizable claim for retaliatory discharge under the First Amendment. The McVey test requires the court to consider:

> (1) whether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest; (2) whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public; and (3) whether the employee's protected speech was a substantial factor in the employee's termination decision.

McVey, 157 F.3d at 277-78. To avoid summary judgment, a plaintiff "is required to adduce evidence sufficient to show material facts in dispute as to each of the three prongs of the McVey test." Adams, 640 F.3d at 561. In moving for summary judgment, Sheriff Millirons argues that Dunn's claim fails under the first and third prongs. For the following reasons, however, the court finds the sheriff's arguments unpersuasive.

### 1.    First Prong of the McVey Test

The first prong of the McVey test requires the court to consider whether Dunn spoke as a citizen upon a matter of public concern. This "threshold inquiry" is "a question of law for the court." Urofsky v. Gilmore, 216 F.3d 401, 406 (4th Cir. 2000).

In determining whether an employee spoke as a citizen or as an employee, "the Supreme Court has instructed [lower courts] to engage in a 'practical' inquiry into the employee's 'daily professional activities' to discern whether the speech at issue occurred in the normal course of those ordinary duties." Hunter v. Town of Mocksville, 789 F.3d 389, 397 (4th Cir. 2015)

13

(quoting Garcetti, 547 U.S. at 422, 424). In Garcetti, the Supreme Court expressly declined to focus on where an employee's speech was made, or whether the speech related to the subject matter of the employee's employment. Garcetti, 547 U.S. at 420. The Court emphasized that "[t]he First Amendment protects some expressions related to the speaker's job," and that "[e]mployees in some cases may receive First Amendment protection for expressions made at work." Id. at 420-421. Accordingly, the Court found "nondispositive" the fact that the employee expressed his views inside his office on an issue related to the employee's job. Id. More recently, in Lane v. Franks, 134 S. Ct. 2369 (2014), the Supreme Court reiterated that "[t]he critical question under Garcetti is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." Lane, 134 S. Ct. at 2379.

Applying these principles, the court concludes that Dunn has adduced evidence sufficient to establish that he spoke as a citizen when he met with Sheriff Millirons regarding the animal shelter in July of 2013. In arguing to the contrary, Sheriff Millirons repeatedly emphasizes that "[t]he meeting . . . took place in the sheriff's office during work hours," while "both [men] were on duty." Def.'s Br. Supp. Summ. J. 7; see also Def.'s Reply Br. Supp. Summ. J. 6 ("The meeting between Dunn and Sheriff Millirons occurred in the sheriff's office, during work hours, while both Dunn and Sheriff Millirons were on duty."). As explained above, however, the mere fact that Dunn expressed his concerns inside the sheriff's office, rather than publicly, is "not dispositive." Garcetti, 547 U.S. at 420. Nor is the fact that the subject of Dunn's comments related to the "policies and operations" of his employer. Def.'s Reply Br. Supp. Summ. J. 6. See Lane, 134 S. Ct. at 2379 (emphasizing that "Garcetti said nothing about speech that simply relates to public employment" and that prior decisions "recognized that speech by public employees related to their employment holds special value").

14

Moreover, with respect to the "critical question under Garcetti," nothing in the record before the court indicates that Dunn's speech regarding the animal shelter fell within the scope of Dunn's ordinary duties as a deputy. Lane, 134 S. Ct. at 2379. Indeed, it is undisputed that Dunn was not responsible for maintaining the shelter, overseeing the animals' care, or supervising Perkins. Thus, in reaching out to Sheriff Millirons regarding the animal shelter, Dunn was not simply doing his job. Instead, the evidence viewed in the light most favorable to Dunn demonstrates that he acted as a private citizen, at the behest of other citizens elected to the Board of Supervisors.

Based on the current record, the court also concludes that Dunn's comments regarding the animal shelter pertained to a matter of public concern. This inquiry turns on the "content, form, and context" of the speech at issue. Connick, 461 U.S. at 147-48. "Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community." Kirby v. City of Elizabeth City, 388 F.3d 440, 446 (4th Cir. 2004). "This does not include 'personal complaints and grievances about conditions of employment.'" Durham, 737 F.3d at 300 (quoting Campbell v. Galloway, 483 F.3d 258, 267 (4th Cir. 2007); see also Stroman v. Colleton Cty. Sch. Dist., 981 F.2d 152, 156 (4th Cir. 1992) ("Personal grievances, complaints about conditions of employment, or expressions about other matters of personal interest do not constitute speech about matters of public concern that are protected by the First Amendment, but are matters more immediately concerned with the self-interest of the speaker as employee.").

In the instant case, the content and context of Dunn's statements regarding the county animal shelter indicate that he was speaking on a matter of public concern as opposed to one of mere personal interest. Dunn approached Sheriff Millirons, at the request of other members of the Board of Supervisors, after the board received complaints from local citizens regarding the

animal shelter. Dunn advised Sheriff Millirons that the complaints included allegations that animals were not being properly cared for at the animal shelter, and that the employee responsible for the animals' care was being paid for hours that she did not actually work. Dunn emphasized that members of the Board of Supervisors were upset about the allegations, and that his biggest concern was the possible misuse of county funds.

It is well settled that speech that "'seek[s] to bring to light actual or potential wrongdoing or breach of public trust'" necessarily involves matters of public concern, Jurgenson v. Fairfax Co., Va., 745 F.2d 868, 879 (4th Cir. 1994) (quoting Connick, 461 U.S. at 148), as does speech regarding the misuse of government funds. See Lane, 134 S. Ct. at 2380 (emphasizing that an employee's speech pertaining to the misuse of state funds and corruption in a government program "obviously involves a matter of significant public concern"); see also Robinson v. Balog, 160 F.3d 183, 188 (4th Cir. 1998) (holding that speech concerning allegations that employees "knowingly misused public funds" addressed a matter of public concern). Given the content of Dunn's speech regarding the animal shelter, and context in which it was made, the court concludes that Dunn was speaking on a matter of public concern. While the concerns raised by Dunn may seem minor in comparison to other cases involving corruption in a public program, that does not render them any less deserving of constitutional protection. See, e.g., Meredith v. Russell County Sch. Bd., No. 1:13CV00084, 2015 U.S. Dist. LEXIS 125693, at *12 (W.D. Va. Sept. 21, 2015) (holding that complaints regarding a county official's misuse of the school bus garage for the purpose of obtaining inspection stickers for his personal vehicles, while "minor," nonetheless addressed a matter of public concern).

In moving for summary judgment on this issue, Sheriff Millirons focuses exclusively on the form of Dunn's speech, specifically the fact that the speech was made in the confines of the

sheriff's office. However, the fact that Dunn did not voice his concerns publicly "does not, in any way, undermine the public concern encompassed in his speech." Goldstein v. Chestnut Ridge Volunteer Fire Co., 218 F.3d 337, 354 (2000). Existing precedent makes clear that "[p]ublic employees do not forfeit the protection of the Constitution's Free Speech Clause merely because they decide to express their views privately rather than publicly." Cromer v. Brown, 88 F.3d 1315, 1326 (4th Cir. 1996) (citing Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410, 413-14 (1979)). Accordingly, the form of the speech at issue does not "deprive[] it of its public import." Id.

In sum, the court concludes that that Dunn's comments to Sheriff Millirons regarding the animal shelter were made by Dunn as a private citizen speaking on a matter of public concern. As such, Sheriff Millirons is not entitled to summary judgment under the first prong of the McVey test.

### 2. Second Prong of the McVey Test

The second prong of the McVey tests requires the court to consider "whether the employee's interest in speaking upon a matter of public concern outweighed the government's interest in providing effective and efficient services to the public." McVey, 157 F.3d at 277-78. "The interest of the community is also weighed in this evaluation." Love-Lane v. Martin, 355 F.3d 766, 778 (4th Cir. 2004) (citing Cromer, 88 F.3d at 1326). When the employee and the community have a strong interest in the subject of the employee's speech, a public employer bears "a heavier burden in attempting to show that their efficiency concerns outweigh [the employee's] free speech interests." Id.

In the various briefs filed in support of his summary judgment motion, Sheriff Millirons does not address this prong of the McVey test. In the absence of any evidence of disruption

17

resulting from Dunn's communications to the sheriff regarding the animal shelter, the court concludes, on the present record, that Dunn's interest in addressing a matter of public concern outweighed those on the other side. Accordingly, summary judgment on this element is inappropriate.

### 3. Third Prong of the McVey Test

Under the third prong of the McVey test, the court considers whether the employee's exercise of his First Amendment rights "was a 'substantial' or 'motivating' factor" in the employer's decision to terminate his employment. Bland v. Roberts, 730 F.3d 368, 375 (4th Cir. 2013) (quoting Wagner v. Wheeler, 13 F.3d 86, 90 (4th Cir. 1993)). Because this issue is a factual one, it "can be decided on 'summary judgment only in those instances where there are no causal facts in dispute.'" Love-Lane, 355 F.3d at 776 (quoting Goldstein, 218 F.3d 337, 352 (4th Cir. 2000).

Viewing the record in the light most favorable to Dunn, the court concludes that the evidence raises a triable issue of fact as to whether Dunn's speech regarding the animal shelter was a motivating factor in Sheriff Millirons' decision to terminate his employment. According to Dunn's sworn deposition testimony, the sheriff became upset when Dunn approached him in July of 2013 regarding the complaints received by the Board of Supervisors, and warned Dunn that it would be in Dunn's "best interest just not to worry about [the shelter]." Dunn Dep. Tr. 68. Following the meeting, Sheriff Millirons behaved in an increasingly hostile manner toward Dunn, and implied that Dunn had initiated the complaints regarding the shelter, which were ultimately publicized in the local newspaper. In August of 2013, after Dunn agreed to meet a local police chief who was interested in acquiring surplus vehicles, Sheriff Millirons accosted Dunn and directed multiple expletives at him. In September of 2013, the sheriff demoted Dunn and advised

18

him that he was hated by everyone in the office. The following month, Sheriff Millirons terminated Dunn's employment. Given the relatively short period of time involved, and the evidence that Sheriff Millirons' behavior became increasingly hostile, a reasonable jury could find that Dunn's termination was "'the end result of an ongoing pattern of retaliatory behavior.'" Hinton v. Conner, 366 F. Supp. 2d 297, 308 (M.D.N.C. 2005) (quoting Warren v. Prejean, 301 F.3d 893, 900 (8th Cir. 2002); see also Beyer v. Borough, 428 F. App'x 149, 154-155 (3d Cir. 2011) (noting that a plaintiff can establish that protected conduct was a substantial factor in retaliation by showing "a pattern of antagonism coupled with timing to establish a causal link").

The court acknowledges that Sheriff Millirons has cited reasons for the termination decision apart from Dunn's protected speech. Based on all of the evidence presented, however, a reasonable jury could discredit the sheriff's assertions, and find that Dunn's protected speech was a motivating factor in the termination decision. Because of the causal facts in dispute, the third prong of the McVey test cannot be decided in Sheriff Millirons' favor on summary judgment.

For these reasons, the court concludes that that Sheriff Millirons is not entitled to summary judgment on the merits of Dunn's First Amendment claim.

### B.    Qualified Immunity

Sheriff Millirons also contends that he is entitled to qualified immunity. The defense of qualified immunity shields government officials "who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) (citing Saucier v. Katz, 533 U.S. 194, 206 (2001)). "The burden of proof and persuasion with respect to a defense of qualified immunity rests on the official asserting that defense." Meyers v. Baltimore County, 713 F.3d 723, 731 (4th Cir. 2013). To prevail under this defense, Sheriff Millirons "must show either that

19

no constitutional violation occurred or that the right violated was not clearly established at the time it was violated." Hunter, 789 F.3d at 396.

Here, the court has already determined that the record, when viewed in the light most favorable to Dunn, contains sufficient evidence to establish that he was terminated in violation of his right to speak freely on matters of public concern. Consequently, the court must decide whether the constitutional right at issue was clearly established. "To ring the 'clearly established' bell, there need not exist a case on all fours with facts at hand." Id. at 401. Instead, "the unlawfulness must be apparent in light of pre-existing law." Trulock v. Freeh, 275 F.3d 391, 400 (4th Cir. 2001).

In this case, the underlying right that Sheriff Millirons allegedly violated – "that of a public employee to speak as a citizen on matters of public concern – is clearly established and something a reasonable person in the [defendant's] position should have known was protected." Adams, 640 F.3d at 566. While Sheriff Millirons argues that a reasonable sheriff would have assumed that Dunn's comments were not entitled to constitutional protection since they were made in the sheriff's office while both men were on duty, such assumption is contrary to existing precedent. The Supreme Court has made clear that the fact that statements are expressed inside an employee's office, rather than publicly, "is not dispositive," and that "[e]mployees in some cases may receive First Amendment protection for expressions made at work." Garcetti, 547 U.S. at 420; see also Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410, 414 (1979) ("This Court's decisions . . . do not support the conclusion that a public employee forfeits his protection against governmental abridgement of freedom of speech if he decides to express his views privately rather than publicly."). Accordingly, the mere fact that Dunn expressed his concerns within the confines of the sheriff's office does not entitle Sheriff Millirons to qualified immunity.

20

**Conclusion**

For the reasons stated, Sheriff Millirons' motion for summary judgment will be granted in part and denied in part, and the case will proceed to trial on Dunn's claim of retaliatory discharge in violation of the First Amendment. The Clerk is directed to send copies of this memorandum opinion and the accompanying order to the plaintiff and all counsel of record.

DATED: This __31st__ day of March, 2016.

_Glen Conrad_

Chief United States District Judge